# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| MARADA INDUSTRIES, INC. D/B/A COSMA BODY ASSEMBLY MICHIGAN, a Michigan corporation, | Case No. 1:22-cv-2333 |
| | Judge _____ |
| Plaintiff, | **VERIFIED COMPLAINT** |
| v. | |
| ANCHOR TOOL & DIE CO. D/B/A ANCHOR MANUFACTURING GROUP, INC., an Ohio corporation, | |
| Defendant. | |

NOW COMES PLAINTIFF, Marada Industries, Inc. d/b/a Cosma Body Assembly Michigan ("CBAM"), by and through its attorneys, Vorys, Sater, Seymour and Pease LLP and Varnum LLP, and for its Verified Complaint states as follows:

## INTRODUCTION

1.  Defendant Anchor Tool & Die Co. d/b/a Anchor Manufacturing Group, Inc. ("Anchor" or "Defendant") supplies automotive parts to CBAM pursuant to a fixed-price Purchase Order that requires Anchor to continue supply for the length of the applicable OEM production programs.

2.  Anchor first breached its supply obligation by delivering defective parts and by failing to provide parts in the quantities and at the times required under the parties' contract. Instead of correcting these shortcomings, Anchor informed CBAM that Anchor wished to terminate the parties' business relationship. This too was a breach of the parties' contract, which had a significantly longer term. However, due to Anchor's persistent performance problems,

CBAM agreed to the early termination, provided that Anchor agreed to an orderly transition that protected the end customer, General Motors Company ("GM").

3. Anchor initially agreed to CBAM's transition plan. However, as the parties were working to complete the transition, Anchor threatened to discontinue supply in the absence of an extracontractual price increase, which CBAM agreed to pay solely to ensure continued supply.

4. Anchor has terminated its supply, but has refused to return certain tooling to CBAM (the tooling is owned by General Motors and is the subject of a Bailment Agreement between CBAM and Anchor) until CBAM makes a disputed payment to Anchor.

5. Anchor has no lawful right or claim to the tooling. To the contrary, Anchor is expressly obligated under the Bailment Agreement to return the tooling to CBAM immediately upon CBAM's request, and to resolve any claims for payment after the tooling has been returned. Without the return of the tooling, CBAM will not be able to supply parts to GM, and CBAM expects to run out of parts beginning the week of January 9, 2023.

6. The consequences of the supply interruption that will inevitably result from Anchor's refusal to promptly return tooling will be substantial and irreparable, including among others: (i) millions of dollars per week in direct and immediate monetary losses; (ii) a shutdown of CBAM's manufacturing processes and GM's assembly lines, (iii) the layoff or idling of countless employees up and down the supply chain, and (iv) immeasurable harm to the goodwill and reputation of CBAM in the automotive industry.

7. Accordingly, CBAM respectfully requests that this Court enter a temporary restraining order and preliminary injunction, compelling Anchor to immediately release and return the tooling.

## PARTIES, JURISDICTION, AND VENUE

8. CBAM is a Tier 1 automotive supplier supplying automotive frame assemblies to original equipment manufacturers (OEMs) such as General Motors. CBAM is a Michigan corporation with a principal place of business in New Hudson, Michigan.

9. Defendant Anchor is an Ohio corporation with a principal place of business in Cleveland, Ohio.

10. The amount in controversy in this matter exceeds $75,000, exclusive of interest and costs.

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## BACKGROUND

13. Anchor contracted to supply certain frame assembly automotive parts (the "Parts") to CBAM, and CBAM uses the Parts to produce vehicle frame assemblies, which it supplies to its OEM customer General Motors for use in several SUVs and the Chevrolet Volt.

14. Like most Tier 1 automotive suppliers and all OEMs, CBAM employs a "just-in-time" inventory management system, whereby CBAM orders parts from its suppliers as necessary for the manufacture and supply of frame assemblies which, in turn, is dictated by CBAM's OEM customers. As such, CBAM maintains hardly any excess inventory or "bank" of the Parts for future production needs, but rather, relies on timely shipments from suppliers.

### The Supply Agreement

15. CBAM issued a purchase order (No. 101403) to Anchor for the Parts on December 30, 2019 (the "Purchase Order"). *See* **Exhibit A**.

16. The Purchase Order identified the shipping destination, thirty-six Parts by part number, and the unit price for each Part, and further stated that the Quantity was "100% at our [CBAM's] demand, defined by delivery schedule issued by our materials department." *Id.*

17. Anchor accepted the Purchase Order by beginning performance thereunder, including by shipping in response to subsequent delivery schedules or releases issued by CBAM.

18. The Purchase Order was made expressly subject to CBAM's terms and conditions (the "Terms," a copy of which is attached as **Exhibit B**), as is expressly noted on the face of each Purchase Order at issue: "Buyer's Purchase Order Terms and Conditions, which are available on the internet at www.magna.com, are incorporated in this Purchase Order. … SELLER'S ACCEPTANCE OF THIS PURCHASE ORDER IS LIMITED TO THE TERMS AND CONDITIONS SPECIFIED ABOVE AND INCORPORATED BY REFERENCE HEREIN, AND ADDITIONAL OR DIFFERENT TERMS OR CONDITIONS PROPOSED BY SELLER ARE HEREBY REJECTED, UNLESS OTHERWISE EXPRESSLY AGREED IN WRITING BY BUYER AND SIGNED BY BUYER'S AUTHORIZED REPRESENTATIVES." *See* Ex. A at 1.

19. The Purchase Order further provides that "SUPPLIER MUST ACHIEVE AND MAINTAIN COMPLIANCE WITH ALL OF THE REQUIREMENTS OF THE MAGNA SUPPLIER QUALITY ASSURANCE REQUIREMENTS MANUAL. IN ADDITION TO THE FOREGOING STATEMENT, THIS PURCHASE ORDER SHALL BE GOVERNED BY THE BUYER'S PURCHASE ORDER TERMS AND CONDITIONS WHICH ARE AVAILABLE ON WWW.MAGNA.COM." *See* Ex. A at 8.

20. The Purchase Order, together with the incorporated Terms, is a valid and binding contract between CBAM and Anchor, and is referred to herein as the "Supply Agreement."

21. The Terms state that the Purchase Order is an offer that may be accepted by silence and/or performance thereunder, among other methods of acceptance:

> The first occurring expression of acceptance of this Order by Seller, including Seller's (i) written acceptance, (ii) commencement of work on the goods subject to this Order (the "Goods"), (iii) shipment of the Goods, (iv) commencement of performance of all or any portion of the services subject to this Order (the "Services"), (v) failure to object to this Order, in writing, within ten (10) days of receipt of this Order, and (vi) conduct that indicates Seller's acceptance, including preparation for Seller's performance, shall constitute an acceptance of Buyer's offer. If Seller objects, Seller's objections are deemed waived if Seller subsequently commences work on the Goods, or upon shipment of the Goods or performance of the Services without an express written modification made by Buyer . . . .

Terms ¶ 1(a).

22. The Terms further provide that any acceptance of a Purchase Order "<u>is limited to and conditional upon Seller's acceptance of the Terms</u>" and that CBAM explicitly rejects any attempt to vary its Terms:

> <u>Any proposal for additional or different terms or any attempt by Seller to vary any of the Terms, whether in Seller's quotation form, acknowledgement form, invoice, correspondence or otherwise, shall be deemed material and is hereby objected to and rejected by Buyer</u>, but any such proposal or attempted variance shall not operate as a rejection of this Order if Seller accepts Buyer's offer by commencement of work, shipment of the Goods or performance of the Services, or by other means acceptable to Buyer, in which case this Order shall be deemed accepted by Seller without any additional or different terms or variations whatsoever.

*Id*. (emphasis added).

23. The Purchase Order itself also specifies that acceptance is limited to the terms of the Purchase Order and the Terms, and preemptively rejects any additional or different terms. See ¶ 18 above.

24. The Terms also specify that the Purchase Order "does not constitute an acceptance of any prior offer or proposal by Seller . . . ." Terms ¶ 1(a).

25. The Terms also contain an integration clause, providing:

5

> This Order contains the entire agreement between Buyer and Seller and, except as otherwise expressly stated in this Order, supersedes all prior agreements, orders, quotations, proposals and other communications relating to the subject matter hereof and there are no other understandings or agreements, verbal or otherwise, in relation hereto that exist between Buyer and Seller.

*Id.* ¶1(b).

26. The Terms further provide that the Purchase Order is binding on the parties "for the length of the production life of the applicable original equipment manufacturer ("OEM") vehicle program for which Buyer intends to incorporate the Goods or Services." *Id*. ¶2(a).

27. The Terms provide that "Time is of the essence of this Order. Seller shall deliver the Goods in the quantities and on the delivery dates and times specified in this Order." *Id*. ¶ 5(a).

28. The Terms make clear that the parties have a long term supply commitment, stating that the Purchase Order creates an irrevocable option pursuant to which CBAM may purchase the Parts from Anchor "in such quantities and on such delivery dates and times as indicated in the firm delivery or shipping releases . . . issued or transmitted by Buyer to Seller from time to time in reference to this Order . . . and Seller shall deliver such quantities on such dates and times, at the price and on the other terms specified in this Order . . . ." *Id*. ¶ 5(b).

29. The Terms provide for a right of setoff in addition to any right of setoff provided by law:

> In addition to any right of set-off or recoupment provided by law, all amounts due to Seller and its subsidiaries and affiliates shall be considered net of indebtedness or obligations of Seller and its subsidiaries and affiliates to Buyer and its subsidiaries and affiliates, and Buyer and its subsidiaries and affiliates may set-off against or recoup from any amounts due or to become due from Seller and its subsidiaries and affiliates to Buyer and its subsidiaries and affiliates however and whenever arising. Buyer may do so without notice to Seller or its subsidiaries or affiliates. If any obligations of Seller or its subsidiaries or affiliates to Buyer or its subsidiaries or affiliates are disputed, contingent or unliquidated, including Customer warranty claims made before final determination of cause, Buyer may defer payment of amounts due until such obligations are resolved.

¶ 11.

30. The Terms contain a warranty by Anchor that the Parts will meet certain quality standards, particularly that the parts will:

> (i) conform to all drawings, specifications, samples and other descriptions furnished, specified or adopted by Buyer; (ii) comply with all applicable laws, regulations, rules, codes and standards of the jurisdictions in which the Goods or the Services, and the products containing the Goods and Services, are to be sold; (iii) be merchantable; (iv) be free from any defects in design, to the extent furnished by Seller or any of its subcontractors or suppliers, even if the design has been approved by Buyer; (v) be free from any defects in materials and workmanship; (vi) be fit, sufficient and suitable for the particular purpose for which Buyer intends to use the Goods or the Services, including the specified performance in the component, system, subsystem and vehicle location and the environment in which they are or may reasonably be expected to perform; and (vii) be free of all liens, claims and encumbrances whatsoever.

*Id.* ¶ 14(a).

31. The Terms provide CBAM broad rights to "satisfactorily deal with" any defective Parts at Anchor's expense. *Id.* ¶ 15(a) ("If any of the Goods or the Services fail to meet the Seller's Warranties, Seller shall, upon notice thereof from Buyer at any time, promptly repair, replace or otherwise satisfactorily deal with the same in a manner acceptable to Buyer, all at Seller's expense and without limiting or affecting Buyer's other rights or remedies available hereunder or at law.").

32. The Terms provide that any tooling provided by CBAM or its customer (here, GM) to Anchor shall be held on a bailment basis and "[u]pon receipt of Buyer's demand or disposition directions, Seller shall, at Seller's expense, prepare the [tooling] for shipment and shall deliver it to such locations as may be specified by Buyer" and that "[i]f Buyer or Seller defaults under this Order, Seller shall upon Buyer's demand immediately deliver the [tooling] to Buyer and, if Buyer so requests, grant Buyer access to Seller's premises for the purpose of removing the Buyer's Property." *Id.* ¶ 17(b).

33. Nothing on the face of the Purchase Orders or the Terms provides any right for Anchor to modify the unit price. See *id*. ¶ 13(b); ¶ 36 ("No modification of this Order, including any waiver of or addition to any of the Terms, shall be binding upon Buyer, unless made in writing and signed by Buyer's authorized representative.").

34. The Terms further provide that "Seller warrants that the prices in this Order shall be complete, and no surcharges, premiums or other additional charges of any type shall be added, without Buyer's prior written consent. Seller expressly assumes the risk of any event or cause (whether or not foreseen) affecting such prices, including any foreign exchange rate changes, increases in raw materials costs, inflation, increases in labor and other manufacturing costs." *Id*. ¶ 13(b).

35. In the event of Anchor's failure or refusal to deliver Parts as required, the Terms require Anchor to reimburse CBAM for all "excess costs incurred" as well as all other "direct, consequential, and incidental damages incurred by Buyer as a result of Seller's failure to meet the delivery dates or times … including the cost of any line shutdown and the cost of obtaining goods from an alternate source." *Id*. ¶ 6(a).

36. Anchor accepted all terms of the Purchase Orders by beginning performance by shipping Parts.

**The Bailment Agreement**

37. To produce the Parts, Anchor took possession at its facility of a total of 15 die sets owned by General Motors.

38. CBAM and Anchor entered into a Bailment Receipt Agreement, dated March 5, 2019 (the "Bailment Agreement"), pursuant to which Anchor, as Bailee, acknowledged receipt of certain tooling from CBAM owned by General Motors, consisting of the 15 die sets identified on

Schedule A of the Bailment Agreement and depicted in photographs on Schedule B (referred to in the Bailment Agreement as the "Property" and in this Complaint as the "Tooling" or the "die sets"). See Bailment Agreement, **Exhibit C.**

39. The Bailment Agreement provides that Anchor has no ownership right in the Tooling and has waived any lien in the Tooling:

> The Bailee acknowledges that it has no title, ownership or any other proprietary right in or to the Property and agrees to keep the Property free from liens or claims of any kind and hereby waives any lien claim it may have in the Property, statutory or otherwise, to the extent permitted by law. The Bailee shall protect the Property with respect to any third party, including tax, labour and social security authorities and from any other authority, undertaking any necessary actions to avoid attachments or levies and/or seizure thereof.

*Id.* ¶ 15.

40. The Bailment Agreement further provides that CBAM "or its agent shall have the right to enter the premises of the Bailee and remove the Property at any time. The foregoing right of access shall continue for so long as is reasonably necessary to remove or complete the Property."
*Id.* ¶ 16.

41. Anchor agreed to resolve any financial disputes <u>after</u> it returned the Tooling to CBAM:

> If the Division chooses to take possession of the Property (whether directly or through an assigned agent) as provided in paragraph 16 above or requires the Bailee to assign to the Division a purchase order with an agent of the Bailee as provided in paragraph 6 above, **Bailee acknowledges that any financial settlement with respect to amounts in dispute relating to the Property or the purchase order will occur after the Division is in possession of the Property or the assignment of the purchase order has been completed.** Such settlement will be limited to commitments outlined in the Letter of Intent, the Tooling Purchase Orders issued by the Division, and Product Change Notice transmittal notices issued by the Division or payments made under the assigned purchase order, in each case, only in respect of the particular Property at issue. The Division and the Bailee may utilize arbitration to facilitate settlement.

*Id.* ¶ 17 (emphasis added).

42. The Bailment Agreement also contains an acknowledgment that CBAM will not have an adequate remedy at law and is entitled to specific performance for breach of the agreement:

> In addition to any other rights and remedies afforded the Division under this agreement and applicable law, and in connection with any action or proceeding to enforce the terms of this agreement, the Bailee agrees that the Division will not have an adequate remedy at law, that the Property is unique and that the Division is entitled to specific performance of the Bailee's obligations to afford the Division immediate access to the Property in accordance with the terms of this agreement. The Bailee agrees that the Division will suffer irreparable harm if the Division invokes its rights under this agreement to obtain access to the Property and the Bailee fails to cooperate with the Division in allowing the Division access to the Property in accordance with the terms of this agreement. Accordingly, the Bailee waives, to the fullest extent possible under applicable law, the right to notice in connection with any proceedings—judicial or otherwise—instituted by the Division to enforce its rights to the Property.

*Id.* ¶ 19.

### **Anchor Breaches The Supply Agreement By Supplying Defective Parts And Failing To Meet Release Requirements**

43. During the summer of 2022, Anchor supplied defective parts to CBAM, including parts that were cracked and misshapen, in breach of the Supply Agreement. CBAM has incurred several hundred thousand dollars in damages due to Anchor's supply of defective Parts.

44. CBAM notified Anchor of the defective parts in June of 2022, and on several occasions thereafter as the parties had ongoing discussions regarding the defects.

45. Around that same time, Anchor began to consistently ship fewer parts than required by CBAM's releases, in breach of the Supply Agreement.

46. Due to Anchor's inability to meet its required production under the Supply Agreement, Anchor informed CBAM that Anchor desired to terminate the parties' agreement.

47. While Anchor had no right to terminate the agreement, CBAM was willing to transition the supply due to the quality issues with the Parts from Anchor and due to Anchor's

inability to supply a sufficient quantity of Parts. CBAM notified Anchor by letter on August 31, 2022 that CBAM would begin resourcing certain Parts to an alternate supplier, and explained the requirements for the transition process.

48. The parties agreed that Anchor would supply sufficient quantities of the parts being moved to an alternate supplier in order to build a bank of those Parts to sustain CBAM's needs during the transition. The parties also agreed on a schedule for the staged release of the tooling, which would allow the successor supplier to ramp up production at the same time that Anchor was winding down production.

49. Without waiving any rights and in order to mitigate its damages, CBAM has cooperated with Anchor in retrieving the Tooling from Anchor so that CBAM can transition supply of all Parts to an alternate supplier.

50. CBAM will incur significant costs from transitioning the Parts to an alternate supplier, including paying increased unit prices above the contract prices at which Anchor was required to supply, as well as downtime and other incidental and consequential costs.

**Anchor Demands a Price Increase and Threatens To Stop Shipment of the Parts**

51. As the parties were working through the transition to the new supplier, Anchor sent a letter to CBAM stating that Anchor would no longer supply the Parts to Magna unless CBAM agreed to extra-contractual price increases, in repudiation and breach of Anchor's obligation under the Supply Agreement to continue supplying at the prices stated in the Purchase Order for the life of the applicable OEM programs. *See* October 28, 2022 Letter, **Exhibit D**.

52. CBAM agreed to pay the higher prices in order to ensure continued supply, which the parties documented through CBAM issuing a revised Purchase Order with increased unit prices but otherwise containing the same terms as the original Purchase Order. *See* November 2022

Email Thread, **Exhibit E**; Revised Purchase Order, **Exhibit F**. Notably, Anchor refused to allow CBAM to indicate in return correspondence that CBAM was paying the demanded increased prices under protest, and would only ship once CBAM agreed to remove that language.

### **Anchor Wrongfully Refuses To Return Tooling**

53. To date, Anchor has returned 14 of the 15 dies sets to CBAM, leaving one remaining stamping tool in Anchor's possession known as "transfer die for CBAM B1-1213/1253 with check fixture," which is used to create vehicle frames.

54. CBAM has demanded that Anchor release the remaining die set immediately, including most recently in correspondence from CBAM's counsel, a copy of which is attached as **Exhibit E**.

55. Anchor has refused to release the remaining die set until CBAM pays the final bill for parts produced, the first portion of which is not due until early January 2023.

56. However, as a result of the damages CBAM has suffered and will continue to suffer as a result of Anchor's breaches of the Supply Agreement as described above, CBAM is entitled to a set off against any amounts Anchor claims due for Parts produced, such that CBAM has no outstanding liability to Anchor.

57. As a result of Anchor's actions and omission described herein, CBAM has suffered, and will continue to suffer, significant damages exceeding $75,000, including but not limited to:

    a. Internal CBAM downtime related to missed shipments or quantities sent below release requirements;

    b. Freight costs to move dies, fixtures, and raw material;

    c. Premium costs paid to produce Parts P/N D1-1411A and D1-1510A at temporary alternate suppliers due to stamping press breakage at Anchor's facility;

    d.  Repair costs for dies sets damaged during moves;

    e.  Quality sorting, containment, and related cost due to poor quality parts received from Anchor; and

    f.  Supplier quality resources expended at Anchor's facility to support movement of material and dies.

58.  In addition, if Anchor does not promptly release the Tooling it continues to hold at its facility, CBAM expects to run out of parts beginning the week of January 9, 2023, which will cause additional harm including but not limited to a shutdown of CBAM's manufacturing processes and GM's assembly lines, the layoff or idling of countless employees up and down the supply chain, and immeasurable harm to the goodwill and reputation of CBAM in the automotive industry.

## COUNT 1 – BREACH OF CONTRACT (BAILMENT AGREEMENT)

59.  The foregoing allegations are incorporated by reference as if fully restated herein.

60.  The Bailment Agreement constitutes a valid and binding contract.

61.  CBAM is in full compliance with its contractual obligations and has otherwise fully performed under the parties' contract, satisfying all conditions precedent (if any) to Anchor's return performance under the Bailment Agreement.

62.  Anchor has materially breached and/or repudiated its obligations under the Bailment Agreements as alleged herein, including but not limited to, by refusing to allow Plaintiff to access and take possession of the Tooling.

63.  As a direct and proximate result of Anchor's breach of contract, CBAM has suffered, and will continue to suffer, substantial direct, incidental, and consequential damages, including attorneys' fees and costs, and irreparable harm.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendant in an amount to be determined at trial, plus interest, costs, and attorney fees, issue an injunction requiring Defendant to comply with its obligations under the Bailment Agreement, and award any other relief that the court may deem appropriate under the circumstances.

## **COUNT 2 - REPLEVIN PURSUANT TO OHIO R.C. 2737.02**

64. The foregoing allegations are incorporated by reference as if fully restated herein.

65. CBAM has an interest in the Tooling, which is evidenced by the Bailment Agreement.

66. Anchor has been in possession of the Tooling since 2019.

67. On or about December 27, 2022, CBAM demanded a return of the Tooling, and Anchor has failed to or refused to return the Tooling to CBAM.

68. Upon information and belief, the Tooling was delivered to and remains in the wrongful possession of Anchor, which is located at 12200 Brookpark Rd., Cleveland, Ohio, 44130.

WHEREFORE, CBAM respectfully demands that the Court enter an order directing Defendant to turn over and deliver the Tooling to CBAM and award CBAM such other and further relief as the Court deems just and appropriate.

## **COUNT 3 - INJUNCTIVE RELIEF**

69. The foregoing allegations are incorporated by reference as if fully restated herein.

70. The Bailment Agreement and Supply Agreement each constitute a valid, enforceable and mutually binding agreement between CBAM and Anchor.

71. CBAM is in full compliance with its contractual obligations and has otherwise fully performed under the Bailment Agreement, satisfying all conditions precedent (if any) to Anchor's return performance under the Bailment Agreement.

72. CBAM is in full compliance with its contractual obligations and has otherwise fully performed under the Supply Agreement, satisfying all conditions precedent (if any) to Anchor's return performance under the Supply Agreement.

73. Anchor has materially breached and/or repudiated its obligations under the Bailment Agreement and Supply Agreement as alleged herein, including but not limited to by refusing to allow Plaintiff to access and take possession of the Tooling upon request.

74. Absent immediate injunctive relief, CBAM will suffer immediate and irreparable harm, including, (i) millions of dollars per day in direct and immediate monetary losses for each day that CBAM is without access to the Tooling; (ii) a shutdown of CBAM's related manufacturing facilities and likely General Motor's assembly plants, (iii) the layoff or idling of countless employees up and down the supply chain, and (iv) immeasurable harm to the goodwill and reputation of CBAM with its customers in the automotive industry around the world, especially its relationship with its OEM customers. The monetary damages caused by this cascading effect are not readily ascertainable.

75. The public interest weighs in favor of the issuance of an injunction requiring Anchor to release the Tooling subject to the Bailment Agreement and Supply Agreement.

76. CBAM has fully performed all of its obligations under the Bailment Agreement and Supply Agreement, and Anchor is unilaterally breaching those Agreements by refusing to perform.

77. Thus, CBAM is likely to succeed on the merits of its claims.

78. Anchor will suffer no prejudice or harm by merely returning the Tooling immediately and resolving claims for payment later, as required by the terms of the Bailment Agreement.

79. Thus, the balance between the irreparable harm CBAM will suffer and any injury Anchor could suffer (which is none) favors CBAM.

80. Thus, CBAM is entitled to injunctive relief until a decision is made on the merits of this matter.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendant in an amount to be determined at trial, plus interest, costs, and attorney fees, issue an injunction requiring Defendant to comply with its obligations under the Bailment Agreement and Supply Agreement, and award any other relief that the court may deem appropriate under the circumstances.

## COUNT 4 - SPECIFIC PERFORMANCE

81. The foregoing allegations are incorporated by reference as if fully restated herein.

82. The parties' rights and obligations with respect to the Tooling is governed by the Bailment Agreement and the Supply Agreement.

83. The Bailment Agreement and the Supply Agreement each constitute a valid, enforceable and mutually binding agreement between the parties.

84. Anchor's obligations under the Bailment Agreement and the Supply Agreement are unambiguous, ascertainable and sufficiently explicit to warrant enforcement.

85. Anchor has materially breached and/or repudiated its obligations under the Bailment Agreement and the Supply Agreement as alleged herein by clearly indicating its refusal to release all of the Property at CBAM's request.

86. Anchor's failure and refusal to perform consistent with its contractual obligations leaves CBAM without an adequate remedy at law.

87. CBAM cannot reasonably and timely obtain substitutes of the Property, which is unique, if Anchor does not perform under the Bailment Agreement and the Supply Agreement.

88. CBAM is entitled to Anchor's specific performance of all terms of the Bailment Agreement and Supply Agreement, including its obligation to release the Tooling as and when requested by CBAM.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendant in an amount to be determined at trial, plus interest, costs, and attorney fees, issue an injunction requiring Defendant to comply with its obligations under the Bailment Agreement, and award any other relief that the court may deem appropriate under the circumstances.

## COUNT 5 - DECLARATORY RELIEF

89. The foregoing allegations are incorporated by reference as if fully restated herein.

90. Anchor has clearly conveyed its firm and definite intention to refuse to release the Tooling, in violation of the Supply Agreement and the Bailment Agreement, until CBAM makes certain payments not required by the parties' contracts.

91. CBAM is entitled to a declaration that Anchor is obligated to perform all of its obligations and commitments under the terms of the Bailment Agreement, including the obligation to release the Tooling to Magna immediately at CBAM's request, regardless of whether any financial disputes remain to be resolved between the parties.

92. An actual controversy now exists between CBAM and Anchor, and it is within the jurisdiction of this Court, under 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, to render a declaratory judgment as to the parties' respective rights under the Bailment Agreement.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendant declaring that Defendant is required to immediately release the Tooling to Plaintiff under the terms of the Bailment Agreement and Supply Agreement.

### COUNT 6 - COMMON LAW CONVERSION AND CIVIL THEFT PURSUANT TO OHIO R.C. 2307.60 (A)(1)

93. The foregoing allegations are incorporated by reference as if fully restated herein.

94. Anchor is in possession of the Tooling.

95. CBAM is entitled to possession of the Tooling.

96. CBAM has demanded that Anchor tender possession of the Tooling to CBAM.

97. Anchor has failed or refused to tender possession of the Tooling to CBAM.

98. Anchor came into possession of the Tooling lawfully but has unlawfully refused to tender possession to CBAM.

99. As a result of the above-described actions, Anchor has unlawfully exercised dominion over property to which CBAM is entitled to possession.

100. CBAM is entitled to recover liquidated damages up to three times the value of the property under Ohio R.C. 2307.61(A)(1) as well as exemplary damages authorized by any section of the Ohio Revised Code under R.C. 2307.60.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendant in an amount to be determined at trial, plus interest, costs, and attorney fees, and award any other relief that the court may deem appropriate under the circumstances.

### COUNT 7 – BREACH OF CONTRACT (SUPPLY AGREEMENT)

101. The foregoing allegations are incorporated by reference as if fully restated herein.

102. The Supply Agreement constitutes a valid and binding contract.

103. CBAM is in full compliance with its contractual obligations and has otherwise fully performed under the parties' contract, satisfying all conditions precedent (if any) to Anchor's return performance under the Supply Agreement.

104. Anchor has materially breached and/or repudiated their obligations under the Supply Agreement as alleged herein, including by delivering defective parts, failing to deliver parts as required by CBAM's releases, demanding extracontractual price increases under threat of termination of supply, clearly indicating its refusal to continue supply prior to the termination of its contractual supply obligation, and refusing to release the Tooling at CBAM's request.

105. As a direct and proximate result of Anchor's breach of contract, CBAM has suffered, and will continue to suffer, substantial direct, incidental, and consequential damages, including attorneys' fees and costs, and irreparable harm.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendant in an amount to be determined at trial, plus interest, costs, and attorney fees, issue an injunction requiring Defendant to comply with its obligations under the Supply Agreement, and award any other relief that the court may deem appropriate under the circumstances.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court issue an Order providing for:

A. Temporary, preliminary, and permanent injunctive relief under Federal Rule of Civil Procedure 65 preventing Defendant from taking any action inconsistent with its obligations under the Bailment Agreement or the Supply Agreement;

B. Replevin under O.R.C. 2737.02 requiring Defendant to turn over and deliver the Tooling to Plaintiff;

C. Temporary, preliminary, and permanent injunctive relief under Federal Rule of Civil Procedure 65 requiring Defendant to release the Tooling in its possession to Plaintiff;

D. A decree of specific performance requiring Defendant to release the Tooling in its possession to Plaintiff;

E. A declaratory judgment under 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 that Defendants has anticipatorily repudiated and/or materially breached its obligations under the Bailment Agreement and the Supply Agreement and is required to release the Tooling to Plaintiff under the terms of those agreements;

F. An award of money damages in favor of Plaintiff sufficient to compensate it for all forms of economic loss including, without limitation, actual, consequential and incidental damages, attorneys' fees and costs, amounts it has been wrongly forced to pay to secure supply, cover damages, lost profits, lost goodwill and other costs incurred as a result of Defendant's breach of contract;

G. Such other relief as this Court may deem just, equitable or appropriate under the circumstances.

Dated: December 28, 2022

Respectfully submitted,

*/s/ Marcel C. Duhamel*

Marcel C. Duhamel (0062171)
VORYS, SATER, SEYMOUR and PEASE LLP
200 Public Square, Suite 1400
Cleveland, OH 44114
(216) 479-6112 (phone)
(216) 479-6060 (fax)
mcduhamel@vorys.com

Ronald G. DeWaard (*pro hac vice* pending)
(616) 336-6480
rgdewaard@varnumlaw.com
Brion B. Doyle (*pro hac vice* pending)
(616) 336-6479 (phone)
bbdoyle@varnumlaw.com
VARNUM LLP
333 Bridge Street NW, Suite 1700
Grand Rapids, Michigan 49504

*Attorneys for Plaintiff*