```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
 2                         EASTERN DIVISION

 3

 4    MARADA INDUSTRIES, INC.,        Case No. 1:22-cv-2333
                                      Cleveland, Ohio
 5              Plaintiff,

 6        vs.                         WEDNESDAY, JANUARY 18, 2023

 7    ANCHOR TOOL & DIE CO.,

 8              Defendant.

 9

10        TRANSCRIPT OF CONTINUED TEMPORARY RESTRAINING ORDER
               AND PRELIMINARY INJUNCTION PROCEEDINGS
11                  HELD VIA ZOOM VIDEOCONFERENCE
               BEFORE THE HONORABLE DAVID A. RUIZ
12                  UNITED STATES DISTRICT JUDGE

13

14    APPEARANCES:

15    For Marada Industries:     Ronald G. DeWaard, Esquire
                                  Brion B. Doyle, Esquire
16                                Marcel C. Duhamel, Esquire

17
      For Anchor Tool & Die:     Adam C. Smith, Esquire
18                                John E. Benko, Esquire

19

20
      Court Reporter:            Sarah E. Nageotte, RDR, CRR, CRC
21                               United States District Court
                                 801 West Superior Avenue
22                               Court Reporters 7-189
                                 Cleveland, Ohio 44113
23                               Sarah_Nageotte@ohnd.uscourts.gov

24

25       Proceedings recorded by mechanical stenography, transcript
             produced with computer-aided transcription.
```

1

## TABLE OF CONTENTS

2

3                                                                    PAGE

4    CROSS-EXAMINATION OF THOMAS TANASOFF
     BY MR. SMITH:                                                      4
5
     REDIRECT EXAMINATION OF THOMAS TANASOFF
6    BY MR. DOYLE:                                                     79

7    DIRECT EXAMINATION OF RICHARD ROSS
     BY MR. SMITH:                                                     87
8
     CROSS-EXAMINATION OF RICHARD ROSS
9    BY MR. DeWAARD:                                                  118

10   REDIRECT EXAMINATION OF RICHARD ROSS
     BY MR. SMITH:                                                    152
11
     RECROSS-EXAMINATION OF RICHARD ROSS
12   BY MR. DeWAARD:                                                  159

13

14

15

16

17

18

19

20

21

22

23

24

25

|   |   |
|---|---|
| | WEDNESDAY, JANUARY 18, 2023 |
| 1 | |
| 2 | - - - |
| 3 | (Proceedings resumed at 8:37 a.m.) |
| 4 | - - - |

08:37:52  5       COURTROOM DEPUTY:  This United States District

6       Court for the Northern District of Ohio is open for the

7       transaction of business, the Honorable David A. Ruiz

8       presiding.

9           The Court calls case number 1:22-cv-2333, Marada

08:38:05 10      Industries, Inc., versus Anchor Tool & Die Co.

11           THE COURT:  Good afternoon, everyone.

12           For purposes of the record, I'm going to ask

13      plaintiff's counsel to please identify yourselves for the

14      record, first starting with lead counsel, and then if the

08:38:20 15      other counsel present can identify themselves.

16               MR. DeWAARD:  Good morning, Your Honor.

17           Ron DeWaard for the plaintiff, Marada Industries,

18      d/b/a Cosma.

19               MR. DOYLE:  Good morning, Your Honor.

08:38:35 20          Brion Doyle for the plaintiff as well.

21               MR. DUHAMEL:  And good morning, Your Honor.

22          Marcel Duhamel for plaintiff.

23               THE COURT:  All right.  Then will counsel for

24      the defense please identify yourselves for the record.

08:38:46 25              MR. SMITH:  Yes.  Good morning, Your Honor.

**Tanasoff (Cross)**

1        This is Adam Smith on behalf of the defendant, Anchor

2    Tool & Die Company.

3              MR. BENKO:  Good morning, Your Honor.

4        Attorney John Benko also appearing on behalf of

08:38:57  5    Anchor.

6              THE COURT:  Now, this is day two, a

7    continuation of a hearing I began last week.  The Court took

8    a recess due to time constraints.  The witness, Thomas

9    Tanasoff, had provided direct testimony and now is subject

08:39:16 10    to cross-examination.

11        Mr. Tanasoff, do you understand that you're still

12    under oath?

13              THE WITNESS:  I do.

14              THE COURT:  And, Mr. Smith, or Attorney Smith,

08:39:25 15    are you prepared to begin your cross-examination?

16              MR. SMITH:  Yes, Your Honor.

17              THE COURT:  All right.  You may proceed.

18              MR. SMITH:  Thank you, Your Honor.

19          **CROSS-EXAMINATION OF THOMAS TANASOFF**

08:39:31 20    **BY MR. SMITH:**

21    **Q**    Good morning, Mr. Tanasoff.

22    **A**    Good morning.

23    **Q**    Did you have any discussions with your attorneys

24    regarding your testimony that you provided on January 12th?

08:39:39 25    **A**    No.

**Tanasoff (Cross)**

1    **Q**    When did you start working at Cosma?

2    **A**    August 31st of 2020.

3    **Q**    Okay.  And the relationship between Anchor and Cosma

4    began when?

08:39:54  5    **A**    Before that.  I don't know the exact date, but it was

6    before I had started.

7    **Q**    So fair to say 2019, would that be fair?

8    **A**    Sure.

9    **Q**    And so, you said this, you weren't working at Cosma

08:40:10  10   when the relationship began; is that right?

11   **A**    Correct.

12   **Q**    You also weren't there when the tooling at issue was

13   provided to -- by Cosma to Anchor; is that right?

14   **A**    Correct.

08:40:21  15   **Q**    Is tooling important for producing parts?

16   **A**    Yes.

17   **Q**    Is the quality of tooling important for producing

18   parts?

19   **A**    Yes.

08:40:30  20   **Q**    The tooling that was provided by Cosma to Anchor for

21   the purpose of -- that was provided to Anchor for the

22   purpose of producing parts; is that right?

23   **A**    I'm sorry.  Repeat the question.

24   **Q**    Sure.

08:40:45  25        The tooling that was provided by Cosma to Anchor in

6

**Tanasoff  (Cross)**

1    connection with the relationship, that was for the purpose

2    of producing certain parts; correct?

3    **A**    Correct.

4    **Q**    Okay.  And what were those parts again?

08:40:57  5    **A**    There was the full listing of approximately 15 dies.

6    **Q**    Well, those were the dies; right?

7         But the parts, I'm talking about specifically the end

8    product, that's different than the dies; correct?

9    **A**    Correct.

08:41:11  10        So there are some dies that have two-off.  There's

11    some that have just one part per.  There was the full

12    listing of BEV program, so the Chevy Bolt products.  The

13    C1YX program parts.  And the T1XX program parts.

14    **Q**    Was the tooling at issue used by another company to

08:41:33  15    produce parts prior to when the tooling was provided to

16    Anchor?

17    **A**    I do not have that information.  I believe that they

18    may have been, but I don't have the full information.

19    **Q**    Are you familiar with Matcor-Matsu?

08:41:49  20    **A**    I am familiar with the name.  I dealt with them with

21    other suppliers when I had worked with previous companies,

22    but not with Magna CBAM.

23    **Q**    And you are not aware of whether or not Matcor-Matsu

24    used the tooling prior to when Anchor used the tooling; is

08:42:08  25    that right?

**Tanasoff (Cross)**

1  **A**    I am not certain, but I wouldn't be surprised that --

2  that does sound like it was a possibility, yes.

3  **Q**    Do you know if any of the tooling was damaged while

4  Matcor was using it?

08:42:22  5  **A**    I do not have any knowledge of that.

6  **Q**    Are you aware of whether any of the tooling was

7  altered or fabricated between the time of when Matcor used

8  it and when it was delivered to Anchor?

9  **A**    I do not know that, no.

08:42:37  10  **Q**    Are you familiar with Richard Tool & Die?

11  **A**    I am familiar with Richard Tool & Die.  We have used

12  them.

13  **Q**    You have used -- Cosma's used them in the past?

14  **A**    Yes.

08:42:47  15  **Q**    What does Richard Tool & Die do?

16  **A**    They do stamping operations and they make tools or

17  they work on tools.

18  **Q**    Do they fabricate or modify tools?

19  **A**    I believe they can.  I don't -- are you talking about

08:43:05  20  these tools in particular?  Or --

21  **Q**    I'm just, in general, Richard Tool & Die right now --

22  **A**    In general, I believe that they do, yes.

23  **Q**    Okay.  And do they repair damaged tools, I guess is my

24  question, in addition to other things?

08:43:16  25  **A**    Yeah, I believe they do.

8

**Tanasoff  (Cross)**

1   **Q**    But you don't know whether or not the tooling here at

2   issue was repaired by or altered in any way by Richard Tool

3   & Die; is that right?

4   **A**    I don't have personal knowledge of that, no.

08:43:31  5   **Q**    You also don't know whether or not Matcor altered or

6   modified the tooling; is that right?

7   **A**    Correct.  No.

8   **Q**    And so, I assume here, but I just want to understand

9   specifically, are you aware of issues that Matcor

08:43:48  10   encountered while producing parts for Cosma while using

11   these tools?

12   **A**    No, I'm not aware of that.

13       So we do have tracking information for what we call

14   QPFs, and those are quality metrics, and I can tell you that

08:44:06  15   there wasn't a large number of those issues from any

16   supplier.  We looked back at history.  I don't have it here

17   in front of me, but we can pull up that information.

18   **Q**    So is it your testimony that Matcor encountered no

19   issues in connection with using the tools at issue?

08:44:21  20   **A**    I wouldn't say that, no.  I would have to go through

21   the history and review.

22   **Q**    Okay.  So you don't know whether or not Matcor

23   encountered issues while using the tooling with respect to

24   producing the parts?

08:44:33  25   **A**    I can tell you that we looked at the history across

**Tanasoff  (Cross)**

1    the board, just a general look over, and there wasn't a

2    large number of any issues prior to Anchor.

3    **Q**    Okay.  And in these types of -- well, let me ask this

4    question.

08:44:48  5         With respect to the relationship between Matsu and

6    Cosma, would that relationship have been for the entire

7    duration of, you know, providing parts for this program?

8    **A**    Which program?

9    **Q**    Well, these -- I believe you testified that,

08:45:08  10   ultimately, Cosma engages suppliers to provide parts for the

11   entirety of a program.

12        Do I have that right?

13   **A**    Yes.  We generally award based on the entire length of

14   the program, sure, yes.

08:45:20  15   **Q**    Okay.  And the relationship between Cosma and Matcor,

16   would that have been for the duration of the program?

17   **A**    I don't have any of the documents to tell that, no.

18   I'm not sure.

19   **Q**    Would --

08:45:30  20   **A**    Typically it would be.

21   **Q**    Typically it would be.

22        Okay.  But you're unsure of whether or not --

23   **A**    I haven't reviewed any of the documents regarding old

24   supply agreements, no.

08:45:40  25   **Q**    Do you know why Cosma and Matcor terminated their

**Tanasoff  (Cross)**

1    relationship?

2    **A**    I do not.

3    **Q**    But you would agree with me that the relationship was

4    terminated; correct?

08:45:50    5    **A**    Yeah, we are not working with Matcor currently.

6    **Q**    And then, ultimately, after that relationship

7    terminated with respect to the use of this tooling, the

8    tooling then was provided to Anchor; is that right?

9    **A**    Correct.  Yes.  Correct.

08:46:12    10    Can you hear me?

11    **Q**    I can.  I can.  Thank you.

12    When did Cosma and Anchor begin discussing Anchor

13    producing parts for Cosma?

14    **A**    That predated my starting.

08:46:24    15    **Q**    Okay.  And so, you were not involved in those

16    discussions; correct?

17    **A**    I was not involved in the original sourcing, no.

18    **Q**    Okay.  Do you know who, on behalf of Cosma, was

19    involved in those discussions?

08:46:36    20    **A**    I do not.  It -- the -- I can conjecture, but it would

21    strictly be a guess at this point.  I do not have firsthand

22    knowledge, no.

23    **Q**    Okay.  Are you aware of whether Cosma informed Anchor

24    about tooling issues prior to Anchor receiving the parts or

08:46:53    25    producing the parts?

**Tanasoff  (Cross)**

1  A     I do not know.

2  Q     Did --

3  A     Well, actually -- I'm sorry.

4  Q     Go ahead.

08:47:02  5  A     We do have the document that we reviewed last time

6  that stated that the tooling was in good condition that

7  Anchor signed off on.

8  Q     Which -- what document are you talking about?

9  A     That was the bailment agreement.

08:47:17  10  Q     Okay.  Actually, let's take a quick look at that

11  bailment agreement.

12        Let me ask you this quickly:  Do you know when the

13  tooling was delivered to Anchor?

14  A     I do not, no.

08:47:26  15        I would assume it would be very close to the time that

16  that bailment was reviewed and signed, but I don't have that

17  exact date, no.

18  Q     And, generally, the bailment receipt, I believe is

19  what it's called, that's delivered at the time the tools are

08:47:45  20  delivered or shortly after the tools are delivered; is that

21  how the process works?

22  A     In general, it can be anywhere from the point of tool

23  receipt all the way through several months after.

24  Q     Okay.  But, generally speaking, the bailment is

08:48:01  25  delivered when the tools are at least on-site of the seller;

**Tanasoff  (Cross)**

1    is that right?

2    **A**    There are times when the tool -- when a house will

3    visit the existing supplier and review tools at that other

4    site, so it can be before.  I can't give a definitive answer

08:48:19  5    without looking at the particular incidents.

6    **Q**    Understood.

7         Do you know in this case if Anchor visited Matsu's

8    facilities to review the tooling?

9    **A**    I do not.

08:48:28  10    **Q**    Do you know if Anchor was given the opportunity to

11    visit Matcor's facility to review the tooling?

12    **A**    I do not have firsthand knowledge of that, no.

13    **Q**    Okay.

14    **A**    It --

08:48:39  15    **Q**    Go ahead.

16    **A**    It very well could be, but I don't know.

17    **Q**    Understood.

18         Would it surprise you that the tooling was -- began to

19    be delivered to Anchor's facility in or about October of

08:48:51  20    2019?

21    **A**    I wouldn't be surprised, no.

22    **Q**    You don't have a reason to not believe that, I guess

23    is what I'm saying?

24    **A**    No.  No.  I do not have a reason to not believe that.

08:49:01  25    I'm sorry.  There's a lot of double negatives there.

**Tanasoff (Cross)**

| | |
|---|---|
| 1 | **Q**    Sure. |
| 2 | **A**    It would not surprise me if it was delivered in that |
| 3 | October time frame. |
| 4 | **Q**    Let me ask it differently. |
| 08:49:12 5 | Do you believe that to be untrue? |
| 6 | **A**    I don't have knowledge one way or another, but it |
| 7 | wouldn't surprise me. |
| 8 | **Q**    Okay.  I'm just going to share my screen here. |
| 9 | Can you see this document, which is labeled at the top |
| 08:49:29 10 | as Exhibit C but what we've been referring to as Exhibit 3? |
| 11 | **A**    Yes. |
| 12 | **Q**    Okay.  Is this the bailment receipt that you were just |
| 13 | describing? |
| 14 | **A**    Yes.  It looks like it, yes. |
| 08:49:44 15 | **Q**    And what's the date on this document? |
| 16 | **A**    March -- it's a little blurry -- 5th, 2019. |
| 17 | **Q**    Okay.  So the tooling -- and I understand you said you |
| 18 | had no reason to not believe it, I understand that, but if |
| 19 | the tooling was delivered in October 2019, that would have |
| 08:50:02 20 | predated this bailment receipt by, you know, seven months or |
| 21 | so; is that right? |
| 22 | MR. DOYLE:  I object to the form of the |
| 23 | question. |
| 24 | I think counsel just misspoke, Your Honor.  Predated |
| 08:50:15 25 | versus postdated. |

**Tanasoff (Cross)**

1          MR. SMITH:  No.  I was saying that the

2     bailment receipt is predated.

3     **BY MR. SMITH:**

4     **Q**    The bailment receipt precedes -- the date on the

08:50:24  5     bailment receipt precedes when the tooling was delivered to

6     Anchor; is that accurate?

7          MR. DOYLE:  And I'm going to object on

8     foundation there.  This witness has testified that he does

9     not know that date.

08:50:37 10          THE COURT:  Objection is sustained based upon

11     lack of foundation.

12          MR. SMITH:  Okay.

13     **BY MR. SMITH:**

14     **Q**    Would you have any reason to believe that -- that this

08:50:46 15     bailment receipt was delivered seven months prior to when

16     the tools were actually delivered to Anchor?

17     **A**    I don't have knowledge of that.

18     **Q**    And if, ultimately, the tools were delivered in

19     October, that would be true; correct?

08:50:59 20     **A**    If, ultimately, that they were delivered in October,

21     then it is possible, yes.

22     **Q**    And this is the document you were stating describes

23     the quality of the tooling; is that right?

24     **A**    It -- it's the sign-off of the tooling at award, yes.

08:51:19 25     **Q**    Okay.  Mr. Tanasoff, have you ever stamped metal with

15

**Tanasoff (Cross)**

1    tool and die sets to manufacture automotive parts?

2    **A**    Have I personally?

3    **Q**    Yes.

4    **A**    No.

08:51:40 5    **Q**    Did you ever see Anchor using the tooling at issue?

6    **A**    Yes.

7    **Q**    When did you see Anchor using the tooling?

8    **A**    I had made visits to Anchor a few times over the

9    preceding months prior to exit, so in 2021 -- there may have

08:52:01 10   been a visit in early 2021 and then other visits in 2022.

11    **Q**    Okay.  And were you actually on the floor at Anchor's

12    facility?

13    **A**    Yes.

14    **Q**    Who were you with?  Who accompanied you?

08:52:17 15   **A**    So I had multiple visits.  Rich Ross.  There was some

16    quality individuals and various other people from time to

17    time.  There was -- I don't recall.  I'd have to go back

18    through my notes to pull up the full list of individuals.

19    **Q**    Okay.

08:52:38 20   **A**    But, generally, production and quality individuals.

21    **Q**    Do you recall why you made those visits?

22    **A**    We were experiencing quality issues and we were

23    reviewing their facility.

24    **Q**    I believe you testified that you believe that Anchor

08:52:57 25   was improperly feeding steel which may have been causing

**Tanasoff (Cross)**

1    quality issues with the parts.

2         Do I have that right?

3    **A**    Yes.

4    **Q**    Did you personally witness those perceived issues?

08:53:11 5    **A**    No, I did not personally witness that.

6    **Q**    How did you learn of that then?

7    **A**    Our individual tooling expert, toolmaker by trade,

8    Claudio Caloura, was there and contacted me while he was at

9    the facility.

08:53:29 10   **Q**    Okay.  Can you explain how improperly feeding steel

11   would cause quality issues.

12   **A**    You can have bunching up of the steel within the --

13   within the press causing a wrinkle, fold, or split, or scrap

14   buildup in the tool.

08:53:47 15   **Q**    And just so I understand, are we talking about -- I

16   believe you're talking about the elevation at which the

17   steel was being fed; is that right?

18   **A**    Correct.

19   **Q**    But, ultimately, if the steel becomes parallel within

08:54:02 20   the guides of the press, their quality issues would not

21   arise; is that right?

22   **A**    There can be other issues that cause quality issues as

23   well.

24   **Q**    Sure.  But I'm trying to stay focused on what I

08:54:19 25   understood your testimony to be, which was -- and correct me

**Tanasoff (Cross)**

1  if I'm wrong, if you disagree -- that the elevation of the

2  way that the steel was being fed was causing issues or at

3  least that was one of the items you testified to; is that

4  right?

08:54:30  5  **A**    That was one of the contributing factors, yes.

6  **Q**    Okay.

7  **A**    There were other contributing factors.

8  **Q**    Understood.

9         But focusing on that specifically, if the steel

08:54:39 10  ultimately becomes parallel within the guides, would those

11  quality issues exist?

12  **A**    I can't speak to that with the other issues that we

13  were experiencing.

14  **Q**    I'm just talking about with respect to the elevation,

08:54:53 15  the feeding of it from an elevation perspective.

16  **A**    Right.  And I can't answer that with the other tooling

17  preventative maintenance issues that we were experiencing.

18  **Q**    Okay.  And I -- so moving to -- I believe you

19  indicated that there was, I think, some -- you said some

08:55:11 20  metal scrap was getting stuck in the tooling; is that right?

21  **A**    Was getting built up, yes.

22  **Q**    And how do you know that?

23  **A**    Same discussion with Claudio Caloura when he was

24  there.

08:55:24 25  **Q**    But you did not personally witness this occurring;

**Tanasoff (Cross)**

1    correct?

2    **A**    Correct.

3    **Q**    Would a design in the tooling create scrap buildup?

4    **A**    I can't speak to that.  I'm not a toolmaker.

08:55:36  5    **Q**    You don't know one way or another?

6    **A**    It is possible.  I can't speak to whether or not --

7    **Q**    I believe you -- I'm sorry.

8    **A**    What I would -- what I had stated previously is that

9    if that were the case, then we would see -- if there were

08:55:54  10    issues with the die itself, we would have seen a consistent

11    issue with quality throughout the process versus Anchor's

12    diminishing quality aspects over time.

13    **Q**    Okay.  But from the standpoint -- I guess, from the

14    standpoint of the scrap buildup, would you agree with me, or

08:56:18  15    do you not know, that a design defect in the tooling can

16    result in scrap buildup?

17    **A**    I cannot speak to that.  I wouldn't be surprised, but

18    I can't speak to that.

19    **Q**    I believe you testified that Anchor did not have

08:56:34  20    enough toolmakers on-site when producing parts for Cosma; is

21    that right?

22    **A**    Yes.  They have lost a lot of toolmakers.

23    **Q**    How do you know that Anchor lost, to your point, a lot

24    of toolmakers?

08:56:47  25    **A**    So we had Claudio Caloura, and then we had another

**Tanasoff (Cross)**

1    toolmaker in quality -- supplier quality individual, Michael

2    Suszycki, and some other individuals there viewing tools,

3    viewing parts off those tools, and they had contacted me

4    while they were there with that indication of down to just

08:57:08  5    one toolmaker, when, in the past, we've seen multiple more.

6    **Q**    So did you understand them to say that there was

7    only -- they only saw one toolmaker?  Or that they had

8    reason to believe that Anchor was only employing one

9    toolmaker at that time?

08:57:23  10    **A**    They had stated that they had reason to believe there

11    was only one toolmaker at Anchor at that time.

12    **Q**    Employed at Anchor at that time?

13    **A**    That there was some discussion of hiring others, so

14    where they stood in that hiring process, I do not know.

08:57:39  15    **Q**    Okay.  Did you witness that firsthand, the reduction

16    in toolmakers at Anchor?

17    **A**    I did not.

18    **Q**    Do you know how either Mike or Claudio learned of the

19    information that you just described?

08:57:56  20    **A**    By reviewing the tools, going into the tool shop, and

21    discussing with the toolmaker and other individuals at

22    Anchor is my understanding.

23    **Q**    Just so we're clear, we're talking about the number of

24    toolmakers at Anchor; right?

08:58:13  25    **A**    Correct.

**Tanasoff (Cross)**

1   **Q**    And what you're saying is that Mike and Claudio

2   determined that there was a reduction in toolmakers as a

3   result of viewing the quality of the parts?

4   **A**    No.  Viewing the -- the tools in the tool shop,

08:58:26 5   talking to the toolmaker that was there, and talking to

6   other individuals at Anchor.

7   **Q**    Okay.  So they came up with this information based

8   upon their review of or evaluation or assessment of the

9   tooling, that's one part; is that right?

08:58:41 10  **A**    The assessment of the tooling and the quality issues

11  that were expanding.

12  **Q**    How would they know how many toolmakers were at Anchor

13  just by reviewing the tooling?

14  **A**    They asked.  They asked the individual that was the

08:58:54 15  toolmaker that was there at the time:  Is there any other

16  individuals that are working on these?  Because there was

17  more than one part that needed to be worked on at the time.

18  **Q**    Okay.  Do you know who they spoke with?

19  **A**    I do not know.  I know they spoke to the individual

08:59:10 20  toolmaker.  I do not know who else they spoke with.

21  **Q**    Okay.  And you don't know the identity of that

22  toolmaker; is that right?

23  **A**    I do not.

24  **Q**    And I believe your testimony was that Anchor was down

08:59:22 25  to one toolmaker; is that right?

**Tanasoff (Cross)**

1   **A**     Yes.  That's my understanding.

2   **Q**     Is that based upon the same information that you

3   received from Claudio and Mike that you just described?

4   **A**     Yes.

08:59:46  5              MR. SMITH:  And, Your Honor, I apologize.  I

6   should have asked the first time.

7        Is it okay if I just share my screen sort of at will?

8              THE COURT:  Yes, it is.  For efficiency sake,

9   go ahead.

08:59:57 10              MR. SMITH:  Thank you, Your Honor.

11   **BY MR. SMITH:**

12   **Q**     Can you see this -- I'm sorry.  I'm trying to --

13   Mr. Tanasoff --

14              THE COURT:  Counsel, Attorney Smith, when you

09:00:34 15   share your screen and you're asking the witness about a

16   particular document, if you can identify what exhibit, if

17   it's exhibit letter, exhibit number, that way we can have a

18   clear record.

19        Thank you.

09:00:45 20              MR. SMITH:  Absolutely, Your Honor.

21        Thank you.

22   **BY MR. SMITH:**

23   **Q**     Mr. Tanasoff, do you see the document that I'm sharing

24   on my screen here?

09:00:55 25   **A**     It's listed as Exhibit D.  I think we've been

**Tanasoff (Cross)**

1    referring to that as Number 4.

2    **Q**    Yes.  And I will state for the Court and yourself

3    that, yes, this is Exhibit D and has been produced

4    previously by the plaintiff as Exhibit 4.  And I'll just

09:01:11  5    scroll down for you.  You can see that there's just one page

6    here.

7         Have you seen this document before?

8    **A**    Yes.

9    **Q**    I believe you testified that -- I believe you

09:01:30  10    previously testified that you received this letter on

11    October 28th; is that right?

12    **A**    I'd have to look at my email for the exact date.  It

13    was either the 28th or the 29th I believe.

14    **Q**    Okay.  And this is a letter that was signed by Anchor;

09:01:49  15    is that right?

16    **A**    Yes.

17    **Q**    Do you know who made the initial draft of this letter?

18    **A**    So I had made a draft at one point.  It was not on

19    Anchor letterhead and there was different terminology that

09:02:07  20    was listed.

21    **Q**    Okay.  So did you draft the first letter?

22    **A**    I believe I did.  I would have to go back in history,

23    but that sounds accurate.

24    **Q**    Okay.  So just so I understand, you drafted the first

09:02:24  25    letter that was going to be put on Anchor letterhead with

**Tanasoff (Cross)**

1    respect to the subject matter of this letter; right?

2    **A**    I don't know if Anchor planned to put it on their

3    letterhead or if they were just going to sign off.  There

4    was discussion with Tony Parente asking us to put together

09:02:40 5    an initial draft.

6    **Q**    Okay.  But this is from Tony to you; right?

7    **A**    Correct.

8    **Q**    Okay.  And in this letter, it's describing that Anchor

9    can no longer support production to Cosma with product

09:03:03 10   according to our current contract and purchase orders for

11   many reasons we have discussed over the past several weeks;

12   is that right?

13   **A**    Correct.

14   **Q**    So this is really Anchor making this statement and not

09:03:14 15   really Cosma; yet, you drafted the letter?

16   **A**    I drafted the initial draft.  They changed it to this

17   verbiage.

18   **Q**    Okay.

19   **A**    My initial draft did not discuss the prior

09:03:29 20   discussions.

21   **Q**    Understood.

22            MR. SMITH:  Your Honor, I'm going to show the

23   witness what has been marked as Exhibit B, and this is

24   Defendant's Exhibit B.

09:03:52 25            THE COURT:  You may proceed.

**Tanasoff (Cross)**

1          MR. SMITH:  Thank you, Your Honor.

2     **BY MR. SMITH:**

3     **Q**     Okay.  Mr. Tanasoff, have you -- and I can -- let me

4     ask you this:  Do you have these exhibits?

09:04:04  5          I'm happy to scroll through them, give you an

6     opportunity to look at them.  I just want to make sure

7     you're familiar with the document, and however is most

8     efficient or however you want to do it is fine with me.

9          I'm happy to scroll through if you're comfortable with

09:04:16  10    that.

11    **A**     I am.

12         I have hard copies of defense and plaintiff's

13    exhibits.  If you want me to read the hardcopy, it may be

14    easier to see, but I'm happy for you to scroll through, and

09:04:28  15    if I have something that I need to read by the hardcopies, I

16    can do that as well.

17    **Q**     Yes.  That works.  Just let me know if you either need

18    me to expand it or if you want to look at your own hardcopy.

19    **A**     Okay.

09:04:39  20    **Q**     I'm going to scroll through, give you an opportunity

21    to review this.

22    **A**     Okay.

23    **Q**     Then there's also -- there's also this document here.

24         Do you see that?

09:05:22  25    **A**     Yes.

**Tanasoff (Cross)**

1    **Q**    Okay.  So is this -- who is -- we've mentioned him a

2    couple times, I believe, but this is to Claudio Caloura.

3        Do I have that right?

4    **A**    Yes.

09:05:45 5    **Q**    Who does Claudio work for?

6    **A**    So at the time of this, he worked for Robert Seecoomar

7    in our plant quality and supplier quality group.

8    **Q**    What I meant was, does he work for Cosma?

9    **A**    Yes.

09:06:03 10    **Q**    Or CBAM?

11    **A**    Yes.

12    **Q**    So -- and I think you began to describe it, but does

13    he report to you or somebody else?

14    **A**    He does not report to me currently.  He did at one

09:06:13 15    point.  We've moved supplier quality under a different

16    department.

17    **Q**    Did he work under you in October of 2022?

18    **A**    Not directly under me, but we have a very tight

19    relationship that we utilized our supplier quality on a

09:06:32 20    regular basis for our purchasing needs.

21    **Q**    Okay.

22    **A**    So more of a dotted-line-type arrangement, if you're

23    familiar with that, or some joint responsibilities.

24    **Q**    Okay.  Who is Tony Parente?

09:06:46 25    **A**    President of -- at the time of Anchor.

**Tanasoff (Cross)**

1    **Q**    Okay.  So he was with Anchor?

2    **A**    Yep.

3    **Q**    This -- you agree with me, this says:  We

4    appreciate -- this is to Tony from Claudio.  We appreciate

09:06:59   5    you reaching out to us to gain Anchor support for the issue

6    CBAM may have with General Motors.

7         Do you see that?

8    **A**    Yep.

9    **Q**    So this is an indication that Claudio reached out to

09:07:13  10    Tony regarding an issue -- the issue they were having with

11    GM.

12         Do I have that right?

13    **A**    This was from Tony to Claudio.

14    **Q**    Right.

09:07:20  15         And this says:  Dear, Claudio -- right -- we

16    appreciate you reaching out to us to gain Anchor support for

17    the issue CBAM may have with General Motors.

18         Right?

19    **A**    I wouldn't call it an issue with General Motors, but

09:07:35  20    Tony did.

21    **Q**    Okay.  But it says:  We appreciate you reaching out?

22    **A**    Yep.

23    **Q**    So he's saying that Claudio reached out to Tony about

24    what he says is an issue that CBAM may have with General

09:07:45  25    Motors?

**Tanasoff  (Cross)**

1    **A**    Yes.

2    **Q**    Do you see that?

3    **A**    Yes.  I see that.

4    **Q**    And I understand these aren't your words.  I'm saying

09:07:50  5    from the perspective of Claudio here.

6    **A**    Well, from the perspective of Tony, because he's the

7    one writing this.  Right?

8    **Q**    Sure.

9         But this is talking about Claudio reaching out --

09:08:01 10   **A**    Sure.

11   **Q**    -- to Tony; right?

12   **A**    Understood.

13   **Q**    Do you have reason to dispute that Claudio reached out

14   to Tony regarding what he characterizes as an issue CBAM may

09:08:10 15   be having with General Motors?

16   **A**    Again, I wouldn't call it an issue.  But I understand

17   him reaching out and talking to Tony about the situation.

18   **Q**    Right.  That's why I said characterizing it that way.

19   I understand those might not be your words.

09:08:23 20        But I'm saying:  Do you have any reason to dispute

21   that there was a contact made?

22   **A**    I do not.  I would believe that the contact was made,

23   yes.

24   **Q**    Okay.  By Claudio to Tony?

09:08:32 25   **A**    Yes.

**Tanasoff (Cross)**

1    **Q**     And Tony tells Claudio:  We'll support your efforts to

2    gain recovery from them.

3         Do you see that?

4    **A**     Yes.

09:08:40  5    **Q**     What's he talking about there, do you know?  Do you

6    know what the recovery he's talking about?

7    **A**     Yes.  So if we are trying to seek recovery from GM,

8    which we are trying to but there's no current indication if

9    we're going to receive recovery or not, but we need them --

09:08:55 10    we needed Anchor to document their position.

11    **Q**     Are you speaking in present terms or are you talking

12    about at the time that the email was drafted when you're

13    saying you're seeking?

14    **A**     At the time of Claudio reaching out, they -- we needed

09:09:11 15    to understand, Anchor documenting their position.

16         Now I'm speaking of current terms, we are currently

17    asking for some recovery from GM, but we have no indication

18    if they are going to provide any or not.

19    **Q**     And in connection with seeking that recovery, you

09:09:28 20    provided the letter from Anchor that we just looked at; is

21    that right?

22    **A**     We had discussed and then we provided a draft, yes.

23    **Q**     You provided a draft to GM?

24    **A**     We provided a draft to Anchor, then Anchor provided us

09:09:42 25    a letter where they revised verbiage, and then we provided

**Tanasoff (Cross)**

1    that to General Motors.

2    **Q**    Got it.

3        Okay.  Are you aware of whether there was a text

4    message or other communication regarding what Tony's

09:10:01  5    referring to when he says that Claudio reached out to Tony?

6    **A**    I don't have personal knowledge, but I wouldn't be

7    surprised if there were text messages.

8    **Q**    Okay.  And the third sentence states that Anchor will

9    need to receive purchase orders effective September 1st,

09:10:23  10    2022 immediately for price increases.

11        Do you see that?

12    **A**    Yes.

13    **Q**    And then Tony also indicates that the reason for that

14    are the tooling issues based upon when -- from the time that

09:10:34  15    Anchor received the tooling; right?

16    **A**    I understand that's what he's indicating.

17    **Q**    And you didn't see the tools or have any knowledge of

18    what the tools looked like when they were delivered to

19    Anchor; is that right?

09:10:46  20    **A**    I did not.

21    **Q**    Do you have any reason to dispute that Anchor had been

22    having problems with the tooling since it received the

23    tooling?

24    **A**    Yes.  I have issue with that.  We -- I previously

09:11:00  25    testified that, first of all, they signed off on the tools

**Tanasoff (Cross)**

1     in good condition.  And, secondly, if there was tooling

2     issues, we would have seen constant quality issues, not the

3     tiered deterioration in quality over time.

4     **Q**     Okay.  But you don't -- well, let me ask you this:  So

09:11:20  5     there were remediation efforts with respect to the parts

6     after they were -- after the tools were used; is that right?

7     **A**     As far as?

8     **Q**     The parts, there was remediation efforts on the parts

9     after the tooling was used at Anchor; correct?

09:11:35  10    **A**     There was -- there was actions.  There was -- when

11    you're saying remediation, are you talking about the quality

12    issues that they drove into root cause and corrective

13    action?

14    **Q**     Yes.  I'm talking about burring that occurred, splits,

09:11:53  15    different issues associated with the quality of the parts

16    after the tooling was used.

17    **A**     Yes.  And any time there was a quality issue, there

18    would be what we refer to as a QPF, and then Anchor would

19    drive then to root cause and corrective action.

09:12:10  20    **Q**     And do you know if those quality issues were occurring

21    at Anchor's facility from the day Anchor received the

22    tooling?

23    **A**     I do not know the exact date, but I can tell you that

24    we looked at the amount of issues from early on versus where

09:12:31  25    we are currently and at the end of this agreement, and the

**Tanasoff (Cross)**

1    quality issues drastically increased.

2    **Q**    Okay.  Those -- if the parts showed up or they were

3    produced and provided ultimately to CBAM, would the -- let

4    me say a different question.

09:12:52 5        If Anchor provided remediation or cured some defects

6    with the parts after using the tooling, that could still

7    satisfy quality demands of Cosma; is that right?

8    **A**    If they drove into true root cause and corrective

9    action and fixed the issue at hand, then, yes, that would

09:13:17 10    solve -- that would correct that individual issue.

11    **Q**    No.  What I'm saying is that, okay, so we used the

12    tooling, a part comes off the line and there's defects with

13    this part.

14        Okay?

09:13:30 15    **A**    Yes.

16    **Q**    That part then is -- there's remediation efforts on

17    that part, whether it's fixing burring or splits or things

18    like that.

19        Okay?

09:13:39 20    **A**    Yes.

21    **Q**    If that -- if those defects are remedied, that part

22    would still be acceptable to Cosma; is that right?  Or could

23    be still acceptable to Cosma; is that right?

24    **A**    It could be, yes.

09:13:53 25    **Q**    Okay.  And you don't know if, from the beginning of

**Tanasoff (Cross)**

1      when Anchor received the tooling, if it was performing

2      remediation work on those parts from day one?

3      **A**      I do not know from day one, I wasn't here.

4      **Q**      The last sentence of this email, it states, Tony

09:14:16   5      states to Claudio:  Please send us a draft of a letter you

6      would want from Anchor to review and we will work with you

7      on recovery from your customer.

8             Do you see that?

9      **A**      I do.

09:14:26  10      **Q**      Is this -- to your knowledge, is Tony referring to the

11      letter that we just looked at on the Anchor letterhead?

12      **A**      Yes, I believe so.

13      **Q**      And so, ultimately, Tony's asking for CBAM to draft a

14      letter; right?

09:14:44  15      **A**      Correct.

16      **Q**      And then, did you ultimately draft a letter based upon

17      this?  Well, maybe not based upon this discussion, but did

18      you subsequently draft a letter after this email was

19      exchanged?

09:14:57  20      **A**      Yes.  We did draft that letter.

21      **Q**      And you drafted the first letter?

22      **A**      Yes.

23      **Q**      I'm going to --

24             MR. SMITH:  Your Honor, I'm going to show the

09:15:15  25      witness Defendant's Exhibit C.

**Tanasoff (Cross)**

1      THE COURT:  You may proceed.

2      MR. SMITH:  Thank you, Your Honor.

3 **BY MR. SMITH:**

4 **Q** Mr. Tanasoff, if you could take a look.  I'll show the

09:15:46 5 top of it just so it's easier.

6 **A** So is there a particular area you want me to focus on?

7 I can do that.

8 **Q** So all I'm asking is:  Are you familiar with this

9 document?

09:17:11 10 **A** Yes.

11 **Q** And I'll also pull down and show you what are two

12 exhibits to this that were attached to this email, this

13 document.

14   Have you seen this document?

09:17:22 15 **A** Yes.

16 **Q** And have you seen this document?

17 **A** Yes.

18 **Q** Okay.  This document here, this last document that's

19 attached, what is the date of this document?

09:17:41 20 **A** October 27th is what it shows here.

21 **Q** Okay.  And I'm just going to bounce back to this

22 other --

23     MR. SMITH:  Which is Exhibit D, Your Honor,

24 but it's been referred to as Exhibit 4.

25

**Tanasoff (Cross)**

1   **BY MR. SMITH:**

2   **Q**      The date on this, the signed document here, was

3   October 28th; right?

4   **A**      Correct.

09:18:00  5   **Q**      Okay.  Going back to Defendant's Exhibit C, is this

6   the letter that you drafted?

7   **A**      We had a few drafts, but, yes, it looks like the draft

8   from the 27th.

9   **Q**      And is this the first draft that was provided to

09:18:20 10   Anchor?

11   **A**      I'm not sure if it's the first, but it was one of the

12   early drafts.

13   **Q**      Okay.

14   **A**      I think there was one that -- no, I take that back.

09:18:31 15   I'm not seeing the duress language in this one and I believe

16   our original one did call out the duress language.

17   **Q**      Okay.  So take a look at the substance of this letter

18   here, if you don't mind for a moment, and I'm just -- I'll

19   tell you what, I can -- yeah, just take a look at this

09:18:52 20   really quickly and I'll go back to the other letter here in

21   a minute.

22   **A**      I have read.

23   **Q**      Okay.  And, actually, it probably will be easier for

24   me to put these alongside one another.

09:19:22 25           Can you see both letters?

**Tanasoff (Cross)**

1    **A**     Yes.  I think I have it all, yep.

2    **Q**     Okay.

3    **A**     The videos on the one on the right are interfering

4    now.

09:19:47  5    **Q**     You can't see both letters?

6    **A**     I can see the majority of the one on the right, the

7    one that I had drafted, but there's the videos.  I might be

8    able to move these.  So I can move the videos around to see

9    both.

09:20:04  10         Okay.  I can see both, and I'll move these videos, the

11    video feeds as necessary.

12    **Q**     Okay.  Is the second sentence in the letter you

13    drafted initially different than the second sentence in the

14    final letter?

09:20:25  15    **A**     So the second sentence starts with Anchor

16    Manufacturing understands on the one on the right.

17         And then, the one on the left is -- yes, I see the

18    difference.

19    **Q**     You agree with me that the difference of -- the

09:20:54  20    difference between the initial draft and then the final

21    draft was that in the initial draft, it says that Anchor

22    Manufacturing understands that CBAM and OEM customer

23    production lines would be immediately shut down; right?

24         And then, in the final letter, it says:  CBAM has told

09:21:11  25    Anchor that CBAM and OEM customer production lines will be

**Tanasoff (Cross)**

1    impacted.

2        Do I have that right?

3    **A**    Correct.

4    **Q**    So the difference is, obviously, that, you know, CBAM

09:21:20 5    informing Anchor versus CBAM -- or Anchor understanding, and

6    also the difference is production lines being impacted

7    versus immediately shut down; correct?

8    **A**    Yes.

9    **Q**    And then, in the last sentence, the initial -- the

09:21:43 10   initial draft says:  If CBAM does not grant the price

11   increases listed in the attached with an effective date

12   October 1st, 2022, Anchor will stop all shipments.

13       Do you see that?

14   **A**    Yes.

09:21:54 15   **Q**    And then, in the final letter, it says:  If Anchor

16   doesn't grant the price increases listed with an effective

17   date of October 1st, 2022, Anchor cannot continue to ship

18   and will cease all shipments; right?

19   **A**    Correct.

09:22:08 20   **Q**    So there's an inclusion of the fact that if there's

21   not a price increase, Anchor cannot ship the parts; is that

22   right?

23   **A**    Correct.

24   **Q**    I'm going back to this same document that we were just

09:22:47 25   looking at, which is Exhibit C, back up to the email here.

**Tanasoff  (Cross)**

1          What's the date of this email?  And who is it from?

2     And who is it sent to?

3     **A**     So you have a email from Claudio Caloura to Tony

4     Parente.  It's dated the 27th of October 2022.

09:23:12  5     **Q**     Were you involved in drafting this email?

6     **A**     I may have been.  I'm -- let me -- I believe I had at

7     least reviewed.

8     **Q**     Okay.  And it says in the very first sentence:  Thank

9     you for the time today to discuss your proposed price

09:23:33 10     increase and issues with production.

11          Do you see that?

12     **A**     Yes.

13     **Q**     Were you involved in that discussion?

14     **A**     I believe so.  I would have to go back to notes and

09:23:45 15     look at the exact date.

16     **Q**     Do you recall what -- how that discussion was had?

17     Was it in person?  Via telephone?

18     **A**     Most of these discussions in the December -- in the

19     October time frame were by telephone.

09:24:03 20     **Q**     Okay.  Do you recall who else was a part of that

21     discussion?  If -- well, let me ask a different question.

22          So are you unsure of whether or not you were a part of

23     that discussion?

24     **A**     It does -- it does strike a bell.  It does -- it makes

09:24:19 25     sense that I was.  I'm not disputing that I was or not.  I

**Tanasoff (Cross)**

1    just would need to go back to my notes to review the exact

2    conversation and discussions.

3    **Q**    Okay.  So I guess that -- would you recall who would

4    have been part of the discussion?

09:24:36  5    I imagine the answer is no, but I just want to check.

6    **A**    No.  I don't know exactly who was involved in that

7    without referring to notes.

8    **Q**    Okay.  And in the first sentence of the second

9    paragraph, you see it says:  CBAM will agree to the attached

09:24:53  10   price increases under duress based upon the threat of

11   stopped shipments from Anchor Manufacturing.

12   Do you see that?

13   **A**    Yes.

14   **Q**    Do you know if this was part of the discussion that

09:25:07  15   Claudio references in the first sentence here?

16   **A**    I know we had discussions about us being under duress.

17   I know that Anchor was stating that they can't speak to our

18   duress but they understood the situation was my

19   recollection.

09:25:24  20   **Q**    And where does that recollection flow from, specific

21   discussions?

22   **A**    Yeah.  There were specific discussions that I, and

23   others here at CBAM where I was a part of, had discussed it

24   with Anchor.

09:25:36  25   **Q**    And who specifically at Anchor did you have those

**Tanasoff (Cross)**

| | |
|---|---|
| 1 | discussions? |
| 2 | **A**    Most of these discussions at this time were with Tony. |
| 3 | **Q**    Okay. |
| 4 |        MR. SMITH:  Your Honor, I'm going to show the |
| 09:26:20  5 | witness Exhibit D, which is Defendant's Exhibit D. |
| 6 | **BY MR. SMITH:** |
| 7 | **Q**    I believe -- so the last email we just discussed was |
| 8 | October 27th; correct? |
| 9 | **A**    Yes. |
| 09:26:36  10 | **Q**    Okay.  Now, this email -- well, go ahead.  If you want |
| 11 | to take a look, go ahead. |
| 12 |    But this email is dated October 28th, you'll agree |
| 13 | with me, one day later? |
| 14 | **A**    Yes. |
| 09:26:50  15 | **Q**    Still from Claudio to Tony; correct? |
| 16 | **A**    Yes. |
| 17 | **Q**    But this email is missing that sentence about duress; |
| 18 | correct? |
| 19 | **A**    Correct. |
| 09:27:01  20 | **Q**    Otherwise, substantively, it looks pretty similar to |
| 21 | the prior email; right? |
| 22 | **A**    It does look similar, yes. |
| 23 | **Q**    And contains the same estimated timing moves? |
| 24 | **A**    Looks to be the same, yeah. |
| 09:27:17  25 | **Q**    Okay.  Do you know why Claudio removed that sentence? |

**Tanasoff (Cross)**

1   **A**      There was discussion that I had individually with

2   Tony, and Claudio had, where Tony had said -- stated

3   specifically Anchor cannot speak to the duress of CBAM.

4   **Q**      So --

09:27:35  5   **A**      And they -- and the -- and the additional comment was

6   any discussion with duress they would not agree to.

7   **Q**      So that was going to be my question.

8         So Anchor disputed whether CBAM was under duress

9   relative to the price increase?

09:27:52  10   **A**      The statement, though, that was made to me by Tony was

11   not disputing Anchor's duress, it was stating that Anchor

12   cannot speak to CBAM's duress.

13   **Q**      Okay.  So, therefore, Tony was -- Tony did not agree

14   that CBAM was under duress then; is that right?

09:28:08  15   **A**      He said he could not speak to it.  It's not that he

16   agreed or disagreed.  He said he cannot speak to duress

17   of -- to our duress.

18   **Q**      Okay.  Right.

19         So -- but that specific sentence is removed from this

09:28:21  20   email here; correct?

21   **A**      Yes.

22   **Q**      And that was a result of discussions with Tony saying

23   that has to be removed; right?

24   **A**      Yes.

09:28:33  25   **Q**      This is -- so I'm going to take you down to the

**Tanasoff (Cross)**

1      exhibits that were attached to this specific email.

2          Have you seen this letter before?

3    **A**    Yes.

4    **Q**    And this one's dated one day later as well,

09:28:49  5    October 28th; correct?

6    **A**    Yes.

7    **Q**    This letter -- I'm happy to bring them both up and

8    compare them, but this letter now includes this sentence

9    down here at the very bottom, states:  Anchor understands

09:29:07  10   that CBAM is under duress in accepting any increase.

11         Right?

12   **A**    Right.

13   **Q**    Did you add that?

14   **A**    That was part -- this was my draft, so, yes.

09:29:15  15   **Q**    Okay.  So it wasn't in the prior letter, but you added

16   it to this letter?

17   **A**    Correct.

18   **Q**    Okay.  And that was -- you added it even though Tony

19   said he couldn't agree that CBAM was actually under duress

09:29:31  20   with respect to the pricing increase; right?

21   **A**    I don't recall the actual date of Tony stating that.

22   I think it was the same date as this letter was drafted.

23   But I -- I would have to go back to my notes to look at the

24   exact dates and times.

09:29:51  25   **Q**    Okay.  But we're in agreement that this is the

**Tanasoff (Cross)**

1    difference between October 27th and October 28th, and

2    October 27th the letter doesn't contain the duress language

3    and the October 28th language -- letter does contain that

4    language; correct?

09:30:05  5    **A**    Correct.

6    **Q**    Okay.  I'm going to go back up to the email itself.

7         All right.  So the email -- and I'll -- feel free to

8    take a look.

9         The email provides that CBAM's going to grant a price

09:30:26  10    increase to be paid retroactively to October 1st, 2022; is

11    that right?

12    **A**    Correct.

13    **Q**    And Anchor would receive a lump sum payment for the

14    price increase; right?

09:30:37  15    **A**    For the quantities that shipped from the date of --

16    hold on.  Let me read this.

17    **Q**    Uh-huh.

18    **A**    That area in particular, so it was talking about price

19    increase and the effective date of 10-1.  And then it lists

09:31:01  20    a phase 1 plan is to have a bank build and moved as soon as

21    possible.  Items number -- listed in phase 2 have a bank

22    build as soon as possible with a mutually agreed date of

23    11-14.  And the remaining items are going to stay at Anchor

24    for an indefinite period of time.

09:31:25  25    **Q**    Okay.  So -- go ahead.

**Tanasoff (Cross)**

     1    **A**     So they're talking about the lump sum payment for the

     2    difference only is what's referenced here in -- so above the

     3    spaces, where it says:  Following is the estimated timing

     4    for the moves, Claudio gives an example of if 5,000 -- if

09:31:45  5    parts of example part ABC ship between 10-1 and the date of

     6    transfer, Magna will provide payment for the difference

     7    between the PO price and the requested increase price, so

     8    it's the delta only that was to be paid in the lump sum.

     9    **Q**     Right.

09:32:03 10    **A**     Yes.

    11    **Q**     So ultimately -- initially, Cosma provides a PO to

    12    Anchor at the start of the relationship in December of 2019;

    13    correct?

    14    **A**     That sounds correct.  I wasn't there at the time, but

09:32:15 15    I understand where --

    16    **Q**     You've seen the PO, you testified about it --

    17    **A**     Yes.

    18    **Q**     -- previously; correct?

    19    **A**     Yes.

09:32:20 20    **Q**     Okay.  And, ultimately, the PO -- then there's another

    21    PO that will increase the prices; correct?

    22    **A**     Correct.

    23    **Q**     And then, the difference in those prices for the parts

    24    from Anchor, that delta, as you characterized it, would be

09:32:38 25    the lump sum payment that Cosma would pay to Anchor;

**Tanasoff (Cross)**

1    correct?

2    **A**    For phase 1 and phase 2 parts.

3    **Q**    Okay.  And just so -- and I want to get there in a

4    second, but -- so you're saying, with respect to phase 1 and

09:32:52  5    phase 2, that lump sum payment would be made retroactive

6    10-1 to when ultimately the dies, the tooling was returned

7    to Cosma; is that right?

8    **A**    Those parts in phase 1 and phase 2, yes.  And for the

9    delta between the PO price prior to 10-1 and the pricing

09:33:12 10    after 10-1, yes.

11    **Q**    And you're saying that just with respect to phase 1

12    and phase 2?

13    **A**    Correct.

14    **Q**    You're saying that there is no lump sum or there's no

09:33:21 15    price adjustment with respect to the non-phase 1/phase 2

16    parts?

17    **A**    Well, it states here in the letter that the remaining

18    parts will stay at Anchor, in the third bullet point, for an

19    indefinite period of time, price increase -- your cursor is

09:33:38 20    right over it -- contractually agreed and paid as of the

21    effective date of the price increase.  In return, Anchor

22    will sign and return the letter confirming their position of

23    stop shipment without a price increase.  There will not be a

24    renegotiation of pricing unless both parties have mutually

09:33:53 25    agreed to do so.

**Tanasoff (Cross)**

1   **Q**    So there was a price increase with the non-phase 1 and

2   phase 2 parts; right?

3   **A**    Yes.

4   **Q**    But you're saying that there was no lump sum payment

09:34:03  5   owed for the non-phase 1/phase 2 parts?

6   **A**    We did have a retro payment for some parts.  I would

7   need to look at the specifics of payment, but, yeah, there

8   was a payment made for quantities that shipped between -- so

9   the phase 1 and phase 2 parts were the difference of PO

09:34:27 10   pricing to the requested price increase.

11        I may not be following your question.  Can you

12   restate.

13   **Q**    Sure.

14        I mean, my understanding is your testimony was that

09:34:35 15   there was only lump sum payments that were due to be paid

16   for phase 1 and phase 2 parts.

17        Do I have that right?

18   **A**    So there are phase 1/phase 2 parts where we were

19   paying the lump sum payment at time of tool move.

09:34:49 20   **Q**    Okay.

21   **A**    There were other -- there were other lump sum payments

22   that were made.

23   **Q**    There were other lump sum payments made for non-phase

24   1 and phase 2 parts; is that right?

09:35:02 25   **A**    There -- there were times at which items had changed,

**Tanasoff (Cross)**

1    yes.  There was when the press broke down and we were

2    demanded to make lump sum payments.  There were other issues

3    that had occurred.  So I need a specific situation in order

4    to review exactly what you're talking about.

09:35:19 5    **Q**    Well, my -- I think my question -- my question is I

6    believe that your testimony was that -- previous testimony

7    was that Cosma only agreed to make lump sum payments for

8    phase 1 and phase 2 parts.

9    Do I have that right?

09:35:32 10    **A**    We were making lump sum payments for the difference,

11    the delta.

12    **Q**    Right.  For phase 1 and phase 2.  I'm focused on the

13    parts now.  So I'm just talking about with respect to

14    phase 1 and phase 2.

09:35:44 15    Is that right?

16    **A**    Yes.  I don't think I'm understanding your question

17    correctly.

18    **Q**    Okay.  Do you see here in this first bullet point --

19    **A**    Yes.

09:35:53 20    **Q**    -- it says phase 1?

21    **A**    Yes.

22    **Q**    And there are specific parts that are a part of

23    phase 1; right?

24    **A**    Yes.

09:36:00 25    **Q**    And there was a price difference between those parts

**Tanasoff (Cross)**

1    from the first PO in December of 2019 to -- ultimately to

2    the PO that was issued subsequently in 2022; right?

3    **A**    Correct.

4    **Q**    And that -- and with respect to phase 1 parts, Cosma

09:36:18 5    agreed to make a lump sum payment retroactive to

6    October 1st, 2022; correct?

7    **A**    For the delta, yes.

8    **Q**    Yes.

9         And the same holds true with phase 2 parts; correct?

09:36:32 10   **A**    Yes.

11   **Q**    What I'm saying is, my -- I understand your testimony

12   to be previously that that same arrangement with respect to

13   lump sum payments for retroactive payments back to

14   December -- or, excuse me -- to October 1st was not required

09:36:45 15   or Cosma did not agree to make those lump sum payments for

16   parts outside of phase 1 and phase 2 parts.

17        Do I have that right?

18   **A**    There were times that we discussed different amounts.

19   Like I say, when the press broke down, then we did make

09:37:01 20   additional lump sum payments.

21        So at the time of the drafting of this document, was

22   there a plan to make a lump sum payment?  No.

23   **Q**    There was -- even though this says the remaining parts

24   that are going to stay at Anchor for an indefinite period of

09:37:17 25   time will have the price increase contractual agreed to and

**Tanasoff (Cross)**

1    paid as of the effective date of the price increase; right?

2    **A**    So we had the price increase that was effective on

3    November 10th.  We did make a retro payment for some of

4    these parts for quantities that shipped for the point of

09:37:35  5    10-1 through 11-9.

6    **Q**    But this says the effective date is 10-1-22; right?

7    **A**    Correct.

8         So we issued the PO on 11-10 --

9    **Q**    Uh-huh.

09:37:48  10   **A**    -- so was there a price increase that was paid for the

11   lump sum difference at that time?  I would need to look at

12   the payment schedules.

13   **Q**    Okay.  But this looks to me like with respect to --

14   I'm just talking non-phase 1/phase 2.

09:38:03  15        Okay?

16   **A**    Yes.  Uh-huh.

17   **Q**    With respect to those other parts, it appears to me

18   that there was going to be a payment for those parts with a

19   retroactive date, an effective date of October 1st, 2022;

09:38:16  20   right?

21   **A**    The delta of the price increase?

22   **Q**    Yes.

23   **A**    Between -- between the 11-9 date and 10-1 date?

24   **Q**    Correct.

09:38:29  25        There would be a lump sum payment for non-phase 1 and

**Tanasoff (Cross)**

1    phase 2 parts; correct?

2    **A**    Only for the delta.

3    **Q**    Right.

4    So when you testified previously that the lump sum --

09:38:39  5    the delta what you're calling and I'm calling the lump

6    sum -- applied only to phase 1 and phase 2, it actually

7    applied to all of the parts; correct?

8    **A**    No.   No.   I still -- the -- and we may be getting

9    mixed up on terminology and information here, but -- so was

09:38:59 10    there a retroactive amount that was paid between the dates

11    of 10-1 and 11-9?   Yes.   There was payments that were made

12    in that regard --

13    **Q**    Okay.

14    **A**    -- for --

09:39:17 15    **Q**    So I'm calling it lump sum, but what you're saying is

16    a delta payment was made with respect to non-phase 1/phase 2

17    parts.

18    Do I have that right?

19    **A**    I would have to look at the payment schedules and the

09:39:30 20    information, yes, but I know there were different times when

21    we did pay.

22    **Q**    Fair enough.   That was a bad question.

23    Cosma agreed to make a delta payment for non-phase

24    1/phase 2 parts; correct?

09:39:42 25    **A**    Right here, we were stating that we were going to keep

**Tanasoff  (Cross)**

1    the parts at Anchor so they would be paid with normal

2    payment terms.

3            So clearly state your question, please, and if you

4    have any documents that show it, that would be ideal, which

09:40:02  5    payments are we looking at making and is it just from the

6    10-1 to 11-9 date, I can answer that question.

7    **Q**    So this says an effective date of 10-1; right?

8    **A**    Yep.

9    **Q**    And then you're saying 11-9, that's the delta, that's

09:40:17  10   the area of where, like, the retro payment of between 10-1

11   and 11-9; right?

12   **A**    Correct.

13   **Q**    So with respect to non-phase 1 and phase 2 parts,

14   Cosma agreed to make a payment for the delta within that

09:40:35  15   time period for those parts; correct?

16           MR. DOYLE:  Your Honor, I'm going to object.

17   This has been asked and answered I think many times.

18   I think we're just repounding the same ground over and over.

19           THE COURT:  Objection overruled.

09:40:41  20   Witness may answer the question.

21           THE WITNESS:  I would need to see the dates

22   that you're referring to and the amounts that were -- that

23   were in discussion at that time.

24           So I'm -- my understanding is that phase 1 and phase 2

09:40:53  25   parts, as we're pulling the die, that's when we're paying

**Tanasoff (Cross)**

1    the delta difference in PO price.

2    **BY MR. SMITH:**

3    **Q**    And pulling the die only related to phase 1 and

4    phase 2; right?

09:41:03 5    **A**    At the time, yes.

6    **Q**    So is it your testimony, ultimately, then, this delta

7    payment wasn't owed for the parts, the non-phase 1/phase 2

8    parts?  Or it was?

9    **A**    The delta payment we had made at various times based

09:41:17 10   on press breakage and based on demands made by Anchor.

11   **Q**    When was the press broken?

12   **A**    In November.

13   **Q**    Would it surprise you if it was actually in -- well,

14   so, excuse me, was -- so it would have been -- was it after

09:41:33 15   this November 9th date that you just testified about?

16   **A**    Yes.

17   **Q**    Okay.  So there's still this delta before the press

18   break where there was an agreement to make this delta

19   payment; correct?

09:41:45 20                   MR. DOYLE:  Object to the form.

21        Mischaracterizes prior testimony.

22                   THE COURT:  Objection sustained.

23        You may rephrase the question.

24   **BY MR. SMITH:**

09:41:53 25   **Q**    With respect to non-phase 1 and phase 2 parts, there

**Tanasoff  (Cross)**

1    was an agreement to make the delta payment between

2    November 9th and October 1st; is that right?  Or is that

3    wrong?

4    **A**    So, again, I would need to look at the exact details

09:42:09 5    of payments that were requested.  There was demands made by

6    Anchor for different amounts at different times.

7    **Q**    Okay.  So -- but based upon this document, based upon

8    your knowledge that you have right now, you don't know one

9    way or another?

09:42:22 10    **A**    Based on this document and the amounts that were going

11    to be demanded by Anchor, on this alone -- if I can look at

12    the payments, I can tell you.  If I look at the documents

13    related to those payments, I can tell you.  Just based on

14    this document alone, no, I can't tell you conclusively if

09:42:42 15    there was any amount.

16    **Q**    Okay.  I believe you testified previously about -- do

17    you recall there was an August letter that you testified

18    about -- and I'm happy to bring it up, if you'd like --

19    where you mentioned a six-week bank build of parts?

09:43:01 20    **A**    Yes.

21    **Q**    Do you recall that?

22    **A**    Yes, I do.

23    **Q**    That was in August of 2022; correct?

24    **A**    Yes.

09:43:12 25    **Q**    Do you see here in these bullets with respect to

**Tanasoff (Cross)**

1    phase 1 and phase 2 where there's a discussion about bank

2    build?

3    **A**    Yes.  There's bank build right there listed in

4    phase 1.

09:43:26  5    **Q**    Does that give -- does this specifically state what

6    the number of weeks of bank build would be required?

7    **A**    In this area, it does not.  I'm not sure if there's

8    anything else in the letter.  I reviewed it.  I don't think

9    it does state.  But I would conclude that it's something

09:43:43  10   similar to the six-week timing that we had asked for in the

11   31 letter.

12   **Q**    I'm happy to show you this email.

13        Do you see an amount of time with respect to the bank

14   build?

09:43:58  15       I can expand it, if you want.

16   **A**    Yes, please.

17   **Q**    Sure.  And I can move down.  I'm sorry.

18   **A**    So the payment will be made lump sum at the time of

19   tools being removed.  And then it does not state a bank

09:44:28  20   build that I am seeing as far as that quantity.  I'm not

21   seeing it.

22   **Q**    Is -- do you know if CBAM had personnel on-site at

23   Anchor, you know, during this phase 1 and phase 2 rollout?

24   **A**    So we had individuals at Anchor for many different

09:44:52  25   periods of time.  When I first drafted the phase 1 and

**Tanasoff  (Cross)**

1    phase 2 letter of 8-31, I don't know if there was anybody

2    there on that date, but we had people around there, before,

3    after, both, yes.

4    **Q**    Okay.  Do you know if any individuals that -- excuse

09:45:13  5    me, let me rephrase that -- if there were any Cosma

6    employees or representatives of Cosma at Anchor that

7    specified the number of parts to be produced by Anchor

8    during phase 1 and during the phase 1 and phase 2 time

9    periods?

09:45:33  10    **A**    So when the original letter was drafted on 8-31, we

11    were asking for a six-week bank.  There was discussion to

12    reduce that quantity.  It's not on this document, but I know

13    I've seen other documents that referenced a smaller, I think

14    it was a four-week bank quantity at different times.

09:45:53  15    **Q**    Okay.  And this document, again, it doesn't identify

16    the number of weeks of bank build; right?

17    **A**    Correct.

18    **Q**    But are you aware of personnel from Cosma at Anchor

19    that explained how many parts Cosma needed Anchor to produce

09:46:12  20    during this time period?

21    **A**    During this time period, yes.  We were talking about a

22    six-week and then a four-week bank.

23    **Q**    It's your testimony that the individuals that were at

24    Anchor specified to Anchor that they needed a four-to-six --

09:46:26  25    **A**    No.  No.  I'm sorry.  I don't know what they

**Tanasoff (Cross)**

1    specified. I'm sorry.

2    **Q**    That's what my question is, if you know what the

3    representative of Cosma at Anchor specified relative to a

4    bank build during phase 1 or phase 2.

09:46:39 5    **A**    Other than what was documented in writing, no, I don't

6    have any knowledge. And our agreements are in writing as to

7    understanding terms.

8    **Q**    But you understand I'm not talking about documents,

9    I'm talking about individuals that were on location at

09:46:49 10    Anchor and what they communicated to Anchor; right?

11    **A**    Yeah, I understand your question. No, I can't answer

12    that.

13        But I can state that our agreements are in writing, so

14    we should have a document that states what is required.

09:47:03 15    **Q**    Okay. So what document provides for the number of

16    weeks of bank build?

17    **A**    So we had an 8-31 letter and then we had other

18    communication after that.

19    **Q**    Okay. The -- and again, the 8-31 letter predates this

09:47:19 20    October 28th email; right?

21    **A**    Correct.

22    **Q**    And this email doesn't provide for any number of weeks

23    of bank build; right?

24    **A**    This letter does not. Correct.

09:47:30 25    **Q**    Okay.

**Tanasoff (Cross)**

1          MR. SMITH:  Your Honor, I am planning to show

2     the witness Defendant's Exhibit E.

3               THE COURT:  That's fine.  You may proceed.

4               MR. SMITH:  Thank you, Your Honor.

09:48:03  5   **BY MR. SMITH:**

6     **Q**     Mr. Tanasoff, can you see this document?

7     **A**     Yep.  Dated October 28th from Tony to myself.  Draft.

8     **Q**     Yes.

9          Have you seen this document?

09:48:21 10        Take your time to take a look at it, if you'd like.

11    **A**     Yeah.  Yes.  I've seen this.

12    **Q**     Okay.  Do you know if this letter was drafted after

13    the letter we just looked at in Exhibit D?

14    **A**     I don't know.  I would need to look at the timing of

09:48:49 15   emails and things.  But I believe it was drafted after the

16    28th.

17         Go back to the 28th letter.  Do you have the 28th

18    letter?

19    **Q**     Sure.

09:48:57 20   **A**     So I believe it was drafted after that.

21    **Q**     When you say -- you're saying that you believe Exhibit

22    E, which I'm showing you right now, was drafted after

23    Exhibit D?

24    **A**     Yes.

09:49:08 25   **Q**     Okay.  This letter states that Anchor cannot support

**Tanasoff (Cross)**

1    production for Cosma for many reasons we have discussed over

2    the past several weeks; right?

3    **A**    Uh-huh.  Yes.

4    **Q**    Does the letter also identify what those reasons are?

09:49:25  5    **A**    It does not.

6    **Q**    So let's take a look here.

7    **A**    Oh, wait.  It includes -- I'm sorry.  This is the

8    draft.  This was not the final letter.  So in the past

9    several weeks, this includes condition of CBAM's supplied

09:49:40  10    tooling.  So it does reference that there.

11    **Q**    So based upon this letter, is it -- would it be

12    Anchor's position here that the -- what's referred to as

13    many reasons we have discussed over the past several weeks.

14    This includes the condition of the CBAM supplied tooling as

09:49:58  15    received at Anchor which has impacted Anchor's manufacturing

16    and cost structure.

17          Do you see that?

18    **A**    That's what Anchor is saying.

19    **Q**    Okay.  Do you have any reason to dispute that this was

09:50:08  20    what Anchor perceived to be the reasons for asking for the

21    price increase?

22    **A**    Yes.  So where they state the discussions that we've

23    had, our discussions had involved the failed preventative

24    maintenance.

09:50:22  25    **Q**    Okay.  Does failed preventative maintenance show up in

**Tanasoff (Cross)**

1    here as a reason?

2    **A**    It does not.  It states that there -- the discussion

3    points that we've talked about over the past period of time.

4    **Q**    Sure.

09:50:35  5        But then, the only discussion points that are set

6    forth in here are the tooling issues; right?

7    **A**    Yes.  This is Anchor's draft, yes, so they're going to

8    highlight their perspective, yes.

9    **Q**    Okay.

09:50:56  10            MR. SMITH:  Your Honor, I'd like to show the

11   witness Defendant's Exhibit F.

12   **BY MR. SMITH:**

13   **Q**    Mr. Tanasoff, you have -- if you can take a look at

14   this letter.

09:51:13  15  **A**    Yep.  Yes.  Okay.

16   **Q**    Have you seen this document before?

17   **A**    Yes.

18   **Q**    Do you know who prepared it or made the highlighting?

19   **A**    I do not know.

09:52:03  20  **Q**    Okay.  Do you know why the portions here are

21   highlighted?

22   **A**    I believe that's areas that Anchor is stating that we

23   had issue with and we didn't -- we didn't agree, so I would

24   think that that's a part of our discussion points of, no, we

09:52:31  25  don't agree with tool condition and other aspects.

**Tanasoff (Cross)**

1    **Q**    But you're unaware if that's the case, is that my

2    understanding?

3    **A**    I'm unaware of who highlighted those specific areas

4    for discussion.  I don't know if those were highlighted at

09:52:51 5    the time, if those were discussion points that didn't end up

6    in the final draft based on our conversations.

7    No, I don't have the firsthand knowledge of

8    discussions relating to the highlights other than if you ask

9    me now, or at the time, I would say that, no, CBAM does not

09:53:10 10    agree with the tool condition areas, so we wouldn't want a

11    letter from Anchor that would state it's tool condition when

12    we have had multiple discussions involving failed

13    preventative maintenance and setup issues.

14    **Q**    I'm just going to compare this document here, Exhibit

09:53:33 15    F, with the one that we had looked at previously, which is

16    Exhibit D or Exhibit 4 -- excuse me -- Plaintiff's

17    Exhibit 4.

18    **A**    Yep.

19    **Q**    You've seen this letter before, we've talked about it;

09:53:52 20    right?

21    **A**    Yes.  The signed one, yes, from October 28th.

22    **Q**    Is the only difference between these two letters the

23    removed highlighted language?

24    **A**    Looks like it.  The video is in the way here, but,

09:54:08 25    yes.  So we can compare -- I wouldn't think that there is or

**Tanasoff (Cross)**

1    not much substantial.

2         So the first sentence:  As discussed on the conference

3    calls, Anchor can no longer support.  No longer support.

4    That's the first sentence.

09:54:24  5         Production of Magna Cosma Body's -- according to

6    current contract and purchase orders.  Current contract and

7    purchase orders.

8         For many reasons discussed in the past.  For many

9    reasons discussed in the past weeks.  Those are the same.

09:54:39 10   Removal of that highlighted section, yes.

11        CBAM has told Anchor that the OEM.  CBAM has told

12   Anchor that the OEM.  Yes.  If CBAM does not grant the

13   increase.

14        Yes, it looks like it is the same with just the

09:54:58 15   removed highlighted areas.

16   **Q**    So the portion in the final letter, for the many

17   reasons we have discussed in the past several, is still in

18   the final letter; right?

19   **A**    Yes.

09:55:09 20   **Q**    And based on this highlighted letter, Anchor's

21   inclusion of this language here, that the reasons are the

22   tooling; right?

23   **A**    That is Anchor's claim, yes.

24   **Q**    Okay.  So just to be clear, this final letter here,

09:55:36 25   this is the letter that CBAM wanted from Anchor regarding

**Tanasoff (Cross)**

1      the price increase; correct?

2      **A**     We were asking them to document their position.  And,

3      yes, that's the letter that meets that requirement or that

4      need.

09:55:50  5   **Q**     And CBAM drafted, initially drafted this letter?

6      **A**     We drafted a letter.  This changed substantially, yes,

7      but we drafted a letter.

8      **Q**     Drafted the first letter in connection with providing

9      a letter to GM; right?

09:56:05  10  **A**     Correct.

11     **Q**     And yet, it's your testimony that CBAM was under

12     duress in agreeing to a price increase even though it's the

13     one that requested the letter?

14     **A**     We didn't request the price increase, yes.

09:56:22  15  **Q**     You requested the letter regarding the price increase

16     though; right?

17     **A**     Yeah.  We were asking for them to document their

18     position.

19     **Q**     Right.

09:56:30  20     And then, you drafted the letter that was going to go

21     to GM about the price increase; right?

22     **A**     At Tony's request, yes.

23     **Q**     Okay.  So -- okay.  And all of that, yet, CBAM is

24     still claiming that it was under duress even though it

09:56:44  25  drafted the first letter?

**Tanasoff (Cross)**

1    **A**    We drafted the letter at Tony's request, yes.

2    **Q**    Okay.  Showing you what is marked as Defendant's

3    Exhibit H.

4         Have you seen this email before?

09:57:14  5         In fact, it's one of the exhibits in plaintiff's

6    exhibits.

7    **A**    Okay.  Looks familiar.  Keep going down.  Go back up

8    for a second.

9    **Q**    Sure.

09:57:30 10   **A**    So retro payments of 10-1 to 11-9 on dies moving out

11   will be made once the dies have exited.  Yes, that's the

12   phase 1 exit.  Okay.  So the -- yes, I do recognize this.

13   **Q**    Okay.  I'm only going to really ask you questions

14   about -- primarily about this first email.  And we can get

09:58:00 15   to the other emails, if you need to review them, that's

16   fine.

17   **A**    Okay.

18   **Q**    Who is Ben Nekola?

19   **A**    He is our buyer, our program buyer.

09:58:12 20   **Q**    He works for Cosma; right?

21   **A**    Yes.

22   **Q**    Does he work under you?

23   **A**    Yes.

24   **Q**    Did he work under you on November 10th, the date of

09:58:18 25   this email?

**Tanasoff  (Cross)**

1    **A**    Yes.

2    **Q**    The email states that Ben has attached updated POs?

3    **A**    Correct.

4    **Q**    Correct?

09:58:28  5    **A**    Yes.

6    **Q**    And it says:  All pricing effective 11-10-22; right?

7    **A**    Yes.  Yep.

8    **Q**    And the retro payments, I think this is what you're

9    describing as the delta payments --

09:58:41  10    **A**    Uh-huh.

11    **Q**    -- were between October 1st and November 9th; is that

12    right?

13    **A**    And it says on dies moving out.

14    **Q**    Okay.  So on dies moving out.  So necessarily

09:58:52  15    everything -- and then, this fourth column says:  Payment

16    owed to Anchor post die exit; correct?

17    **A**    Yes.

18    **Q**    And this would only be, so then, phase 1 and phase 2

19    parts?

09:59:04  20    **A**    This says phase 1.

21    **Q**    Okay.  So phase 1 exit.

22          Okay.  And just -- I'm going to scroll down to the POs

23    really quickly.

24          Have you seen these purchase orders?

09:59:24  25    **A**    Yes.

**Tanasoff (Cross)**

1  **Q**      Okay.  Is the -- and the unit price is where it's

2  reflected the price variance; is that right?

3  **A**      Yes.

4  **Q**      Okay.  So the POs that were initially issued in

09:59:37  5  December, December 30th of 2019, those prices were less than

6  what's set forth in this unit price here; is that right?

7  **A**      I can compare the two, but it looks like it, yes.

8  **Q**      Well, that was the reason for the -- providing the PO,

9  this PO, right, was to reflect the price increase?

09:59:56  10  **A**      Correct.  Yeah.  Assuming it's the correct exhibit and

11  they were attached correctly, it looks like it.

12  **Q**      I'll state to you that it is.

13  **A**      Okay.

14  **Q**      Do -- and you're familiar with this purchase order?

10:00:12  15  **A**      Yes.

16  **Q**      This is Magna's purchase order?

17  **A**      Yes.

18  **Q**      Cosma, same entity; right?

19  **A**      We're a division, but, yes.

10:00:21  20  **Q**      Sure.

21  But this is Cosma, Magna's document, this is not

22  Anchor's document; correct?

23  **A**      Yes.

24  **Q**      And are you familiar with the terms that are set forth

10:00:29  25  in this PO?

**Tanasoff (Cross)**

1    **A**    Yes.

2    **Q**    Specifically, does this PO -- this contains some

3    language down here that you've testified about in your

4    direct examination?

10:00:44  5    **A**    The terms and conditions, yes.

6    **Q**    Yes.  Right.

7          And that comes from this language here, do you agree

8    with that?

9    **A**    Yes.

10:00:53  10    **Q**    Do the -- does this PO state anywhere that it's being

11    issued without prejudice or under protest?

12    **A**    There was a related item that was sent with this, a

13    Excel spreadsheet attachment, that did reference a forced

14    price increase.

10:01:10  15    **Q**    Okay.  But this PO is what -- I believe you said this

16    PO is the governing document, right, in your direct

17    testimony?

18    **A**    Yes.

19    **Q**    And it doesn't say without prejudice or under protest;

10:01:23  20    correct?

21    **A**    I do not see that in here, no.

22    **Q**    So there's a -- there's this table here in -- this is

23    back to Ben's email -- there's this table here; right?

24    **A**    Yes.

10:01:45  25    **Q**    That you see in his email?

**Tanasoff (Cross)**

1  **A**   Yes.

2  **Q**   And I think you just said that these are just related

3  to phase 1 parts; is that right?

4  **A**   Correct.

10:01:54  5  **Q**   And that's -- it says part number and then there's all

6  these part numbers here; right?

7  **A**   Yes.

8  **Q**   Okay.  I'm just going to put another document next to

9  this one for ease.

10:02:32  10      Okay.  Do you see my screen again, Mr. Tanasoff?

11  **A**   I can.

12  **Q**   Okay.  And then, you see on the left side -- there's

13  two PDFs here; correct?

14  **A**   I -- I believe you had only -- I can only see Exhibit

10:02:50  15  J at the top of the one.  I don't see any at the top -- so

16  it looks like two different documents, yes.

17  **Q**   So you see Exhibit J here on top.  This is a

18  document -- I'll scroll through.  This is a document that

19  you had testified about on your direct examination that

10:03:07  20  we've been referring to as Exhibit 10.

21      Do you recall that?

22  **A**   Yes.

23  **Q**   Okay.  And here's this letter that we were talking

24  about, the October [sic] 31st, 2022 letter that was sent by

10:03:19  25  you; right?

**Tanasoff (Cross)**

1    **A**    Correct.

2    **Q**    Okay.  And in this letter, you provide phase 1 and

3    phase 2 parts; correct?

4    **A**    Yes.

10:03:33 5    **Q**    Okay.  And there are -- under this letter, there are

6    seven part numbers listed between phase 1 and phase 2?

7    **A**    Yes.

8    **Q**    And then, in Ben's email, he lists what looks like, I

9    believe, let's see here, 12 parts?

10:04:01 10    **A**    Right.

11    **Q**    So these parts that are listed here contain, in

12    addition to phase 1 and phase 2 parts, they also contain

13    non-phase 1 and phase 2 parts; right?

14    **A**    Yes.  I think there's a combination of ones that we

10:04:15 15    originally suggested and then some additions, yes.

16    **Q**    Okay.  And this says:  Payment owed to Anchor post die

17    exit; right?

18    **A**    Post die exit, yes, so after the die exits.

19    **Q**    Right.

10:04:29 20    But with respect -- but this includes, again,

21    non-phase 1 and phase 2 parts; right?

22    **A**    Well, this is stating that this is a new phase 1 list

23    on the --

24    **Q**    It says it's a new phase 1 list?  Where does it say

10:04:44 25    that?

**Tanasoff (Cross)**

1   **A**     It says phase 1 exit and they're amending the parts.

2   **Q**     But your letter also said phase 1 over here; right?

3   **A**     Correct.  Yep.

4   **Q**     It doesn't indicate in Ben's email that there is a

10:04:57  5   modification to phase 1, does it?

6   **A**     It does not state that specifically, but it does

7   include additional parts.  So phase 1 changed based on

8   discussions and additional communication.

9   **Q**     Okay.  What -- where were those?  Do you have

10:05:14  10   documents to support that there is a change to phase 1?

11   **A**     Well, this document is showing that there is

12   additional items.

13   **Q**     Well, this is what -- this is characterizing phase 1

14   to include parts that are different than what this phase --

10:05:27  15   that your letter on August 31st is characterizing as phase 1

16   parts; right?

17   **A**     Correct.

18        So he's saying there's an attached -- data attached in

19   the tab, and he's saying phase 1 exit, so we can look at

10:05:42  20   that phase 1 tab and see what additional parts were reviewed

21   at that time.

22   **Q**     Okay.  So what you're saying is that just based upon

23   the fact that Ben sends this email containing parts that he

24   characterized as phase 1, that means that these are now

10:05:58  25   phase 1 parts, even though it's different than what your

**Tanasoff (Cross)**

1    letter says on August 31st; is that right?

2    **A**    Yes.  There's additional communication and there's

3    documentation related to that, yes.

4    **Q**    Okay.  And this also -- the email from Ben in the

10:06:14  5    fourth column again which says:  Payment owed to Anchor post

6    dies exit.

7         Do you see that?

8    **A**    I do.

9    **Q**    Okay.  And this amount that's set forth in this box

10:06:25  10   here, is it your understanding that this would be what you

11   characterized, sir, as the delta between the prices starting

12   October 1st and November 9th; is that right?

13   **A**    So can you just zoom in on the -- I don't think we

14   need to see the 8-31 letter any more, if you want to push

10:06:45  15   that aside.

16   **Q**    Yeah.  And I'm going to get there.  I'm happy to do

17   that.  Let me open it up for you, but then I'm going to come

18   back.

19        Does that help you?

10:06:53  20   **A**    Yes.

21        So also in the attached file, historical receipts, is

22   a tracking sheet for retro payment that will be scheduled

23   for all other parts.  So the 274 included some -- the delta

24   of 10-1 to 11-9 of this and some other parts.

10:07:15  25        So we can look at the additional tab, where he's

**Tanasoff (Cross)**

1    referring here to supporting data attached in tab of phase 1

2    exit, we can review that full amount in there for the 274

3    and the amounts there included.

4    **Q**    Okay.  But is it your understanding that this price

10:07:33  5    here, say, for example, part number A1-1004A, that there's

6    this, under column four, payment owed to Anchor post die

7    exit which is $27,975.12; right?

8    **A**    Yes.

9    **Q**    Is it your understanding that that is the delta, or

10:07:53 10    the lump sum, that would be owed for the price increase that

11    was to be retroactive between October 1st and November 9th?

12    **A**    I would need to look at that phase 1 exit tab to

13    confirm, but that looks like it is accurate.

14    **Q**    Okay.  All right.  Did Cosma make all of these

10:08:29 15    payments?  Has Cosma made all of these payments?

16    **A**    So that total on the bottom of 274,888, on the

17    bottom --

18    **Q**    Yep.

19    **A**    -- I know that was made, so I would need to add the

10:08:46 20    amounts up and confirm what was all included in that.  But,

21    yes, we made that 274,888 payment.

22    **Q**    Sure.  But my question was a little bit different.

23    **A**    Okay.

24    **Q**    This $274,888.55, that amount is different than what's

10:09:04 25    being referred to in this fourth column; correct?

**Tanasoff (Cross)**

1  **A**     I -- I would need to add that up.

2  **Q**     So you don't know if these amounts that are set forth

3  in this column are included or excluded from this

4  $274,888.55?

10:09:22  5  **A**     So it looks like they would be included based on this

6  documentation.  I would want to review the historical

7  receipts tab and the information to completely verify to

8  make sure the calculation is correct.  But that looks

9  correct, yes.

10:09:36  10  **Q**     Okay.  Is it your -- has Cosma made all lump sums

11  to -- for the price increase to Anchor?

12  **A**     Have we made all -- have we made all retro payments?

13  **Q**     Yes.  Referring to either retroactive payments or lump

14  sum payments, however you want to refer to it, have all

10:10:00  15  those payments been made?

16  **A**     Just the delta between the piece price and the -- and

17  the PO price, I believe so.  I would need to look at

18  documentation, if there was anything to the contrary, but I

19  believe so.

10:10:15  20  **Q**     Okay.  But that -- those payments were to be made as

21  the dies left Anchor's facilities; correct?

22  **A**     For the phase 1/phase 2 exit.

23  **Q**     This being what you just testified to as a phase -- as

24  part of the phase 1 exit; right?

10:10:34  25  **A**     Correct.  Yes.

**Tanasoff (Cross)**

1      **Q**     Okay.  So these lump sums were to be made once the

2      dies left Anchor's facilities; correct?

3      **A**     For these particular parts, yes.

4      **Q**     So moving back to a document that you testified to

10:11:12  5      previously.  Let's see here, I think I have to -- so this is

6      -- what I've just brought up is Exhibit N, which has been

7      previously referred to as Exhibit 14 by the plaintiffs.

8      This is the plaintiff's exhibit.

9           Do you recall testifying about this document here?

10:11:48 10      **A**     I do.

11      **Q**     Okay.  And I'm just going to scroll down here.

12           Do you see here -- do you see here this email that's

13      in Plaintiff's Exhibit 14?  And I'm comparing it to

14      Defendant's Exhibit H.  Do you see the email in Exhibit 14?

10:12:14 15      Does that look like the same email?  Are we in the same

16      email chain here?

17      **A**     It appears to be.

18      **Q**     Okay.  So then, after -- and this Exhibit H does not

19      have an email at the top, but now I'm looking up in this, so

10:12:32 20      the email in Exhibit 14 that we were looking at was

21      November 10th at 12:03 p.m.; right?

22      **A**     Yes.

23      **Q**     And then there is a subsequent email from Dan Piwowar

24      of Anchor to Ben that's on December 1st at 7:47.

10:12:53 25           Do you see that?

**Tanasoff (Cross)**

1    **A**    Yes.

2    **Q**    And Ben says -- Dan says to Ben:  Please call me this

3    morning or send me a contact of who I can talk with to make

4    sure that we keep payments clean and both sides can

10:13:04 5    reconcile accounts through this transition.

6         Do you see that?

7    **A**    Yes.

8    **Q**    Okay.  And then Ben writes back later on December 1st

9    to Dan, he says:  Here is what we are seeing as owed

10:13:18 10    currently.

11         Do you see that?

12    **A**    Yes.

13    **Q**    Okay.  Do you know if the dies as of December 1st,

14    2022 had been removed?  Or some of them had been removed?

10:13:33 15    **A**    I don't know the exact date.  I know that we were

16    looking at moving dies within that time frame.

17    **Q**    Okay.  And, you know, does this table that we're

18    looking at in Exhibit 14 appear to be -- contain the same

19    four columns, the same first four columns as Exhibit H?

10:13:57 20    **A**    Yes.

21    **Q**    And then, in Exhibit 14, there's these two added:

22    Moved, and then, up for payment; right?

23    **A**    Correct.

24    **Q**    Okay.  I want to focus on the parts that say --

10:14:15 25    that -- where it says "N."

**Tanasoff (Cross)**

1    **A**    Okay.

2    **Q**    And the parts -- so that's parts 1210, 1235, 1265,

3    1281, 1517, and 1518.

4    Do you see that?

10:14:29  5    **A**    Yes.

6    **Q**    These are your -- these parts, it is your testimony,

7    are a part of phase 1; correct?

8    **A**    Yes.  A revised phase 1, but, yes.

9    **Q**    Revised.

10:14:39 10    Okay.  And this email indicates, as of December 1st,

11    that these -- that the dies used to produce these parts had

12    not been moved, is that what this means?

13    **A**    That's what it looks like that column is saying, yes.

14    **Q**    Okay.  And as of December 1st, what this is also

10:14:54 15    saying is that lump sum payment has not been made for those

16    six parts that we just talked about; right?

17    **A**    That's what it looks like it's saying.

18    **Q**    Do you know if the lump sum payments for those parts

19    have -- have been made yet by Cosma?

10:15:13 20    **A**    The lump sum payments for these particular parts with

21    a yes in the moved column?

22    **Q**    No.  The no.

23    **A**    Oh, I would need to look at the payment schedules and

24    information.

10:15:25 25    **Q**    But you don't know one way or another, as of today,

**Tanasoff (Cross)**

1    whether or not those lump sum payments have been made?

2    **A**    I would need to look at the payment history.  We made

3    lots of payments.  I would need to look at specifics.

4    **Q**    Okay.  Has Cosma made all payments for parts that had

10:16:00 5    been invoiced by Anchor to Cosma?

6    **A**    No.  There are still other invoices that are not due

7    yet.  And we do have other disputed amounts and damages.

8    **Q**    No.  I understand that.  I was asking a very specific

9    question, though, and you answered the first part, which is

10:16:21 10    fine.

11    **A**    Okay.  So, yes, there are still open invoices that

12    Anchor is claiming.

13    **Q**    And you don't know if there's open lump sum payments,

14    I believe you said that; is that right?

10:16:34 15    **A**    I would need to look at the details, but I don't

16    believe there's much in lump sums.  If there are, I would

17    want to look at the details.

18    **Q**    You say much.  Does that lead -- I'm just trying to

19    understand if you -- if, ultimately, the lump sum payments

10:16:51 20    were made or not.  If you don't know, that's fine.  But I'm

21    just trying to understand that.

22    **A**    I know we've made the retroactive payments for deltas

23    at various times.  We've made many different payments.  Or

24    we've made several different payments.  I would need to look

10:17:04 25    at the details of those payments and those amounts to tell

**Tanasoff (Cross)**

1    you the exact what was covered within them.

2    **Q**    Okay.  Has the tooling with respect to these -- I'm

3    looking back at exhibit -- with 14 --

4    **A**    Uh-huh.

10:17:19  5    **Q**    -- has the tooling used to produce the six parts here

6    that we just talked about that had not been moved, right --

7    **A**    Uh-huh.

8    **Q**    -- has that tooling been taken by Cosma out of

9    Anchor's facility?

10:17:35  10    **A**    So let me see here.  All that's listed in the nos are

11    B1 and I don't see a 1213/1251 in there, so, yes, I believe

12    that all payments have been made on those parts.

13    **Q**    That's not --

14    **A**    And the -- and the tooling has moved, yes.

10:17:53  15    **Q**    Okay.  So the tooling has moved, and you believe that

16    lump sum payments have been made with respect to these

17    parts?

18    **A**    Again, lump sum, I'm -- the delta in pricing I believe

19    has been paid.

10:18:06  20    **Q**    Okay.

21    **A**    I would need specifics, but that's my belief.

22    **Q**    Okay.  You testified CBAM's taken possession of 14 or

23    15 die sets that were at Anchor's facilities; right?

24    **A**    Correct.

10:18:20  25    **Q**    Were the die sets, after they were taken from Anchor's

**Tanasoff (Cross)**

1    facility, altered or modified in any way?

2    **A**    Yes, in many cases they were by the new sources.

3    **Q**    What do you mean the new sources?

4    **A**    So we have re-sourced many parts based on the press

10:18:41  5    blowing up and based on -- we had the original plan.  The

6    plan was not necessarily thrown out the window but changed

7    drastically based on Anchor's press breaking.  So we had

8    moved those tools to alternative sources.

9    **Q**    Okay.  And since those -- since that tooling left

10:18:59  10   Anchor's facilities, you're saying that the tooling has been

11   altered since leaving the facility?

12   **A**    Yes.  There are modifications that are needed to fit

13   other people's presses and things, yes.

14   **Q**    Okay.

10:19:12  15   **A**    And preventative maintenance that was done.

16   **Q**    Who made the modifications or alterations?

17   **A**    The new sources.

18   **Q**    Okay.

19   **A**    Or they outsourced it.

10:19:21  20   **Q**    Who is the new source?

21   **A**    We have multiple.

22   **Q**    Okay.  Who are they?

23   **A**    So we have Fleetwood.  DSI, who has some relation to

24   Richard Tool that you referenced earlier.  And I believe

10:19:40  25   there's one or two others, but --

**Tanasoff (Cross)**

1    **Q**     And the die sets that we're talking about, the 14 die

2    sets that were moved by Cosma from Anchor's facilities are

3    presently with those suppliers that you just mentioned?

4    **A**     Cleveland-Cliffs.  I think there are some that are

10:19:56  5    with AMT, Accurate Machine.  And then there's DSI, yes.

6    **Q**     And that tooling is presently being used; is that

7    right?

8    **A**     Yes.

9    **Q**     Okay.

10:20:14  10               THE COURT:  Attorney Smith, approximately how

11    much do you have left with your cross-examination?

12          We've been going about an hour and 20 minutes now.

13               MR. SMITH:  That concludes my

14    cross-examination, Your Honor.

10:20:23  15               THE COURT:  All right.  Thank you.

16          And, Attorney Doyle --

17               MR. DOYLE:  Yes, Your Honor.

18               THE COURT:  -- do you have any redirect?

19          And if you do, I expect you to be extremely brief

10:20:37  20    based upon -- I've given a lot of leeway to both sides in

21    the direct and cross-examination to address larger issues

22    that are not directly germane to the TRO and preliminary

23    injunction issues, so I would expect, if there's any

24    redirect, it will be extremely narrow to the issues raised

10:20:55  25    in the TRO/preliminary injunction motion rather than what

**Tanasoff (Redirect)**

1    has been elicited on direct and cross that was more of a

2    discovery-type investigation.

3                      MR. DOYLE:  Understood and agreed, Your Honor.

4                      THE COURT:  All right.  Then do you have

10:21:16  5    redirect, Attorney Doyle?

6                      MR. DOYLE:  I do have some redirect, Your

7    Honor, yes.

8                      THE COURT:  You may proceed.

9                      MR. DOYLE:  Thank you, Your Honor.

10:21:23 10              **REDIRECT EXAMINATION OF THOMAS TANASOFF**

11    **BY MR. DOYLE:**

12    **Q**    Good morning, Mr. Tanasoff.

13    **A**    Good morning.

14                      THE COURT:  And, Counsel, just to interject

10:21:32 15    real quick.

16         I believe I informed you all before, but I do have a

17    sentencing starting at 11:00 today, so we will be adjourning

18    for me to attend to that sentencing.  And I know I've set a

19    third day available as well.  We're now at 10:21.

10:21:51 20         So, Attorney Doyle, you may proceed.

21                      MR. DOYLE:  Thank you, Your Honor.

22    **BY MR. DOYLE:**

23    **Q**    Mr. Tanasoff, will you please refer to Plaintiff's

24    Exhibit 9.  It's also Exhibit I.

10:22:05 25    **A**    Yes.

**Tanasoff (Redirect)**

1    **Q**    And there was -- during counsel's examination,

2    reference was made in some October communication that you

3    saw where Anchor asserted that they were having issues

4    related to the conditions of the die sets.  I want to refer

10:22:26  5    you to Exhibit I, which is a couple months earlier,

6    August 25, 2022.

7    **A**    Yep.  I have it here in front of me.

8    **Q**    All right.  In that email, does Mr. Evans of Anchor

9    state why Anchor needs to exit the business relationship?

10:22:45  10   **A**    We no longer have capacity in both labor and press

11   time to meet the schedules of CBAM parts.

12   **Q**    Does he mention anything having to do with the

13   conditions of the die sets?

14   **A**    No.

10:22:55  15   **Q**    Is that communication that you saw in late

16   October 2022, a couple months later, is that the first time

17   that you're aware of that Anchor raised the condition of the

18   die sets as some sort of justification for needing to exit

19   the relationship and/or increase the price?

10:23:15  20   **A**    They did have other discussions.  I think that's the

21   first time I saw documentation to that effect.

22   **Q**    And, in fact, in the documentation, when Anchor

23   announced in this August 25, and in previous communication,

24   did Anchor ever indicate that it was anything having to do

10:23:32  25   with the die conditions that was leading to them exiting the

**Tanasoff  (Redirect)**

1      relationship?

2      **A**      Not to my knowledge, no.

3      **Q**      Was Anchor authorized under your terms and conditions

4      to unilaterally exit the relationship?

10:23:46  5      **A**      No.

6      **Q**      Does Cosma consider that to be a breach of contract?

7      **A**      Yes.

8      **Q**      Was Anchor authorized under the terms and conditions

9      to unilaterally increase the price?

10:23:57 10      **A**      No.

11      **Q**      Does Cosma consider that to be a breach of contract?

12      **A**      Yes.

13      **Q**      Why did Cosma agree to the price increase?

14      **A**      Only to ensure supply to ourselves and GM and ensure

10:24:12 15      that we didn't incur an enormous charge from GM.

16      **Q**      There was talk on -- during counsel's examination of

17      the lump sum or retro payments and I want to be crystal

18      clear.

19           In any discussion involving the retroactive payments

10:24:39 20      from the date of 10-1 through 11-9, was it ever contemplated

21      that the retroactive payments, the lump sum payments

22      included anything other than the price delta?

23      **A**      No.

24      **Q**      Did those retroactive payments, was there ever a

10:24:55 25      discussion that those would include all payables or any

**Tanasoff  (Redirect)**

1    portion of the payables?

2    **A**    No.

3    **Q**    And was there ever any discussion of those retro or

4    lump sum payments applying to the 1213/1253 die set that is

10:25:16  5    still at Anchor?

6    **A**    No.

7    **Q**    And counsel asked you quite a few questions about the

8    phase 1 and phase 2 proposal.  As we saw in your letter, you

9    set forth a number of requirements that had to be carried

10:25:34  10    out in connection with that proposal.

11    My question is:  Did that phase 1 or phase 2 plan ever

12    get carried out?  Or was it interrupted and a new plan had

13    to be implemented?

14    **A**    It was interrupted based on the press breakage and we

10:25:47  15    had to realign and ensure that we had product.

16    **Q**    In other words, is it the case that the contemplated

17    phase 1 and phase 2 transition of certain dies, that plan

18    was never brought to fruition?

19    **A**    It was not.

10:26:02  20    **Q**    Mr. Tanasoff, will you please look at Defendant's

21    Exhibit H.

22    **A**    I have it.  Yep.

23    **Q**    All right.  I apologize, Mr. Tanasoff.  Will you

24    please look at Plaintiff's Exhibit 14.  It's also N.

10:27:05  25    You can set aside Exhibit H, Defendant's Exhibit H.

**Tanasoff (Redirect)**

1    Please look at Plaintiff's Exhibit 14, or N.

2    **A**    I have it.

3    **Q**    All right.  And can you go to, it should have page

4    number 10 at the bottom, it's an email from Ben Nekola on

10:27:49 5    November 10, 2022, at 12:03 p.m.

6    **A**    Yes.

7    **Q**    And do you see a discussion from Mr. Nekola regarding

8    the retro payments that we've discussed in respect to the

9    phase 1 exit only?

10:27:59 10    **A**    Yes.

11    **Q**    And what was Mr. Nekola's indication to Anchor about

12    when the phase 1 retro payments will be made?  Was it before

13    the dies exited?  Or after?

14    **A**    After.

10:28:13 15    **Q**    So is it the case that even on these limited retro

16    payments that were discussed with respect to phase 1 and

17    phase 2 only, even then the payments were made after the

18    dies exited?

19    **A**    Yes.  Post die exit.

10:28:47 20                MR. DOYLE:  Those are all my questions, Your

21    Honor.

22         Thank you.

23                THE COURT:  Thank you, Counsel.

24         Attorney Smith, any recross based upon that limited

10:28:55 25    redirect?

```
             1              MR. SMITH:  No, Your Honor.

             2         Thank you.

             3              THE COURT:  All right.  Thank you.

             4         Mr. Tanasoff, you're now off the witness stand.

10:29:01     5              THE WITNESS:  Thank you.

             6              THE COURT:  Now, Attorney Doyle, is there

             7    additional witnesses you intend to call?

             8              MR. DOYLE:  No, Your Honor.

             9              THE COURT:  All right.  Then, with that, does

10:29:10    10    the plaintiff rest?

            11              MR. DOYLE:  I apologize.  I was muting my

            12    computer to transition it over to Mr. DeWaard.

            13         Can you repeat that, Your Honor.

            14              THE COURT:  My question was, if you have no

10:29:23    15    additional witnesses to call, then --

            16              MR. DOYLE:  Your Honor, at this time, we rest

            17    our case.

            18              THE COURT:  All right.  Attorney Smith, does

            19    the defense have any witnesses --

10:29:34    20              [Zoom audio/video interruption]

            21              MR. SMITH:  I'm sorry, Your Honor.  You're

            22    frozen on my screen.

            23              MR. DeWAARD:  He's frozen on ours also.

            24              MR. DUHAMEL:  The Court is also frozen on my

10:29:54    25    screen.
```

1           THE COURT:  Attorney Smith.

2           MR. SMITH:  Your Honor, I'm sorry.  I missed

3    that.  You were frozen on my screen.

4           THE COURT:  Sorry, Counsel.  It looks like my

10:30:08  5    video froze there.

6       The last thing I heard was plaintiff's counsel

7    indicating that they were resting.  Then I turned to

8    Attorney Smith.  I'm not sure if it came up in the audio or

9    not, but I asked if the defense had any witnesses it intends

10:30:20 10   to call.

11          MR. SMITH:  Yes, Your Honor.

12      The defense does have two witnesses it intends to

13   call.

14          THE COURT:  All right.  Then you may proceed

10:30:25 15   with your -- well, actually.  One moment.

16                  (Pause in Proceedings)

17          THE COURT:  Okay.  Attorney Smith, you may

18   proceed with your first witness.

19          MR. DeWAARD:  Your Honor, I'm very sorry to

10:30:38 20   interrupt.

21      Your Honor, I just wanted to make sure the exhibits

22   were entered.  I thought they were entered yesterday -- or

23   our previous hearing.  But is -- do we have an agreement

24   that all the exhibits in the book are entered?

10:30:50 25      Otherwise, I can go ahead and --

1          THE COURT:  Well, let me ask this.

2          Based upon my understanding of the discussion at the

3     last hearing, any exhibits that were used with a witness

4     would be admitted without objection.

10:31:05  5          Now I directly in front of me don't have the list

6     checked off as to every exhibit that was presented

7     prehearing and to confirm whether or not it was used at this

8     time.

9          So what's being admitted is if an exhibit was used and

10:31:23 10     a witness was asked questions about those exhibits,

11     plaintiff and defendant exhibits are admitted without

12     objection.

13               MR. DeWAARD:  That's fine, Your Honor.

14               MR. SMITH:  That's my understanding, Your

10:31:33 15     Honor.

16          And there will be no objection on my side outside of

17     anything that you just stated.

18               THE COURT:  Okay.  Great.

19          And, Attorney Smith, you may proceed.

10:31:40 20               MR. SMITH:  Yes, Your Honor.

21          I call Rich Ross.

22               THE COURT:  All right.  Mr. Ross, my courtroom

23     deputy is going to place you under oath for purposes of your

24     examination.

10:31:52 25          Go ahead, Ms. Gallagher.

Ross (Direct)

1                    (Witness was sworn)

2                         THE COURT:  All right.  Attorney Smith, you

3       may proceed.

4                         MR. SMITH:  Yes, Your Honor.

10:32:09  5              **DIRECT EXAMINATION OF RICHARD ROSS**

6       **BY MR. SMITH:**

7       **Q**      Good morning.

8               Could you please state your name and also spell it for

9       the record, please.

10:32:14  10    **A**      Richard Ross.

11              R-I-C-H-A-R-D.  R-O-S-S.

12      **Q**      Okay.  And can I call you Rich?

13      **A**      Yeah, Rich is good.

14      **Q**      Rich, where do you work?

10:32:24  15    **A**      Anchor Manufacturing.

16      **Q**      How long have you been at Anchor Manufacturing?

17      **A**      A little over three years.

18      **Q**      What's your current job title?

19      **A**      Vice president of business development and CTO.  I'm

10:32:37  20    responsible for sales, program management, estimating,

21      tooling, and engineering.

22      **Q**      Okay.  What are your current obligations?

23      **A**      My current obligations?

24      **Q**      Yes.  Under your current job title, yes.

10:32:53  25    **A**      I just stated them.  I'm in charge of sales.  Sales,

**Ross (Direct)**

1    estimating, program management, tooling, and engineering.

2    **Q**    Sorry.  I think I froze there.  And that's -- I didn't

3    catch that last part.  My apologies.

4    **A**    That's okay.

10:33:11  5    **Q**    Where is Anchor located?

6    **A**    Cleveland, Ohio.

7    **Q**    Is that its only location?

8    **A**    Yes.

9    **Q**    How long has Anchor been in business?

10:33:21  10    **A**    52 years.

11    **Q**    And what is Anchor's business?

12    **A**    Primarily, a metal fabricator.  Stamping and

13    fabricator.  We stamp and weld.

14    **Q**    And has Anchor always been engaged in this business

10:33:40  15    since its inception?

16    **A**    Yes.

17    **Q**    Are you familiar with Marada Industries, Inc., d/b/a

18    Cosma Body Assembly Michigan?

19    **A**    Yes, I am.

10:33:52  20    **Q**    Okay.  If I refer to that entity as either CBAM or

21    Cosma, will you understand that I'm referring to the entity

22    I just named?

23    **A**    Yes.

24    **Q**    Where is CBAM headquartered?

10:34:04  25    **A**    They are in Michigan.

**Ross (Direct)**

1    **Q**    Okay.  Know of any --

2    **A**    New Hudson.

3    **Q**    I'm sorry?

4    **A**    New Hudson.

10:34:12  5    **Q**    Do you know of any facilities or locations in Ohio?

6    **A**    No.

7    **Q**    Did Anchor have occasion to do business with CBAM?

8    **A**    We -- this is our only business with them, the one we

9    was talking about.

10:34:26 10    **Q**    Okay.  So is it fair to say that the location or the

11   office that you were dealing with, that Anchor was dealing

12   with was in New Hudson, Michigan?

13   **A**    Yes.

14   **Q**    Okay.  Were you employed at the beginning of the

10:34:43 15   relationship between Anchor and CBAM or when it was started?

16   **A**    No, I was not.  I joined in September -- I joined in

17   September of 2019.

18   **Q**    So is that -- were any parts manufactured for CBAM by

19   Anchor before you arrived at -- before you became employed

10:35:03 20   at Anchor?

21   **A**    I do not believe so.

22   **Q**    Okay.  So all parts were -- to your knowledge, all

23   parts that are manufactured by Anchor were post your date of

24   employment with Anchor?

10:35:13 25   **A**    Yes.

**Ross (Direct)**

1   **Q**     Tell me about, as far as you know, the start of the

2   relationship between Anchor and CBAM.

3   **A**     They were approached earlier in the year to quote

4   jobs, some -- they kept coming in, more and more of them.

10:35:34  5   Quote had went idle for a while, and then, GM -- I believe

6   GM went on strike, and at that point in time, that's when

7   CBAM wanted to take the opportunity to move the work from

8   the previous supplier to us.

9   **Q**     Okay.  So is it -- it's about, what, like early in

10:35:55  10   2019 --

11   **A**     Yes.

12   **Q**     Let me finish my question, if you don't mind, and

13   then --

14   **A**     Okay.

10:36:01  15   **Q**     -- you can respond.

16        Was it early 2019 that CBAM and Anchor began

17   discussions about Anchor providing parts for CBAM?

18   **A**     From looking back at the quotations and stuff like

19   that, yes.

10:36:15  20   **Q**     But parts did not -- when did Anchor start

21   manufacturing parts for CBAM?

22   **A**     I believe in October of 2019.

23   **Q**     Okay.  And you're saying that that time period was,

24   the lag there was as a result of, I think you said, a GM

10:36:32  25   shutdown?

**Ross (Direct)**

1   **A**    Uh-huh.  A strike.  They were on strike.

2   **Q**    Oh, on strike.

3         Okay.  And, Mr. Ross, just use verbals, if you can,

4   just yes or no.

10:36:44  5   **A**    Okay.

6   **Q**    Thank you.

7         Do you know when -- well, let me ask you a different

8   question.

9         Did CBAM provide tooling to Anchor for manufacturing

10:36:53 10   the parts?

11   **A**    Yes.

12   **Q**    When did the tooling arrive?

13   **A**    At Anchor, I recall in October --

14   **Q**    Okay.

10:37:04 15   **A**    -- of 2019.

16   **Q**    And what were Anchor's obligations as part of its

17   relationship with CBAM?

18   **A**    We were to put the parts -- make the parts, stamp

19   them, and send them to CBAM.

10:37:20 20   **Q**    Same type of work that Anchor has done and always has

21   done?

22   **A**    Yes.

23   **Q**    Did you have -- did Anchor have to use tools provided

24   by CBAM to manufacture parts for the automotive framing or

10:37:37 25   the parts?

**Ross  (Direct)**

1    **A**    Yes.

2    **Q**    How much -- how does the tooling come, generally?

3    **A**    So the tooling comes -- there was problems with

4    probably about some --

10:37:51  5    **Q**    Just let me -- I'm not asking about problems just yet.

6    I'm just wondering, how does the tooling generally come?

7    Does it come in die sets?

8    **A**    Yeah.  Die sets.  They are delivered on a truck and we

9    put them -- bring them into our tool room and store them.

10:38:06  10   **Q**    Okay.  And approximately how many tool and die sets

11   were delivered to Anchor by Cosma?

12   **A**    15.

13   **Q**    Do you know what CBAM's obligations were under the --

14   under its relationship with Anchor?

10:38:27  15   **A**    We -- their obligation was to buy our parts and pay us

16   for them.

17   **Q**    So, ultimately, pay for the parts that were

18   manufactured by Anchor?

19   **A**    Yes.

10:38:38  20   **Q**    Are you aware of a supplier or any suppliers that had

21   the tooling at issue prior to when Anchor received it?

22   **A**    Yes.

23   **Q**    Who was the supplier?

24   **A**    Matcor-Matsu.

10:38:58  25   **Q**    And to be fair, there may be other suppliers; is that

**Ross (Direct)**

1    fair to say?

2    **A**    That's correct.  I don't know but that one.  Yes.

3    **Q**    But you know of one, which is Matcor; is that right?

4    **A**    Matcor.

10:39:10  5    **Q**    Okay.  Are you aware of whether Matcor had issues with

6    this specific tooling?

7    **A**    I -- they -- yes.

8    **Q**    How are you -- how did you become aware of that?

9    **A**    One, the people from CBAM told us.  And I know of an

10:39:36 10    acquaintance from a previous job that worked there.

11    **Q**    Are you aware of any work done or alteration to the

12    tooling that Anchor received prior to when Anchor received

13    it in October of 2019?

14    **A**    Yes.  There was work done on several of the tools.

10:39:55 15    **Q**    Can you describe what you're aware of or how the

16    tooling was reworked.

17    **A**    One -- one specific set of tools that we were told by

18    CBAM that they were sent to Richard Tool & Die.  And they

19    also sent us a documentation of all the issues that came

10:40:16 20    with that die and pictures of those issues of -- they wanted

21    us to be aware of and to include in our, what we call a safe

22    launch.

23    **Q**    And the safe launch is there to identify potential

24    issues with tooling?

10:40:33 25    **A**    Yes.  Normally, when you start a new program or you do

**Ross (Direct)**

1    a takeover, you go through a period of time and you agree on

2    looking at what quality criteria you need for a specified

3    time to make sure that those parts are stable.

4    **Q**    And with respect to that, I think you called it a

10:40:53  5    safety launch.  Do I have that right?

6    **A**    Yes.

7    **Q**    As part of that safety launch and the issues that were

8    identified as part of the safety launch, do you understand

9    that those were issues that were had by Matcor?

10:41:03  10    **A**    They were on -- they were issues on that specific die.

11    **Q**    So, yes, then?

12    **A**    Yes.

13    **Q**    You mentioned Richard Tool & Die.

14          Prior to Richard Tool & Die reworking the tooling at

10:41:20  15    issue, did you become -- do you know of Richard Tool & Die

16    outside of that?

17    **A**    Yes.  They're -- the way I know them is they're a tool

18    shop.  I think they're up in Toledo.  And they're also

19    nicknamed the die hospital.

10:41:37  20    **Q**    Why are they called the die hospital, to your

21    knowledge?

22    **A**    Because they do -- they do specialty work of repairing

23    tools and broken tools and that's what they specialize in.

24    They like the tough jobs and they do it and they do a very

10:41:52  25    good job usually.

**Ross (Direct)**

1    **Q**    Were any parts shipped -- I'm talking about parts, not

2    the tooling.  But were any parts shipped from Matcor to

3    Anchor when Anchor took over production?

4    **A**    Yes.

10:42:04  5    **Q**    Did you notice anything about the parts that arrived?

6    **A**    Yeah.  There was an imbalance of several thousands of

7    pieces from a tool that made a left and a right hand and

8    there was an imbalance of parts.

9    **Q**    What does that mean imbalance?  Understand that not

10:42:25 10    everybody is in metal fabricating like this, sheet metal.

11    What does that mean, imbalance?

12    **A**    Every time a press takes a hit, two pieces come off, a

13    right and a left.  If I have several thousand of more than

14    another, that means that most likely they were thrown

10:42:42 15    away --

16    **Q**    Does that mean --

17    **A**    -- because they were defective.

18    **Q**    So you're hitting -- basically, one side of the tool

19    is creating parts that were acceptable and the other side

10:42:53 20    was not?

21    **A**    Correct.

22    **Q**    Did Anchor encounter this same issue that you just

23    described?

24    **A**    Yes.

10:43:06 25    **Q**    And it created an imbalance of being able to provide

**Ross  (Direct)**

1    parts?

2    **A**    Yes.

3    **Q**    Did that -- when did those -- when did those issues

4    arise?

10:43:17  5    **A**    We started running full production probably January of

6    2020, in that time frame.

7    **Q**    Is that the first time you were running parts?

8    **A**    Within the first couple times we were, yes.

9    **Q**    Okay.  So tooling -- so tooling delivered in

10:43:36  10    October 2019.

11         When did you start manufacturing parts?

12    **A**    If it came in, we probably would have started

13    manufacturing within a couple weeks of running those parts.

14    I don't remember the exact date of that.

10:43:51  15    **Q**    But you recall noticing this imbalance issue when?

16    **A**    When they delivered them, because we have to enter

17    them in our system.

18    **Q**    No.  I'm talking about the imbalance that Anchor

19    encountered.

10:44:06  20    **A**    Oh, Anchor caught it, but we started noticing it

21    largely in probably January of 2020.

22    **Q**    Okay.  Does tooling usually come with

23    three-dimensional data?

24    **A**    Yes.

10:44:20  25    **Q**    What's three-dimensional data and what's it used for?

**Ross (Direct)**

1    **A**      When you design the tool, it's used to make spare

2    components and the original tool itself.  So that is the

3    match piece.

4          And with our industry, you can take that data and

10:44:38  5    download it to your equipment and create the replacement

6    part or the tool as a normal.

7    **Q**      And that 3D data accompanying the tooling, that's

8    standard?

9    **A**      Yes.

10:44:52  10    **Q**      Does the three-dimensional data usually comport with

11    or line up with the tooling?

12    **A**      Yes.

13    **Q**      Did the CBAM tooling come with three-dimensional data?

14    **A**      Yes, it did.

10:45:07  15    **Q**      Did the three-dimensional data line up with the CBAM

16    tooling?

17    **A**      No, it did not.

18    **Q**      What is -- what happens when that occurs, when there's

19    a mismatch between the tooling and the three-dimensional

10:45:23  20    data that's provided?

21    **A**      What happens is that when we go to replace --

22    typically, you replace punches, which is what cuts, pops

23    holes in the part or something.  When you go to do that, if

24    the three-dimensional doesn't line up perfectly, the punches

10:45:41  25    will cause tears and -- could cause tears and splits in the

**Ross (Direct)**

1    part because of gaps between the metal and the surfaces.

2    **Q**    Is there -- do you know why or do you have a belief as

3    to why the three-dimensional data did not match the CBAM

4    tooling?

10:46:04 5    **A**    Yeah.  Because they were increasing the radiuses of

6    where the metal was being bent, which will help eliminate

7    cracking.

8    **Q**    So it was based -- the mismatch was caused by an

9    alteration to the tooling?

10:46:23 10    **A**    Yes.

11    **Q**    Did the deviation from the design of the tooling

12    create problems for Anchor?

13    **A**    Yes.

14    **Q**    Can you describe those problems.

10:46:33 15    **A**    Yes.  Like I said, we would -- when we were doing work

16    on the tool and we would do a replacement of a punch or a

17    die section, we'd go in and we'd place it in there, and you

18    make a first hit and it could crack the detail or it can

19    cause a crack in a part, and then we have a scanner which we

10:46:58 20    validated the old part and the new part and saw what the

21    difference was, so --

22    **Q**    And did Anchor notice those issues same timeline,

23    January 2020?

24    **A**    Yeah.  When we started making replacement details is

10:47:12 25    when we realized that there was problems with --

**Ross  (Direct)**

1    **Q**    Okay.

2    **A**    -- the original data to what the tool was at.

3    **Q**    Okay.  Since Anchor began manufacturing parts for

4    CBAM, did CBAM -- excuse me -- did Anchor inform CBAM about

10:47:31  5    issues with the tooling?

6    **A**    Yes.  We --

7    **Q**    Go ahead.

8    **A**    Yeah.  We -- you know, it was stated that we didn't

9    have a lot of quality issues.  In January or February time

10:47:47  10    frame, they were -- because of issues with the parts, we

11    were placed on a controlled shipping level 2, which is an

12    industry standard where you hire a third party to inspect

13    the parts, and that was put on by CBAM.

14    **Q**    With respect to these communications that Anchor had

10:48:10  15    with CBAM about the defective nature of the tooling, were

16    you a part of those conversations?

17    **A**    Yes.  And we had conversations with Claudio and, I

18    believe, with Byron, who was the purchasing manager at the

19    time.

10:48:28  20    **Q**    And that was at the beginning of when parts were being

21    manufactured by Anchor?

22    **A**    Yes.

23    **Q**    Did those communications continue throughout the

24    relationship?

10:48:37  25    **A**    Yes.  They softened because of COVID, because the

**Ross (Direct)**

1    volumes dropped and everything like that, but, yes.

2         It would be we would get control of it, and it would

3    just be a vicious circle that we do some work and they'd

4    make some improvements.  In time, the tools continued to

10:48:55  5    deteriorate and then the same issues would come back, a lot

6    of burrs and cracks.

7    **Q**    To deal with those burrs and cracks, what would Anchor

8    do?  Would it scrap -- would it scrap the parts?  Or would

9    it try to cure them?

10:49:13 10    **A**    We would fix them, repairing them by deburring it

11    with, you know, a grinder, you grind a burr off.  And so, we

12    were doing rework on the parts.

13    **Q**    I'll just ask the question here now, but is -- how

14    many years of experience do you have with stamping and

10:49:33 15    providing parts through the use of tooling like this?

16    **A**    30 years.

17    **Q**    And based upon your experience, would you say that the

18    tooling that CBAM provided was defective?

19    **A**    A good portion of them were, yes.

10:49:47 20    **Q**    So describe for me the issues that the tooling caused

21    and how it impacted Anchor.  And I want to specifically

22    focus on the timing.

23         What did -- what did Anchor have to do to, you know,

24    respond to the defective nature of the tooling?

10:50:07 25    **A**    Yeah.  One of the specific tools, 1004/1044, makes a

**Ross (Direct)**

1    right and a left hand.  We had three people that were a

2    hundred percent of the parts, were grinding burrs off a

3    hundred percent of the parts.

4    **Q**    So was there -- did you -- did Anchor have to

10:50:26 5    resharpen the tools?

6    **A**    It didn't matter.  It was -- it's the cutting

7    condition.  It didn't matter if you sharpened the tool or

8    not, it was occurring.

9         And, in fact, we were -- we stated -- we had

10:50:42 10   conversation with them and they asked us to quote them the

11   cost to do that, because we quoted the cost to repair the

12   tool, and based off of the life of the program, it would not

13   pay back to repair the tool.

14   **Q**    Okay.

10:50:56 15   **A**    So we submitted that quote to do the grinding.

16   **Q**    Okay.  So, you know, I know you said the sharpening

17   wouldn't help.

18        Does sharpening usually help tooling?

19   **A**    Yes.

10:51:09 20   **Q**    Approximately how often is it -- what's customary with

21   resharpening tooling so that it can be used?

22   **A**    So, typically, on the die set that cuts, that's the

23   most preventative maintenance you would do on a die, basic

24   preventative maintenance would be sharpen a tool.

10:51:23 25        Typically, you would get somewhere between a hundred

**Ross (Direct)**

1    and 200,000 hits before you have to sharpen a tool.

2    **Q**    And when did you try to resharpen the tooling provided

3    by CBAM?

4    **A**    Usually, on the problematic tools, we have to sharpen

10:51:38  5    them every run or even within the run that we were doing,

6    which means you stop the press, take the tool out, sharpen

7    it, and put it back in.

8    **Q**    And how many hits is that through one run

9    approximately?

10:51:49 10    **A**    We normally would do -- we tried to do two weeks worth

11    of run on every part.  So depending on the platform, there

12    was, you know, the 5,000-a-week platform is the CY, I think

13    it's 15,000 a week is the T1, and the BEV was about 800 a

14    week.

10:52:09 15    **Q**    So how many hits would you use for the tooling until

16    you had to try to resharpen it, the tooling provided by

17    CBAM?

18    **A**    On the problematic ones, we would do -- we would do it

19    probably once or twice per run.

10:52:24 20    **Q**    Okay.  Did you ever have to rebuild the tooling?

21    **A**    Yes.

22    **Q**    Describe that process and time constraints associated

23    with it.

24    **A**    Yeah.  So one particular tool, 1210/1265, it didn't

10:52:43 25    have -- it was a center -- it wasn't balanced real well left

**Ross (Direct)**

1    to ride side, so the part could rock, and if you got a crack

2    in it or from the cracking portion of it, it could get hung

3    up on the tool and then it makes a miss hit.

4        And the tooling has room for the material in the shape

10:52:58   5    it is, so if the -- if the steel is not laying on the tool

6    right, you'll bust that tool in making it.  So it could be

7    severe, we would have to pull the tool out and take several

8    hours or days to repair it, or you take three to four hours

9    to pull it out and sharpen it and put it back in.

10:53:19  10   **Q**    And --

11   **A**    We were -- we were experiencing, on the one

12   problematic, 1210/1265, that would be -- a normal run for us

13   on a normal tool for that volume would be two shifts, we

14   would have two shifts to get two weeks.  Normally, we run

10:53:38  15   average two days running it, so that would be six shifts

16   since we run three shifts.

17   **Q**    Did the tool rebuilding, was that -- that Anchor had

18   to perform, was that as a result of the defective nature of

19   the tooling in your opinion?

10:53:51  20   **A**    Yes.  Very poor conditions was noted.

21   **Q**    Okay.  I want to talk about scrap, because there was

22   some discussion about that previously.

23        Does this process, stamping process result in scrap?

24   **A**    Yes.

10:54:06  25   **Q**    And approximately -- and I'm just talking about a

**Ross (Direct)**

1    standard, approximately what percentage of scrap results

2    from the process?

3    **A**    This -- their process?  Or normal?

4    **Q**    No.  Generally.

10:54:21 5    **A**    One percent.

6    **Q**    Okay.  And how much scrap was there using the CBAM

7    tooling?

8    **A**    Over ten percent.

9    **Q**    What was the cause of that?

10:54:33 10    **A**    A lot of cracking.

11    **Q**    Was it the design?  Or was it the tooling?  What

12    specifically about it?

13    **A**    We -- it is the design that causes cracks.  This is --

14    this is materials called super-high-strength steel.  And, in

10:54:52 15    fact, at the beginning of the program, CBAM sent a corporate

16    engineer down because we were having cracks to help us out

17    and look at that, and he stated that because of this

18    material, he had to redo their standards of how they would

19    make the tools with dual face.  You had to run with

10:55:17 20    increased radiuses, which I spoke to, they tried to do by

21    hand.

22        I asked him for the documentation of that, because

23    it's helpful and useful because we build tools too, and he

24    said he couldn't share it, it's proprietary.  But he said

10:55:31 25    that they would not build the tools this way.

**Ross (Direct)**

1    **Q**    The tools that you presently have would not be built

2    the same way?

3    **A**    Yeah, the problem -- yes.

4    **Q**    As a result of design defects or what?

10:55:43  5    **A**    They would have changed the design of a part and the

6    tool --

7    **Q**    Okay.

8    **A**    -- to not -- so this cracking and splitting would go

9    away.

10:55:54 10   **Q**    So I want to talk quickly about the reworking that you

11   mentioned a moment ago, taking care of the burrs and the

12   splitting and things with respect to the parts.

13         What is -- I'm going to go back to, you know, based

14   upon your years of experience, approximately how often or

10:56:11 15   what's the percentage of parts that generally need to be

16   reworked in your experience?

17   **A**    We try to get -- we try to get a first time through of

18   99 percent, so that would -- one percent, which would

19   include -- you know, which would be just normal scrap that

10:56:30 20   we would experience.

21   **Q**    So you're saying that, generally speaking, and not

22   necessarily what you shoot for, but what happens, how often

23   do you have -- what percentage of the time, using other

24   tooling in your experience, does the part have to be

10:56:42 25   reworked?

**Ross  (Direct)**

1      **A**      Almost never.

2      **Q**      Okay.  And approximately what percentage of the parts

3      had to be reworked by Anchor with respect to the CBAM

4      tooling?

10:56:57  5      **A**      On certain tools, like I spoke earlier, was a hundred

6      percent.  Cracking you can't repair, so that's where the

7      high scrap rate is.  And -- but burrs you can.  And it would

8      come and go.  So if we were doing burrs, it would be on a

9      hundred percent of the burrs, but it was not on every single

10:57:17  10      run.

11      **Q**      So is the percentage higher with respect to rework on

12      the CBAM products than what you've generally experienced

13      over the years?

14      **A**      Yes.  Yes.

10:57:24  15      **Q**      Significantly higher?

16      **A**      Significantly higher.

17                  THE COURT:  All right.  Attorney Smith, we're

18      now at the 10:57.  We're going to go off the record for a

19      moment.

10:57:39  20                      (Pause in Proceedings)

21                  THE COURT:  What I want to do is just take a

22      five minute break so I can address another matter.  We'll

23      come back and go back on the record.  Attorney Smith, you

24      can resume your direct examination.

10:58:08  25                  MR. SMITH:  Understood, Your Honor.

**Ross (Direct)**

1          Thank you.

2                            - - -

3                    (Recess taken at 10:58 a.m.)

4                    (Court resumed at 11:02 a.m.)

11:02:13  5                            - - -

6                    THE COURT:  Court is back in session having

7      taken a brief recess.

8          Attorney Smith, you may continue your direct

9      examination of Mr. Ross.

11:02:21 10                    MR. SMITH:  Thank you, Your Honor.

11     **BY MR. SMITH:**

12     **Q**      Rich, we discussed just a moment ago the timing and

13     the issues caused by the tooling regarding the resharpening

14     of the tool, the rebuilding of the tool, the scrap, the

11:02:36 15     rework, and things like that.

16          Are those issues that Anchor anticipated when it

17     entered into the relationship --

18     **A**      No.

19     **Q**      -- with CBAM?

11:02:43 20     **A**      No.

21     **Q**      Is that -- are those issues that you -- well, let me

22     ask it differently.

23          Are those unanticipated issues, did those create

24     problems for Anchor?

11:02:55 25     **A**      Yes.

**Ross (Direct)**

1    **Q**    How so?

2    **A**    We -- it's -- you're doing constant maintenance on the

3    tools to keep it running, so you have to decide whether

4    you're going to have extra people to rework the parts,

11:03:11  5    sanding burrs off, or do you have the time to sharpen the

6    tool and get it fixed.

7    **Q**    Would Anchor have quoted the price it did if it knew

8    about all the issues with the tooling?

9    **A**    No.  We would not have quote -- used the same pricing.

11:03:31 10    We would have added the extra labor and the extra man hours

11    to do the work on the tools.

12    **Q**    And to your knowledge, the tooling was not received in

13    March of 2019; is that right?

14    **A**    That's correct.

11:03:43 15    **Q**    I believe you mentioned that CBAM came down to take a

16    look at the tooling; is that right?

17    **A**    What time frame are we talking?

18    **Q**    Early on, you know, during 2020.

19    **A**    Yes.  Yeah, they would -- the tools were not a hundred

11:04:16 20    percent geometrically correct, so our deal with them was we

21    would make the part the same as the current part was being

22    made off the tool.

23    **Q**    Who specifically from CBAM came down early on, I'm

24    talking first quarter of 2020?

11:04:36 25    **A**    Claudio was down the majority of the time.  And there

**Ross (Direct)**

1    was a quality engineer, I do not recall her name at this

2    point in time.

3    **Q**    Did Claudio -- what was his reaction to the issues

4    with the tooling?

5    **A**    He said that they took care of a lot of the tooling

6    issues and they believed what the work they did was going to

7    do that.

8         In fact, on one of the high-running jobs, one of the

9    quality issues we actually had for a small crack in it, he

10   came down -- this was just recently in 2000 [sic] before the

11   tools went back -- and we showed him the original part, that

12   his name with signature on, had that exact crack in it, and

13   we were getting rejected for that.

14   **Q**    And when you said -- I think you said the issues that

15   Claudio said they thought they had cleaned up, is that what

16   you said?

17   **A**    Yes.

18   **Q**    What -- are those the issues that predated the

19   relationship with Anchor, to your knowledge?

20   **A**    Yes.

21   **Q**    The issues that Matsu had encountered or Matcor had

22   encountered?

23   **A**    Yeah.  He showed us the -- like I said earlier, he

24   showed us the pictures of what was happening before, and

25   they're identical, almost identical to the same issues that

**Ross (Direct)**

1    we incurred.

2    **Q**    That occurred from Matcor?

3    **A**    Yes.

4    **Q**    So do you believe that the issues were fixed?

11:05:59 5    **A**    No.  We saw the exact same defects.

6    **Q**    Did GM ever have occasion to visit the Anchor facility

7    in connection with the tooling?

8    **A**    Yes.  They were looking at extending what we call the

9    C1Y program, which is 5,000 pieces a week.  There was

11:06:19 10    several tools that we wanted to have rebuilt.  They -- we

11    quoted it to CBAM.  They said that -- got GM involved.  GM

12    came out and looked at the tools.  And they agreed, if they

13    were extending the program, that they would redo these sets

14    of tools.

11:06:42 15       And, to my knowledge, they never extended the program,

16    but never came back with us with the tooling, you know, to

17    take us off on tooling.

18    **Q**    And you heard testimony regarding, on behalf of CBAM,

19    that Anchor's manufacturing process was to blame for issues

11:07:02 20    with the parts.

21       Do you recall that?

22    **A**    Yes.

23    **Q**    Do you agree with that?

24    **A**    No.

11:07:07 25    **Q**    And was there -- specifically, you know, you can --

**Ross (Direct)**

1      whatever, however you heard it or you thought about it, but,

2      specifically, was there an allegation that, in your mind,

3      the steel was being improperly fed?

4      **A**      Yeah.  Let me explain that a little bit.  If it's not

5      on the same height, one, if it's extremely off, it won't --

6      every die has guides that you guide into the first

7      operation.  Once it's in there, it -- it's being held to be

8      square to the tool and aligned to the tool properly.  So --

9      so you can't -- if it doesn't go through that, you're so far

10     off and it bunches, as he claimed, you don't even make a

11     hit, so you can't run.  It will not allow the part to go

12     through the tool.

13          And the scrap buildup, if the tool is designed

14     properly, we do not have -- no stamper has somebody standing

15     there watching a press go up and down.  The parts should

16     come off the end good, the parts should drop through the

17     scrap -- where the scrap is, and go out.  We have shaker

18     conveyors that take it from underneath the tool to go out.

19     So that's -- that -- you can go to any stamper and they

20     don't have somebody just watching that.  And if it's

21     building up, then there's something wrong with -- the scrap

22     is too large or something like that to have any problems or

23     issues with it.

24     **Q**      And your belief is that this -- these tools, that this

25     tooling creates significant -- a significant increase in the

**Ross (Direct)**

1    scrap that you're customarily used to seeing?

2    **A**    Yes.  The scrap I was referring to is the engineered

3    scrap, not the actual scrap of the parts that fall.

4         When I cut the shape, they said -- that's what they

11:08:55  5    were claiming was building up.

6    **Q**    Sure.

7         Okay.  And I'm going to share my screen with you.

8    This was a prior exhibit, Exhibit L, which actually is

9    Exhibit 12.  It's a plaintiff's exhibit.

11:09:10  10       Have you -- just flip through this.  And I'm just

11    going to focus on this letter.

12        Have you seen this letter before?

13   **A**    Yes.

14   **Q**    There's a reference in here, in the second paragraph,

11:09:32  15   it says:  CBAM nevertheless attempted to work with Anchor to

16   help in several areas.  We have sent our resources to aid in

17   the issues which Anchor has been experiencing.  We have

18   viewed that our dies do not exhibit typical signs of

19   preventative maintenance.  And then, he says:  We have

11:09:50  20   repeatedly requested to view the preventative maintenance

21   documentation.

22        What is preventative maintenance?

23   **A**    Preventative maintenance is similar to a car that you

24   do an oil change, right, every 10,000 miles, you put oil in

11:10:07  25   it to prevent damage to your engine.

**Ross (Direct)**

1    In a tool would be a -- every so many hits, you would

2  check out to make sure all your bolts are tight and your die

3  sections are sharpened.  And based off historical data, you

4  would either extend it or you shorten that time frame to

11:10:31  5  make sure that you don't have -- you would not have

6  unexpected failure.

7  **Q**    And did --

8  **A**    And we did --

9  **Q**    Was Anchor -- yeah, so was Anchor able to perform

11:10:47  10  preventative maintenance on the tooling?

11  **A**    No.  It was constant maintenance, I would categorize

12  it as.  Just to keep it running, it was constant

13  maintenance.  There was no time where we put it in, the job

14  would -- on the problem tools that we had, we would be

11:11:00  15  working on them within the run or reworking all the parts so

16  you can get through the run and then deal with the tool

17  outside the progress.

18  **Q**    So the result of the tooling is really why you had to

19  do ongoing maintenance of the tooling?

11:11:18  20  **A**    Yes.  So, typically, preventative maintenance would be

21  done on a monthly or quarterly or tool-number-of-hits basis.

22  We never got to that with the problem tools.

23  **Q**    Okay.  Over the course of the relationship between

24  Anchor and CBAM, did demand by CBAM change?  And what I mean

11:11:35  25  is, demand of parts change?

**Ross (Direct)**

1    **A**      Yes, in two programs.

2           One, the high-volume platform, which was, we called

3    the T1XX, they were going from a demand of 15,000 pieces per

4    week to 18,000 pieces a week is what they were telling us

11:11:56  5    they was going to go to.

6    **Q**      And do you know, were there specific reasons why maybe

7    demand was lower at the beginning of the relationship?

8    **A**      There was two key factors that was lower.  One was

9    COVID and the chips.  The volume dropped because of --

11:12:13  10   **Q**      And you said chips.  Are you referring to microchips?

11   **A**      Yes.  The microchips they couldn't get for their

12   vehicles.

13   **Q**      Was there any other factor through GM or otherwise?

14   **A**      Yes.  GM was opening up their Oshawa plant to make

11:12:31  15   more trucks so that -- where they would need more capacity

16   to do that.

17   **Q**      When did the factory open approximately?

18   **A**      I believe the factory opened somewhere in August,

19   September time frame.  I do not know when the first -- we

11:12:47  20   don't deliver directly to them, so I don't know when they

21   made the first trucks.

22   **Q**      But, ultimately, it's your understanding that as a

23   result of opening the factory, that boosted demand as well?

24   **A**      That's correct.

11:12:59  25   **Q**      Along with the shortage of microchips and the impacts

**Ross (Direct)**

1    of COVID?

2    **A**    Yes.

3    **Q**    Okay.

4    **A**    Also, on the electric vehicle, on our most problematic

11:13:14  5    tool, the volume doubled and we weren't sure why that was.

6    And because I believe it was a chip issue, there was two

7    versions of the car and we didn't realize it.  We quoted a

8    certain volume, I think between 700 and 800 a week, I

9    believe, and only that one part we had was used on both

11:13:32  10    platforms, which brought that one job up to almost 1,700 a

11    week, so almost a thousand piece increase per week.

12    **Q**    So when demand was low or lower, was Anchor able to

13    keep up despite the tooling issues you discussed a moment

14    ago?

11:13:50  15    **A**    Yes.

16    **Q**    How so?

17    **A**    Because the one job I just spoke of, that one

18    increased, we used nine people on that job.  So we normally

19    could get, put that -- set that on our third shift and we

11:14:08  20    would run that with one shift and get that product made in

21    one day running by hand.

22        So once it did that, we -- once it increased on that,

23    we would have to leave it in the press, because we only had

24    enough manpower in one shift because that's only one job we

11:14:26  25    run once every other week and we don't have the manpower

**Ross (Direct)**

1    to -- on the off shifts to run that.

2    **Q**    So you've heard the discussion about Anchor's capacity

3    and ability.

4        What is that capacity related to in your mind?  Is it

11:14:44  5    as a result of the tooling or other issues?

6    **A**    Yeah, it was -- a lot of the problematic dies were

7    taking days to run instead of shifts.  So now you compound

8    that with increasing volumes, that's -- you start running

9    out of time during the week.  And we were trying to be

11:15:02  10    proactive based off, if these numbers are real, we're going

11    to have problems.  Specifically, the one part I talked to,

12    we run by hand, could not make -- sustain that.

13    **Q**    Was the -- were the issues with respect to keeping up

14    to the demand, were they a result of other business that

11:15:20  15    Anchor had?

16    **A**    No.  The one press that failed was almost

17    predominantly CBAM.  Our other business did not run in the

18    same presses.

19    **Q**    So they were specifically related to the tooling, in

11:15:36  20    your mind?

21    **A**    Yes.

22    **Q**    So the issues with the tooling as demand rose, Anchor

23    couldn't keep up with all of the remediation and the issues

24    caused by the tooling; is that right?

11:15:48  25    **A**    Correct.

1              MR. SMITH:  Okay.  I have no further

2    questions, Your Honor.

3              THE COURT:  All right.  Thank you, Attorney

4    Smith.

11:15:58  5       Any cross-examination?

6              MR. DOYLE:  Your Honor, there will be

7    cross-examination.

8         Mr. DeWaard stepped out for just a moment.  If we

9    could have a two-or-five-minute break, that would be --

11:16:13 10              THE COURT:  Let's take a five-minute recess

11   before the cross-examination of Mr. Ross begins.

12        The Court stands in recess.

13                         - - -

14              (Recess taken at 11:16 a.m.)

11:19:39 15              (Court resumed at 11:20 a.m.)

16                         - - -

17              THE COURT:  Okay.  Court is back in session.

18        Cross-examination of Mr. Ross is going to begin.

19        And I believe Attorney DeWaard is going to conduct

11:21:12 20   cross-examination; is that correct?

21              MR. DeWAARD:  Yes, Your Honor.

22        Thank you.

23              THE COURT:  All right.  You may proceed,

24   Counsel.

25

Ross (Cross)

1                    **CROSS-EXAMINATION OF RICHARD ROSS**

2        **BY MR. DeWAARD:**

3        **Q**     Mr. Ross, you indicated that in your role, part of

4        what you do is purchasing; correct?

11:21:24 5        **A**     Program management, sales, estimating, tooling, and

6        engineering.

7        **Q**     I'm sorry.  I said that wrong.  I should have said

8        sales.

9               You're -- part of your role is sales; correct?

11:21:38 10       **A**     Correct.

11       **Q**     And in sales, you deal with purchase orders I take it?

12       **A**     Yes.

13       **Q**     And you deal then with issues of contracting as it

14       relates to purchase orders; correct?

11:21:53 15       **A**     Yes.

16       **Q**     And you're familiar then with the concept of terms and

17       conditions that apply; is that fair to say?

18       **A**     Yes.

19       **Q**     And with the purchase orders that were issued by Cosma

11:22:10 20       in this matter, you're aware that those purchase orders

21       integrated into the purchase order Cosma's terms and

22       conditions?

23       **A**     Yes.  That was shown on the documentation, yes.

24       **Q**     You've seen that.  I don't need to refer back to --

11:22:28 25       **A**     No.

**Ross (Cross)**

1    **Q**      -- the references?

2          And so, it was your understanding then at Anchor that

3    Cosma's terms and conditions controlled the contractual

4    relationship between the parties; is that fair to say?

11:22:40  5    **A**      Yes.

6    **Q**      In other words, your terms and conditions at Anchor

7    did not control; correct?

8    **A**      I believe that to be true, yes.

9    **Q**      All right.  I'm going to show you a document here,

11:23:06  10   which is Magna's -- rather, Cosma's Exhibit 8, which

11   previously was Exhibit H.

12         In paragraph 2, you see that I brought up here

13   paragraph 2 of what is Cosma's terms and conditions?

14   **A**      Yes.

11:23:43  15   **Q**      And do you see right here in the second line where it

16   says, quote:  This order is binding on buyer and seller for

17   the length of the production life of the applicable original

18   equipment manufacturer vehicle program, close quote?

19         Do you see that?

11:24:03  20   **A**      Yes.

21   **Q**      So was it your understanding that the duration of the

22   purchase orders would be for the life of General Motors'

23   program that these tools were associated with?

24   **A**      Yes.  That's what this says.

11:24:22  25   **Q**      All right.  Let me take you a little bit further down

**Ross (Cross)**

1    to paragraph 5, and under heading (b) here, if you jump to

2    this section that starts right here with seller grants, do

3    you see where I'm at there?

4    **A**    Uh-huh.

11:24:42  5    **Q**    And it states there, quote:  Seller grants to buyer an

6    irrevocable option during the term of this order to purchase

7    the goods in such quantities and on such delivery dates and

8    times as indicated in the firm delivery or shipping

9    releases, authorizations, manifests, broadcasts or similar

11:25:03  10   written instructions issued or transmitted by buyer to

11   seller from time to time in reference to this order, close

12   quote.

13       Was it your understanding that under these terms and

14   conditions, then, that it was Anchor's obligation to supply

11:25:25  15   in accordance with the amounts ordered by Cosma?

16   **A**    To a limit, based off of the quoted amount.

17   **Q**    And are you aware -- where would it be that there

18   would be a limitation on the amount that Cosma could order?

19   **A**    It's definitely on our quote package to them.  And we

11:26:00  20   are supposed to quote to Magna an LCR -- an MCR, which is

21   max capacity rate, which is --

22   **Q**    Can you --

23   **A**    -- typically 15 percent over the LCR quoted volume.

24   **Q**    Can you cite to any provisions in the terms and

11:26:19  25   conditions or in the purchase orders that limits Cosma's

**Ross (Cross)**

1    ability to order parts as GM requires from Anchor?

2    **A**    I -- in the little bit you showed me, I don't see it.

3    **Q**    Okay.  Do you know of any other place in the terms and

4    conditions or in the purchase order where there is such a

11:26:37  5    limitation?

6    **A**    Not to my knowledge.

7    **Q**    All right.  So the purchase order, along with the

8    terms and conditions then, had a set price; correct?

9    **A**    Yes.

11:26:49  10    **Q**    And it was for the life of the OEM program; correct?

11    **A**    Yes.

12    **Q**    And it was for the amounts that Cosma ordered;

13    correct?

14    **A**    From what I've seen here, yes.

11:27:07  15    **Q**    And Anchor didn't have the ability then to just change

16    the price on its own; correct?

17    **A**    I don't -- I -- I don't know that.

18    **Q**    Well --

19    **A**    Based on what --

11:27:26  20    **Q**    Pardon?

21    **A**    Go ahead.

22    **Q**    Well, the way that Anchor tried to change the price

23    was by indicating it wouldn't ship unless the price was

24    changed; correct?

11:27:38  25    **A**    That's what was requested us to send a letter to, yes.

**Ross (Cross)**

1  **Q**     Well -- but that was your position as well, wasn't it,

2  at Anchor that you weren't going to ship unless the price

3  was changed?

4  **A**     I don't know that the -- the only time I know that was

11:27:55  5  put in writing was when the -- with the draft that came from

6  Mr. Tanasoff back.  I wasn't on all the calls at that time

7  with that.  They were having conversations with Tony.  And

8  the only time I saw any documentation of that was with the

9  draft that came back from Mr. Tanasoff.

11:28:15  10  **Q**     But the letter that was actually sent was sent by

11  Mr. Parente; correct?

12  **A**     Yes.

13  **Q**     That was Mr. Parente's letter; correct?

14  **A**     Yes.

11:28:24  15  **Q**     And it was written from Anchor to Cosma; right?

16  **A**     Yes.

17  **Q**     And that letter stated that Anchor would not ship

18  unless the price was changed; right?

19  **A**     Yeah.  But I believe that letter was signed before --

11:28:45  20  after we got the documentation, after we got the price

21  increase.

22  **Q**     That letter said, though, didn't it, that Anchor would

23  not ship unless Cosma increased the price, that's what it

24  said?

11:28:58  25  **A**     That's what it says on the letter, yes.

**Ross (Cross)**

1    **Q**    And the reason that Anchor wanted to exit on some of

2    these parts initially was because of capacity issues; right?

3    **A**    There was -- one affiliation was there was capacity

4    issues that was related to tooling issues and we explained

11:29:23  5    that to them.

6    **Q**    But it was primarily based on capacity issues;

7    correct?

8    **A**    The capacity issues were due to the fact that it was

9    taking us multiple shift -- more shifts to run than the

11:29:40  10    standard shifts on the work and the volume increase on the

11    one platform.

12    **Q**    But Mr. Evans' email about wanting to exit, he never

13    said anything about those things, did he?

14    **A**    Not in that documentation.

11:29:50  15    **Q**    No.  All he said was capacity; correct?

16    **A**    That's all that was stated on there.

17    **Q**    And that was in an exhibit, Plaintiff's Exhibit 9,

18    that was shown to you earlier.

19    And -- but wasn't one of the reasons that you had

11:30:05  20    capacity issues at Anchor was because you had added

21    additional capacity from --

22    **A**    No.  I had spoke to that earlier, that the majority of

23    the work we have with CBAM ran on one press and that was the

24    one press that broke.  And the other one, it's lower volume,

11:30:24  25    much lower volume, and it doesn't run in the same competing

**Ross (Cross)**

1    presses.  The volume is 250 pieces a week in -- on our new

2    business.

3    **Q**    The plan to exit certain of the dies that was

4    contemplated, there was going to be a phase 1 and a phase 2;

11:30:57 5    correct?

6    **A**    Yes.

7    **Q**    And then it was contemplated initially that there

8    would be other parts that would actually stay at Anchor;

9    correct?

11:31:04 10   **A**    That's correct.

11   **Q**    And one of the dies that produced those particular

12   parts that would stay included the die that you're currently

13   holding on to; correct?

14   **A**    Yes.  I believe so.

11:31:18 15   **Q**    And that is 1213 and 1253, is that the die?

16   **A**    Yes.

17   **Q**    And that die was not included in phase 1 or phase 2;

18   correct?

19   **A**    It was initially listed in phase 1 on this

11:31:36 20   documentation, I believe.

21   **Q**    It was not part of phase 1, though, was it?

22   **A**    If you look back there, I believe that's what -- the

23   original phase 1, it did include it I think.

24   **Q**    I don't believe so.

11:31:51 25   **A**    I'm wrong.  That was 12 -- no, I was wrong.  That was

**Ross (Cross)**

1235.  I'm sorry.

**Q**     Right.

So 1213, the one you're hanging on to now, was not in phase 1 or phase 2; correct?

**A**     Yes.

**Q**     Did you answer that?

**A**     Yes.  Yes, I did.

**Q**     Now, it was anticipated, right, that before dies would exit Anchor would build a bank of four to six weeks' parts; right?

**A**     The initial document stated that.  And then, in conversations, we were told to run to a number, and that was with the people that were here.  We had a daily touch point. And a lot of times, even the number we were told to, they would say we have enough parts, we want to ship the die now. They were telling us on a -- daily how many to run and what to run next in order to run the tools out.

**Q**     But you never produced the bank of six weeks worth of bank or parts, did you?

**A**     I don't believe we ran six weeks of parts, no.

**Q**     Right.

And you agree that this lump sum that's been referred to in these documents, that wasn't payment of all the accounts payable; correct?

**A**     That -- that's the delta between the two price

1    differences over that period of time.

2    **Q**    Right.

3         So it's a delta, it's not the full amount that would

4    ultimately be due on invoices; right?

11:33:30  5    **A**    I was not a part of that, but -- that part of the

6    discussion of what that lump sum payment was.  But as we're

7    talking here, that appears to be the delta between.

8    **Q**    Well, whether or not you were a part of those

9    discussions at the time, you later became aware that the

11:33:48 10    lump sum did not include all the accounts payable; right?

11    **A**    I -- I don't know that.  I don't know what the

12    conversations were, so I don't know that, if there was ever

13    a conversation to talk about that, so I can't say that it

14    was or wasn't.

11:34:09 15    **Q**    Well, the lump sum amount, the delta, there never was

16    any agreement, was there, that that delta, that retroactive

17    amount, would be paid for the die that you're currently

18    holding on to; correct?

19    **A**    Say that again.  I'm not sure of the question.

11:34:27 20    **Q**    There never was any agreement to pay the retroactive

21    lump sum for the die that you're holding on to; correct?

22    **A**    I understood it that we were going to get a delta on

23    all tools as they left.

24    **Q**    And what's your basis for that?

11:34:47 25    **A**    I don't know what the basis wouldn't be for that.

**Ross (Cross)**

| | |
|---|---|
| 1 | **Q**    You never had any discussions with anyone at Cosma |
| 2 | which they agreed to pay the lump sum for the parts |
| 3 | associated with the 1213 die, did you? |
| 4 | **A**    I did not have a conversation. |
| 11:35:09  5 | **Q**    Let me jump you forward right away to an email you |
| 6 | wrote, which is Plaintiff's Exhibit 13, previously marked |
| 7 | Exhibit M.  This was -- purports to be an email from you to |
| 8 | Cosma employees dated December 14, 2022. |
| 9 |        Do you recognize that email? |
| 11:35:57 10 | **A**    Yes. |
| 11 | **Q**    All right.  And this is -- this email is well after |
| 12 | those conversations about phase 1 and phase 2; correct? |
| 13 | **A**    That's correct. |
| 14 | **Q**    Okay.  And in this email, you indicate:  While the |
| 11:36:15 15 | original agreement only addressed the payment of the lump |
| 16 | sum amount when a tool left Anchor, the dynamics of the |
| 17 | arrangements have now changed. |
| 18 |        Correct, that's what you said? |
| 19 | **A**    Okay.  Yes. |
| 11:36:26 20 | **Q**    So at some point here you had some understanding of |
| 21 | lump sum, even though you weren't part of those |
| 22 | conversations; correct? |
| 23 | **A**    Uh-huh. |
| 24 | **Q**    And then, you state that, quote:  Originally Anchor |
| 11:36:38 25 | was going to supply the high volume T1XX parts well beyond |

**Ross (Cross)**

1    the removal of the other tools.  Due to the press breakdown,

2    the plan changed and these -- those tools have been removed,

3    close quote.

4         That's what you said; right?  Correct?

11:36:55  5    **A**    Yes.

6    **Q**    And so, it was anticipated, when the parties first

7    started talking about tools exiting, that you were going to

8    keep the tools and produce the parts, including those on

9    1213; right?

11:37:11 10    **A**    Yes.

11    **Q**    And that only changed because of the press breakdown;

12    right?

13    **A**    Yes.

14    **Q**    Because once the press broke down, you couldn't

11:37:21 15    produce those parts; right?

16    **A**    After the press broke down, we continued to run parts

17    by hand.

18    **Q**    So -- but there was no way of running parts by hand

19    you're going to meet the requirements that would exist for

11:37:40 20    these parts; right?

21    **A**    All the parts in total, no.

22    **Q**    Okay.  So you -- everything had to change at that

23    point and you couldn't keep the parts that you intended to

24    keep originally; right?

11:37:54 25    **A**    Yes.

**Ross  (Cross)**

1    **Q**    And at that point, Cosma and the parties had to move

2    quite quickly to get those tools in the hands of an

3    alternative supplier; right?

4    **A**    Yes.

11:38:06    5    **Q**    And you say -- after that paragraph, you say, quote:

6    As a result, Anchor needs payment in full for account

7    balances related to each specific part as the corresponding

8    tool is loaded for shipment to CBAM's designated location,

9    close quote.

11:38:26    10    That's what you said in the email; right?

11    **A**    Uh-huh.

12    **Q**    And so, you're saying at this point that you need full

13    payment for account balances, meaning that before this date

14    you hadn't been asking for full payment of account balances;

11:38:40    15    correct?

16    **A**    I wasn't.  I don't know if anybody else was.

17    **Q**    Well, you're in charge of purchasing; right?

18    **A**    No.

19    **Q**    Or -- I'm sorry.  You're in charge of sales; correct?

11:38:55    20    **A**    Yes.

21    **Q**    All right.  And in -- being in charge of sales, you

22    would be aware of any agreement, wouldn't you, on whether

23    Cosma had agreed to pay Anchor in full for any parts related

24    to tools that were released?  You would be aware of that,

11:39:13    25    wouldn't you?

**Ross (Cross)**

1    **A**    This being a special case, I don't -- I was not in the

2    initial conversation that was done by our president at the

3    time, Tony Parente, so I don't have any awareness of that,

4    if that was the case.

11:39:26  5    **Q**    Well, here, you're asking for a change; correct?

6    **A**    Yes.

7    **Q**    You referenced the original agreement and then you

8    said now you need full payment.

9        That's a change; correct?

11:39:42  10    **A**    Yes.

11    **Q**    And then, later on, you say it is in -- in the last

12    paragraph, you claim, quote:  This is in line with industry

13    practice and is not meant to be an unusual request, close

14    quote.

11:39:55  15        So when you say -- you say this is a request; right?

16    **A**    That's my words.

17    **Q**    Okay.  When you write this, you're not aware of any

18    agreement that Cosma has made to provide full payment for

19    accounts before tools are released; right?

11:40:14  20    **A**    I'm not aware of that.

21    **Q**    Okay.  And you don't believe that, if there was such

22    an agreement, one of the people who works for you or works

23    with you wouldn't have told you that there was such an

24    agreement?

11:40:36  25    **A**    If -- I don't know what the conversations, all the

**Ross (Cross)**

1    conversations that Tony had at the time, and he -- so I did

2    not -- I was not aware of any other conversations.

3    **Q**    Okay.  But you felt comfortable enough about the

4    relationship to write this email directly to Ben Nekola and

11:40:57  5    Claudio Caloura who were involved in the conversations;

6    correct?

7    **A**    I -- that seems accurate.

8    **Q**    And nobody from Cosma, including those two

9    individuals, ever wrote you back and said that they would

11:41:14  10    agree to this; true?

11    **A**    True.

12    **Q**    There's no email we're going to find in which Cosma

13    agreed that they would pay you, Anchor, full account

14    balances before -- to get tools released; right?

11:41:30  15    **A**    I don't believe one exists.

16    **Q**    And they never said that verbally either, that they

17    would agree to pay full account balances before tools were

18    released; correct?

19    **A**    Not to me.

11:41:41  20    **Q**    Well, to your knowledge, did they say that to anyone

21    at Anchor?

22    **A**    Not to my knowledge.

23    **Q**    And don't you think, when we're involved in this

24    expensive preliminary injunction hearing and lawsuit, that

11:41:55  25    if such an agreement existed, you'd know about it by now?

**Ross (Cross)**

1      **A**      The -- I can't answer that because Tony is no longer

2      with us and I don't know what he had said about it.

3      **Q**      So when this lawsuit was filed over a week ago now,

4      didn't anyone try to call Tony to see what kind of

11:42:20  5      conversations Tony had had?

6      **A**      I did not.

7      **Q**      All right.

8      **A**      I'm not sure if anybody else did.

9      **Q**      All right.  So you're here testifying as the lead in

11:42:31 10      sales for Anchor and you can't testify about whether Tony

11      Parente had any agreement or not with Cosma about full

12      payment to get release of tools?

13      **A**      That's what I'm saying, I don't have any knowledge.

14      **Q**      But you have -- you can point to no evidence of such

11:42:54 15      an agreement; correct?

16      **A**      Correct.

17      **Q**      And, in fact, at this point in time, there were only a

18      few tools left there at Anchor; correct?

19      **A**      Correct.

11:43:12 20      **Q**      There were five tools, weren't there?

21      **A**      I'm not sure of the exact number at that point in

22      time, but that seems likely.

23      **Q**      All right.  And Anchor went ahead and released all of

24      the tools that were left there, except for this last one,

11:43:31 25      without demanding full payment of the account balances;

**Ross (Cross)**

1    correct?

2    **A**    That's correct.

3    **Q**    And so, unlike what you're saying here, Anchor, as a

4    tool needed to be released, didn't say here's the amount of

11:43:49 5    accounts payable associated with that tool, we need that

6    paid before we release that tool, that didn't happen with

7    those other tools; correct?

8    **A**    I don't believe so.

9    **Q**    And what happened was Anchor waited until the very

11:44:04 10    last tool and then said you have to pay us $2 million to get

11    that very last tool; correct?

12    **A**    I don't know that -- the exact number of -- the

13    number.  I think it was that number, less the contra for the

14    material.

11:44:23 15    **Q**    Well, again, you're in charge of sales, you're not

16    aware of what Anchor demanded from Cosma to get that tool

17    released?

18    **A**    Yeah, that was not put in -- under my -- under me for

19    that.

11:44:44 20    **Q**    But you are aware that there -- Anchor, your company,

21    is asking for everything in total to be paid before the tool

22    gets released; right?

23    **A**    I believe so, yes.

24    **Q**    And so, some of these parts that we're talking about

11:45:01 25    were shipped rather recently, weren't they?

**Ross (Cross)**

1    **A**    Yes.

2    **Q**    So the terms of the purchase order, the payment terms,

3    that is, are second day, second month; right?

4    **A**    I believe so.

11:45:15  5    **Q**    Okay.  So that could stretch out as long as 60 days

6    before payment is due on parts that are shipped; right?

7    **A**    Yes.

8    **Q**    And so, this demand that's being made for full payment

9    on everything is a request for some parts to be paid for

11:45:32 10    where the payment isn't even due yet; right?

11    **A**    Yes.

12    **Q**    And so, what contractual basis does Anchor have to

13    demand payment from Cosma for amounts that aren't even due

14    under the parties' purchase agreement?

11:46:02 15    **A**    I don't know.

16    **Q**    You're also demanding payment for all parts, not just

17    parts that were made by the tool 1213/1253; correct?

18    **A**    Correct.

19    **Q**    So as -- in your involvement as in charge of sales,

11:46:34 20    are you also involved in issues relating to your possession

21    of tooling there at Anchor?

22    **A**    What do you mean by that?

23    **Q**    Well, the tooling's part of sales; right?

24    **A**    When initially you get involved, yeah.

11:46:58 25    **Q**    And that -- so that falls under your purview; correct?

**Ross  (Cross)**

1    **A**      Yeah.

2    **Q**      Now, with the -- when that press broke and tools had

3    to be moved quickly, you would agree that Cosma likely had

4    some substantial costs involved in expediting the movement

11:47:26  5    of those tools and getting those tools very quickly up and

6    running at these alternative suppliers, they would have

7    costs with that; right?

8    **A**      It's reasonable to believe that.  They never shared

9    anything or said anything to us while they were doing it.

11:47:44  10    **Q**      But that makes sense to you, doesn't it, when tools

11    are rushed from one supplier to another, there are costs

12    involved with that; correct?

13    **A**      I would think so.

14    **Q**      And you wouldn't be surprised by that that -- well,

11:47:57  15    let me back up.

16          That press breaking, that's not on Cosma, that's on

17    Anchor; correct?

18    **A**      Yeah.  I -- yeah, the press was -- it's our press and

19    it broke.

11:48:13  20    **Q**      Right.

21          And it limited your ability to supply parts; right?

22    **A**      Yes.

23    **Q**      So you wouldn't be surprised if Cosma were going to

24    make a claim for its additional costs associated with that

11:48:26  25    press breakdown, you wouldn't be surprised by that, would

**Ross (Cross)**

1    you?

2    **A**    No.

3    **Q**    And so -- and I'm not asking you whether you agree

4    whether Magna's entitled to that or not, but you would agree

11:48:42  5    that Magna and Anchor -- rather, Cosma and Anchor have a

6    dispute about that; correct?

7    **A**    I guess so, yes.

8    **Q**    Well, Cosma doesn't think certain amounts are owed,

9    including things that aren't even due yet, and apparently

11:49:07  10    Anchor thinks amounts are owed; right?

11    **A**    Yes.

12    **Q**    And Cosma thinks it's entitled to certain costs it

13    incurred as a result of things that happened at Anchor, and

14    Anchor doesn't think it should be responsible for those

11:49:25  15    costs; is that fair?

16    **A**    I don't know that we had -- I did not have any

17    discussions with them on those costs, personally with

18    Mr. Tanasoff or anybody.

19    **Q**    All right.  So you think that Anchor should pay those

11:49:43  20    costs?

21    **A**    I'm not saying that.  I'm just saying that I had no

22    discussion whether -- the only thing I saw was -- I heard

23    was the numbers when Mr. Tanasoff showed the costs that they

24    had.

11:49:56  25    **Q**    All right.  But in your position in sales, you would

**Ross (Cross)**

1    agree with me, it's perfectly -- it's perfectly clear here

2    that these parties have a dispute over what's owed to which

3    party; fair to say?

4    **A**    That's fair to say.

11:50:10  5    **Q**    And you understand that Cosma has taken a position

6    with Anchor that the quality issues are Anchor's fault,

7    you're aware of that; right?

8    **A**    That's what they're saying.

9    **Q**    And you're saying the opposite; right?

11:50:27  10    **A**    I'm saying that, from day one, that the tools were

11    problematic and had issues since the inception and sometimes

12    the quality criteria would change and sometimes it would get

13    worse.

14    **Q**    But in terms of quality, you would agree, you did lose

11:50:45  15    a quality manager there at Anchor, didn't you?

16    **A**    Yes.

17    **Q**    And that, you know, could have an affect on your

18    ability to deliver quality parts, couldn't it?

19    **A**    Our quality manager left at the end of December.

11:51:05  20    **Q**    All right.  But before that, you had left -- you had

21    lost material managers, hadn't you?

22    **A**    Materials manager, yes.  We replaced the materials

23    manager.

24    **Q**    And you had lost tool shop operators, hadn't you?

11:51:20  25    **A**    A couple, yes.

**Ross  (Cross)**

1   **Q**     It's fair to say that your ability to produce parts

2   was, to some degree, stressed by your loss of certain

3   employees, wasn't it?

4   **A**     No.  We had the -- it was stated that we were down to

11:51:38 5   one employee.  We've never been.  We've always had roughly

6   five to seven toolmakers.  So if we -- if we had a capacity

7   issue, we can send tooling out and have it made on the

8   outside.

9   **Q**     You're aware that Cosma claims it had downtime costs

11:52:00 10   as a result of Anchor's inability to supply parts on time?

11   **A**     That's what they claim.

12   **Q**     And you're also aware that they -- they're claiming

13   the difference in the amounts they have to pay to

14   alternative suppliers from what they would have had to pay

11:52:18 15   Anchor, you're aware they're claiming that as well; right?

16   **A**     I'm not aware of that part of it, no.

17   **Q**     Okay.  I'm going to go back to Exhibit 8, which is H.

18   These are the Cosma terms and conditions.  We're going to go

19   to paragraph -- oh, I'm sorry.  I need to share this.  All

11:53:20 20   right.  I'm going to paragraph 11 here, the terms and

21   conditions that are in Exhibit 8.

22        The title of this paragraph is set-off, recoupment;

23   correct?

24   **A**     Yes.

11:53:46 25   **Q**     And in your role of sales, you're familiar with the

**Ross (Cross)**

1    concept of set-off, aren't you?

2    **A**    Yes.

3    **Q**    And buyer, as referred to in this paragraph, you would

4    understand that to be Cosma; correct?

11:54:02  5    **A**    Correct.

6    **Q**    Seller is Anchor; right?

7    **A**    Yes.

8    **Q**    And you see here, the part I've highlighted there, it

9    says, starting here with buyer:  Buyer and its subsidiaries

11:54:15  10   and affiliates may set-off against or recoup from any

11   amounts due or to become due to seller and its subsidiaries

12   and affiliates from buyer and its subsidiaries and

13   affiliates however and whenever arising.

14        Do you see that?

11:54:31  15   **A**    I see that.

16   **Q**    And so, doesn't that appear to give Cosma a right to

17   set-off amounts due to it from amounts that would otherwise

18   be due to Anchor?

19   **A**    To what -- to what level and what degree and what

11:54:52  20   proof?

21   **Q**    All right.  Well, I'm going to show you that right

22   here.  If you look here at the bottom, it says, at paragraph

23   11, it says, quote:  If any obligations of seller or its

24   subsidiaries or affiliates to buyer or its subsidiaries or

11:55:07  25   affiliates are disputed, contingent or unliquidated,

**Ross (Cross)**

1      including customer warranty claims made before final

2      determination of cause, buyer may defer payment of amounts

3      due until such obligations are resolved, close quote.

4          Do you see that portion?

11:55:23  5   **A**    Yes, I do.

6      **Q**    So this, you would agree, says that Cosma can set-off

7      disputed or unliquidated amounts against amounts otherwise

8      due to Anchor, that's what that says; right?

9      **A**    Yes.

11:55:43  10  **Q**    And you just indicated before that we've got a dispute

11     here.  So you wouldn't fault Cosma for not paying amounts

12     Anchor believes are due where Cosma claims it has amounts

13     that are due to it from Anchor, you wouldn't fault them for

14     doing that under paragraph 11, terms and conditions, would

11:56:05  15  you?

16     **A**    No.

17     **Q**    All right.  I want to go to Exhibit 3 here.

18         How many years did you say you were at Anchor?

19     **A**    Three years.

11:56:53  20  **Q**    I think my share screen didn't work there.  All right.

21     Now, for whatever reason, this is not coming up.

22         Well, do you have the exhibits in front of you?

23     **A**    Yes, I do.

24     **Q**    I'll see if Mr. Doyle can share this.

11:57:44  25         I'm going to take -- you see Exhibit 3, which is

**Ross (Cross)**

1      previously Plaintiff's Exhibit C?

2      **A**      Yes.

3      **Q**      Do you recognize this as the bailment agreement for

4      the tools here at issue?

11:58:01 5   **A**      Yes.

6      **Q**      If you go to the back of this agreement, it's signed

7      by a Michael P. Randall with title chief financial officer.

8             You were there at the company when this was signed;

9      correct?

11:58:20 10  **A**      No.  I started in September of 2019.

11     **Q**      Okay.  Where you aware of this bailment agreement?

12     **A**      I became aware of it when it was presented as an

13     exhibit.

14     **Q**      Okay.  And are you familiar with Michael Randall?

11:58:33 15  **A**      Yes.

16     **Q**      And is he still the chief financial officer?

17     **A**      No, he's not.

18     **Q**      But you're aware that he was the chief financial

19     officer?

11:58:42 20  **A**      Yes.

21     **Q**      And do you have any reason to believe that he would

22     not have the authority to enter into this agreement?

23     **A**      No.

24     **Q**      So you would agree with me that this agreement is an

11:58:58 25  agreement in effect between Cosma and Anchor that relates to

**Ross (Cross)**

1  these tools; correct?

2  **A**    Yeah, it is.  But it's signed before we even got the

3  tools or saw the tools.

4  **Q**    All right.  Well, let's go to the back of the

11:59:17  5  agreement, Schedule A.

6      Do you see the Schedule A here?  If you look, this

7  Schedule A lists the tools that this agreement applies to;

8  correct?

9  **A**    Yes.

11:59:28  10  **Q**    All right.  And the bottom here, you see there

11  progressive -- transfer die --

12  **A**    Uh-huh.

13  **Q**    -- for CBAM B1-1213/1253?  Do you see that?

14  **A**    Yes.

11:59:48  15  **Q**    That's the die that you're holding on to; correct?

16  **A**    Yes.

17  **Q**    And if you go to the Exhibit B, the second page of

18  Exhibit B, right there, in the bottom left-hand corner,

19  that's a picture of the die with the identifying marks of

12:00:10  20  the die you're holding on to; correct?

21  **A**    That is.

22  **Q**    All right.  So you would agree that this agreement

23  does apply to the die you're holding on to; correct?

24          MR. SMITH:  Objection.

12:00:23  25          THE COURT:  Basis for the objection.

**Ross  (Cross)**

1          MR. SMITH:  Sorry.  Seeks a legal conclusion

2   on the governing nature of the document and when ultimately

3   it came into effect.

4          THE COURT:  Attorney DeWaard.

12:00:40   5          MR. DeWAARD:  Well, I think he can answer the

6   question, he's in charge of sales, whether he thinks this

7   applies to the die that's referenced here.

8          THE COURT:  The question pertains to the

9   defendant's witness based upon his position within the

12:00:56  10   company.  I'm overruling the objection.

11      The witness can answer.

12          THE WITNESS:  It's -- that's the die that we

13   have right there.

14   **BY MR. DeWAARD:**

12:01:09  15   **Q**    All right.  So this agreement applies to that die, in

16   your view, doesn't it?

17          MR. SMITH:  Same objection, Your Honor.

18          THE COURT:  Objection's overruled.

19      To the extent the witness can answer the question, he

12:01:24  20   can answer.

21          THE WITNESS:  It -- as I'm going through this,

22   I have not read the -- every single detail about this on

23   here, so the picture of the die is on the documentation and

24   it references it.

25

144

**Ross (Cross)**

1    **BY MR. DeWAARD:**

2    **Q**    All right.  And you don't know of any other agreement

3    that applies to this die; correct?

4            THE COURT:  Mr. Ross, did you answer the

12:02:12  5    question?

6            THE WITNESS:  I said no.  Yes.

7            THE COURT:  Could you re-ask the question

8    again, because I just wanted to make sure the record is

9    clear.

12:02:23  10   **BY MR. DeWAARD:**

11   **Q**    You're not aware of any other agreement that applies

12   to this die, are you?

13   **A**    I am not.

14   **Q**    Go to the beginning of the agreement, paragraph 1.

12:02:39  15           Paragraph 1 indicates that the dies that this

16   agreement applies to are the ones found on Schedule A;

17   correct?

18   **A**    Yes.

19   **Q**    Turn to the second page, paragraph 15.

12:03:01  20   **A**    It says that we received the tooling.  We did not

21   receive the tooling until October.  It says March 5th.

22   **Q**    Well, you ultimately received 1213 because you're

23   holding on to it; right?

24   **A**    Yes.  We received it.

12:03:18  25   **Q**    Okay.  And look at paragraph 15.

**Ross (Cross)**

1      You understand, right, that -- well, you understand

2  that the dies are actually owned by General Motors; correct?

3  **A**    Correct.

4  **Q**    And General Motors is not Anchor's customer; right?

12:03:42  5  **A**    Correct.

6  **Q**    You don't claim that GM owes any money for parts that

7  were made by this die; correct?

8  **A**    Correct.

9  **Q**    Anchor doesn't have any contract with GM; right?

12:03:56  10  **A**    Not that I know of.

11  **Q**    Cosma is your customer; correct?

12  **A**    Yes.

13  **Q**    All right.  In paragraph 15, if you look here in the

14  second line, it says, quote:  Agrees to keep the property

12:04:19  15  free from liens or claims of any kind and hereby waives any

16  lien claim it may have in the property, statutory or

17  otherwise, to the extent permitted by law, close quote.

18      So in connection with that paragraph 15, Anchor agreed

19  that it wouldn't put any liens on die 1213/1253; correct?

12:04:44  20  **A**    That's what the document says.

21  **Q**    And Anchor also agreed that it would waive any lien

22  claim it could potentially have on die 1213 or 1253;

23  correct?

24  **A**    That's what it says.

12:05:01  25  **Q**    Turn to paragraph 16, which is on the next page.

**Ross (Cross)**

1          The second sentence of paragraph 16 says, quote:  The

2    division or its agent shall have the right to enter the

3    premises of the bailee and remove the property at any time,

4    close quote.

12:05:21  5          Now, the division includes Cosma; correct?

6    **A**     Yes.

7    **Q**     And the bailee is Anchor; right?

8    **A**     Yes.

9    **Q**     And what this provision appears to allow Cosma to do

12:05:40  10   is come to Anchor's place of business and remove die

11   1213/1253; correct?

12   **A**     That's what this says.

13   **Q**     And it says that Cosma can do it at any time; right?

14   **A**     It appears so.

12:06:09  15   **Q**     All right.  Look at paragraph 17, the next paragraph.

16          And at the beginning of that, it says:  If the

17   defendant chooses to take possession of the property --

18   sorry.

19          If the division chooses to take possession of the

12:06:31  20   property -- let me jump down a few lines there, it says,

21   quote:  Bailee acknowledges that any financial settlement

22   with respect to amounts in dispute relating to the property

23   or the purchase order will occur after the division is in

24   possession of the property, close quote.

12:06:51  25          Did I read that correctly?

**Ross (Cross)**

1    **A**    Yes, you did.

2    **Q**    So you testified that the parties here have a dispute;

3    right?

4    **A**    Yes.

12:07:06  5    **Q**    And this language in the agreement, just on a

6    common-sense meaning, says that Cosma is entitled to get

7    that die now and any dispute will be settled after that,

8    doesn't -- isn't that what that says?

9    **A**    Yep.

12:07:33 10    **Q**    Pardon?

11    **A**    I said yes.

12    **Q**    All right.  Jump to paragraph 19.

13    Paragraph 19, if you go down three lines, says, quote:

14    The bailee agrees that the division will not have an

12:07:55 15    adequate remedy at law, that the property is unique, and

16    that the division is entitled to the specific performance of

17    the bailee's obligations to afford the division immediate

18    access to the property in accordance with the terms of this

19    agreement, close quote.

12:08:13 20    And then, it goes on to say, quote:  The bailee agrees

21    that the division will suffer irreparable harm if the

22    division invokes its rights under this agreement to obtain

23    access to the property and the bailee fails to cooperate

24    with the division in allowing the division access to the

12:08:29 25    property in accordance with the terms of this agreement,

**Ross (Cross)**

1    close quote.

2         So it's true here, isn't it, that Anchor is not

3    cooperating in giving tool 1213/1253 to Cosma; correct?

4                   MR. SMITH:  Your Honor, I'm just going to

12:08:53  5    interpose an objection here.

6         I think we're going outside the scope of the direct

7    examination.  We didn't talk about contracts.  We didn't

8    talk about terms.  We didn't read the terms.  I mean, we

9    talked about the quality, nature of the tooling, and the

12:09:05  10    defective nature of it.  I just don't think that this fits

11    within the scope of the direct examination.

12                   THE COURT:  Attorney DeWaard, anything you

13    want to state?

14                   MR. DeWAARD:  Your Honor, this is the head of

12:09:17  15    sales.  This is -- even though the questions were just about

16    quality, this is the head of sales.  It's fair game to ask

17    him these questions.  He should know these.

18         These are agreements at the heart of the issue.  These

19    are probably what should have been talked about on the

12:09:30  20    direct.  And I shouldn't be limited to go into, when he

21    calls his witness -- for all I know, he's not going to call

22    another witness.  This is the right witness for these

23    contracting documents.

24                   THE COURT:  The objection is overruled.

12:09:42  25         The witness may answer the question.

**Ross (Cross)**

1    **BY MR. DeWAARD:**

2    **Q**    And so, I'll just repeat it.

3              THE COURT:  Rephrase the question so that way

4    it's current in the witness's mind.

12:09:53  5              MR. DeWAARD:  Yes, Your Honor.

6    **BY MR. DeWAARD:**

7    **Q**    So I just read from these provisions that are in front

8    of you in paragraph 19 of Exhibit 3, the bailment agreement.

9              And it's true, isn't it, that Anchor is not

12:10:04  10   cooperating by turning over the die 1213/1253 to Cosma, is

11   it?

12   **A**    By cooperating, we're still supplying parts and making

13   parts for them.

14   **Q**    But you're not going to turn over the tool unless

12:10:25  15   Cosma meets your demands and makes the payment you're

16   requesting; correct?

17              THE COURT:  Can you answer the question?

18              THE WITNESS:  I wasn't really the one that --

19              THE COURT:  To your knowledge.  The question

12:10:58  20   is to your knowledge.

21              THE WITNESS:  Just to my knowledge, yes.

22   **BY MR. DeWAARD:**

23   **Q**    All right.  And so, in that circumstance, don't you

24   agree that this says that Cosma's entitled to specific

12:11:15  25   performance of Anchor's obligations under this bailment

**Ross (Cross)**

1    agreement when you don't cooperate?

2    **A**    That's what this says.

3    **Q**    And that means, as everyone understands, specific

4    performances, that Anchor's got to get Cosma the tool;

12:11:31 5    right?

6    **A**    I think that's why we're here.

7    **Q**    Well, don't you agree that's what that says?

8    **A**    Yes.

9    **Q**    Were you involved in sending a lien letter to --

12:12:11 10    **A**    No.

11    **Q**    Okay.  So you don't know anything about that?

12    **A**    Nope.

13    **Q**    Take a look back at Exhibit 8, paragraph 17.  I'm

14    sorry.  Paragraph -- actually, paragraph 36.  Paragraph 36

12:13:49 15    of Exhibit 8 is entitled modifications.

16        And this provision of the terms and conditions state,

17    quote:  No modification of this order, including any waiver

18    of or addition to any of the terms, shall be binding upon

19    buyer unless made in writing and signed by buyer's

12:14:12 20    authorized representative, close quote.

21        You understand that to mean that to change Cosma and

22    Anchor's contractual relationship, there would have to be a

23    writing that's signed by Cosma?

24    **A**    That's what that says.

12:14:33 25    **Q**    And are you aware of any writing signed by Cosma in

**Ross  (Cross)**

1    which Cosma changed its rights under the bailment agreement?

2    **A**    I'm not aware.

3    **Q**    Are you aware of any writings signed by Cosma in which

4    it ever agreed to make payment of accounts payable before it

12:15:02   5    could get the tools held by Anchor?

6    **A**    Not aware.

7                    MR. DeWAARD:  I have nothing further at this

8    time, Your Honor.

9                    THE COURT:  All right.  Thank you, Counsel.

12:15:15  10          Attorney Smith, any redirect --

11                    MR. SMITH:  Just very --

12                    THE COURT:  -- based on the cross questioning.

13                    MR. SMITH:  Just very briefly.

14          I know that we talked about noon, Your Honor.  Should

12:15:27  15    I just proceed?  And I think it should only be five, ten

16    minutes at most.

17                    THE COURT:  All right.  That's fine.

18          I do have a 12:30 so --

19                    MR. SMITH:  So do I.

12:15:37  20                    THE COURT:  -- if you can do a brief redirect

21    that would be efficient, go ahead.

22                    MR. SMITH:  Yes.

23

24

25

**Ross (Redirect)**

<u>**REDIRECT EXAMINATION OF RICHARD ROSS**</u>

**BY MR. SMITH:**

**Q**     Rich, you looked at a bunch of agreements just now, the bailment -- the bailment receipt, excuse me, the terms and conditions.

        Do you recall looking at those just now?

**A**     Yes.

**Q**     They're Exhibits 17 [sic] and 3; right?

**A**     Yes.

**Q**     Okay.  Is it your understanding that with respect to those agreements Cosma was required to provide Anchor with nondefective tools so that it could provide parts for Cosma?

**A**     Yes.

**Q**     Did Cosma provide Anchor with nondefective parts -- or tooling, excuse me, so that it could provide parts to Cosma?

**A**     No.

**Q**     Is it your belief that based upon that failure Cosma breached those agreements by failing to provide nondefective parts to Anchor?

**A**     Yes.

**Q**     Are you aware of various emails, that you've seen discussed previously, about lump sum payments, agreements to pay the delta, various items in that respect?

**A**     Yes.

**Q**     Are those writings in your mind, do you know?

**Ross (Redirect)**

1    **A**    Yes.

2    **Q**    And were those writings, was there an agreement to

3    make lump sum payments relative to phase 1/phase 2 and other

4    tools?

12:17:06 5    **A**    Yes.

6    **Q**    To your knowledge, have the lump sum payments been

7    made?

8    **A**    Not all of them.

9    **Q**    To your knowledge, has the accounts receivable, those

12:17:17 10   payments been made?

11   **A**    No.

12   **Q**    You also heard some testimony about the payment that's

13   set forth under the terms and conditions being second day,

14   second month.

12:17:29 15       Do you recall that?

16   **A**    Yes.

17   **Q**    And based upon some of the questioning, it sounded

18   like there was some testimony about whether or not the

19   amounts under the accounts receivable were yet due.

12:17:44 20       Do you recall that?

21   **A**    Yes.

22   **Q**    Is it your understanding that Cosma presently is

23   refusing to pay the accounts receivable?

24   **A**    Yes.

12:17:51 25   **Q**    So, in your mind, does it matter when the payment

**Ross (Redirect)**

1    becomes due because they're refusing to pay anyway?

2    **A**    Yes.  No, it does not.

3    **Q**    So it's your understanding that it does not matter

4    because -- that the payment isn't due because Cosma has

12:18:06  5  communicated to Anchor that it's refusing to pay the

6    accounts receivable?

7    **A**    Yes.

8    **Q**    Is it your understanding that based on the agreements

9    that we just talked about that Cosma has an obligation to

12:18:18  10  make payments under those agreements?

11    **A**    Yes.  And stated in writing.

12    **Q**    I just want to quickly take you to --

13              MR. DeWAARD:  He already testified that he

14    doesn't --

12:18:34  15              MR. SMITH:  I'm getting some feedback.  It

16    sounds like --

17              MR. DeWAARD:  Oh, sorry.

18    **BY MR. SMITH:**

19    **Q**    Rich, is it your belief that it was Cosma that

12:18:58  20  terminated the parties' relationship?

21    **A**    Yes.

22    **Q**    How did it terminate the parties' relationship?

23    **A**    They did not give us the tooling that was -- the

24    tooling was defective when it came in and they weren't --

12:19:16  25  they did not pay.

**Ross (Redirect)**

1    **Q**    Did they ultimately -- did they ultimately, Cosma that

2    is, direct Anchor to take the tooling and ship it elsewhere

3    and that Anchor was no longer to perform or provide parts

4    for Cosma?

12:19:32  5    **A**    Yes.

6    **Q**    Is that part of the termination?

7    **A**    Yes, it is.

8    **Q**    Okay.  I just want to quickly share my screen here

9    with you.

12:19:41  10    Do you see this, the document that's up on the screen?

11    **A**    Yep.

12    **Q**    This was Exhibit H that has been reidentified by

13    the -- it's a plaintiff's exhibit that was previously H.

14    Do you recall seeing this document?

12:19:59  15    **A**    Yes.

16    **Q**    Okay.  We are down on paragraph 24.

17    Do you see in 24(a) that this indicates that the buyer

18    may, in its sole discretion, upon 30 days notice to seller

19    or, if applicable, such shorter period as may be required by

12:20:18  20    the customer, terminate this order for convenience or any

21    other reason?

22    Do you see that?

23    **A**    Yes.

24    **Q**    Is the buyer, is it your understanding, is that Cosma?

12:20:27  25    **A**    Yes.

**Ross (Redirect)**

1  **Q**    So is it your belief that Cosma terminated pursuant to

2  this provision here?

3  **A**    Yes.

4  **Q**    And in that respect, if -- I'm going to direct your

12:20:37  5  attention to subsection (c) where it provides that buyer

6  shall, in addition to making payment of the price specified

7  in this order for the goods and the services delivered or

8  performed and accepted by the buyer prior to the effective

9  date of termination, pay to seller the following amounts,

12:20:53  10  without duplication, number one, the price specified in this

11  order for the goods and services manufactured or provided in

12  accordance with the terms of the order but not previously

13  paid for, and, number two, the actual costs of

14  work-in-process and parts and raw materials incurred by

12:21:07  15  seller in performing its obligations under this order, to

16  the extent such costs are reasonable in amount and are

17  properly allocated or apportioned.

18         Did I read that correctly?

19  **A**    Yes.

12:21:17  20  **Q**    So is it your understanding that Cosma, pursuant to

21  this, was required to pay accounts receivable and also any

22  amounts that were due and owing, such as the delta or the

23  lump sum payments?

24  **A**    Yes.

12:21:31  25  **Q**    And just to be clear, those payments have not been

**Ross (Redirect)**

1    received by Anchor; is that right?

2    **A**    Correct.

3    **Q**    Is it your belief that Cosma has breached this, this

4    provision of the agreement?

12:21:41 5    **A**    Yes.

6    **Q**    We talked a little bit about capacity.  And I know

7    that there was a letter by one of your colleagues from

8    Anchor that discussed capacity.

9         Do you recall that?

12:22:03 10   **A**    Yes.

11   **Q**    What does capacity -- from Anchor's perspective, from

12   your perspective, what does capacity mean from Anchor's

13   ability to provide parts to Cosma using the tooling at

14   issue?

12:22:15 15   **A**    As I stated, that -- as their volume increased, that

16   the -- that's when the issue became more evident, because

17   the volume increased with that, and I said one went from

18   15,000 to 18,000 a week, and then, that puts more strain on

19   the amount of time I need because, as I said, some of the

12:22:40 20   tools would take days instead of shifts.

21   **Q**    What I mean, also, is when we talk about capacity,

22   when Anchor's talking about capacity, is it referring to

23   tooling or is it referring to some other issue?

24   **A**    Tooling.

12:22:53 25   **Q**    Is it referring to only tooling?

**Ross (Redirect)**

1    **A**    Yes.

2    **Q**    You understand that Cosma is taking issue with that,

3    they're saying that there's quality -- there's an issue with

4    quality of the parts; right?

12:23:02 5    **A**    Yes.

6    **Q**    But is that Anchor's position?

7    **A**    We're saying the tool perform -- that we were given is

8    performing and has the same defects as they always had since

9    the inception.

12:23:15 10    **Q**    And, frankly, that even the former supplier was

11    encountering too?

12    **A**    Correct.

13    **Q**    There was also a discussion about a run of six or four

14    weeks in the bank.

12:23:24 15    Do you recall that?

16    **A**    Yes.

17    **Q**    Okay.  Were you on-site at Anchor when Cosma had

18    employees at Anchor's facility dictating the number of parts

19    that should be -- that should be produced by Anchor?

12:23:37 20    **A**    Yes.

21    **Q**    And, specifically, were you there when -- I'm talking

22    about the phase 1 and phase 2 productions.

23    **A**    Yes.

24    **Q**    Did those Cosma employees direct Anchor on how much

12:23:50 25    specifically, how many parts specifically to produce at that

**Ross  (Recross)**

1    time?

2    **A**    Yes.

3    **Q**    And did they ever mention four-to-six-week banks?

4    **A**    No.

12:24:01  5    **Q**    Did they identify just the number of parts and then

6    Anchor was to provide those parts?

7    **A**    Yes.  That's all.

8              MR. SMITH:  I have no further questions, Your

9    Honor.

12:24:13  10             THE COURT:  Attorney DeWaard.

11             MR. DeWAARD:  Very briefly, Your Honor.

12             **RECROSS-EXAMINATION OF RICHARD ROSS**

13   **BY MR. DeWAARD:**

14   **Q**    You couldn't continue to supply parts as needed

12:24:22  15   because your press broke; right?

16   **A**    On those -- on the three part numbers.

17   **Q**    All right.  And one of those parts was 1213/1253;

18   correct?

19   **A**    Correct.

12:24:36  20   **Q**    All right.  And the provision that you were cited to

21   by your counsel in the terms and conditions, Exhibit 8,

22   paragraph 24, termination for convenience upon notice,

23   there's a provision that follows that, right, that's

24   termination upon seller's default, there's another

12:25:02  25   termination provision; correct?  There's two termination

**Ross  (Recross)**

1    provisions; correct?

2    **A**    There's two there.

3    **Q**    And you were never told that there was a termination

4    of convenience here, were you?

12:25:27  5    **A**    I was never told that?

6    **Q**    Correct.  Nobody said this is a termination for

7    convenience under section 24, nobody ever said that;

8    correct?

9    **A**    Not to my knowledge.

12:25:40  10    **Q**    In fact, you're aware now in this lawsuit that Cosma

11    is claiming that Anchor is in breach of the contract, you're

12    aware they're claiming that; correct?

13    **A**    That's what you said, yes.

14    **Q**    Yes.

12:25:52  15    So if any termination were done here, in Cosma's

16    position, it would be a termination upon default; is that

17    fair to say?

18    **A**    I -- I can't come to that conclusion.

19    **Q**    All right.  And, previously, you testified, when we

12:26:11  20    pointed out the set-off provision, that there was a set-off

21    right.

22    You're not aware of any limitation on the set-off

23    right regardless of which termination is applied; correct?

24    **A**    Correct.

12:26:30  25    MR. DeWAARD:  I have nothing further, Your

1    Honor.

2                     THE COURT:  All right.  Thank you, Counsel.

3           With that, then, Mr. Ross, you're now off the witness

4    stand.

12:26:41  5           Attorney Smith, any additional witnesses that the

6    defense intends to call?

7                     MR. SMITH:  I do want to -- excuse me.  I do

8    intend to call Fred Pfaff, Your Honor.

9                     THE COURT:  All right.  It's currently --

12:26:53  10   we're going to go off the record right now for discussion.

11                        (Pause in Proceedings)

12                     MR. SMITH:  I guess, actually, I do feel

13   compelled just to raise the issue.  I understand that I

14   don't want to get into if there's argument or whatever, but

12:32:07  15   I do feel compelled to bring it up.

16          There was some testimony today by Mr. Tanasoff about

17   the use of the other 14 die sets that are -- that were

18   manipulated, changed, and now are being used.  Obviously,

19   one of the big issues that we have in this case is the

12:32:25  20   quality and the nature of that tooling.

21          I do have some preservation concerns at this point

22   with respect to that tooling, and, you know, no experts,

23   nobody's had a chance to look at it or anything like that in

24   connection with this case.  Obviously, it relates,

12:32:42  25   specifically in our eyes, to the defective nature of the

1    parts, so I do feel compelled to bring that up because that

2    was the -- that was testimony elicited today, Your Honor.

3            THE COURT:  All right.  Before we proceed, I'm

4    going to turn to the court reporter.

12:33:20  5            (Pause in Proceedings)

6            THE COURT:  All right.  Attorney Smith, the

7    issue you raised is now on the record.

8        At this point, I don't believe there's anything to

9    address.  But I think, Counsel, you all can discuss the

12:33:30 10   issue during the interim between now and Monday, and, if

11   necessary, we can address the issue further on Monday.

12            MR. SMITH:  Understood.

13        Thank you, Your Honor.

14            THE COURT:  All right.  Counsel, with that,

12:33:42 15   I'm going to adjourn.

16        Take care, everyone.

17        Court stands in recess until Monday morning.

18                    - - -

19            (Proceedings recessed at 12:33 p.m.)

12:35:07 20

21

22              **C E R T I F I C A T E**

23        I certify that the foregoing is a correct transcript
     of the record of proceedings in the above-entitled matter
24   prepared from my stenotype notes.

25        */s/ Sarah E. Nageotte*              *1/20/2023*
         SARAH E. NAGEOTTE, RDR, CRR, CRC          DATE