1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
2                         EASTERN DIVISION

3

4    MARADA INDUSTRIES, INC.,      Case No. 1:22-cv-2333
                                   Cleveland, Ohio
5              Plaintiff,

6         vs.                      THURSDAY, JANUARY 12, 2023

7    ANCHOR TOOL & DIE CO.,

8              Defendant.

9

10        TRANSCRIPT OF TEMPORARY RESTRAINING ORDER
          AND PRELIMINARY INJUNCTION PROCEEDINGS
11             *HELD VIA ZOOM VIDEOCONFERENCE*
          BEFORE THE HONORABLE DAVID A. RUIZ
12             UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15   For Marada Industries:    Ronald G. DeWaard, *Esquire*
                               Brion B. Doyle, *Esquire*
16                             Marcel C. Duhamel, *Esquire*

17

     For Anchor Tool & Die:    Adam C. Smith, *Esquire*
18                             John E. Benko, *Esquire*

19

20
     Court Reporter:           Sarah E. Nageotte, RDR, CRR, CRC
21                             United States District Court
                               801 West Superior Avenue
22                             Court Reporters 7-189
                               Cleveland, Ohio 44113
23                             Sarah_Nageotte@ohnd.uscourts.gov

24

25      Proceedings recorded by mechanical stenography, transcript
           produced with computer-aided transcription.

1

**TABLE OF CONTENTS**

2

3                                                                                      <u>PAGE</u>

4    DIRECT EXAMINATION OF THOMAS TANASOFF
     BY MR. DOYLE:                                                      8

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    THURSDAY, JANUARY 12, 2023

 2                              - - -

 3              (Proceedings commenced at 3:09 p.m.)

 4                              - - -

 5              COURTROOM DEPUTY:  This United States District

 6    Court for the Northern District of Ohio is open for the

 7    transaction of business, the Honorable David A. Ruiz

 8    presiding.

 9         The Court calls case number 1:22-cv-2333, Marada

10    Industries, Inc., versus Anchor Tool & Die Co.

11                    THE COURT:  Good afternoon.

12         Will counsel for the United States -- excuse me --

13    will counsel for the plaintiff please enter your appearance

14    for the record.

15         I apologize.  I've had many criminal proceedings

16    lately.

17         Would counsel for the plaintiff please identify

18    yourself.

19                    MR. DeWAARD:  I used to be an AUSA, so I

20    sometimes will say for the United States myself.

21         Yes, Your Honor.

22         Ron DeWaard and Brion Doyle and Marcel Duhamel as well

23    for Plaintiff Marada Industries, who we often refer to as

24    Cosma.

25                    THE COURT:  And will counsel for the defendant
```

1    please identify yourself for the record.

2                    MR. SMITH:  Yes.

3         Good afternoon, Your Honor.

4         This is Adam Smith, and also on the line here is John

15:10:27  5    Benko of McDonald Hopkins.  We represent the defendant,

6    Anchor Tool & Die Company.

7                    THE COURT:  Good afternoon.

8         Now, the purpose of today's proceeding, the Court is

9    conducting a videoconference hearing on the plaintiff's

15:10:37 10    motion, which the Court is combining for purposes of the

11    proceeding, the plaintiff's motion for temporary restraining

12    order as well as its request for a preliminary injunction.

13         Now, Counsel, prior to going on the record today, I

14    have received a number of proposed exhibits from both sides,

15:11:11 15    and, for efficiency sake, I'm wondering if there's a

16    stipulation as to the authentication and admissibility of

17    each side's proposed documents, proposed exhibits.

18                    MR. DeWAARD:  The plaintiff will stipulate to

19    that, Your Honor.

15:11:30 20                    MR. SMITH:  Your Honor, Adam Smith.

21         We received four additional exhibits yesterday and

22    they were provided to the Court.  I know that the Court

23    opened up the opportunity to provide exhibits last Tuesday

24    in advance of that hearing.  I know that there was four

15:11:51 25    additional ones.  I'm not -- I'm not inclined to object.

1           I'll just say that, frankly, from our understanding,

2      the exhibits were closed as of last Tuesday.  But,

3      nevertheless, you know, if they want to introduce those

4      exhibits, that's fine.

15:12:05  5           I will say, Your Honor, I think that there could be

6      some objections to the documents relative to potentially

7      hearsay on some of these documents.  So, you know,

8      authenticity wise, that's okay, but I reserve the right with

9      respect to hearsay objections, Your Honor.

15:12:24 10               THE COURT:  All right.  That's fine, Counsel.

11           All right.  Then does either side request an

12      opportunity to present an opening statement?

13           I've got the briefs.  I've had a chance to read the

14      briefs and the issue's fully briefed.  So I think we can

15:12:44 15      proceed straight to witnesses, unless either side wants to

16      request an opportunity to present an opening statement.

17               MR. DeWAARD:  Your Honor, since you have the

18      briefs and read the briefs, we appreciate that, I don't

19      believe we need to because we want to get right into the

15:13:01 20      evidence.

21           On the evidence -- oh, I'll wait to see what Mr. Smith

22      has to say on that.

23               THE COURT:  All right.  Attorney Smith, do you

24      represent an opportunity to present opening statement or can

15:13:14 25      we move straight to the witnesses?

1        MR. SMITH:  No, Your Honor.

2            We can move straight to the witnesses.  As you said,

3    you have the briefs.

4                THE COURT:  All right.  Attorney DeWaard, you

15:13:24  5    were going to make a statement.

6                MR. DeWAARD:  I was just going to ask, Your

7    Honor, whether -- because our time is somewhat limited, even

8    though we have potentially the extra day if -- I wanted to

9    ask whether the Court and others have these in hardcopy, so

15:13:38  10    that if we refer to them, everybody will have the exhibits

11    versus -- there might be reason to put them on the screen at

12    some point, but that can sometimes appear small and might

13    slow us down a little bit.  I wanted to make sure, for

14    instance, that the Court had the exhibits.

15:13:54  15                THE COURT:  I'll indicate that for plaintiff's

16    exhibits, I have before me Exhibit -- what's been marked as

17    Exhibits A through Q.  And then, for defendant's exhibits, I

18    have what's been marked Exhibits A through J.

19                MR. SMITH:  And, Your Honor -- go ahead, Ron.

15:14:12  20                MR. DeWAARD:  I was just going to say, those

21    do reflect our exhibits that we submitted.

22                MR. SMITH:  And, Your Honor, I would just say

23    that that's the same, holds true for us.  We marked ours

24    alphabetically, as we're the defendant, but, you know, if

15:14:29  25    you want us to move to numbers so that it's easier for

1    everyone, that would be fine, or if the plaintiff wants to

2    move to numbers.  Just, customarily, I've always, as the

3    defendant, have used letters.

4                THE COURT:  All right.  Let's do this, just to

15:14:56  5    prevent any confusion, if plaintiff would refer to their

6    exhibits by numbers, so instead of Exhibit A, Exhibit 1, and

7    so forth.

8                MR. DeWAARD:  Sure.  We'll do that.  And our

9    witness, I'm assuming the witness is --

15:15:18 10                THE COURT:  You can make the double reference.

11    You can reference Plaintiff's Exhibit Q and then clarify

12    what exhibit number it would be.

13                MR. DeWAARD:  Right.  Thank you.

14                THE COURT:  And I'm assuming, then, that the

15:15:33 15    witnesses have copies of the exhibits.

16          Is that correct, Counsel?

17                MR. DeWAARD:  Our witness does.

18                MR. SMITH:  Yes, Your Honor.

19          Our witnesses has both sets, ours and the plaintiff's.

15:15:44 20                THE COURT:  Okay.  All right.  Then let's go

21    ahead and proceed.

22          If plaintiff will call their first witness.

23                MR. DeWAARD:  Yes, Your Honor.

24          We're going to call Tom Tanasoff.

15:15:56 25          And my partner, Mr. Doyle, is going to be handling his

8

**Tanasoff (Direct)**

1    testimony.

2                    THE COURT:  All right.  Mr. Tanasoff, I'm

3    going to ask my courtroom deputy to swear you in.

4         Please raise your right hand.

15:16:10 5         Ms. Gallagher, you can proceed.

6                         (Witness was sworn)

7                    THE COURT:  All right.  Counsel, you may

8    proceed.

9                    MR. DOYLE:  Thank you, Your Honor.

15:16:25 10              **DIRECT EXAMINATION OF THOMAS TANASOFF**

11   **BY MR. DOYLE:**

12   **Q**    Good afternoon, Mr. Tanasoff.

13   **A**    Good afternoon.

14   **Q**    For the court reporter's benefit, could you state your

15:16:38 15   full name for the record, please, as we start.

16   **A**    Thomas Jordan Tanasoff.

17   **Q**    I want to start this afternoon, Mr. Tanasoff, with

18   some background questions about your employment.

19        Where are you currently employed?

15:16:41 20   **A**    I am employed at Marada Industries, doing business as

21   Cosma Body Assembly Michigan.

22   **Q**    And for the benefit of the court reporter, and others,

23   I'll refer to that as Cosma as we go forward, if that makes

24   sense.

15:16:55 25   **A**    Sure.

**Tanasoff  (Direct)**

1   **Q**   All right.  In what role are you employed with Cosma?

2   **A**   I'm the purchasing and supply chain manager here.

3   **Q**   How long have you been in that role?

4   **A**   Two and a half years.

15:17:06  5   **Q**   Is that when you started with Cosma?

6   **A**   That is.  I've held that title the entire time I've

7   been here.

8   **Q**   Again, in general terms, can you tell us what your

9   responsibilities are as the purchasing and supply chain

15:17:19  10   manager for Cosma.

11   **A**   Yeah.  I'm responsible for all aspects of purchased

12   components and items that go into our facility here in New

13   Hudson, Michigan.

14   **Q**   And let me take a step back.

15:17:33  15   What type of business is Cosma in?  What does Cosma

16   do?

17   **A**   We supply automotive parts to, primarily, General

18   Motors.  We have -- it's frame assembly components, so it's

19   items that go onto the frame that support the vehicles for

15:17:50  20   General Motors primarily.

21   **Q**   And so, in that context, when you talk about managing

22   production supply chain relationships, what type -- what are

23   those relationships that you're referring to?

24   **A**   So we have production and non-production suppliers

15:18:05  25   that supply everything from all of the components that go

**Tanasoff (Direct)**

1    into the vehicles and then every related equipment and

2    related products that we utilize in our facility.

3    **Q**    And do those include subsuppliers that supply parts

4    for the parts that you, in turn, supply to General Motors?

15:18:24  5    **A**    They do.

6    **Q**    How many of those types of supply relationships do you

7    manage?

8    **A**    For that type of -- so for that, we refer to it as

9    production, and that's a couple of dozen suppliers.

15:18:37  10    **Q**    Does that include the defendant in this case, Anchor

11    Manufacturing?

12    **A**    It does.

13    **Q**    On a day-to-day basis, what types of issues do you

14    deal with, manage in those production supply chain

15:18:51  15    relationships?

16    **A**    So we manage getting material into our facility for

17    all of the -- to support GM's full production facility.  It

18    involves purchasing, ensuring that we can meet the

19    requirements, and provide products online with good quality

15:19:12  20    parts for the full life of the program.

21    **Q**    Very good.

22         I want to turn to the defendant in this case.

23         How are you familiar with Anchor Manufacturing Group?

24    **A**    Anchor has supplied stamping products to us since I've

15:19:29  25    been here.  We've had certain components that we purchased

**Tanasoff (Direct)**

1    from them throughout my entire time here at CBAM, or Cosma

2    Body.

3    **Q**    You said stamping products.  Can you talk a little bit

4    about the types of parts that Anchor supplies to Cosma.

15:19:48  5    **A**    Yeah.  The simplest explanation that I can put to you

6    is if you think like Play-Doh, so instead of Play-Doh, it

7    would be steel that Anchor is providing, but you roll out

8    the Play-Doh, or roll out steel, and then you cut it like a

9    cookie cutter into the Play-Doh forming the product and

15:20:08  10   different draw and areas that form the product that we need

11   to be made.

12   **Q**    In what vehicles are Anchor's products incorporated

13   for GM?

14   **A**    So they provide products for the BEV program, or they

15:20:24  15   were providing for the BEV program, which is the Bolt EV

16   platform.  They provide for the -- they still provide the

17   last die for the C1YX program, which is the Traverse and

18   other SUV products.  And the T1XX program, which is for the

19   trucks for General Motors.

15:20:44  20   **Q**    In all instances, is Cosma using the parts that it

21   receives, the subcomponents it receives from Anchor for

22   frame assembly pieces for all those vehicles that you just

23   mentioned?

24   **A**    Yes.

15:20:58  25   **Q**    I want to turn to plaintiff's proposed exhibit, you

**Tanasoff  (Direct)**

1    have it in front of you, Mr. Tanasoff, as Plaintiff's A but

2    it's going to be Plaintiff's Exhibit 1.

3    **A**    Yeah.  I have it here.

4    **Q**    Do you recognize this document?

15:21:20  5    **A**    I do.  This is our purchase order with Anchor

6    Manufacturing.

7    **Q**    And as such, does it identify the supplier and the

8    customer?

9    **A**    Yes.  Anchor is the supplier and Cosma Body is the

15:21:32 10    customer.

11    **Q**    All right.  How many different parts are covered by

12    this purchase order?

13    **A**    A few dozen.  I think it's, like, 36 parts.

14    **Q**    Does this purchase order encompass the entire supply

15:21:50 15    relationship between Cosma and Anchor?

16    **A**    We have additional terms and conditions and other

17    items in our agreements, but this is the controlling

18    document for the pricing and supply relationship.

19    **Q**    Are you aware of any other purchase order absent --

15:22:06 20    and I'm not talking about any amendments to this, but are

21    you aware of any separate purchase orders with Anchor that

22    cover the supply relationship?

23    **A**    No.

24    **Q**    In other words, this is the one purchase order that

15:22:16 25    governs the relationship --

**Tanasoff  (Direct)**

1   **A**      Right.

2   **Q**      -- in your understanding?

3   **A**      Yes.

4   **Q**      I want to call out your attention to a couple of terms

15:22:24  5   on the purchase order.

6        At the top right, there's a box with a purchase order

7   number, and to the left of that, there's blanket order with

8   an X?

9   **A**      Yep.

15:22:36  10   **Q**      I want to ask you, sir, what's your understanding of

11   blanket order?  What's that mean?

12   **A**      So the -- there is a -- the blanket order being marked

13   with an X means that it is a blanket order, meaning that we

14   need our full requirements and ongoing supply relationship

15:22:53  15   versus the spot buyer, which would be a onetime event.  You

16   buy one, you know, cup or one item, you are done with it

17   after that and you no longer supply that product.

18        This is a blanket order, so it's ongoing for the life

19   of the program.

15:23:07  20   **Q**      And I was just going to ask you about the term.

21        What is the term of this purchase order with respect

22   to the various parts there listed?

23   **A**      It is for the full life of the program.

24        So it -- there are various programs, as we stated

15:23:19  25   earlier, with the BEV, the C1YX, and the T1 program, each

**Tanasoff  (Direct)**

1      has different program end dates.

2      **Q**      Can you give us, in general terms, the range of

3      program end dates.

4      **A**      Yep.  So the BEV program is scheduled to end at the

15:23:35  5    end of this year, as the C1YX is scheduled to end as well.

6      There's a refresh of that that may continue, but that's not

7      covered here.  And then, the T1Y -- or the T1XX program

8      continues through 2024, 2025.

9      **Q**      So that would be the end date of the purchase order

15:23:55 10    for those particular parts?

11      **A**      Correct.

12      **Q**      There's a -- if we look a little bit lower on that

13      first page under the supplier box, there's a box that says

14      payment terms, and it states:  Second day, second month.

15:24:07 15         Do you see that?

16      **A**      I do.

17      **Q**      What does that mean?

18      **A**      So it's a -- it's an average range.  It's widely used

19      in the industry.  That's what GM uses with us as well.  It

15:24:20 20    is the second day, so, for example, February 2nd, and the

21      second month, two days later, so invoices between a range of

22      dates will get paid on February 2nd or January, February,

23      March 2nd.  It's an average of about 47 days.

24      **Q**      An average of 47 days, meaning, do I understand you to

15:24:44 25    say, that's, on average, how long -- under the second day,

**Tanasoff  (Direct)**

1    second month payment term, from receipt of invoice to

2    payment is on average 47 days?

3    **A**      Yes.

4    **Q**      There's a date order of 12-30-19 written below that

15:25:00   5    box?

6    **A**      Yes.

7    **Q**      You talked about being in your position at Cosma for

8    about two and a half years.

9          Is it fair to say this supply relationship was ongoing

15:25:07  10    when you started at Cosma?

11    **A**      Yes.  Yes.  A hundred percent.

12    **Q**      And then, at the bottom of each page, there's a --

13    there's language incorporating the Magna purchasing order

14    terms and conditions.

15:25:23  15          Are you familiar with those terms and conditions?

16    **A**      Yes.

17    **Q**      I want to turn to those next.

18                MR. DOYLE:  But before I do that, I'll move

19    for the admission of Plaintiff's Exhibit 1.

15:25:37  20                THE COURT:  Let's do this, Counsel.  Let's

21    hold off on moving for admissions of any documents until the

22    end of the proceeding, and then I'll determine if there's

23    any objections to any of the proposed exhibits.

24                MR. DOYLE:  Very good.

15:26:00  25          Thank you, Your Honor.

**Tanasoff  (Direct)**

1          THE COURT:  All right.

2    **BY MR. DOYLE:**

3    **Q**    Mr. Tanasoff, please turn to Plaintiff's proposed

4    Exhibit H, which is also renumbered 8, so H or 8.  And if

15:26:12   5    you would let me know when you're there.

6    **A**    Give me one minute.

7          I am there.

8    **Q**    All right.  Do you recognize this document?

9    **A**    I do.

15:26:29  10    **Q**    What is it?

11    **A**    These are our purchasing terms and conditions --

12    **Q**    Is this --

13    **A**    -- from the -- they're incorporated from the purchase

14    order as referenced previously.

15:26:39  15    **Q**    Is this a document that you've become familiar with in

16    your role as purchasing and supply chain manager?

17    **A**    Yes.

18    **Q**    I want to walk you through some of the key provisions

19    that may be relevant in this case.

15:26:51  20          Starting on the first page, paragraph 1(a), paragraph

21    1(a) states that each purchase order -- and we just looked

22    at a purchase order -- issued by buyer is an offer to

23    seller.

24          That paragraph goes on to state:  The first occurring

15:27:13  25    expression of acceptance of this order by seller, including

**Tanasoff  (Direct)**

1    -- there's a few subcategories, shipment of goods,

2    commencement of performance -- and then it states:   Shall

3    constitute an acceptance of buyer's offer.

4         My question is this, and I think it's an obvious one:

15:27:29  5    Has Anchor shipped goods to Cosma?

6    **A**     Yes, they have.

7    **Q**     Has Anchor performed under the purchase order?

8    **A**     Yes.

9    **Q**     I next want to turn your attention to paragraph 2(a),

15:27:45  10    which is on page 2.  The page numbers are at the top of the

11    document.

12    **A**     Yep.

13    **Q**     Paragraph 2 is entitled:   Time period of order.

14         And is this the paragraph that talks about the length,

15:28:00  15    the term of the purchase order?

16    **A**     Yes.   It covers the term as the OEM, the original

17    equipment manufacturer's vehicle life.

18    **Q**     Does -- to your knowledge, do these terms provide

19    Anchor with any unilateral termination rights, the rights to

15:28:24  20    terminate the purchase order before that end of the OEM, the

21    applicable OEM program life?

22    **A**     No.   They have no rights to terminate.

23    **Q**     Let me turn next, Mr. Tanasoff, to page 3 and

24    paragraph 5(b).

15:28:42  25    **A**     Okay.   I'm there.

**Tanasoff  (Direct)**

1    **Q**     Now, 5(b) references, if you see the first sentence

2    there, references, in quotes:  Blanket order.  And it talks

3    about what it means if blanket order is indicated on the

4    face of the purchase order.

15:28:55  5        And what's your understanding of what the terms

6    provide on that point?

7    **A**     Yeah, so we issue releases on a regular basis, we

8    transmit via EDI, electronic data interchange, and it is

9    that the supplier must meet our requirements for all

15:29:16  10   quantities that are released.

11   **Q**     I know it can vary, but how often will Cosma provide

12   releases for a specific quantity of parts?  Is that monthly?

13   Weekly?

14   **A**     Daily.  It's multiple shipments a week.

15:29:34  15   **Q**     All right.  I want to turn next to page 6 and

16   paragraph 11.

17   **A**     Page 6 or item 6?

18   **Q**     Page 6.

19   **A**     Okay.

15:29:49  20   **Q**     And do you see paragraph 11 entitled:  Set-off,

21   recoupment?

22   **A**     Yep.

23   **Q**     In general terms, what rights are afforded to Cosma

24   under this paragraph?

15:29:57  25   **A**     We are afforded the right to set-off or take away the

**Tanasoff  (Direct)**

1    cost of products when there are certain aspects that are not

2    met in terms of meeting our requirements.

3    **Q**    And I want to take you in particular to the very last

4    sentence of this paragraph, and it states:  If any

15:30:23 5    obligations of seller or its subsidiaries or affiliates to

6    buyer or its subsidiaries or affiliates are disputed,

7    contingent or unliquidated -- and it continues -- buyer may

8    defer payment of amounts due until such obligations are

9    resolved.

15:30:39 10    What's your understanding as to the rights afforded

11    there, Mr. Tanasoff?

12    **A**    So until we reach a settlement of what is in dispute,

13    we are not obligated to pay.

14    **Q**    All right.  On that same page, I want to take you down

15:30:57 15    to paragraph 13(b).

16    **A**    All right.

17    **Q**    And this is a paragraph entitled:  Price warranties

18    and competitiveness.

19    Looking at paragraph 13(b), does Anchor have any right

15:31:11 20    to unilaterally modify or increase the prices set forth in

21    the purchase order?

22    **A**    No, they do not.  It specifically states that they do

23    not have any right to increase prices.

24    **Q**    I want to talk about modification of the purchase

15:31:28 25    order more generally, and I'll have you turn to page 17.

**Tanasoff  (Direct)**

1    **A**    Okay.  I'm there.

2    **Q**    All right.  Do you see the paragraph 36:

3    Modifications?

4    **A**    Yes.

15:31:48  5    **Q**    What does that paragraph provide as it relates to the

6    binding effect of any proposed modification to the purchase

7    order or these terms?

8    **A**    It states that no modifications are made unless we do

9    so in writing and signed by the buyer's authorized

15:32:05 10    representative.

11    **Q**    Buyer being?

12    **A**    So myself or one of the buyers that works with my

13    team.

14    **Q**    All right.  And the last provision I want to discuss

15:32:17 15    with you is on page 8, and it's paragraph 17:  Materials,

16    equipment, tools and facilities.

17    **A**    Okay.

18    **Q**    And actually, if you would, turn to page 9 where that

19    section continues in subparagraph (b).

15:32:50 20    **A**    Yeah, I'm there.

21    **Q**    Paragraph 17(b) states that the seller, being Anchor,

22    expressly acknowledges and agrees that all parts, tools,

23    dies -- and it lists a number of categories -- and any

24    special tooling produced by seller for the performance of

15:33:09 25    its obligation that are furnished to seller, or Anchor, are

21

**Tanasoff  (Direct)**

1    defined as the buyer's, or Cosma's, property and shall be

2    held, it states, by seller on a bailment basis and remain

3    the property of Cosma.

4    **A**    Yes.

15:33:30  5    **Q**    Now, did Cosma provide Anchor with any tooling or dies

6    in connection with the purchase order?

7    **A**    We did.

8    **Q**    Were those tools or dies owned by Cosma or someone

9    else?

15:33:47  10    **A**    Those were owned by our customer, General Motors.

11    **Q**    Was there a separate agreement that governed,

12    specifically governed the tooling that Cosma -- the B1

13    tooling that Cosma provided to Anchor?

14    **A**    Yes.  We have a bailment agreement.

15:34:05  15    **Q**    And I want to look at that with you next.  That is,

16    Mr. Tanasoff, Exhibit C or Exhibit 3, Plaintiff's proposed

17    Exhibit C/3.

18    **A**    I am there.

19    **Q**    All right.  Is this the bailment -- do you recognize

15:34:32  20    this as the bailment agreement that you just referred to?

21    **A**    Yes.

22    **Q**    The first question I'll ask you about this agreement

23    is:  Did Anchor sign it?

24    **A**    They did.

15:34:41  25    **Q**    Where is the signature located?

**Tanasoff  (Direct)**

1    **A**    It is on page 5.  Page 5.

2    **Q**    Thank you.

3         Turn to the first page, if you would.

4    **A**    Yep.

15:34:58 5    **Q**    This agreement begins by reciting that the bailee, or

6    Anchor, in consideration of being allowed to use the

7    property, as defined below, agrees to comply with the

8    following terms and conditions.

9         And then, the first paragraph states:  The bailee

15:35:18 10    hereby acknowledges receipt from the division, or Cosma, of

11    the tooling, equipment, fixtures, gages and/or materials

12    described in the attached Schedule A, it's defined as the

13    property, in good order and condition.

14         Can you turn to that Schedule A for us, which is after

15:35:34 15    the signature page we just saw.

16    **A**    Yes.

17    **Q**    What are we looking at, this list here on Schedule A?

18    **A**    So this is a listing of all of the die -- the dies

19    that I described earlier as pushing a cookie cutter into

15:35:58 20    Play-Doh, 15 die sets and related fixtures and fingers.

21    **Q**    And if we turn to the next page, there's an Exhibit B

22    with some pictures.

23         What do those pictures represent, Mr. Tanasoff?

24    **A**    Those are pictures of those -- those dies and

15:36:21 25    equipment.

23

**Tanasoff (Direct)**

1    **Q**    All right.  So turning back to Schedule A, page 6 of

2    the agreement.

3    **A**    Yep.

4    **Q**    Does this represent the complete set of 15 dies that

15:36:33 5   Anchor has had at one point or another in its possession?

6    **A**    Yes.

7    **Q**    Now, we see that there are dollar amounts listed next

8    to the dies.  Strike that.

9         Let me ask you this:  As we sit here today, of these

15:36:51 10  15 die sets, how many remain at Anchor?

11   **A**    There is just one die set remaining at Anchor.

12   **Q**    Can you identify which die set that is?

13   **A**    Yeah.  It's the seventh from the bottom.  It's

14   transfer die for CBAM B1-1213/1253 with check fixture.  And

15:37:15 15  it has a total amount of $310,436.

16   **Q**    That's the one die set that remains at Anchor.

17        What happened to the other 14?

18   **A**    Those were all moved to alternative suppliers based on

19   Anchor's need or -- or require -- they couldn't meet our

15:37:35 20  requirements.

21                 MR. SMITH:  Objection as to foundation.

22                 MR. DOYLE:  Your Honor, I --

23                 THE COURT:  Objection sustained.

24                 MR. DOYLE:  Thank you, Your Honor.

25

**Tanasoff (Direct)**

1    **BY MR. DOYLE:**

2    **Q**     Mr. Tanasoff --

3    **A**     Do you want me to redescribe it?

4    **Q**     Mr. Tanasoff, are you familiar with, in your role as

15:37:59  5    the purchasing and supply chain manager --

6    **A**     Yes.

7    **Q**     -- were you familiar with the events and circumstances

8    surrounding the transfer of the die sets from Anchor's

9    facility to alternative suppliers?

15:38:14  10   **A**     Yes, I was.

11   **Q**     And we'll get into the reasons why those die sets were

12   transferred in just a moment.

13        With respect to the die set that remains, the

14   1213/1253, I want to talk to you about the dollar amount

15:38:35  15   there, the $310,436 amount, figure.

16   **A**     Yes.

17   **Q**     What does that figure represent?

18   **A**     That was the original value of the tool when they

19   were -- when it was first produced.

15:38:47  20   **Q**     And is that the value that Cosma places on that tool

21   today?

22   **A**     No.

23   **Q**     How does Cosma value the tool currently?

24   **A**     So that -- that tooling amount is general -- is a

15:39:02  25   General Motors tool and they would amortize that over the

**Tanasoff  (Direct)**

1    life of the program.

2    **Q**    And when you say over the life of the program, how

3    many years?  Or what time period are we talking about?

4    **A**    In this one, it is the C1YX program, so that was

15:39:20 5    approximately six years.

6    **Q**    How much time remains on the life of the program and

7    the amortized value of that part?

8    **A**    Less than a year.

9    **Q**    So based on -- if we look at a valuation based on the

15:39:36 10    useful or amortized life of the part, what type of valuation

11    does Cosma place on that die set today?

12    **A**    So you can divide that amount of 310,000 by the six

13    years, and 12 months in a year, you get an amount per month,

14    and original timing that this was scheduled for was July,

15:39:57 15    August, it has since been planned to run until December, but

16    the original planning would have been on about six months

17    left, so about 30-some thousand dollars.

18    **Q**    Are there other ways to value the part other than its

19    remaining useful life?

15:40:15 20    **A**    We could look at scrap value and just a round number

21    of a dollar per pound.  I don't know the exact weight of the

22    die, but I would estimate it in the 20, 30,000 pound range.

23    And at a dollar per pound, that would be approximately

24    $30,000, so similar to the useful life, amortization

15:40:38 25    calculation.

**Tanasoff  (Direct)**

1    **Q**    Let's turn back to the terms and conditions that

2    Anchor agreed to comply with, and I want to take you to page

3    2.

4    **A**    That was exhibit?

15:40:55  5    **Q**    C or 3.  C/3.

6    **A**    C/3 is the bailment?

7    **Q**    Yep.  Yeah.  I want to look at the terms and

8    conditions in the bailment agreement.

9    **A**    Got you.  I understand.

15:41:08 10    **Q**    And when you're there, I'd like to start at page 2.

11    **A**    I am there.

12    **Q**    And I'll direct you to the very bottom of page 2,

13    paragraph 15.

14        Mr. Tanasoff, what did Anchor agree in paragraph 15

15:41:21 15    with respect to its right to place any liens on the tooling

16    that it received, the die sets that it received?

17    **A**    It expressly -- it expressly says that they waive any

18    right to any claim, any lien or claim.

19    **Q**    On page 3, I want to next look at paragraph 16.

15:41:40 20    **A**    Okay.

21    **Q**    And I want you to look at -- you don't need to read it

22    out loud, but I want you to start looking at the second

23    sentence there on paragraph 16.

24        And my question to you is:  What did Anchor agree with

15:41:52 25    respect to Cosma's rights to access and its right to demand

**Tanasoff  (Direct)**

1        the return of the tooling?

2        **A**     It says that we have right to access their facility

3        and get our tooling at any time.

4        **Q**     Now I want to next look at paragraph 17 with you, and

15:42:11  5   I want to ask you:  In a situation like we're in today where

6        there's a dispute over whether or not or how much Cosma owes

7        to Anchor and Cosma has demanded the return of its tooling,

8        what does paragraph 17 -- what did Anchor agree in paragraph

9        17 it would do in this precise circumstance?

15:42:35  10             MR. SMITH:  Your Honor, I'm just going to

11        object that the document says what it says they agreed to.

12             Your Honor can make an interpretation regarding the

13        agreement.  The witness can't weigh in on what his

14        interpretation is relative to this.  That's the Court's

15:42:47  15   responsibility.

16             MR. DOYLE:  Your Honor --

17             THE COURT:  Attorney Doyle, go ahead.

18             MR. DOYLE:  I understand why counsel is

19        objecting.  This is one of the key points in the case where

15:42:56  20   Anchor specifically agreed that even if there was a dispute

21        over what's owed, they would immediately return the

22        equipment upon demand, and, certainly, that's what it says.

23             So I was going to have the witness talk through that

24        very point, but that's -- that's what it says and that's

15:43:11  25   what I want him to describe.

**Tanasoff (Direct)**

1          THE COURT:  All right.  The objection is

2    sustained in part.  You can rephrase the question to ask the

3    witness's interpretation of the provision, not what it

4    definitively states as a legal conclusion.

15:43:27 5          MR. DOYLE:  Certainly.

6    **BY MR. DOYLE:**

7    **Q**    Mr. Tanasoff, what is your understanding as to what

8    Anchor agreed to in paragraph 17 in the event that Cosma has

9    demanded that the tooling be returned and there's some sort

15:43:38 10   of dispute over amounts owed to Anchor?

11   **A**    It states that they cannot -- they will allow us to

12   get that tool and that any disputed amounts will be settled

13   outside of this -- the disputed amounts will be settle --

14   set aside for arbitration and settlement.

15:44:03 15   **Q**    Why was it important, in your view, for Cosma and

16   Anchor to agree that money disputes be resolved after the

17   tooling was returned?

18   **A**    We're supplying parts in a matter of days to General

19   Motors, supplying on an ongoing basis.  If we don't have

15:44:25 20   access to that die, it would be irreparable harm to our

21   business and General Motors.

22   **Q**    Well -- and on the subject of irreparable harm, look

23   at paragraph 19.

24          What's your understanding as to Anchor's agreement

15:44:39 25   about whether Cosma will suffer irreparable harm if Anchor

**Tanasoff  (Direct)**

1    refuses to return tooling upon demand?

2              THE COURT:  Which paragraph, Counsel?

3              MR. DOYLE:  Paragraph 19, Your Honor.

4    **BY MR. DOYLE:**

15:44:57 5    **Q**    And, certainly, take your time to read it before you

6    answer, Mr. Tanasoff.

7    **A**    Okay.

8    **Q**    And let me direct you, in the sake of time here, I

9    want -- in the middle of paragraph 19, it states:  The

15:45:14 10   bailee agrees that the division will suffer irreparable harm

11   if the division invokes its rights under this agreement to

12   obtain access to the property and the bailee fails to

13   cooperate with the division in allowing the division access.

14        What's your understanding as to what's -- what Anchor

15:45:32 15   is agreeing to there?

16   **A**    They're allowing -- they're agreeing to allow us to

17   get that bailed property back at any time that we need and

18   agree to settle any disputes outside of this.

19   **Q**    Has Cosma demanded the return of that remaining die

15:45:51 20   set?

21   **A**    We have.

22   **Q**    I want to have you turn to Exhibit G, which is also

23   Plaintiff's Exhibit 7.

24   **A**    I am there.

15:46:15 25   **Q**    Do you recognize this document?

**Tanasoff  (Direct)**

1    **A**    I do.

2    **Q**    And what do you recognize it to be?

3    **A**    This is our -- our case of -- this is our demand to

4    give us that die.

15:46:30  5    **Q**    Did you -- the Varnum law firm is Cosma's counsel in

6    this case; correct?

7            MR. SMITH:  Your Honor, I'm just going to

8    object here, interpose an objection that -- now, this letter

9    came from opposing counsel to my client.  It wasn't sent by

15:46:46  10   Mr. Tanasoff.

11           And also, with respect to a demand letter from a firm,

12   you know, I don't see how it's relevant.  It's also -- you

13   know, this wasn't sent by Mr. Tanasoff either.  It's

14   actually sent by counsel of record.

15:47:02  15           MR. DOYLE:  Your Honor, in response to that, I

16   can certainly establish the foundation that Mr. Tanasoff was

17   aware of and authorized this letter to go out.

18           And the import is that a demand was made by Cosma

19   through its lawyer for the return of their remaining die

15:47:19  20   set.

21                THE WITNESS:  Yes, I can --

22                THE COURT:  Hold on, Mr. Tanasoff.

23                MR. SMITH:  And, Your Honor, if that's the

24   case, that's fine.

15:47:24  25           But at the end of the day, that should just be

**Tanasoff  (Direct)**

1    provided to Your Honor.  The witness testifying about this

2    is what makes it problematic.

3                    THE COURT:  Attorney Doyle, anything further?

4                    MR. DOYLE:  The purpose of having the witness

15:47:41  5    testify is to confirm that he authorized this to be sent and

6    that a demand was made, Your Honor.  It's not complicated.

7                    THE COURT:  I'm going to overrule the

8    objection.

9            You may proceed, Attorney Doyle.

15:47:52  10         I'll consider the evidence to the extent --

11                    MR. DOYLE:  Thank you, Your Honor.

12                    THE COURT:  -- that it is appropriate within

13    my discretion.

14                    MR. DOYLE:  Thank you.

15:48:02  15                    THE COURT:  You may proceed.

16    **BY MR. DOYLE:**

17    **Q**    Mr. Tanasoff, did you authorize your attorneys at the

18    Varnum law firm to send this letter to Anchor Manufacturing?

19    **A**    I did.

15:48:10  20    **Q**    And is this a demand by Anchor [sic] for the immediate

21    return of the remaining die set?

22    **A**    It's a demand by CBAM to have Anchor return the bailed

23    property, yes.

24    **Q**    Thank you.  I'm all set with that exhibit, sir.

15:48:26  25            I want to turn next, Mr. Tanasoff, to the current

**Tanasoff (Direct)**

1 status of the relationship between Cosma and Anchor.

2      You testified that 14 of the 15 die sets have been

3 transferred to alternate suppliers?

4 **A**    Yes.

15:48:43 5 **Q**    And that Cosma's demanded the return of the remaining

6 die set?

7 **A**    Yes. Yes.

8 **Q**    Were those die sets transferred because the

9 relationship ran its normal course and the term of the

15:48:54 10 purchase order came to an end?

11 **A**    No.

12 **Q**    Why were they transferred?

13 **A**    They were transferred based on Anchor's request and a

14 failure of their press. There was a press that was broken

15:49:10 15 and they could not meet our requirements.

16 **Q**    I want to go into those issues in a little more

17 detail, and I want to have you turn to what you'll have in

18 front of you, which is Plaintiff's Exhibit -- Plaintiff's

19 proposed Exhibit J, which, for the court reporter's benefit,

15:49:27 20 will be renumbered as Plaintiff's renumbered Exhibit 10.

21 **A**    I have it.

22 **Q**    All right. And the very last two pages of this

23 exhibit, Mr. Tanasoff, are a two-page email, and that's

24 where I'm going to have us start, so if you'll turn to the

15:49:46 25 last two pages.

**Tanasoff  (Direct)**

1      **A**      I'm there.

2                    MR. SMITH:  I'm sorry.  Which letter was it?

3                    MR. DOYLE:  J.

4                    MR. SMITH:  Thank you.

15:49:55  5                    MR. DOYLE:  Yep.  And just so I keep it

6      straight, also 10.

7      **BY MR. DOYLE:**

8      **Q**      All right.  Mr. Tanasoff, do you see the email that's

9      forwarded to you from a Claudio Caloura on August 18, 2022

15:50:09 10      at 11:44 a.m.?

11      **A**      I do.

12      **Q**      Do you recall receiving this email?

13      **A**      I do.

14      **Q**      Who is Mr. Caloura?

15:50:18 15      **A**      Claudio Caloura is a individual in -- at Cosma Body.

16      He is within my team.

17      **Q**      All right.  And the email Mr. Caloura forwards to you

18      is an August 17, the day earlier, email from Bill Evans at

19      Anchor to Mr. Caloura, and that's on the second page, if you

15:50:45 20      turn to the very last page of this exhibit.

21      **A**      Yes.

22      **Q**      Based on your receipt and review of this email, what

23      is Anchor communicating to Cosma here?

24      **A**      Anchor is looking to exit all 15 die sets.  These are

15:51:04 25      all the die sets that we had referenced in the original

**Tanasoff  (Direct)**

1    purchase order.

2    **Q**    And is Anchor giving a reason as to why it needs to

3    exit the relationship completely?

4    **A**    Yeah.  So they were experiencing capacity constraints

15:51:24   5    is what they reference.

6    **Q**    What was Cosma's reaction to this communication?

7    **A**    We were very surprised, so we were looking for

8    additional information at that time to understand exactly

9    what was happening with this request.

15:51:43  10    **Q**    On that note, if you flip back to the page we looked

11    at first.

12    **A**    Yep.

13    **Q**    At the top of that page is an email that you write to

14    Bill Evans and Rich Ross at Anchor.  It's August 18, 2022 at

15:52:00  15    2:09 p.m.

16         Do you see that email?

17    **A**    I do.

18    **Q**    You say you were -- that you, and Cosma, was surprised

19    by this demand from Anchor to exit the relationship.

15:52:11  20         Is this something that Cosma wanted in August '22 for

21    the --

22    **A**    No, it is not.

23    **Q**    -- for the relationship to prematurely end?

24    **A**    No, it is not.

15:52:23  25         There were several parts that were ending in not less

**Tanasoff  (Direct)**

1    than a year, so it would much be -- it would be at our

2    request to continue running those products through the end

3    of those programs on different individual die sets.

4    **Q**    In your email response back the next day to Anchor,

15:52:41  5    are you agreeing here to let them off the hook, let them

6    exit the relationship early?

7    **A**    No.  Absolutely not.

8         I was looking to gather information so I could

9    understand what was even driving their request.

15:52:55  10   **Q**    What type of information were you looking for?

11   **A**    So that's what I enumerated here.  Based on their

12   capacity constraint that they reference, I was asking them,

13   number one, the background behind their request to move all

14   of the tools listed, to define the capacity constraint that

15:53:12  15   they had listed, what steps they have taken to continue,

16   and -- what they've taken and continue to take to alleviate

17   those constraints, and then we wanted to understand the

18   impact of newer business that they had as opposed to this

19   business that had been in place for years.

15:53:34  20   **Q**    Help me understand that.  Help me understand that

21   final point.

22        What did you mean by the impact to newer business

23   versus the items that we have in our current contract that

24   you wrote?  What does that mean?  What are you looking at

15:53:48  25   there?

**Tanasoff  (Direct)**

1    **A**      So we made many visits to Anchor over the months prior

2    to this.  I, myself, had gone over there and met with Rich

3    Ross.  And we had viewed some of the other business that was

4    coming in and received some information about the business

15:54:03 5    that was coming in to Anchor.

6    **Q**      Why did that information cause you to ask that

7    question about the impact of newer business?

8    **A**      So capacity is the level of the amount of business

9    that they have in their facility.  If they're taking on

15:54:18 10    additional business and then our business -- the capacity

11    that was set for our business is at risk.

12    **Q**      Did Anchor ever express a preference as to that

13    newer -- whether it wanted to work on that newer business

14    that came in after you versus your parts?

15:54:39 15    **A**      Yeah.  They had, yes.  They had referenced that they

16    were looking to get more value-added-type business, like

17    some of that newer business.

18    **Q**      Now --

19    **A**      I only addressed that first item.  If you want me to

15:54:55 20    go through any other items, I'm happy to address those as

21    well.

22    **Q**      And let me ask you this, sir.  You talk in this email

23    about both capacity, that's point number two, and point

24    number three, you raise quality issues?

15:55:08 25    **A**      Yes.

**Tanasoff  (Direct)**

**Q**     Let me just ask you this:  At this time, in August of

2022, was Cosma experiencing issues with Anchor's ability to

supply?  Capacity?

**A**     Yes.

**Q**     And/or with quality?

**A**     Yes.  Both.

**Q**     Let's take capacity.

     What type of issues was Cosma seeing with capacity in

this time period?

**A**     Many short shipments or missed shipments entirely on

individual products day-to-day, and that would cause

downtime at our facility, and several times we were getting

close to shutting down a General Motors facility as well.

It would be if not daily, every couple of days or a few days

there would be another short shipment or missed shipment

entirely.

     And then, the quality aspects, we were getting

products that were just failing the standard quality

required for the products.

**Q**     So when Anchor says to you:  We need to get out of

this relationship, we're getting out because we can't keep

up with capacity, that -- that there was -- that rang some

truth to you; is that fair?

**A**     Yes.  I understood -- again, we wanted to understand

the background of the newer business that they took in, and

**Tanasoff  (Direct)**

1    if they were taking on newer business that was taking

2    precedence over our capacity that was awarded to them, we

3    wanted to understand what was driving that.

4    **Q**    Now, these capacity, quality concerns that you

5    mentioned, were those constant over the life of the program?

6    **A**    No.  It -- it got progressively worse.

7         When I first joined, there were a few items here or

8    there.  And then, as the relationship continued over the

9    past couple -- to the point of the past few months, and now

10   it's -- it was nearly daily missed shipments, short

11   shipments, and quality issues.  If not every day, it was

12   every other day.

13   **Q**    Is this a matter that Cosma -- these quality and

14   capacity issues that were increasing in intensity over time,

15   are those matters that Cosma attempted to investigate?

16   **A**    Yes.

17   **Q**    Have you drawn any conclusions as a result of those

18   investigations as to what you attribute the spike in quality

19   issues and the inability to supply?

20   **A**    Yes.

21        So we sent some of our tooling experts -- so Claudio

22   Caloura is a toolmaker by trade.  He is very knowledgeable

23   of tools and of process parameters.  We sent him and other

24   individuals from our supplier quality, supplier development

25   group out to view Anchor.  And there would be issues where

**Tanasoff  (Direct)**

1    we would see that proper preventative maintenance was not

2    being performed -- I can give a pretty clear example -- and

3    proper process parameters.

4         So an example would be you have a product being run

5    and it should be set up similar to the last time it was run

6    or the first time it was run where you're getting good

7    quality parts.  We viewed where coils were not set to the

8    correct height, and as the press was running, it was getting

9    a bunch up of the steel and scrap was being built up in that

10   die, and then it would cause poor quality parts coming out

11   at the end.

12        And there weren't people from Anchor watching that die

13   or watching the items.  Claudio had come over and stated:

14   Look.  Look at that die.  Look at where it is bunching up in

15   that area.  And there would be those defective quality

16   products coming out of the coil.

17   **Q**    What's a coil?

18        You mentioned a coil.  What's a coil?

19   **A**    A coil is a coil of steel.  So -- so steel, in its

20   flat state, would be wound up into a coil.

21   **Q**    Understood.

22        Other than the lack of preventative maintenance and

23   maintenance, were there other factors as a result of Cosma's

24   investigation that you believe were leading to this increase

25   in quality issues and inability to supply?

**Tanasoff  (Direct)**

1    **A**    Yeah.  They had a number of individuals that were

2    leaving their company over the years, and then more so in

3    the last several months.

4         So one of the biggest examples is their toolmakers.

15:59:32  5    On one of our last visits, we went and viewed and they were

6    down to one toolmaker for their entire business.  Earlier in

7    the relationship, they had quite a few more than that,

8    several.  I don't know the exact number.

9         But then, there were -- if we're a business about the

15:59:48  10   size of Anchor's, I would expect at least five, six, seven

11   at least on staff at all times.  To be down to one was

12   just -- I don't know how that individual could manage all

13   the dies, even our dies, much less all the rest of the

14   business that Anchor has.

16:00:04  15   **Q**    So on August 18, you asked for a variety of

16   information in response to, you know, the pronouncement from

17   Anchor that they're exiting the business.

18        Do you get this information back, this -- that you've

19   asked for?

16:00:17  20   **A**    We do not.

21   **Q**    And I want to turn -- staying in the same exhibit --

22   about a week later.  It's two pages prior and it -- what I

23   want to refer you to, Mr. Tanasoff, is at the bottom of the

24   page, it's an August 25, 2022 email from Bill Evans to you.

16:00:40  25   **A**    Yes.

**Tanasoff  (Direct)**

1    **Q**    The subject is:  Business exit.

2          Do you see that?

3    **A**    I do.

4    **Q**    In this email, Mr. Evans writes to you:  As a follow

16:00:49 5    to our conversation, I wanted to clarify that Anchor's

6    reason for needing to exit the CBAM business is primarily

7    based on capacity issues.

8          Now, again, at this point, a week later, had you

9    received the information that you requested in your email

16:01:03 10   that we just looked at?

11   **A**    I did not.

12   **Q**    Mr. Evans goes on to state:  We would want to start

13   the exit process with these first four tools being removed

14   by September 15.

16:01:15 15        That's about 20 days, and you see he lists them four

16   tools or die sets?

17   **A**    Yes.

18   **Q**    Was it at all realistic for Anchor to just release

19   those four die sets, in your view, 20 days from this email,

16:01:32 20   by September 15?

21   **A**    No.  No.

22         As referenced earlier, in our -- in our terms and

23   conditions, we -- they have no right to cancel.  And to move

24   in that short period of time is completely unrealistic.

16:01:49 25        We would need alternative suppliers to review.  We

**Tanasoff  (Direct)**

1    would need banked quantities in place so that we can ensure

2    smooth transition of supply, make sure that any die

3    modifications that may be needed to fit an alternative

4    supplier's press were performed, those types of actions so

16:02:09  5    that we can ensure that we get good quality products from

6    any new potential supplier.

7    **Q**    And I -- is it fair to say that takes considerably

8    longer than 20 days?

9    **A**    Yes.

16:02:20  10    **Q**    Now, you respond to Mr. Evans.

11    What is your response to his business exit email and

12    indication that four tools will be removed in 20 days?

13    **A**    So, again, I was asking for details and data, I put in

14    parentheses here, on the capacity and labor issues.  I was

16:02:42  15    asking for a review of the capacity -- I state that we

16    reviewed capacity at award.  We have regular capacity

17    reviews on an ongoing basis and there weren't any issues

18    with capacity, both at award or with many of our previous

19    ongoing reviews.

16:03:04  20    Again, I was indicating, looking for a -- information

21    on the new business that they had taken over with other

22    customers.  And we gave them the option to potentially

23    outsource those dies to alternative sources based on our --

24    obviously, we would need to approve the other sources, make

16:03:31  25    sure that they met our quality and delivery standards and

**Tanasoff  (Direct)**

1    any industry requirements of certifications and things, but

2    we were offering to review any potential sources that they

3    may have to run these on Anchor's behalf.

4    **Q**    Now, you conclude the email by saying:  Please gather

16:03:50 5    the necessary data and we will discuss on our 8-30-22

6    conference call?

7    **A**    Yes.

8    **Q**    Did that call occur?

9    **A**    It did.

16:03:58 10    **Q**    Turn to the very first page of this exhibit,

11    Mr. Tanasoff.

12    **A**    Yes.

13    **Q**    Okay.  And you write here to Tony Parente, the

14    president, then president of Anchor:  Tony, please see the

16:04:17 15    attached letter and follow up to our meeting yesterday.

16        Would that have been that August 30 conference?

17    **A**    Yes.

18    **Q**    All right.  And your letter is three pages in to

19    Exhibit J.  It's attached to that email?

16:04:31 20    **A**    Yep.

21    **Q**    It's a two-page letter, it's dated August 31, 2022.

22        Do you see that letter?

23    **A**    I do.

24    **Q**    Could you describe for us what you're outlining in

16:04:41 25    this letter to Mr. Parente at Anchor.

**Tanasoff (Direct)**

1   **A**      So we were looking at a couple of different die sets,

2   we referred to them as phase 1 and phase 2.

3        So phase 1 we would want to implement first based on

4   the request of capacity constraints and based also on the

16:05:04 5   delivery and capacity issues.  We're looking to find a way

6   to help alleviate those capacity constraints, so we had

7   detailed out a phase 1 and a phase 2 plan with certain

8   requirements listed below.

9   **Q**      In proposing that plan to -- for this phase 1 and

16:05:22 10   phase 2 transfer, was Cosma waiving any claim that it had

11   for breach of contract in this letter or otherwise for this

12   premature termination of the contract?

13   **A**      No.

14             MR. SMITH:  Objection.

16:05:34 15        Seeks a legal conclusion.  We're talking a waiver and

16   protest at this point, Your Honor.

17             THE COURT:  Objection sustained.

18        Counsel, if you rephrase the question.

19   **BY MR. DOYLE:**

16:05:44 20   **Q**      In this letter, Mr. Tanasoff, did you indicate that

21   Magna was giving up any claims it had for breach of contract

22   it had for the early termination here?

23   **A**      No.  Absolutely not.

24   **Q**      And have you ever done that?

16:05:55 25   **A**      No.

**Tanasoff (Direct)**

1    **Q**    Now, there's talk of phase 1, a set of I think four --

2    how many die sets were being removed, would be removed as

3    part of phase 1?

4    **A**    So it's four part numbers, but it's either two or

16:06:13  5    three dies.  Like, the 1517 and 1518 parts, I believe, are

6    one die.  1235 and 1281, they may be different die sets or

7    they may be one.  So it's either two or three dies there.

8        And then, the bottom dies would also be, at max, three

9    die sets, but some of those are likely right hand, left

16:06:36 10    hand, or produced in the same tool.

11    **Q**    Again, did Cosma want to release these dies in phase 1

12    and phase 2, is that something that Cosma independently

13    wanted?

14    **A**    No.

16:06:47 15    **Q**    Why were you proposing a phase 1 and phase 2 then,

16    this plan?

17    **A**    Only to help alleviate the capacity constraints that

18    Anchor had claimed and to try to help in getting better

19    quality parts on time to meet our requirements.

16:07:07 20    **Q**    Did you -- in order for this phase 1/phase 2 plan to

21    work, did you impose any requirements or conditions on

22    Anchor?

23    **A**    I did.  I have them enumerated right here below.

24    **Q**    Can you describe those for us, what sort of

16:07:24 25    requirements were put in place.

**Tanasoff (Direct)**

1    **A**    So the first bullet point, indicated as item number

2    one:  Access shall be granted by Anchor for Magna and

3    third-party inspectors and liaisons to ensure continued

4    production and quality methods are being performed and

16:07:40  5    real-time communication is available.  So our people to go

6    in and view those dies and be able to access them and parts

7    being produced.

8         Access for alternative suppliers.  So this is where we

9    were saying the 20-day timing previously proposed was not

16:08:00 10   acceptable and we need to get other suppliers in there to

11   view the tools and to see if they could take those dies on.

12        Bank build quantities.  So that we could ensure a

13   smooth transition to those new suppliers.

14   **Q**    What's a bank build?

16:08:18 15        Sorry to interrupt you.  What's a bank build?

16   **A**    So a bank build is building a quantity ahead of time

17   so that we can move the die and continue to receive those

18   parts for some period of time while the next supplier is

19   making any modifications to the tool to run in their press,

16:08:37 20   making sure that they have all the process parameters in

21   place and set to ensure good quality parts that first time

22   that an alternative supplier runs.

23   **Q**    And on the point of the bank build, it looks like

24   there's some subcomponents of that?

16:08:53 25   **A**    Yep.

**Tanasoff  (Direct)**

1    **Q**    Can you walk us through those, please.

2    **A**    So item (a), I was asking for a six-week quantity of

3    bank build parts, along with the lessons learned, die

4    preventative maintenance records, quality review of the bank

16:09:10 5    builds to ensure that we were getting good quality parts.

6    Based on those quality issues that we were having, we

7    wanted some further review of the -- of those quality parts

8    so that we didn't have a bank quantity built up of parts

9    that were not meeting our quality standards.

16:09:29 10    Item (b) is:  Anchor to provide a timeline to

11    manufacture the bank build quantities and store at Anchor

12    Manufacturing or in offsite warehousing and product to be

13    shipped to Magna release schedules still.

14    So we don't have room in our facility to take a full

16:09:50 15    six-week bank quantity, it would need to be shipped

16    according to normal releases.

17    And then, provide details as to if Anchor was to

18    provide -- produce the bank themselves or if they wish to

19    outsource to another supplier, which we had referenced that

16:10:08 20    we would review and that would be an option for them.

21    **Q**    Now, you --

22    **A**    Item --

23    **Q**    Sorry, sir.  Go ahead.

24    **A**    And then, just item number four:  Additional

16:10:22 25    components may be reviewed for alternate suppliers after

**Tanasoff  (Direct)**

1    phase 1 and phase 2 are completed.

2    **Q**    Now, on the first page, you stated:  The following

3    requirements must be met if this phase 1 and phase 2

4    transfer is going to happen?

16:10:38  5    **A**    Yes.

6    **Q**    Did Anchor meet these requirements that you laid out

7    here?

8    **A**    They did not.

9         They -- they did grant -- they did meet some of the

16:10:47 10   requirements, so they did grant access to our people to view

11   the parts as they were being built.  They did allow access

12   by some alternative suppliers.

13        The bank quantities definitely were not met.  And,

14   yeah, no, they did not meet any type of bank quantities that

16:11:05 15   we were requesting.  And no quality review of those, any

16   bank build quantities.  But the bank build quantities

17   weren't met in any way.

18        And then, the review of additional components after

19   those were completed, well, the phase 1 and phase 2 were

16:11:24 20   changed based on some other conditions of the press

21   breakage.

22   **Q**    All right.  So you sent that letter on August 31.  I

23   want to take you about a week forward, and that's

24   Plaintiff's proposed Exhibit K, also 11.  K/11.

16:11:46 25   **A**    I have it here.

**Tanasoff  (Direct)**

1  **Q**     All right.  And do you recognize this September 6th,

2  2022 email from Bill Evans to you?

3  **A**     I do.

4  **Q**     Again, sent a week after your letter --

16:11:58 5  **A**     Yeah.

6  **Q**     -- outlining the plan and the requirements for the

7  phase 1 and phase 2 transfer?

8        Does Mr. Evans respond by saying:  We agree to your

9  proposal and your requirements?

16:12:10 10  **A**     No, he did not.

11  **Q**     What does he communicate to you?

12  **A**     He says that he wanted other dies out, or it may have

13  been some dies that were similar, but other dies in

14  addition, or changing the order at least, and for sure some

16:12:29 15  other dies, as the priority and to be exited immediately.

16        Yeah, and --

17  **Q**     And --

18  **A**     -- exit immediately, and then he references to -- he

19  has a couple of dashes at the bottom, there's some spaces,

16:12:48 20  and then a --

21  **Q**     Let me stop you there, sir.

22        I wanted to point you to, there's like five or six

23  dashes, there's a break, and then there's a -- two dashes

24  sort of at the end of the email?

16:12:59 25  **A**     Yes.

**Tanasoff  (Direct)**

1    **Q**    You anticipated my question.

2        What Mr. Evans states:  Next step would be to quickly

3    bring our margins into alignment on the balance of the

4    products.  He says:  Without this in place, there is no

16:13:11  5    reason to have further discussion regarding a beneficial

6    relationship for both parties.

7        What's your understanding of what he is saying to you

8    there, Mr. Tanasoff?

9    **A**    He is asking for a price increase and there's no

16:13:23  10    reason for any discussion about any other parts or the

11    quantities that we wanted to -- the dies that we wanted to

12    work with them on and the plan that we had outlined, no

13    further discussions will be stating.

14    **Q**    So you get this response a week later.  It tells you

16:13:40  15    that other dies need to be exited immediately.  It doesn't

16    correspond to your letter.  And it demands a price increase.

17        What's your reaction?

18    **A**    I was shocked.  It's just -- first of all, the request

19    to exit immediately is not workable.  As was stated in the

16:14:00  20    previous exhibits and other items that we've talked about,

21    we need some type of bank quantity so we can ensure a smooth

22    transition of supply and make sure that the new suppliers

23    can meet the good quality parts on time and just -- it's

24    asking for that immediate need.

16:14:21  25        And the price increase doesn't -- isn't allowed for in

**Tanasoff  (Direct)**

1    our terms either, so we were shocked to see them referencing

2    that.

3    **Q**    Did you respond to that correspondence?

4    **A**    I did.

16:14:33  5    **Q**    Turn, if you would, to Plaintiff's proposed Exhibit L.

6    It's also now 12.  L/12.

7    **A**    I'm there.

8    **Q**    And the top of that is an email from you.  It's

9    September 8, 2022, two days after you got the email from

16:14:53  10    Mr. Evans.  And you say:  Attached is CBAM's response.  And

11    if you turn to the third page of this exhibit, you'll see a

12    letter.

13         Do you see that?

14    **A**    Yes.

16:15:03  15    **Q**    Do you recognize this as your September 8th, 2022

16    letter?

17    **A**    Yes.

18    **Q**    And who do you write this to?

19    **A**    To Tony Parente, the president at the time.

16:15:17  20    **Q**    Now, you've got four paragraphs in this letter.  I

21    don't want to go through it in excruciating detail, but I

22    would like for you to sort of outline for us the main points

23    that you're conveying from Cosma to Anchor.

24    **A**    Yes.  So I -- in the first paragraph, I'm referencing

16:15:36  25    back to my August 31st letter where we're outlining the

**Tanasoff  (Direct)**

1    requirements that we would have, building bank quantities

2    and a reasonable timing to ensure smooth transition of

3    supply.  Item (b), how we've attempted to work and help with

4    Anchor Manufacturing in this process.  We've sent our

16:15:59  5    individuals out there.

6        We had referenced in that second paragraph that the

7    tools did not exhibit typical signs of preventative

8    maintenance.  And we've reiterated our request for the

9    records for the preventative maintenance documentation and

16:16:22  10   that Anchor had failed to provide that information to us.

11   We have also asked for the data on the capacity constraints.

12   However, we have not received that data.

13       In the third paragraph, there's reference to Bill

14   Evans' note that there's no reason for further discussion.

16:16:47  15   And I had stated that that response was unacceptable.  We

16   needed to ensure supply to ourselves and to General Motors

17   so that vehicles could be continued to be produced.

18   **Q**    What did you say to Anchor about its obligations under

19   its contract?

16:17:04  20   **A**    Yeah, in that last paragraph, we stated that we don't

21   have an agreement to exit anything other than what we stated

22   in the 8-31 letter and that they were contractually

23   obligated to fulfill their requirements.

24   **Q**    You end the letter by stating:  Please confirm that

16:17:22  25   you will proceed with uninterrupted supply?

**Tanasoff (Direct)**

1     **A**     Correct.

2     **Q**     Did you -- did you get that confirmation?  Did they

3     confirm that they would proceed with uninterrupted supply?

4     **A**     I did not.

16:17:32  5          And we had interruptions causing downtime in our

6     facility.

7     **Q**     You also, throughout this letter, reference, restate

8     earlier requests for information on preventative

9     maintenance, on capacity issues, on quality issues.  You

16:17:45  10   just testified you wrote that because you hadn't received it

11    yet.

12         Did you ever get that information that you've been

13    requesting?

14    **A**     No, we never have.

16:17:55  15   **Q**     Now we're into September now.  Again, for point of

16    reference, that first communication from Anchor we looked at

17    came on August 17 saying we need to exit the business.

18    We're now into September.

19         On -- for your part, for Cosma's part, is Cosma making

16:18:13  20   efforts on phase 1 and phase 2 to look for alternate

21    suppliers?

22    **A**     Yes.  We were bringing suppliers in to Anchor's

23    facility to view the dies to see if they had the correct

24    equipment, press sizes.  And there's different sizes to

16:18:30  25   presses, there's different bed sizes that are involved that

**Tanasoff  (Direct)**

1   hold the die.  Making sure that they had the proper

2   equipment and viewing those tools so that they could assure

3   me if they could run those products.

4   **Q**    Is this something that's taking place during the

16:18:49 5   months of September and into October?

6   **A**    Yes.

7   **Q**    During that time period, is Anchor building the banks

8   that you required for the transition of phase 1 and phase 2,

9   to your knowledge?

16:18:59 10   **A**    They were not.  They were still missing shipments,

11   short shipments, and missed shipments entirely, and poor

12   quality products.

13   **Q**    In other words, they weren't able to keep up?  Is it

14   fair to say, they weren't even able to keep up with the

16:19:12 15   ongoing releases, let alone build a surplus?  Is that what

16   you're saying?

17   **A**    Correct.

18   **Q**    Now, Mr. Evans demanded a price increase in that email

19   we just looked at.  You responded and told him he had --

16:19:27 20   Anchor had no such right?

21   **A**    Correct.

22   **Q**    Was that the end of it?  Or did Anchor continue to

23   request a price increase?

24   **A**    Anchor continued to request price increases.

16:19:45 25   **Q**    And was it a request to negotiate?  Or how would you

**Tanasoff (Direct)**

1    characterize that communication?

2    **A**    I would characterize it as a demand.

3    **Q**    Under what threat?

4    **A**    The threat of stopping shipments.

16:19:58   5    **Q**    I am going to share now a couple of exhibits on the

6    screen, Mr. Tanasoff, because these are the defendant's

7    proposed exhibits.  So I will --

8            MR. DOYLE:  Your Honor, if I may, I'll share

9    my screen.

16:20:18  10            THE COURT:  Yes, you may.

11    **BY MR. DOYLE:**

12    **Q**    Mr. Tanasoff, I'm first going to show you what is

13    Anchor's proposed Exhibit B.

14    **A**    Okay.

16:20:59  15    **Q**    And we can see this proposed Exhibit B is a two-page

16    email with an attachment.

17            THE COURT:  Hold on, Counsel.

18        Mr. Tanasoff, can you see Defendant's Exhibit B?

19            THE WITNESS:  I cannot see it yet.

16:21:16  20            THE COURT:  Okay.  Attorney Doyle, your

21    computer is not sharing its screen.

22            MR. DOYLE:  One moment, Your Honor.

23                (Pause in Proceedings)

24    **BY MR. DOYLE:**

16:21:33  25    **Q**    Mr. Tanasoff, are you able to see it now?

**Tanasoff  (Direct)**

1   **A**    I am.

2   **Q**    All right.  And to restate the question:  You see

3   Plaintiff's [sic] proposed Exhibit B is a two-page email

4   with an attachment?

16:21:45  5   **A**    Correct.  Yes.  I see that defendant's exhibit.

6   **Q**    Thank you.

7        This is, again, Defendant's proposed Exhibit B.

8        Let me ask you a few general questions.

9        Were you familiar -- were you involved with the

16:22:04 10   communication between Anchor and Cosma regarding Anchor's

11   demand for price increases?

12   **A**    Yes.

13   **Q**    Is that something that you would have been involved

14   with as part of your day-to-day job responsibilities as

16:22:17 15   purchasing and supply chain manager?

16   **A**    Yes.

17   **Q**    Did Mr. Caloura, who is copied on this email, keep you

18   apprised of the communication that was occurring between

19   Cosma and Anchor as it related to these demand for price

16:22:35 20   increases?

21   **A**    He did.

22   **Q**    As of October 25, 2022, is it your understanding that

23   Anchor was maintaining its demand for increased prices under

24   threat of stopping shipment?

16:22:46 25   **A**    Yes.

**Tanasoff  (Direct)**

1    **Q**    And is it your understanding, as is stated in this

2    email -- let me refer you to this language.

3         Mr. Parente writes:  Anchor will need purchase orders

4    effective September 1, 2022 immediately for price increases.

16:23:10  5         Is that your understanding that Anchor was demanding

6    that Cosma revise its existing purchase order to update the

7    prices, the increase in prices that Cosma [sic] was

8    demanding?

9    **A**    Yes.

16:23:23  10   **Q**    Now -- that Anchor was demanding.  Sorry.

11   **A**    Yes.  That Anchor was demanding those price increases

12   effective September 1st, yes.

13   **Q**    All right.  Mr. Parente writes, and I want to take you

14   to the first two sentences:  We appreciate you reaching out

16:23:40  15   to us to gain Anchor's support for the issue CBAM, Cosma,

16   may have with General Motors.  We will absolutely support

17   you in your efforts to get recovery from them.

18   **A**    Yes.

19   **Q**    Now, do you understand that reference?

16:23:54  20   **A**    Yes.

21   **Q**    What's your understanding as to what Mr. Parente of

22   Anchor is referring to there?

23   **A**    So we had numerous discussions with Anchor

24   Manufacturing that, look, in order for Magna, Cosma, to

16:24:10  25   request any recovery for the increases that they were

**Tanasoff  (Direct)**

1    demanding, we would need documentation on their position and

2    we were going to try to seek recovery from General Motors.

3    However, there's no guarantee in getting that recovery.  It

4    at least gives us some avenue to try.  We still do not have

16:24:32  5    any indication if we will get any recovery for price

6    increases.

7    **Q**    But to even try that, you needed Anchor, is it fair,

8    to put their position in writing?

9    **A**    Yes.  Document their position.  Absolutely.

16:24:44 10    **Q**    All right.  And was Anchor agreeable to doing that?

11    **A**    Yes, they were.

12    **Q**    I'm going to next share with you Anchor's proposed

13    Exhibit C.

14    **A**    Yes.  I see it.

16:25:20 15    **Q**    All right.  And you see this as a day later,

16    October 27, '22.

17        It's another email exchange between Mr. Caloura of

18    Cosma and Mr. Parente of Anchor?

19    **A**    Yep.

16:25:32 20    **Q**    In this email, Mr. Caloura is outlining a proposal.

21        Let me ask you this:  Were you familiar with the form

22    of proposal that was discussed surrounding Anchor's demanded

23    price increases?

24    **A**    Yes.

16:25:51 25    **Q**    Did Cosma ever agree that it -- that Anchor could

**Tanasoff  (Direct)**

1    increase its prices without recourse?  Or did Cosma indicate

2    that it was only doing so under duress?

3    **A**    We indicated right here in the second paragraph that

4    we would only agree under duress and under the threat of

16:26:18  5    stop shipment from Anchor.

6    **Q**    With that agreement under duress and under the threat

7    of stop shipments, what was the proposal from Mr. Caloura to

8    Anchor here?

9    **A**    So instead of that September 1st date that was

16:26:34 10    referenced in the previous exhibit, the 10-1, October 1st

11    date was the agreed-upon date for that price increase to

12    start.

13    **Q**    In other words, we're already at October 27, so

14    there's a bit of retroactive effect to that price increase?

16:26:52 15    **A**    Right.

16    **Q**    All right.  Please continue.  What else is being

17    outlined?

18    **A**    So then we talked about a lump sum payment for the

19    amount that would be from the effective date of the purchase

16:27:07 20    order to the 10-1 date for items that we were planning to

21    move.  There were other items that we planned to stay at

22    Anchor and we were just going to cover the amount from 10-1

23    to 11 -- to the purchase order date, it was -- 11-10 was

24    when it was modified and we were going to make the lump sum

16:27:33 25    payment at time of re -- that we moved the tools.

**Tanasoff  (Direct)**

1    **Q**    Let me break that down a little bit.

2          This lump sum payment, is it -- do I understand it

3    that it relates to just the delta in the price, so the

4    original price -- the difference between the original price

16:27:54  5    and the increased price for that retroactive period?

6    **A**    Yes.  Absolutely.  Only the delta.

7    **Q**    And when Mr. Caloura talks here about paying that lump

8    sum payment, the difference between the increased price and

9    the original price for that period of a few weeks, is he

16:28:14 10    also talking about making any sort of payment for other

11    payables?  Open payables?  Payables that will become due in

12    the future?

13    **A**    No.

14    **Q**    And when he's talking about making lump sum payment at

16:28:28 15    the time tools are being removed, what tools is he referring

16    to there?

17    **A**    Just the phase 1 and phase 2 parts that we had

18    referenced.

19    **Q**    And those are the only -- those are the only parts

16:28:39 20    that were even in discussion of being removed at this point;

21    correct?

22    **A**    Correct.

23    **Q**    And with respect to --

24    **A**    Let me clarify that.  We did reference in that same

16:28:52 25    letter on October 31st that we would potentially look at

**Tanasoff  (Direct)**

1    other parts, but no agreement was made for anything other

2    than phase 1/phase 2.

3    **Q**    And at this point, were there ever even any concrete

4    plans to move any other die sets, parts?

16:29:06  5    **A**    No.

6    **Q**    Now, this lump sum payment for that retroactive price

7    difference aside, were the increased prices otherwise

8    payable pursuant to the standard purchase order terms?

9    **A**    We would pay everything else besides this amount for

16:29:24  10    the difference or the delta only, the other -- the other

11    payables will be paid based upon normal payment schedules of

12    second day, second month.

13    **Q**    And again, the movement of the phase 1 and phase 2

14    tools, those were -- that transfer was conditioned on very

16:29:46  15    specific requirements that you provided to Anchor?

16    **A**    Yep.  Still the same bank build requirements and

17    ensuring that we could have that smooth transition of

18    supply.

19    **Q**    In other words, the tool is moved and then there's

16:30:03  20    still going to be other amounts that are owed later for

21    payables after that tool is moved to be paid later?

22    **A**    Payables and additional shipments that would even be

23    paid later as those shipments would be made.

24         So, for instance, if we were to move a product on

16:30:20  25    December 1st, there would still be releases that would

1    continue on for what we requested, the original time was six

2    weeks, so that would carry you into February, and those

3    February invoices would be paid second day, second month, so

4    at a future date and time.

16:30:45  5    **Q**    All right.  I want to -- I'll stop the screen sharing

6    and take you back to Cosma exhibits.

7         You reference that Anchor was willing to put its price

8    increase demand and threats of stop shipment in writing?

9    **A**    Right.

16:30:59 10    **Q**    And I want to turn you to that writing.  It's

11    Plaintiff's proposed Exhibit D/4, now known as 4.  And just

12    let me know when you're there.

13    **A**    Yes.

14    **Q**    And do you see an October 28th, 2022 letter on Anchor

16:31:29 15    letterhead to yourself?

16    **A**    I do.  I do.

17    **Q**    And what's the subject of the letter?

18    **A**    Price increase and stop shipment.

19    **Q**    And what's being communicated here to Cosma from

16:31:37 20    Anchor?

21    **A**    That Anchor could no longer support production and

22    that they cannot continue to ship and will cease shipments

23    effective -- if they didn't receive an increase, with the

24    effective date of 10-1, October 1st, 2022.

16:31:57 25    **Q**    Mr. Tanasoff, is it fair to say that there's a short

**Tanasoff (Direct)**

1    term and a longer term message here; being that short term

2    they won't ship at all without a price increase, and longer

3    term they're not going to be able to ship much longer

4    because of capacity issues?

16:32:12  5    **A**    Yes.  Yeah.  Absolutely.

6    **Q**    Did you understand it that you had to pay the price

7    increase just to keep supply going, but based on this

8    letter, the long-term prospects were looking shaky?

9    **A**    Yes.  We still had to look to transition some dies.

16:32:34 10    **Q**    And did Cosma, in fact, update its purchase order

11    pricing in the face of these threats?

12    **A**    We did.

13    **Q**    Turn, if you would, sir, to Plaintiff's proposed

14    Exhibit E.

16:32:50 15    **A**    E?

16    **Q**    Yes.

17    **A**    I have it here.

18    **Q**    Also number 5.  And I'll start you on the first page

19    of the exhibit, the bottom half of which is a November 10,

16:33:08 20    2022 email from Ben Nekola, copying you, to Anchor?

21    **A**    Yes.

22    **Q**    So this is 12 days after that written demand from

23    Anchor.

24         What is Mr. Nekola communicating here on behalf of

16:33:26 25    Cosma?

**Tanasoff  (Direct)**

1    **A**    That we -- he did attach a purchase order with a price

2    increase effective 11-10, and then we were going to make a

3    retro payment for dies that we're moving out only for the

4    period from 10-1 through 11-9.

16:33:52 5    **Q**    And again, just so the record's clear, that retro

6    payment that's being referred to would not include the

7    ongoing payments for parts produced; is that fair?

8    **A**    Yes.

9    **Q**    Did Cosma ever agree to pay, you know, that they

16:34:08 10    would -- that they were willing to pay open payables to exit

11    a die?

12    **A**    No.

13    **Q**    And --

14    **A**    All of our agreements, as referenced in our terms, are

16:34:20 15    made in writing and, no, we did not authorize any.

16    **Q**    And I just want to have you confirm for the record

17    that updated purchase order, which is Plaintiff's proposed

18    Exhibit F, now 6.

19    **A**    Yes.  That is our updated PO --

16:34:41 20    **Q**    Other than the --

21    **A**    -- purchase order.

22    **Q**    -- updated increased prices, were there any other

23    changes to the terms of the parties' contract?

24    **A**    No.

16:34:51 25    **Q**    Did this updated purchase order, with the demanded

**Tanasoff  (Direct)**

1    higher prices, change or impact the bailment agreement in

2    any way?

3    **A**    It did not.

4    **Q**    Mr. Tanasoff, I want to next talk to you about an

16:35:07   5    event that occurred -- the email and this purchase order

6    that we just looked at is November 10, just to keep us

7    oriented in time.

8        I want to talk to you now about an event that occurred

9    before Thanksgiving, a couple weeks later, and I'll ask you

16:35:22 10    this:  Was there an event at Anchor's facility that

11    dramatically impacted the plan to transfer dies?

12    **A**    Yes.

13    **Q**    Can you tell us what that was.

14    **A**    Yeah.  They had a press breakage.  I believe it was

16:35:38 15    some type of gear, a -- their press basically broke down and

16    they had a component that had an eight-week lead time in

17    order to get the replacement product so they could make

18    parts off of that press.

19    **Q**    Help me understand.  How is it that, you know -- how

16:36:00 20    was Cosma's supply from Anchor impacted by that press

21    breaking?

22    **A**    So Anchor could not keep up with quantities without

23    that press.  That was a 1200 ton press that was originally

24    designed or it was -- I'm sorry.  Take back that designed.

16:36:22 25    It was the press that they ran our products in, the majority

**Tanasoff  (Direct)**

1    of our products in.  They ran pretty quickly.  It helped

2    keep up with some level of supply.  Without that press, they

3    could not keep up with release quantities and meet our

4    requirements.

16:36:38  5    **Q**    What was -- what was Cosma's reaction upon learning of

6    this press failing?

7    **A**    Panic.  Without that press, we -- it was an emergency

8    situation.  It -- we've had other suppliers that have had

9    press breakages.  Typically, in the cases where we've had,

16:37:02 10    even this year we've had at least two, and the suppliers

11    supported those releases by finding alternative suppliers.

12    **Q**    Is that the approach that Anchor took here:  Our press

13    broke, we're looking for someone else who can step in and do

14    the work?

16:37:21 15    **A**    It was not.

16    **Q**    What was Anchor's approach?

17    **A**    Anchor left it up to CBAM to find alternative

18    suppliers for those products.

19    **Q**    With the ball in Cosma and CBAM's court, did you look

16:37:41 20    at how much time it would take to prepare the press?

21    **A**    Yes.  We asked that question of Anchor.  We also

22    scoured our -- we have some facilities within Magna that do

23    have presses, so we tried to see if they had that component

24    to help fix that press.  They did not.  We were looking

16:37:59 25    anywhere to try to find that component and help Anchor in

**Tanasoff  (Direct)**

1    that process.  Could not be found.

2         So with that eight-week lead time, our releases and

3    General Motors' releases would be, and requirements would

4    be, impacted nearly immediately.

16:38:18  5    **Q**    You said it was an eight-week lead time to repair the

6    press?

7    **A**    Eight-week lead time, yes.

8    **Q**    So with the press broken, needing eight weeks to

9    repair, Anchor being unable to keep up with supply I guess

16:38:34 10    now hardly at all, what did that do with the transition

11    plan, phase 1/phase 2, et cetera?

12    **A**    Yeah.  That completely changed the plans of a smooth

13    phase 1/phase 2, making sure that we could have a bank in

14    place, anything along those lines.  It was, as I said

16:38:56 15    earlier, complete panic, trying to find alternative sources

16    in a hurry and find somebody that could meet the

17    requirements.

18    **Q**    Was Cosma able to find -- you know, as we are now into

19    the Thanksgiving time period, early December, was Cosma able

16:39:19 20    to find some alternative suppliers?

21    **A**    We were.

22    **Q**    Did Anchor at least initially allow for the release of

23    its tooling to those alternative suppliers?

24    **A**    They did.

16:39:32 25    **Q**    Initially, did Anchor demand any sort of payment on

**Tanasoff (Direct)**

1    the way out the door as tooling would exit?

2    **A**    No.

3        I'm sorry.  They did have some demands on individual

4    pieces and individual dies.

16:39:47  5    **Q**    Well, let's take a look at exhibit -- Plaintiff's

6    proposed Exhibit N, or 14.  And when you're there,

7    Mr. Tanasoff, I'll have you turn to page 8 of the email

8    chain.

9    **A**    I am on Exhibit N and page 8.

16:40:23  10    **Q**    All right.  Just again to orient ourselves, this is --

11    do you see a December 1, 2022 email from Dan Piwowar at

12    Anchor to various individuals at Cosma?

13    **A**    I do.

14    **Q**    All right.  And in early December, is it fair to say

16:40:43  15    there's a mad scramble to get these dies out to whatever

16    alternative suppliers Cosma can find at this point?

17    **A**    Yes.

18        MR. SMITH:  Objection, Your Honor.  It's

19    leading.  There's been a lot of leading and I just have

16:40:56  20    stayed off.  But at this point, I'm going to object on

21    leading.

22        MR. DOYLE:  I'm happy to restate, Your Honor.

23        THE COURT:  Restate the question, Counsel.

24    **BY MR. DOYLE:**

16:41:03  25    **Q**    In this time period, December 1, early December, what

**Tanasoff (Direct)**

1    was -- what was Cosma's approach to finding alternate

2    suppliers for these die sets?

3    **A**    We were in a, again, panic, mad rush to find alternate

4    suppliers to meet our requirements and transfer the tools as

16:41:22  5    quickly as possible so that we could continue support to our

6    facility and General Motors.

7    **Q**    Now, are you aware of an instance when Anchor first

8    started demanding that, in addition to any sort of retro

9    payment on phase 1 and phase 2 dies, that Cosma needed to

16:41:41  10    start paying for all outstanding invoices in order to have

11    dies be released?  Is that something that you became aware

12    of?

13    **A**    Yes.  Through various emails.

14    **Q**    And in that email, we see Mr. Piwowar state to your

16:42:00  15    colleague, Ben Nekola:  Ben, we need to get payment for all

16    outstanding invoices for related parts that are shipped, not

17    just the incremental price increases.

18    What's your understanding as to incremental price

19    increases that's being referenced there?

16:42:16  20    **A**    So the incremental price increases is the delta

21    between the previous PO and the increased PO that was

22    effective or issued on 11-10.  And all invoices is

23    completely different than just the delta.  All invoices

24    is -- there have been many items that are not due at that

16:42:40  25    time that would follow our normal payment schedule of second

**Tanasoff  (Direct)**

1    day, second month.

2    **Q**     The incremental price increases, is it fair to say

3    that those are payments that go backward in time as opposed

4    to outstanding invoices that go forward in time?

16:42:55 5    **A**     Yes.

6                    MR. SMITH:  Objection.  Leading.

7                    THE COURT:  I'll have you rephrase the

8    question.

9                    MR. DOYLE:  Sure.

16:43:03 10    **BY MR. DOYLE:**

11    **Q**     What's the difference between the payment of

12    incremental price increases, Mr. Tanasoff, versus paying for

13    outstanding invoices as it relates to the timing?

14    **A**     Incremental price increases was just the delta.  We

16:43:17 15    issued the PO effective date of 11-10, the normal receipt of

16    which would follow our payment schedule of second day,

17    second month --

18    **Q**     And the incremental --

19    **A**     -- so a future date and time based on the receipt date

16:43:32 20    and the payment thereafter on second day, second month.

21    **Q**     How does that contrast with the incremental price

22    increase time period?

23    **A**     It's much, much sooner.  It's very accelerated in

24    comparison to this timing.

16:43:49 25    **Q**     And what time period did the incremental price

**Tanasoff  (Direct)**

1   increase relate to again, just so the record is clear?

2   **A**    The incremental price -- I'm sorry.  Restate the

3   question.

4   **Q**    What time period did the incremental price increase

16:44:04 5   cover?

6   **A**    The incremental price increase was effective -- the PO

7   was effective on 11-10, it was the delta in price for tools

8   that had moved, for the difference of 10-1 through the 11-9

9   timing.

16:44:21 10  **Q**    To your knowledge, is this December 1, 2022 email the

11  first time that Cosma received a demand from Anchor that,

12  hey, for tools to leave our building, you need to pay for

13  outstanding invoices as well?

14  **A**    Yes.

16:44:34 15  **Q**    Go to page 7.  If you go forward in the email string,

16  I want to look at Mr. Nekola's response.

17  **A**    Okay.

18  **Q**    And I'll ask you:  Did Cosma agree to pay all

19  outstanding invoices in order to get tools released?  Did

16:44:52 20  they agree to that arrangement?

21  **A**    No.  He states right here in that first sentence:

22  Your below additional request is not part of our agreement.

23  We never agreed to pay that, those invoices early.

24  **Q**    And with respect to the retro payments, those were --

16:45:11 25  were those made in reference to specific tools, phase 1 and

**Tanasoff  (Direct)**

1    phase 2 tools?

2    **A**      Yes.  Phase 1 and --

3    **Q**      Was there ever talk on making retro payments on tools

4    outside of phase 1 or phase 2?

16:45:25  5    **A**      No.

6    **Q**      Why -- why was there --

7    **A**      So -- so I'm sorry.  Let me clarify that.

8           So, no, there is no agreement to make payment early on

9    tools, but there is this reference here that he says:  I

16:45:43 10    will work with my management on getting 193,000 released.

11    That is the delta of old price to new price.

12    **Q**      And as we saw in that November 10 email when the new

13    purchase order was transmitted, those retro -- were those

14    retro payments for a specific set of tools in particular?

16:46:04 15    **A**      Yes.

16    **Q**      Being the phase 1 and phase 2 tools?

17    **A**      The phase 1 and phase 2 tools, yes.

18    **Q**      And why was that -- why were those retro payments

19    being proposed for those phase 1 and phase 2 tools?

16:46:19 20    **A**      The retro payments were being made based on our

21    previous listing, the previous exhibit where we said we

22    would make those lump sum payments at the time of move for

23    those specific dies.

24    **Q**      And without -- what would have been the impact to GM

16:46:47 25    without getting the retro payments on payment -- without

**Tanasoff  (Direct)**

1      getting those phase 1 and phase 2 tools transferred?

2      **A**      So with the press breakage and Anchor stating that

3      they would not be able to meet requirements, the impact

4      would be nearly immediately.  If we're to -- it would --

16:47:14   5   Cosma Body's lines would be down.  And within days or hours,

6      depending on the part, GM's lines would be impacted and

7      would be down.

8           And the impact of a General Motors line being down,

9      we've received notification in the past from General Motors,

16:47:28  10   and it's about $900 per minute, so we're talking about

11      millions of dollars within just several days.

12      **Q**      Turning back to this December 1 email, you noted that

13      Mr. Nekola said:  We never agreed to pay outstanding

14      invoices.

16:47:48  15           Now, Mr. Piwowar then responds.  In his response at

16      the top of that page 7, does Mr. Piwowar say:  Yes, that was

17      our agreement?  Or, yes, we did have an agreement?

18      **A**      No.

19      **Q**      What is he saying?

16:48:01  20   **A**      In his comment, he's not referencing agreement at all.

21      He's referencing common practices in his initial response.

22      **Q**      Now, if you turn to the first page of this Exhibit N,

23      or 14, we see that, in fact, Mr. Nekola is confirming that a

24      payment is being made in the amount of $645,358.67.

16:48:34  25           Does that payment relate to specific tools that Cosma

**Tanasoff  (Direct)**

1    needed released immediately?

2    **A**    Yes.  So he's referencing here:  Further to our emails

3    and agreement made on recent calls, please find the below

4    screenshot confirmation encompassing 645,000 being sent --

16:48:56 5    so that was the price increase payment for October 1st

6    through November 9th -- and pull ahead of accounts payable

7    to date.

8        So we were pulling ahead payments just to receive

9    those dies as GM's lines would be, you know, immediately

16:49:15 10   impacted.

11   **Q**    On that point, he talks -- at the very top, he writes

12   an email that says:  Apologies.  Meant to attach the

13   supporting letter.

14   **A**    Uh-huh.

16:49:22 15  **Q**    Go to the very last page of this exhibit.

16       Do you see a letter that Cosma sent to Anchor related

17   to this payment of $645,000?

18   **A**    Yes.

19   **Q**    And what does Cosma state to Anchor as the reason for

16:49:43 20  making that payment?

21   **A**    So we were saying that we were making this payment in

22   good faith and that -- the last paragraph says:  Nothing

23   herein limits or waives our rights under our purchase order.

24   So we reserve our rights.

16:50:02 25       And I should say, it states:  Further, CBAM expressly

**Tanasoff  (Direct)**

1    reserves all rights, including, but not limited to, the

2    right to pursue legal counsel against Anchor related to the

3    current actions from Anchor.

4    **Q**     At this point, given the crisis with the press

16:50:23  5    breakage, did Cosma have time to run to court between

6    December 1 and --

7    **A**     We did not.

8    **Q**     -- December 6th to try and get some sort of injunctive

9    relief?

16:50:35  10    **A**     No.

11              MR. SMITH:  Objection.  Leading.

12              THE COURT:  I'll allow the question.

13         Attorney Doyle, about how much time do you have left

14    with this witness?

16:50:42  15              MR. DOYLE:  Your Honor, I would anticipate

16    about 15 minutes left with this witness.

17              THE COURT:  All right.  You may proceed.

18    **BY MR. DOYLE:**

19    **Q**     With respect to these specific tools that were being

16:50:56  20    paid for, the $645,000, did Cosma, in its estimation, have

21    time between December 1, when this payment was demanded, and

22    December 6th, when the payment was made, to go to court,

23    file a lawsuit, get some sort of injunctive relief in order

24    to prevent an interruption of supply to GM?

16:51:17  25    **A**     No.  We were hours, if not minutes, away from shutting

**Tanasoff  (Direct)**

1    down.  And at that time, it was -- it was hours or minutes

2    after moving the tool we would -- GM would be nearly

3    immediately impacted.

4         These were for the high-running T1 dies, so the

16:51:38  5   General Motors trucks, and those were the higher volume

6    products, and we needed them in order to ensure supply to

7    the three different General Motors plants.  So the $900 a

8    minute that I was referring to previously was times three

9    plants.

16:52:02 10   **Q**    All right.  I want to go forward five days to

11   December 11, and this is Plaintiff's proposed Exhibit M, as

12   in Mary.  It's number 13 now.

13   **A**    Yes.

14   **Q**    Have you seen this communication before --

16:52:22 15   **A**    Yes.

16   **Q**    -- Mr. Tanasoff?

17   **A**    Yes, I have.

18   **Q**    What's your understanding as to what Anchor is

19   communicating to Cosma in this December 14 email?

16:52:32 20   **A**    In the first sentence, they state that while the

21   original agreement only addressed payment of lump sum for

22   the tools -- so they're acknowledging that this was not part

23   of the agreement.  It's -- they're stating that the press

24   that broke has changed the plan and that now they were

16:52:56 25   asking for something different and referencing industry

**Tanasoff  (Direct)**

1    practices, nothing in regards to an agreement.

2    **Q**    And, in fact, is Anchor telling you that it needs full

3    payment of all account balances now --

4    **A**    They were.

16:53:13 5    **Q**    -- for the remaining tools?

6    **A**    Yeah.  In about halfway through the first paragraph,

7    where it starts with:  As a result, Anchor needs full

8    payment of account balances related to specific parts -- to

9    each specific part as it's loaded and shipped to Cosma Body,

16:53:39 10   CBAM.

11   **Q**    This departure, this new request, if you look at the

12   last line, is Mr. Ross saying:  This is pursuant to our

13   existing agreement?  Or is he saying this is a request that

14   we're making?

16:53:54 15   **A**    He's -- he's stating that it's industry practice,

16   nothing regarding an agreement at all.

17         As I stated previously, Cosma Body's agreements are

18   made in writing.  There was no agreement made to this fact

19   at the time.

16:54:11 20   **Q**    And, in fact, he refers to it as a request, does he

21   not?

22   **A**    Yes.  Industry practices is how he's referring to it.

23   **Q**    Do you see where he says that this is in line with

24   industry practice and is not meant to be an unusual request?

16:54:26 25   **A**    Correct.

**Tanasoff  (Direct)**

1    **Q**    Okay.

2    **A**    Yeah.  That's what he's stating there.  But it is not

3    an agreement.  It's a -- it's a request.  He's saying it's

4    not -- it is not meant to be an unusual request.  But it is

16:54:38  5    still a request.

6    **Q**    Did Cosma ever agree to modify its contract terms and

7    agree to pay the full balance forward in order to release

8    dies, toolsets?

9    **A**    No.  So we made an agreement -- or we sent the payment

16:54:56  10    to ensure supply to General Motors on those specific parts.

11    But, no, we did not make any overall-arching agreement to

12    make payments on everything going forward.

13    **Q**    All right.  I'm going to wrap up with a couple last

14    topics here.

16:55:12  15        The last -- I think the last exhibit we're going to

16    look at is Plaintiff's proposed Exhibit Q, as in queen,

17    which is now 17.  We're a little bit later now in December.

18    This is a December 20 email string, Mr. Tanasoff.

19        Do you have that in front of you?

16:55:34  20    **A**    One second here.  I think I do.

21        Yes.  December 20th email string, yes.

22    **Q**    As of December 20, how many die sets, to your

23    knowledge, remained at Anchor?

24    **A**    One.

16:55:47  25        Oh, wait.  Hold please.

**Tanasoff  (Direct)**

1 **Q** Sure.

2 **A** I'm sorry.  So there were some other die sets that

3 were still there on December 20th.  He references it lower

4 on the email where Peter Littkemann's email starts at

16:56:07 5 9:37 a.m.  So there are the -- some BEV or Chevy Bolt dies

6 and then the one remaining C1 die.

7 **Q** Is the one remaining C1 die the 1213/1253 die that's

8 referenced first?

9 **A** It is.

16:56:26 10 **Q** And that's the die that remains there to this day;

11 correct?

12 **A** That is.

13 **Q** In terms of importance to your operation, that

14 1213/1253 die, how would you characterize that in terms of

16:56:40 15 your supply relationship with GM?

16 **A** Critical.

17 SUVs are very good volume.  General Motors sells a lot

18 of them.  And we can't make our parts without that

19 component.  And General Motors cannot make their Traverse

16:56:56 20 and other SUVs without that component.

21 **Q** Now, the other four dies, were those released at some

22 point after December 20?

23 **A** They were.

24 **Q** Did Anchor demand any sort of payment as a condition

16:57:08 25 of release on any of those four dies?

**Tanasoff (Direct)**

1    **A**    They did not require payment, no.

2    **Q**    I'm going to show you -- I don't think I need to show

3    it to you, but do you recall receiving notice that Anchor

4    had sent a -- something called a lien letter in recent days?

16:57:28  5    **A**    I do.  I do recall that, yes.

6    **Q**    And that's, in fact, Defendant's proposed Exhibit J.

7         You don't have that in front of you, Mr. Tanasoff, but

8    that letter purports -- claims that Cosma owes Anchor just

9    under $2 million, less raw material adjustments.

16:57:48  10         Have you seen that letter?

11   **A**    I have seen that letter.

12   **Q**    Prior to seeing that letter, had you ever received any

13   sort of demand that approached close to $2 million from

14   Anchor?

16:57:59  15   **A**    No.  No.  We were very surprised by the amount listed

16   by Anchor.

17   **Q**    What does Cosma calculate, in general terms, that it

18   currently owes -- I understand there could be future

19   payments that become due under the second day, second month

16:58:14  20   payment term.  But as we sit here right now, can you give me

21   an approximation of what Cosma believes it owes in payables.

22   **A**    Yeah.  We've been doing some reconciliation with the

23   information that Anchor has sent, but we calculated out all

24   of our outstanding invoices.  Total amount -- and there's

16:58:28  25   resale steel that has to be subtracted out of this, but the

1    total amount was 1,241,336 and change --

2    **Q**     Does that represent --

3    **A**     -- 96 cents.

4    **Q**     Does that represent the total amount that will be due

16:58:47  5    for every single part that Anchor produced for Cosma?

6    **A**     Less the steel resale value, but, yes.

7          So there's steel that GM provides that we debit back

8    from Anchor, according to our set-off rates when General

9    Motors steel is provided.  So the way it works is General

16:59:09  10    Motors provides steel and then Anchor is repaid for that

11    steel through the piece price.

12          So you have to take off -- we took off $638,536.73.

13    That would result in -- and some of that steel may have gone

14    to these other new suppliers, but we don't have a full

16:59:33  15    reconciliation of those quantities that have shipped to the

16    other suppliers yet.  But that would leave a balance of

17    $602,773.23.

18    **Q**     All of that approximate $600,000 in total payables,

19    how much of that is due under the payment terms today?

16:59:52  20    **A**     A very small amount.  With the pull ahead payment that

21    we made back in December, the -- a very small portion of

22    that would be due for January.

23    **Q**     Let me ask you a different question about your

24    payables to Anchor.

17:00:04  25          With respect to just that one die set that's still

**Tanasoff  (Direct)**

1    sitting in Anchor's building, have you been able to do any

2    sort of calculation as to what will be owed in total for

3    parts that came off the 1213/1253 die set?

4    **A**    I have.

17:00:20  5    **Q**    And describe that for us.

6    **A**    So I calculated -- I believe the last payment

7    encompasses 11-1.  Obviously, there needs to be some

8    reconciliation in making sure that we all agree on the

9    quantity.  But I calculated 62,471 pieces.  The price on --

17:00:43  10    prior to the 11-10 price increase, the value was $2.743 per

11    piece.  That would equate to $171,357.95.  From that, you

12    deduct the steel that was provided, so that would be leave a

13    balance of 41,049.69.

14    Or if we looked at the price increased value, the new

17:01:11  15    price is $3 and -- 3.388, so that would be a total of

16    $211,651.75, less the steel, so it would leave a balance of

17    $81,343.49.

18    **Q**    So if we were just talking about the payables

19    associated with this particular die set, your calculation

17:01:35  20    today is around $81,000 that would be owed for parts that

21    came off that die?

22    **A**    Yeah.  That would be the under-duress-price-increase

23    amount, yes.  If we went with the non-under-duress pricing,

24    that would be $41,000.  Yes, so either 41, or 81 under

17:01:53  25    duress.

**Tanasoff  (Direct)**

1    **Q**    Finally, I want to ask you:  Does Cosma believe --

2    we've heard that Anchor made a demand of close to $2 million

3    for amounts it believes is owed.

4         Does Cosma, for its part, believe that it has claims

17:02:11  5    against Anchor for damages that Cosma has incurred?

6    **A**    Yes.  We have numerous demands -- damages that we have

7    incurred.

8         So from the quality of parts where we had to do

9    additional sorting and grinding at our facility to bring

17:02:28  10    those to a -- either sort out the bad parts or provide

11    additional grinding and things, we had about $51,000 there.

12         We had die repairs going to new suppliers, so where

13    we've stated that there wasn't proper preventative

14    maintenance, it's $705,000.  $705,272.

17:02:54  15         We have freight costs to move those dies at $181,223.

16         And then, our internal downtime where we were getting

17    just shut down on a daily or every couple of days due to the

18    failure to meet our requirements, $562,319.

19         And that doesn't even include the price increases that

17:03:23  20    we're taking from the new suppliers.  We have just -- it's

21    huge numbers when we're talking about the price increased

22    value through the end of the programs.

23    **Q**    In other words, because you had to terminate this

24    prematurely and find alternative suppliers, are you saying

17:03:39  25    that you had to do so and pay increased pricing?

**Tanasoff  (Direct)**

1    **A**    Yes.

2    **Q**    Taking aside -- taking away that, the dollar amounts

3    associated with that price increased claim, the increased

4    prices that you're having to pay to alternate suppliers for

17:04:02 5    the remaining duration of the contract, when you just talk

6    about downtime, shipping, sorting, the first group of

7    categories you described, do you get to an approximate

8    number of your damage claim, apart from those price

9    increases?

17:04:17 10    **A**    Yeah.  Besides the price increases, we're at about

11    $1.6 million.

12    **Q**    I said that would be my last group of questions, but I

13    do have one final.

14        Has Cosma looked at just replacing this die set,

17:04:33 15    ordering another one, you know, fixing it that way?

16    **A**    Yes, we have.

17        Unfortunately, the lead time to produce a tool to make

18    that new die would be almost a year, approximately a year to

19    produce a new die set.

17:04:47 20    **Q**    And what -- on a best-case scenario, how much time

21    does Cosma need to set up this 1213/1253 die set with an

22    alternate supplier?

23    **A**    We need the tool nearly immediately.  We need -- we

24    have some quantity that we agreed to from Anchor for last

17:05:12 25    week's, and I believe they're still producing some quantity.

**Tanasoff  (Direct)**

1  But without that die set and -- and the supply from an

2  alternate supplier, CBAM will be affected in a number of

3  days, and General Motors will be affected nearly immediately

4  after.

17:05:32  5  **Q**    You talked about Anchor producing some additional

6  parts off of the 1213/1253 die.

7      How much -- how much raw material, to your knowledge,

8  does Anchor have to produce those parts?  How many weeks of

9  parts did it have raw materials left to produce?

17:05:48  10  **A**    I believe the 5,000 pieces that they were making last

11  week, and the 7,500 and change number, is just a couple of

12  weeks worth of product.

13  **Q**    And after they make that product, is it your

14  understanding that they will have exhausted their supply of

17:06:06  15  raw materials?

16  **A**    Yes.

17  **Q**    Steel coils?

18  **A**    Yes.

19          MR. DOYLE:  Those are all my -- Your Honor,

17:06:12  20  may I have one moment to consult my notes?

21          THE COURT:  Yes, you may.

22      And while you're doing that, Attorney Smith, if you

23  could give me a sense on what you think your

24  cross-examination would entail.

17:06:26  25      How long you think you would need?

**Tanasoff  (Direct)**

1          MR. SMITH:  So, Your Honor, I actually had

2     this hearing to end six minutes ago and I do have an

3     obligation at 5:30 at the east side.

4          So my anticipated cross, you know, there's a lot we

17:06:44 5     went through, I'd probably be -- my hope would be an hour,

6     but less than an hour I would hope.

7          THE COURT:  That's fine.  I know I had

8     scheduled this to end at 5:00, and so, I want to give you as

9     much time as you reasonably need for your cross-examination,

17:06:55 10     which is why I raised the issue.

11          Let me first turn back to Attorney Doyle.

12          Attorney Doyle, are you completed now?  Or do you have

13     additional questions?

14          MR. DOYLE:  I have just a handful of

17:07:04 15     additional questions related --

16          THE COURT:  Make it brief, sir.

17          MR. DOYLE:  Yes, Your Honor.

18     **BY MR. DOYLE:**

19     **Q**     Mr. Tanasoff, all the exhibits, the emails that we

17:07:10 20     looked at today, were those emails that you provided to me?

21     **A**     Yes.

22     **Q**     And that includes the attachments to those emails as

23     well?

24     **A**     Yes.

17:07:21 25     **Q**     And are those emails and documents that Cosma keeps in

**Tanasoff (Direct)**

1      the course of its regularly conducted business activities?

2      **A**    Yes.

3      **Q**    And to your knowledge, were those emails written at or

4      near the time that the information was transmitted by

17:07:37  5      someone with knowledge?

6      **A**    Yes.

7      **Q**    And those emails that are written, both internally at

8      Cosma and back and forth between Cosma and Anchor, is that

9      part of the Cosma's regular business practice?

17:07:49 10                MR. SMITH:  Your Honor, I'm not going to

11     object based on hearsay relative to business records, et

12     cetera, if that's where we're going.  So this is fine.  We

13     don't have to go through this.  I not -- I didn't object

14     when the exhibits were introduced and I'm not doing so now.

17:08:01 15                THE COURT:  All right.  Thank you, Counsel.

16          Attorney Doyle, does that address the remaining

17     questions you were going to ask --

18                MR. DOYLE:  It does, Your Honor.  I --

19                THE COURT:  -- on the authenticity issues?

17:08:11 20                MR. DOYLE:  It does.

21          I would move to admit the exhibits at this time.

22                THE COURT:  All right.  Let me turn to

23     Attorney Smith.  I know you've got an obligation at 5:30 and

24     it's past the time I had set for this hearing.

17:08:24 25                So are there any objections to the Court admitting the

1   exhibits that were presented through this witness?

2              MR. SMITH:  No.

3        And, Your Honor, I guess that also includes a couple

4   of my exhibits that I intend on utilizing as well.

17:08:40  5              THE COURT:  All right.  Thank you.

6        Well, the Court will admit the exhibits that

7   plaintiff's counsel used, as well as plaintiff's exhibits

8   and the defendant's exhibits that were referenced.  I trust

9   there won't be any objection from Attorney Doyle or the

17:08:59 10   plaintiff if you use those same exhibits during your

11   cross-examination or to future witnesses, Attorney Smith.

12              MR. DOYLE:  Your Honor, there won't be any

13   objection.

14        And I wonder if it just makes sense to admit all the

17:09:12 15   exhibits, that way Attorney Smith doesn't forget to do one

16   by accident and I don't either.  I think I covered every

17   single one, but I guess that would be my proposal.

18              MR. SMITH:  I --

19              THE COURT:  All right.  Let's table that

17:09:27 20   issue, because in a few moments I'm going to adjourn.

21        I've got time set aside for January 18th.  It will

22   give you all an opportunity to confirm in your notes with

23   respect to which exhibits were presented through this

24   witness, so that way there's a clear record as to which

17:09:48 25   exhibits are ripe before the Court to consider.

1       And, Attorney Smith, when we come back -- so I had set

2   aside January 18th starting at 9:00 a.m. to continue this

3   hearing.  When we resume, at that point, Attorney Smith, you

4   can begin your cross-examination.

17:10:07  5              MR. SMITH:  That sounds good, Your Honor.

6   Very much appreciate that.

7       My understanding is we had set aside 9:00 to 11:00, at

8   least that's what I have on the calendar.  I'm just

9   wondering, from the Court's perspective, you know, is that

17:10:23 10  going to be enough time?  I have two witnesses.  I intend to

11  go through them quickly, it was my hope.  I -- but I just

12  want to bring it up, because that was my understanding of

13  the allotted time.

14              THE COURT:  Let me ask you this.  So I've

17:10:37 15  got -- let's go off the record for this discussion.

16      The Court stands in recess at this point.

17                  (Pause in Proceedings)

18              THE COURT:  Okay.  Court is back, having taken

19  a brief recess to coordinate the Court's schedule with

17:14:34 20  counsel's schedule for continuation of this hearing.

21      At this point, the Court is going to adjourn this

22  hearing.  The hearing will resume on January 18th at

23  8:30 a.m. with the cross-examination of Mr. Tanasoff.

24              Now, Counsel, and Mr. Tanasoff, since you're currently

17:14:59 25  under oath and you've provided direct testimony, I'm going

1    to caution counsel about any sort of communication or

2    preparation for cross-examination.  We're proceeding as if

3    this were in open court and there would be no opportunity

4    for counsel to speak with Mr. Tanasoff to prepare testimony

17:15:22  5    for cross-examination.

6         So, Counsel, I would expect that will not occur prior

7    to the point where Mr. Tanasoff leaves the witness stand,

8    which will be sometime after we resume on the 18th.

9         Any questions about that, Counsel?

17:15:37 10              MR. DeWAARD:  No, Your Honor.

11              THE COURT:  All right.  Is there anything else

12   we need to address before I adjourn?

13              MR. SMITH:  Not from the defendant, Your

14   Honor.

17:15:46 15              MR. DeWAARD:  No, Your Honor.

16              THE COURT:  All right.  Counsel, with that,

17   then, court is adjourned.

18                         - - -

19              (Proceedings recessed at 5:15 p.m.)

17:17:01 20

21

22                    **C E R T I F I C A T E**

23        I certify that the foregoing is a correct transcript
     of the record of proceedings in the above-entitled matter
24   prepared from my stenotype notes.

25              */s/ Sarah E. Nageotte*              *1/23/2023*
              SARAH E. NAGEOTTE, RDR, CRR, CRC          DATE