**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARADA INDUSTRIES, INC. *dba Cosma Body Assembly Michigan*, | ) ) ) ) | CASE NO. 1:22-cv-02333 |
| | ) | JUDGE DAVID A. RUIZ |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **MEMORANDUM OPINION AND ORDER** |
| ANCHOR TOOL & DIE CO., *dba Anchor Manufacturing Group, Inc.*, | ) ) ) ) ) | |
| Defendant. | ) | |

This matter is before the Court upon the Motion for Temporary Restraining Order and Preliminary Injunction (R. 2) filed by Plaintiff Marada Industries, Inc., doing business as Cosma Body Assembly Michigan (Plaintiff or Cosma). For the following reasons, Plaintiff's Motion for Preliminary Injunction is GRANTED.

**I. Procedure**

On December 28, 2022, Plaintiff filed a verified civil Complaint alleging, *inter alia*, breach of contract against Anchor Tool & Die Co., doing business as Anchor Manufacturing Group, Inc. (Defendant or Anchor). (R. 1). On the same day, Plaintiff filed the instant Motion requesting that the Court require Defendant to "release and surrender certain manufacturing tooling in its possession to Plaintiff, to which Plaintiff is entitled possession." (R. 2, PageID# 83). Briefing of the Motion was complete as of January 3, 2023. (R. 8; R. 9). After the parties failed to reach a resolution on the issues presented in the instant Motion during a status conference, the Court held a hearing on the Motion over the course of three days. (R. 12; R. 14;

R. 18). During the hearing, the Court heard the testimony of Plaintiff's witness Thomas Tanasoff, and Defendant's witnesses Richard Ross and Frederick Pfaff. The hearing concluded on January 23, 2023, and the Motion is ripe for the Court's review.

## II. Facts

Plaintiff is an automotive supplier that supplies frame assemblies to automobile manufacturers. (R. 2, PageID# 91; R. 8, PageID# 193). Plaintiff is a Michigan corporation with its principal place of business located in Michigan. (R. 2, PageID# 91). Defendant is a manufacturing company that supplies automotive parts to companies like Plaintiff. (R. 1, PageID# 1 ¶ 1; R. 8, PageID# 193).

In 2019, Plaintiff entered into a contract with Defendant, which provided that Defendant would supply Plaintiff with certain automotive parts. (R. 2, PageID# 91–92; R. 8, PageID# 193). Plaintiff would then use these parts to manufacture vehicle frame assemblies, that it would subsequently supply to its customer General Motors. (R. 2, PageID# 91). As relevant for the purposes of this analysis, the parties' contract was comprised of three separate documents: (i) a Purchase Order (R. 20-1, Pl. Ex. 1,[1] PageID# 512), (ii) Plaintiff's Terms and Conditions (R. 20-7, Pl. Ex. 8, PageID# 587), and (iii) a Bailment Receipt (R. 20-2, Pl. Ex. 3, PageID# 521). The Bailment Receipt, which is dated March 5, 2019, acknowledged that Defendant had taken possession from Plaintiff of certain specialized manufacturing tools, owned by General Motors, that Defendant needed in order to produce the automotive parts for Plaintiff. (R. 20-2, Pl. Ex. 3, PageID# 521; R. 2, PageID# 97; R. 8, PageID# 193–194; Pfaff Testimony, Jan. 23, 2023[2]).

---

[1] "Pl. Ex." and "Def. Ex." refer to Plaintiff's and Defendant's exhibits, respectively, that the Court admitted during the hearing. (*See* R. 20; R. 21; R. 22).
[2] The official transcript from the hearing on January 23, 2023, is not yet prepared, so the Court cites to testimony from this day of the hearing as it does above.

Among the materials included in the Bailment Receipt were fifteen die sets, which are stamping tools, identified in Schedule A of the document. (R. 20-2, Pl. Ex. 3, PageID# 526; R. 8, PageID# 193–194).

Plaintiff alleges that in 2022, Defendant breached the parties' contract by manufacturing automotive parts of substandard quality while also failing to produce the required quantity of these parts. (R. 2, PageID# 98–99). Plaintiff further alleges that around this time, Defendant informed Plaintiff that Defendant wished to prematurely exit the parties' contract due to its inability to satisfy the agreement's production requirements. (R. 2, PageID# 98–99). While Defendant disputes these allegations—and, in fact, contends that any production issues were the result of defective tooling provided by Plaintiff (R. 15, PageID# 332)—the parties both acknowledge that they eventually agreed to terminate their contract and transition the supply of parts away from Defendant. (R. 2, PageID# 99; R. 8, PageID# 194). In addition to an agreement by the parties that Defendant would build a supply of parts to sustain Plaintiff during the transition process, the parties also established a schedule by which Plaintiff would retrieve the tooling in Defendant's possession for transfer to a successor supplier. (R. 2, PageID# 99). To date, Defendant has returned fourteen of the fifteen die sets that were identified in the Bailment Receipt, but Defendant has retained possession of the fifteenth: "transfer die for CBAM B1-1213/1253 with check fixture." (R. 2, PageID# 100; R. 15, PageID# 356). Although Plaintiff has demanded that Defendant release the remaining die set, Defendant has refused to do so until Plaintiff pays "the final bill" for parts that Defendant has already produced under the contract. (R. 2, PageID# 100; R. 20-15, Def. Ex. J, PageID# 651). Specifically, Defendant has demanded payment of $1,999,808.53, "less raw material adjustments"—an amount that Plaintiff disputes— before releasing the fifteenth die set to Plaintiff. (R. 8, PageID# 195; R. 20-15, Def. Ex. J,

PageID# 651).

In the instant Motion, Plaintiff requests that the Court order Defendant to release the fifteenth die set, asserting several examples of harms that would befall Plaintiff, and the automobile industry at large, if Defendant were allowed to keep possession of the tooling. (R. 2, PageID# 83–84, 91). Following Plaintiff's filing of the Motion, Defendant purportedly perfected a claim of lien, pursuant to Michigan Compiled Laws § 570.553, on the die set. (R. 20-15, Def. Ex. J, PageID# 651). On January 2, 2023, Defendant sent a letter to Plaintiff, putting Plaintiff on notice of the lien. (*Id.*).

### III. Legal Standard

When deciding whether to issue a preliminary injunction, the Court must examine four factors: "(1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000)). "The four considerations applicable to preliminary injunctions are factors to be balanced and not prerequisites that must be satisfied." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (alteration omitted) (citing *Am. Imaging Servs., Inc. v. Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992). "The proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion because a preliminary injunction is an extraordinary remedy." *Id.* (alteration omitted) (quoting *Leary*, 228 F.3d at 739). "The party seeking the preliminary injunction bears the burden of justifying such relief, including showing irreparable harm and likelihood of success." *Id.* (citing *Granny Goose*

*Foods, Inc. v. Teamsters*, 415 U.S. 423, 441 (1974)).

### IV. Analysis

#### A. Strong Likelihood of Success on the Merits

Plaintiff has established a strong likelihood of success on the merits for its claim that it is entitled to regain possession of the remaining die set, especially due to the clarity of the provisions in the Bailment Receipt. This agreement provides that Plaintiff or its agent "shall have the right to enter the premises of [Defendant] and remove the Property [referenced in Schedule A] at any time." (R. 20-2, Pl. Ex. 3, PageID# 523 ¶ 16). Moreover, the agreement specifies that if Plaintiff were to take possession of the property as stated in the prior provision, "[Defendant] acknowledges that any financial settlement with respect to amounts in dispute relating to the Property or the purchase order will occur *after* [Plaintiff] is in possession of the Property or the assignment of the purchase order has been completed." (*Id.* ¶ 17 (emphasis added)). The parties do not dispute that "transfer die for CBAM B1-1213/1253 with check fixture" is subject to these provisions. (R. 2, PageID# 103–105; R. 15, PageID# 377–379; Pfaff Testimony, Jan. 23, 2023). Therefore, by the clear terms of the agreement, Plaintiff has the right to retake possession of this die set, even as the parties litigate financial disputes related to their supply contract.

Defendant's attempts to set aside the terms of the parties' agreement are unconvincing. Defendant's primary argument is that the repossession provisions of the Bailment Receipt do not apply here because Plaintiff was itself in breach of the contract and owes Defendant damages. (Pfaff Testimony, Jan. 23, 2023). According to Defendant, this apparently means that all the provisions of the parties' contract have become inapplicable, and Defendant is entitled to retain possession of the die set until Plaintiff pays the contractual damages it owes. (*Id.*). However, Defendant cannot point to a single clause in the contract providing for such an outcome.

5

Moreover, Defendant does not—because it cannot—offer any extracontractual legal authority to support such a conclusion, as the terms of a contract do not simply evaporate upon a party's alleged breach. It is also far from clear at this point in the litigation that Plaintiff breached the contract: the parties had performed under the contract apparently without substantial issue for multiple years before the instant dispute arose in 2022, and Defendant offers no evidence to the contrary. Therefore, the Court finds that the Bailment Receipt expressly gives Plaintiff the right to repossess the die set, and that the parties' instant dispute should be resolved after Plaintiff regains possession of the device.

Defendant's second argument involves its purported lien on the die set. Defendant points to a provision of Michigan's Special Tools Lien Act that specifies, "An end user has a lien, dependent on possession, on any special tool in the end user's possession belonging to a customer for the amount due the end user from the customer for metal fabrication work performed with the special tool. An end user may retain possession of the special tool until the amount due is paid." Mich. Comp. Laws § 570.553. Simply put, Defendant argues that pursuant to this statute, Defendant may lawfully retain possession of the die set because of its lien on the property. (R. 8, PageID# 197–201).

Assuming without deciding that Michigan law applies, and that Defendant perfected its lien on the die set, the terms of the Bailment Receipt once again severely undercut Defendant's position. Paragraph fifteen of that agreement provides that "[Defendant] acknowledges that it has no title, ownership or any other proprietary right in or to the Property and agrees to keep the Property *free from liens* or claims of any kind and hereby *waives any lien claim it may have in the Property*, statutory or otherwise, to the extent permitted by law." (R. 20-2, Pl. Ex. 3, PageID# 522–523 ¶ 15 (emphases added)). Defendant attempts to sidestep the parties' contractual

6

language waiving any statutory liens in the property subject to the Bailment Receipt by pointing to a different Michigan statutory provision, this one part of the Construction Lien Act, which states: "A person shall not require, as part of any contract for an improvement, that the right to a construction lien be waived in advance of work performed. A waiver obtained as part of a contract for an improvement is contrary to public policy, and shall be invalid . . . . ." Mich. Comp. Laws § 570.1115(1). Defendant essentially asks the Court to read the Construction Lien Act's public policy provision into Michigan's Special Tools Lien Act, an entirely separate set of statutory provisions. (R. 8, PageID# 197–201). The Court declines this invitation.

A court must read and interpret an unambiguous statute according to the plain meaning of its words. *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 246 (6th Cir. 2004). Likewise, the absence of specific words and provisions, even if found in other statutes, is instructive. If Michigan policymakers intended to include a prohibition on advance lien waivers in the Special Tools Lien Act—the statute that Defendant seeks to enforce—they could have included such express language as they did in the Construction Lien Act, but they did not.

In addition, Defendant has provided no authority for its assertion that the public policy provision in the Construction Lien Act may be applied to liens other than those in the construction context. The two cases Defendant cites to support this assertion both involve the potential application of Michigan's Construction Lien Act to mechanic's liens; however, construction and mechanic's liens are essentially synonymous, so the application of the Construction Lien Act to mechanic's liens is hardly indicative of a broader public policy in Michigan of applying this act's provisions to many different types of liens. *See Kipin Indus., Inc. v. Van Deilen Int'l, Inc.*, 182 F.3d 490, 492–93 (6th Cir. 1999); *In re Imagepoint, Inc.*, 2010 WL 569563, at *1–3 (E.D. Tenn. Feb. 11, 2010); *see also M.D. Marinich, Inc. v. Mich. Nat'l Bank*,

7

484 N.W.2d 738, 741 (Mich. Ct. App. 1992) (explaining that the Construction Lien Act was enacted to "remedy many of the problems associated with a preceding act, the Mechanics' Lien Act of 1891"); *B&V Constr., Inc. v. Twp. of Canton*, 1996 WL 33360725, at *1 (Mich. Ct. App. Aug. 6, 1996) (per curiam) (same).

Even if the Court were to find that the lien waiver in the Bailment Receipt is invalid as a matter of Michigan public policy, the plain language of Michigan Compiled Laws § 570.553 does not apply in Defendant's case. The statute applies to "any special tool in the end user's possession *belonging to* a customer." Mich. Comp. Laws § 570.553 (emphasis added). In a case interpreting a substantially similar statutory provision about liens on plastic molds, the Michigan Court of Appeals held that the words "belonging to" connote ownership. *Gateplex Molded Prods., Inc. v. Collins & Aikman Plastics, Inc.*, 681 N.W.2d 1, 3–5 (Mich. Ct. App. 2004). The Court sees no reason to deviate from that court's well-reasoned analysis of a substantially similar statute. Since Plaintiff is Defendant's "customer" and the parties do not dispute that GM owns the die set at issue—not Plaintiff—Defendant may not avail itself of Michigan Compiled Laws § 570.553.

Since Defendant's arguments to the contrary are undermined by the clear provisions of the Bailment Receipt, and Michigan law, Plaintiff has demonstrated a strong likelihood of success on the merits.

### B. Irreparable Harm

Plaintiff has also demonstrated that it would suffer irreparable harm if the Court does not grant a preliminary injunction. In its Motion and through credible witness testimony, Plaintiff represents that without release of the die set so that Plaintiff could transfer it to a new supplier, Plaintiff's manufacturing process would shut down, which would impact GM's assembly lines

8

and lead to the "layoff or idling of countless employees," not to mention the harm to Plaintiff's goodwill in the automotive industry. (R. 2, PageID# 101; R. 17, PageID# 427). Independent of these contentions, paragraph nineteen of the Bailment Receipt provides, "[Defendant] agrees that [Plaintiff] will suffer irreparable harm if [Plaintiff] invokes its rights under this agreement to obtain access to the Property and [Defendant] fails to cooperate with [Plaintiff] in allowing [Plaintiff] access to the Property in accordance with the terms of this agreement." (R. 20-2, Pl. Ex. 3, PageID# 523).

Defendant does not contest any of the specific harms Plaintiff cites; rather, Defendant primarily argues that Plaintiff's harm would not be irreparable should the injunction not issue because Defendant can continue manufacturing parts to keep Plaintiff's business afloat during the litigation, or at least until the parties reach a resolution. (Pfaff Testimony, Jan. 23, 2023). However, this argument ignores that the basis of the current lawsuit is Plaintiff's allegations that Defendant failed to produce satisfactory quality and quantity of parts pursuant to the parties' supply contract. It would be illogical for the Court to believe, after considering the evidence before this Court, that the onset of litigation somehow made Defendant capable of producing parts satisfactory to Plaintiff and its business.

To the extent that Defendant contends that Plaintiff's harm is purely monetary because Defendant would release the die set upon receipt of a payment of over $1 million from Plaintiff, that argument also fails. (R. 8, PageID# 201–203; Pfaff Testimony, Jan. 23, 2023). The Court will not force Plaintiff to make a disputed payment to Defendant in order for Plaintiff to exercise its contractual rights, or else suffer harm that the parties agreed would be irreparable. If Defendant believes that it is owed monetary damages under the contract, it may elect to pursue such a claim against Plaintiff; but the record before this Court does not permit it to contort the

parties' agreement to force such payment terms on Plaintiff.

Plaintiff has demonstrated that it would suffer irreparable harm if the Court does not grant a preliminary injunction.

### C. Substantial Harm to Others

Granting the injunction would not result in any substantial harm to Defendant. If the Court grants the injunction, Defendant would no longer have possession of the die set, which Defendant argues would "force[]" it to "litigate a lengthy lawsuit simply to get paid what it is owed" under the contract. (R. 8, PageID# 203). This "harm" is simply not substantial: denying Defendant the ability to use the die set as collateral or leverage does not prevent it from accessing the courts to litigate a breach of contract claim against Plaintiff, even if this option is not appealing to Defendant. Moreover, Defendant will be in the position as contemplated by the parties' agreement—having the opportunity to resolve "any financial settlement with respect to amounts in dispute . . . *after* [Plaintiff] is in possession of the Property…." (R. 20-2, Pl. Ex. 3, PageID# 523 ¶ 17 (emphasis added)).

There is also no indication on the record that granting the injunction would cause substantial harm to any interested non-parties. As a result, the Court determines that there would be no substantial harm to others if it grants the injunction.

### D. Public Interest

Finally, granting the injunction would benefit the public interest as employees and consumers would benefit from the avoidance of potential supply chain disruptions in the automotive industry. (R. 2, PageID# 101). Defendant contends that an injunction would not serve the public interest because it would "ignore statutory lien law." (R. 8, PageID# 203). But as the Court already determined above, the Michigan statutory lien provisions that Defendant cites do

10

not apply in this case.

Plaintiff has satisfied each of the four factors, so the Court will issue a preliminary injunction ordering Defendant to release the tooling.[3]

### V. Conclusion

Plaintiff's Motion for Preliminary Injunction (R. 2) is GRANTED. On January 27, 2023, or on such other date if the parties expressly agree to a different date, Defendant shall make available the "transfer die for CBAM B1-1213/1253 with check fixture" during regular business hours to Plaintiff or its agents. As set forth in the parties' Bailment Receipt paragraph 16, Plaintiff "or its agent shall have the right to enter the premises of [Defendant] and remove the Property . . . for so long as is reasonably necessary to remove . . . the Property." (R. 20-2, Pl. Ex. 3, PageID# 523 ¶ 16). Defendant, its agents, and employees shall provide reasonable assistance to enable Plaintiff to take possession of the die set.

IT IS SO ORDERED.

s/ *David A. Ruiz*
David A. Ruiz
United States District Judge

Date: January 26, 2023

---

[3] Since the Court grants a preliminary injunction, it need not issue a Temporary Restraining Order. Therefore, Plaintiff's request for a Temporary Restraining Order is denied as moot.