1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
2                         EASTERN DIVISION

3

4    MARADA INDUSTRIES, INC.,        Case No. 1:22-cv-2333
                                     Cleveland, Ohio
5              Plaintiff,

6         vs.                        MONDAY, JANUARY 23, 2023

7    ANCHOR TOOL & DIE CO.,

8              Defendant.

9

10      TRANSCRIPT OF CONTINUED TEMPORARY RESTRAINING ORDER
            AND PRELIMINARY INJUNCTION PROCEEDINGS
11                 *HELD VIA ZOOM VIDEOCONFERENCE*
             BEFORE THE HONORABLE DAVID A. RUIZ
12               UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15   For Marada Industries:    Ronald G. DeWaard, *Esquire*
                               Brion B. Doyle, *Esquire*
16                             Marcel C. Duhamel, *Esquire*

17
     For Anchor Tool & Die:    Adam C. Smith, *Esquire*
18

19

20
     Court Reporter:           Sarah E. Nageotte, RDR, CRR, CRC
21                             United States District Court
                               801 West Superior Avenue
22                             Court Reporters 7-189
                               Cleveland, Ohio 44113
23                             Sarah_Nageotte@ohnd.uscourts.gov

24

25      Proceedings recorded by mechanical stenography, transcript
           produced with computer-aided transcription.

1                          **TABLE OF CONTENTS**

2

3                                                              <u>PAGE</u>

4      DIRECT EXAMINATION OF FREDERICK PFAFF
       BY MR. SMITH:                                             5
5
       CROSS-EXAMINATION OF FREDERICK PFAFF
6      BY MR. DeWAARD:                                          50

7      REDIRECT EXAMINATION OF FREDERICK PFAFF
       BY MR. SMITH:                                            98
8
       RECROSS-EXAMINATION OF FREDERICK PFAFF
9      BY MR. DeWAARD:                                         106

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|  |  |
|---|---|
|  | 1 | MONDAY, JANUARY 23, 2023 |
|  | 2 | - - - |
|  | 3 | (Proceedings resumed at 8:37 a.m.) |
|  | 4 | - - - |
| 08:37:42 | 5 | THE COURT:  Let's go ahead and go on the |
|  | 6 | record then. |
|  | 7 | Ms. Gallagher, if you could please call the case. |
|  | 8 | COURTROOM DEPUTY:  This United States District |
|  | 9 | Court for the Northern District of Ohio is open for the |
| 08:37:52 | 10 | transaction of business, the Honorable David A. Ruiz |
|  | 11 | presiding. |
|  | 12 | The Court calls case number 1:22-cv-2333, Marada |
|  | 13 | Industries, Inc., versus Anchor Tool & Die Co. |
|  | 14 | THE COURT:  Good morning, everyone. |
| 08:38:07 | 15 | I'm going to first have counsel identify themselves |
|  | 16 | for the record, first starting with plaintiff's counsel. |
|  | 17 | MR. DeWAARD:  Good morning, Your Honor. |
|  | 18 | Ron DeWaard, Brian Doyle, and Marcel Duhamel on behalf |
|  | 19 | of the plaintiff, Marada Industries d/b/a Cosma. |
| 08:38:24 | 20 | THE COURT:  Good morning, Counsel. |
|  | 21 | And then, if defense counsel could identify yourself |
|  | 22 | for the record. |
|  | 23 | MR. SMITH:  Yes.  Good morning, Your Honor. |
|  | 24 | Adam Smith on behalf of the defendant, Anchor Tool & |
| 08:38:32 | 25 | Die Co. |

1              THE COURT:  Good morning, Counsel.

2              MR. SMITH:  Good morning.

3              THE COURT:  All right.  We are here to conduct

4    the continuation of the hearing on plaintiff's motion for a

08:38:38  5    temporary restraining order and preliminary injunction.

6         At the last hearing, before we took a recess to

7    adjourn for the day, the defense, I believe, had concluded

8    its witness and had indicated an intention to call an

9    additional witness, Mr. Pfaff, to provide direct testimony.

08:39:05 10         So, at this time, Attorney Smith, is the defense

11   prepared to proceed?

12              MR. SMITH:  Yes, Your Honor.

13              THE COURT:  And do you intend to call a

14   witness?

08:39:13 15              MR. SMITH:  I do.

16              THE COURT:  Then you may call your first --

17   your next witness.

18              MR. SMITH:  Okay.  The defense calls Fred

19   Pfaff.

08:39:22 20              THE COURT:  All right.  Mr. Pfaff, my

21   courtroom deputy is going to place you under oath.

22              THE WITNESS:  Very good.

23                   (Witness was sworn)

24

25

**Pfaff (Direct)**

### DIRECT EXAMINATION OF FREDERICK PFAFF

**BY MR. SMITH:**

**Q**     Good morning.

**A**     Good morning.

**Q**     Can you please state, spell your name for the record.

**A**     Frederick A. Pfaff.

        P-F-A-F-F.

**Q**     And, Mr. Pfaff, where do you work?

**A**     Anchor Manufacturing Group.

**Q**     How long have --

**A**     Anchor Tool & Die, doing business as Anchor
Manufacturing Group.

**Q**     How long have you worked at Anchor?

**A**     37 years.

**Q**     What is your current job title?

**A**     President and CEO.

**Q**     Have you held other job titles at Anchor?

**A**     That has been my title since 1994.  Prior to that, I
was president only.  And prior to that, I was general
manager.

**Q**     What are your current duties at Anchor?

**A**     I oversee all of our strategic directions.  I also
oversee all of our legal matters.  And also I oversee all
operations; although, I have some functional plant managers
underneath me.

6

**Pfaff (Direct)**

1  **Q**      Are you ultimately responsible for handling contracts

2  involving Anchor?

3  **A**      Yes.  I make sure I review all contracts that are

4  necessary to look at and I determine whether I need legal

08:40:53  5  support or we handle them internally.

6  **Q**      You heard testimony from your employee Rich Ross.

7       Does he -- is he responsible for handling contracts

8  for Anchor?

9  **A**      No.  He will receive the contracts, or his staff will

08:41:07  10  receive the contracts, give it a short review, and if they

11  have any and all questions, those then come to myself.

12  **Q**      Where is Anchor located?

13  **A**      We're located at 12200 Brookpark Road, Cleveland,

14  Ohio.

08:41:20  15  **Q**      And how long has Anchor been in business?

16  **A**      Business, 52 years.

17  **Q**      Always stamping operations?

18  **A**      Well, first five years we were a tool and die builder

19  only.  And then, in 1975, became a metal stamper.

08:41:38  20  **Q**      Are you familiar with the plaintiff in this case,

21  Marada Industries, doing business as Cosma Body Assembly

22  Michigan?

23  **A**      Yes, I am.

24  **Q**      Would you understand if I call it CBAM or Cosma?

08:41:48  25  **A**      Yes, I will.

**Pfaff (Direct)**

1    **Q**    Are you familiar with the relationship between CBAM

2    and Anchor?

3    **A**    Yes.  We provide metal stampings using their tooling

4    to them, which they build then structures which go primarily

08:42:05  5    on General Motors vehicles.

6    **Q**    And we're going to get to the particulars of this, but

7    did CBAM ultimately agree to an increased price from the

8    price initially set forth in POs?

9    **A**    Yes, they did.

08:42:21 10    **Q**    Why?

11    **A**    The tooling we received, which was defective upon

12    receipt, as the volumes continued to increase, it became

13    unworkable for us to be able to make enough parts, and it

14    also was costing a very large amount of money, so we had the

08:42:39 15    price increase, which was meant to bridge the area of time

16    before some of that capacity could be reduced on those

17    tools.

18    **Q**    When was that price increase agreed to?

19    **A**    It was officially granted to us on November 10th in an

08:42:55 20    email we received, which gave us new purchase orders and

21    also authorized certain lump sum payments.

22    **Q**    What was the effective date of the increase?

23    **A**    The effective date was October 1st for all parts.

24    October 1st, 2023 -- 2022.  Excuse me.

08:43:12 25    **Q**    Sure.

8

**Pfaff (Direct)**

1          So because there were, it seems, some retroactive

2     payments, was there a lump sum -- or were there lump sum

3     payments that ultimately were due to Anchor that were to be

4     paid by CBAM?

08:43:24   5     **A**     Yes.  All active parts at the time had a lump sum

6     payment amount attached to them.

7     **Q**     Did CBAM agree to make those lump sum payments?

8     **A**     Yes, they did.

9          That was acknowledged in the purchase orders and in

08:43:36  10     the email from Ben Nekola --

11     **Q**     Did they --

12     **A**     -- on November 10th.

13     **Q**     November 10th.

14          Did CBAM make those payments under any sort of duress

08:43:47  15     or pressure from Anchor?

16     **A**     No, they did not.

17     **Q**     When -- to date, has CBAM made those lump sum payments

18     they agreed to make?

19     **A**     They have made some of the payments, but not all of

08:44:01  20     the payments.

21     **Q**     Is that a breach of the agreement between CBAM and

22     Anchor, in your opinion?

23     **A**     It absolutely is a breach in my opinion.

24     **Q**     Does CBAM also owe Anchor for outstanding accounts

08:44:18  25     receivable?

**Pfaff (Direct)**

1    **A**    Yes.  We have parts we have shipped over the last

2    several weeks and months that we have not been paid for, yet

3    not have been called defective or unusable, so I would

4    expect payment on those.

08:44:32  5    **Q**    Did CBAM agree to make those payments?

6    **A**    Yes, they did.

7    **Q**    Has -- and like you said, just to confirm though, has

8    CBAM paid those accounts receivable?

9    **A**    No.  I show roughly $1.9 million open to us.

08:44:44 10    **Q**    Has CBAM indicated to you whether or not it intends to

11    pay those accounts receivable?

12    **A**    CBAM has indicated they do not intend to pay that

13    amount.

14    **Q**    I want to talk about some of the agreements between

08:44:57 15    CBAM and Anchor.

16           Are you aware of those agreements?

17    **A**    Yes, I am.

18    **Q**    Are there, you know, more than one?

19    **A**    Yes.  There are several agreements that we have with

08:45:08 20    them covering this.

21    **Q**    Does one include, I guess, the -- what we've been

22    looking at as the terms and conditions arising out of the

23    purchase orders?

24    **A**    Yes.  That is one of the agreements.

08:45:21 25    **Q**    Are there also two different sets of purchase orders

**Pfaff  (Direct)**

1    that would be different agreements?

2    **A**    Yes.  There was the original purchase orders issued to

3    us in late 2019, and an additional set of purchase orders

4    that replaced those that were effective October 1st but

08:45:37 5    issued November 10th.

6    **Q**    Do you also consider an agreement between Anchor and

7    CBAM to be the agreement to make the lump sum payments?

8    **A**    That is correct.

9         That is part of the second set of purchase order

08:45:48 10   agreements that had lump sum payment agreements also

11   included.

12   **Q**    Are you aware of discussions between Anchor and CBAM

13   when, you know, the parties thought about entering into a

14   relationship?

08:46:04 15   **A**    Yes.  I'm aware of those discussions.

16   **Q**    Was -- to your knowledge, was Mr. Tanasoff part of

17   those discussions?

18   **A**    No, he was not.  I do not believe he was with CBAM in

19   that capacity at that time.

08:46:16 20   **Q**    Okay.  I'm going to share my screen with you,

21   Mr. Pfaff.

22        Do you see what is -- what shows Exhibit C on the top

23   of this document?

24   **A**    Yes, I do.

08:46:32 25   **Q**    Which has been Exhibit 3, and it's the Plaintiff's

**Pfaff (Direct)**

1    Exhibit 3.  I'm just going to scroll through very quickly.

2    And let me know if you've seen this document before.

3    **A**    I have.

4    **Q**    Okay.  What's the -- what's the date of this document?

08:46:50  5    **A**    March 5th, 2019.

6    **Q**    And when did -- let me ask you this:  It's a bailment

7    receipt; right?

8    **A**    Correct.

9    **Q**    There's an indication of property here.

08:47:04 10    Does that property include the tooling that Anchor was

11    to use to produce parts for CBAM?

12    **A**    Eventually.  I assume that property covers all

13    property that was sent to Anchor.

14    **Q**    When did CBAM actually deliver the tooling to make the

08:47:21 15    parts at issue?

16    **A**    We were not able to see or examine the tooling until

17    earliest was October 2019, and then, shortly thereafter, as

18    more tools arrived.

19    **Q**    Okay.  So CBAM delivered the tooling to Anchor in

08:47:34 20    October, you said, approximately?

21    **A**    Yes.

22    **Q**    2019?

23    **A**    About seven -- yes, about seven months after this

24    agreement was signed.

08:47:41 25    **Q**    Okay.  And just to be clear, so did -- was Anchor

12

**Pfaff (Direct)**

1    afforded the opportunity to look at or evaluate the tooling

2    that was going to be used by Anchor to produce the parts?

3    **A**      No.  We made multiple requests to look at the tools

4    and we were eventually told the supplier would not let us

08:47:59  5    in, the existing supplier would not let us in to see the

6    tooling.

7    **Q**      Nevertheless, is it your understanding that CBAM

8    instructed Anchor to sign the bailment receipt prior to

9    receiving the tooling?

08:48:09  10    **A**      That is correct.  It was a condition of doing

11    business.

12    **Q**      I'm going to flip over here to Exhibit A, which was

13    Exhibit 1, Plaintiff's Exhibit 1.  I'm just going to quickly

14    scroll through here.  And I'll let you look initially at the

08:48:25  15    pricing to give you an idea of which purchase orders these

16    are.

17            Have you seen these documents before?

18    **A**      Yes.  I believe this is the original purchase order

19    issued to us on start of production.

08:48:39  20    **Q**      Okay.  So these are the -- these identify the parts

21    over here that Anchor was going to produce for CBAM; is that

22    right?

23    **A**      That is correct.  Under the category of part number.

24    **Q**      Did Anchor need to use tooling provided by CBAM to

08:48:54  25    produce parts for CBAM?

**Pfaff (Direct)**

1    **A**    Yes, we did.

2         All that tooling is not owned by Anchor.  It's CBAM

3    provided the tooling.

4    **Q**    Is the tooling important for purposes of producing the

08:49:06  5    parts?

6    **A**    The tooling is very important.  The design and build

7    and condition of the tool is integral to being able to keep

8    up with capacity demands and produce quality parts.

9    **Q**    Is the pricing -- let me ask this:  Is this unit price

08:49:24  10    reflective of the price that was agreed to such that Anchor

11    was willing to produce parts for CBAM based upon this amount

12    that's set forth here?

13    **A**    That is the amount we agreed to initially produce the

14    pricing at.  It was based upon, in some degree, information

08:49:42  15    given to us from CBAM as to how fast the dies would run, how

16    many strokes or parts per minute one could make, and we used

17    that information into our quote since we were not able to

18    inspect the tools ourselves.

19    **Q**    Was this -- well, was this pricing offered by Anchor

08:49:58  20    based upon receiving quality, nondefective tooling from

21    CBAM?

22    **A**    Yes.  This assumed the tools would be defect free to

23    industry standard, would run at a rate that they told us it

24    would run at, and would not have quality issues involving

08:50:12  25    extra operations, such as grinding, sorting, and higher

**Pfaff (Direct)**

1    scrap levels, which did occur, but unknown to us at the time

2    of quoting and receiving these tools.

3    **Q**    Prior to offering this pricing, did CBAM inform Anchor

4    that the tooling was defective?

08:50:33 5    **A**    We were not aware of that until after receiving the

6    tools.  We received some information from CBAM indicating

7    that the tools had issues with the prior supplier relative

8    to quality and production.

9    **Q**    Are those the same defects that Anchor noticed when it

08:50:51 10    began producing parts for CBAM?

11    **A**    Yes, we did.  The same defects.

12    They had indicated they had gone to another supply --

13    another outside firm to fix the tools to some degree, but we

14    saw the same conditions, and the attempt to fix them

08:51:06 15    actually created some other conditions.

16    **Q**    So -- and just to be clear, was the tooling that was

17    provided by CBAM, was it defective?

18    **A**    Yes, it was.

19    **Q**    Did that defective nature of the tooling directly

08:51:19 20    impact the pricing that was offered by Anchor in this PO?

21    **A**    Our -- this -- these prices in the PO did not reflect

22    any potential defect in the tooling relative to quality, run

23    rate, scrap, or sorting requirements.

24    **Q**    Did the defective nature of the tooling impact the

08:51:38 25    entirety of Anchor's relationship with CBAM and Anchor's

**Pfaff (Direct)**

1    ability to produce parts as intended?

2    **A**    Yes.  From the very beginning, there were issues with

3    the dies not being able to make a part to quality.  And

4    after a very short period of time, less than weeks, we were

08:51:55  5    put on a containment where sorting was required.  This is

6    very unusual for the tooling industry to receive in your

7    facility.

8    **Q**    So, in your opinion, did CBAM breach the parties'

9    agreement by providing defective tooling?

08:52:09  10    **A**    Yes.  They absolutely breached that agreement.

11    **Q**    Do you see -- and I'm going to have to expand this a

12    little bit here.

13    But do you see in this document where there's a

14    reference to CBAM terms and conditions?

08:52:28  15    **A**    Yes, I do.

16    **Q**    Okay.  I guess, given that CBAM provided Anchor with

17    defective tooling, do you believe that CBAM can enforce

18    these terms and conditions?

19    **A**    No, I do not.

08:52:41  20    **Q**    And why not?

21    **A**    Because the purchase order itself given to us, by not

22    giving us tooling that was capable of running quality parts

23    at efficient rates, breached the contract that was given to

24    us.

08:52:55  25    **Q**    So -- and this is the purchase order; right?  This

16

**Pfaff (Direct)**

1    sets forth the price and what parts are to be provided;

2    right?

3    **A**    That is correct.  That is the purchase order.

4    **Q**    And then the terms and conditions necessarily follow

08:53:07 5    this PO or this document; is that right?

6    **A**    That is correct.

7    **Q**    So then, ultimately, if Anchor can't produce the parts

8    due to the defective tooling provided by CBAM, then would

9    you consider this document really to be the more -- the most

08:53:23 10    significant issue relative to the parties' relationship?

11    **A**    In my 37 years, the purchase order is the guiding.

12    Our customer always tells us that.  The terms and conditions

13    then are secondary to the purchase order.

14        And in this case, where the purchase order was

08:53:38 15    considered, to me, not valid due to the breach of not giving

16    us good tooling, I would not think that the terms and

17    conditions even apply.

18    **Q**    I'll take you to what has been -- what's marked as

19    Exhibit H, but introduced by the plaintiffs as Exhibit 8.

08:53:57 20    Just scroll through this.

21        Have you seen this document?

22        I know I'm going fast, but if you want me to slow

23    down, I can.

24    **A**    Yes, I have.  I have seen this document.

08:54:09 25    **Q**    Okay.  And what is this document?

**Pfaff (Direct)**

1      **A**      This is the terms and conditions, the standard terms

2      and conditions for Magna companies.

3      **Q**      Okay.  And I just want to take you to paragraph 10

4      here.

08:54:21   5      Do you see it's titled payment?

6      **A**      Yes.

7      **Q**      Take a look at that and let me know if this appears to

8      be inconsistent with what I'll show you here, the terms, the

9      payment terms set forth here in Exhibit 1.

08:54:42  10      So I'll let you take a look there and we can take a

11      look at this payment here.

12      **A**      This one says 60 days after invoice date or after

13      goods were delivered.  And the other one says second day,

14      second month, which is roughly 62 days.  But it also

08:55:15  15      averages out based on when the parts were shipped, so

16      perhaps a little higher, more than 70-some days.

17      **Q**      Okay.  So inconsistent?

18      **A**      Yes.

19      **Q**      What about -- I think you mentioned before that CBAM

08:55:28  20      was required to make lump sum payments.

21      Do I have that right?

22      **A**      Yes.  This -- these -- these payment terms and these

23      terms and conditions do not match the lump sum payment

24      agreement we had.

08:55:39  25      **Q**      When was -- when were the lump sum payments due?

**Pfaff (Direct)**

1    **A**      Some lump sum payments were due on the 10th for parts

2    that -- that CBAM had intended for Anchor to keep.  The rest

3    of the payments were due for the dies that they intended to

4    move away from Anchor, those were due as the dies departed

08:56:01  5    Anchor.

6    **Q**      And, what, out of the 15 tool and die sets, 14 had

7    been taken by CBAM; is that right?

8    **A**      That is correct.

9    **Q**      And have any of those -- and then the lump sum

08:56:16  10    payments have not been made on all of those tool and die

11    sets; is that right?

12    **A**      Correct.

13          There were 12 sets of tools that required lump sum

14    payments.  Only six of the 12 did we receive any lump sum

08:56:28  15    payment.  Six lump sum payments are still outstanding.

16    **Q**      Okay.  So you -- so Anchor's holding on to one of the

17    tool and die sets; is that right?

18    **A**      That is correct.

19    **Q**      Why is Anchor still holding on to that tool and die

08:56:40  20    set?

21    **A**      We have no belief that -- that there's actually going

22    to be payment made to us, the lump sum payments; therefore,

23    we consider that's a breach on the lump sum payments.

24          We also know that the AR, which is due to us, is not

08:56:54  25    being paid, so we consider that also a breach in the

**Pfaff (Direct)**

1    agreement.  We also consider that the -- the dies and the

2    status caused this to happen and, yet, action's being

3    brought against me to basically release the tools without

4    getting paid.  I have no confidence that I'm going to be

08:57:12  5    paid if these tools are released.

6         I think I expect protracted litigation to basically

7    wear me down as a smaller company, and, therefore, I'm

8    holding those tools because, in the past, I released the

9    tools and I was supposed to get paid and they did not pay

08:57:27 10    me.

11  **Q**    So you trusted CBAM to pay you based upon the

12    agreement, and it removed the 14 tool and die sets but it

13    never paid; is that right?

14  **A**    That is correct.

08:57:38 15         I was, I guess, gullible in belief that they would

16    actually follow through in what they told me they would do

17    and pay me, so I released the tools expecting payment, and

18    the payment did not come.

19  **Q**    And it's your understanding that neither the

08:57:50 20    outstanding AR nor the lump sum payments are going to be

21    paid by CBAM or CBAM doesn't intend to make those payments?

22  **A**    That is correct.

23         Those -- I'm aware that those payments do not intend

24    to be made.

08:58:03 25  **Q**    Okay.  So I'm going to take you down to paragraph 11

**Pfaff (Direct)**

1    here.

2         Do you see it says set-off, recoupment?

3    **A**    Yes.

4    **Q**    Have you heard testimony regarding this paragraph,

08:58:16  5    this particular provision here?

6    **A**    Yes, I have.

7    **Q**    Do you believe CBAM can avoid paying what it owes by

8    claiming simply that Anchor owes CBAM money and that there's

9    some set-off that's owed?

08:58:27 10    **A**    No, we do not.

11    **Q**    And --

12    **A**    My costs --

13    **Q**    Go ahead.

14    **A**    No, I do not.

08:58:31 15         Because there is -- any cost that CBAM has talked

16    about so far, my costs far exceed those, if I were to pursue

17    those costs, due to the fact that those defective tools had

18    been costing me money since October of 2019, and the amount

19    is far in excess of any amount that CBAM can even claim.

08:58:49 20         Although, I dispute the accuracy of what they have

21    mentioned so far as far as charges they've incurred.

22    **Q**    Sure.  So -- but what I'm talking about is the timing

23    of this.

24         You've heard testimony that seems to suggest that

08:59:01 25    you're required to return the tooling simply because CBAM is

**Pfaff (Direct)**

1    claiming that Anchor owes it money as well.

2         Do you understand that?  Did you hear that type of

3    testimony previously?

4    **A**    Yes, I did.

08:59:16  5         I understand the concept of what a set-off is and that

6    they believe that they have a set-off that allows them to

7    take the tools without getting paid -- excuse me -- without

8    paying.

9    **Q**    So my question is:  Do you believe that that is

08:59:29 10   enforceable given the nature of the parties' relationship

11   and what you described previously?

12   **A**    No, I do not.

13   **Q**    And why not?  Are there any reasons based upon the

14   overarching breach or anything like that?

08:59:40 15  **A**    Well, basically, there was several breaches made by

16   not paying the lump sum payments as they agreed to when the

17   tooling was being released.  They have not proven that any

18   of those costs incurred, has not been any consideration for

19   any costs I have contrary to that.

08:59:57 20        But, bottom line, the terms and conditions do not

21   apply because the initial purchase order was breached.

22   **Q**    Okay.  So you're saying that because the initial

23   purchase order was breached as a result of providing

24   defective tooling, that your belief is that, ultimately,

09:00:09 25  that, you know, they can't pick and choose to seek to

**Pfaff (Direct)**

1    enforce this provision; is that right?

2    **A**    Correct.

3         Any one provision of any one contract can't be held to

4    be the governing contract, in my opinion at least.  I'm not

09:00:21 5    an attorney.  But you can't take one piece of one thing and

6    try to enforce it when you violated a whole bunch of other

7    items that are in the purchase order.

8    **Q**    Okay.  So I'm going to move down to paragraph 17 here.

9         Okay.  Do you see this paragraph 17, which says:

09:00:40 10    Materials, equipment, tools, and facilities?

11   **A**    Yes.

12   **Q**    Have you heard testimony regarding this paragraph?

13   **A**    Yes.

14   **Q**    Okay.  And is your understanding that -- similar,

09:00:52 15   that, ultimately, CBAM's trying to rely upon this paragraph

16   to force Anchor to return tooling without paying Anchor?

17   **A**    Yes.  I've heard -- I've heard that in testimony.

18   **Q**    Do you believe that CBAM can enforce this provision

19   against you?

09:01:07 20   **A**    No.  For the same reasons as the other provision, the

21   defective tooling caused a breach in the initial purchase

22   order and, therefore, when that order is breached, I do not

23   believe these terms and conditions apply.

24   **Q**    Do you -- did CBAM terminate the agreement, the

09:01:24 25   parties' relationship?

**Pfaff (Direct)**

1   **A**      Yes, they did.

2   **Q**      Okay.  I'm going to take you down to paragraph 24

3   here.

4          Do you see where it says:  Termination for convenience

09:01:35 5   upon notice?

6   **A**      Yes.

7   **Q**      Okay.  And it says:  In addition to any other rights

8   of buyer to terminate this order, buyer may, in its sole

9   discretion, upon 30 days prior written notice to seller, or,

09:01:49 10   if applicable, such shorter period as may be required by the

11   customer, terminate this order for convenience or any other

12   reason.

13          Do you see that?

14   **A**      Yes, I do.

09:01:57 15   **Q**      So is it your understanding that CBAM could terminate

16   the parties' relationship for any reason?

17   **A**      That is correct.

18   **Q**      Under -- I want to turn your attention to subsection

19   (c) here, 24(c).

09:02:14 20          Have you seen this paragraph?

21   **A**      Yes, I have.

22   **Q**      Do you believe that this paragraph, as set forth here,

23   requires CBAM to pay accounts receivable and monies that are

24   owed to Anchor upon terminating the parties' relationship?

09:02:32 25   **A**      Yes.  It is clearly stated that that is the case, that

**Pfaff (Direct)**

1    upon their termination, they need to pay me for all goods

2    and services I provided.

3    **Q**    Does this -- does this say -- does this provision or

4    does this paragraph say anything about the right to set-off

09:02:50 5    any amounts that CBAM claims are owed?

6    **A**    No.  I do not see that in that paragraph.

7    **Q**    Okay.  I'm going to take you to paragraph 25 here.  It

8    says:  Termination upon seller's default.

9         Do you understand that Anchor is the seller in this

09:03:14 10   agreement?

11   **A**    I do.

12   **Q**    Or identified as the seller in this agreement?

13   **A**    Yes, I do.

14   **Q**    Did Anchor default?

09:03:20 15   **A**    No, we did not.

16   **Q**    And why not?  How not?

17   **A**    We continued to supply goods to the schedules provided

18   to us by CBAM.  We made -- the quality of parts was as good

19   as, better than what we received the tooling that was sent

09:03:34 20   to us.  So we kept up our end of the purchase order.

21   **Q**    So is it based upon -- is the reason that parts

22   couldn't be produced based upon something Anchor did or

23   something that CBAM did?

24   **A**    No.  It's definitely the condition of the tooling, the

09:03:50 25   design of the tooling.

**Pfaff (Direct)**

1    I know I heard testimony about the lack of tool and

2  die repairmen, which is totally untrue.  We never had less

3  than ten people in our employment in our tool and die

4  department.  And it was stated in the record we only had

09:04:07 5  one, which is totally incorrect by factor of ten.

6    We also maintained the tools to the best possible

7  condition that they be allowed to be maintained.  I heard

8  some discussion of lack of preventative maintenance.  That

9  is not true.  We actually just had to have constant

09:04:16 10  maintenance on the tool as they always had to be repaired,

11  always had to be fixed, had to be pulled out of the press

12  during middle of runs because of the design and the

13  condition of the tool.

14  **Q**    Yeah.  And I think you're hitting on what I was going

09:04:32 15  to ask you about.

16    Specifically, do you recall testimony about capacity

17  and Anchor's capacity relative to producing parts?

18  **A**    Yes, I do.

19  **Q**    And --

09:04:42 20  **A**    I --

21  **Q**    Go ahead.

22  **A**    There were claims made that Anchor had other business

23  coming in to replace them in the key equipment this was

24  running in.  That is untrue.  The main press that ran,

09:04:55 25  95 percent of the parts that ran through there and continue

**Pfaff (Direct)**

1    to run through there were all for CBAM.  Therefore, they

2    were not fighting for capacity with other customers.

3         The capacity constraint came because as we came out of

4    COVID and the volume started increasing and GM was able to

09:05:11  5    get more chips, the volume started increasing, that started

6    in July.  I looked at the releases and the volume started

7    kicking up.  And some parts in particular, between July and

8    October, they went from 14,000 parts a week to 18,000 parts

9    a week.  And that's when it became untenable to continue to

09:05:29 10    produce due to the capacity constraints because of that

11    increased volume due to the die conditions as received.

12         We lived with it for the first two and a half years

13    because the volumes were lower and we fought through it, but

14    when the volumes came up, it became unworkable.  And we

09:05:44 15    warned them in advance that there was going to be a capacity

16    issue as they continued to increase the demand.

17    **Q**    So if CBAM provided useable tooling, would Anchor have

18    been able to keep up with the increased demand?

19    **A**    Yes.  If the tools had run at the rates that we were

09:05:59 20    told they were going to run to, we would have been able to

21    produce at the levels required.

22    **Q**    I want to move to the pricing that we touched upon a

23    bit.

24         Did CBAM -- I know you testified to this, but did CBAM

09:06:15 25    request that -- in connection with the price increase, did

**Pfaff (Direct)**

1    CBAM request that Anchor produce or provide a letter

2    addressed to GM regarding GM's defective tooling or a price

3    increase?

4    **A**    Yes.  We went back and said that we needed temporary

09:06:30  5    pricing release until we can get the capacity issue solved,

6    and at that point in time, when they indicated they could

7    grant it, we -- my president, Tony Parente, showed me a text

8    from CBAM's Claudio Caloura saying -- asking us if we would

9    be open to writing a letter to them that they could show

09:06:53  10   General Motors to help them recover some of the price

11   increase.

12   **Q**    Okay.  So Claudio approached Tony about writing a

13   letter so that CBAM could obtain or seek a price increase

14   from GM due to the defective tooling that CBAM provided

09:07:05  15   Anchor; is that right?

16   **A**    That is correct.

17   **Q**    I'm going to share my screen with you and show you

18   another exhibit, which is -- this is Exhibit B.  This is

19   Defendant's Exhibit B, so it's the accurate exhibit there.

09:07:22  20        Do you see an email on your screen, Mr. Pfaff?

21   **A**    Yes, I do.  Yes, I do.

22   **Q**    Okay.  Have you seen this email before?

23   **A**    Yes, I have.

24   **Q**    And this involves who?  What is the email?  To who?

09:07:39  25   From who?

**Pfaff (Direct)**

1   **A**    This email -- this email is after the text was

2   received and asking us would we be open to writing a letter.

3   This was sent by Tony to Claudio Caloura basically telling

4   him that we would be open to writing that letter to gain our

09:07:57  5   support if you need us to do that.  However, we need to have

6   the price increases as of September 1st.

7       And I will add that I wrote this email, along with

8   most of the emails that Tony sent.

9   **Q**    When this says in the first sentence:  We appreciate

09:08:10 10  you reaching out to us to gain Anchor's support for the

11   issue CBAM may have with General Motors, what does -- what

12   are -- what's being referenced there?  When it says reaching

13   out, it appears that it's Claudio reaching out to Anchor; is

14   that right?

09:08:24 15  **A**    As I mentioned, I wrote this email.  And reaching out,

16   what I was referring to specifically was the text that came

17   in from Claudio asking if we would be open to writing a

18   letter.

19   **Q**    Okay.  Do you see here, it looks like in the second

09:08:42 20  sentence -- let's see here -- and, then, it says here:  As

21   discussed, these increases are a result of the die

22   conditions Anchor has been dealing with since the arrival of

23   the tools from another supplier.

24       You wrote that?

09:09:00 25  **A**    Yes, I did.

**Pfaff (Direct)**

1 **Q**     And are you referring to what we've been discussing

2 here, that the tooling was defective since day one?

3 **A**     Yes, I am.

4       When those tools came in, they were in the same

09:09:10 5 condition as when they left.

6 **Q**     Okay.  And did that -- you're -- you're talking about

7 the pricing that we talked about in the POs, the pricing

8 issue in those POs relative to the tooling, is that what

9 you're referencing here?

09:09:22 10 **A**     Yes, I am.

11       That the initial pricing was based on tooling we

12 thought would run at the rates provided with the quality

13 levels that industry standard are accustomed to, and the

14 fact, as we discussed, is that these die conditions, since

09:09:33 15 the day the tools arrived from another supplier, had these

16 issues.

17 **Q**     Do you know if Claudio disputed this, the ongoing

18 issue with the tooling and the tooling showing up in a

19 defective manner?

09:09:45 20 **A**     My understanding is that they were -- that Claudio was

21 very much aware of the condition of the tools.  I have seen

22 emails going back to when the tool, shortly after they first

23 arrived, acknowledging the tools had issues with the prior

24 supplier.

09:10:03 25             MR. DeWAARD:  Objection.  Foundation.

**Pfaff (Direct)**

1    Move to strike the last answer.

2                    MR. SMITH:  Your Honor --

3                    THE COURT:  Attorney Smith, go ahead.

4                    MR. SMITH:  Yeah, sure.

09:10:10 5    So, Your Honor, this is already testified to by

6    Mr. Ross.  And, obviously, you now have testimony that

7    Mr. Pfaff was specifically involved in the emails and

8    specifically involved with the relationship leading up to

9    the providing of the tools.

09:10:21 10    And I can ask him if he knows or he had any

11    discussions or aware of discussions about Claudio

12    identifying issues with the tooling when it showed up, but I

13    believe that's already been certainly testified to and there

14    is -- there is a foundation for the question.

09:10:51 15                    THE COURT:  All right.  The objection is

16    overruled.

17    I'll consider the testimony as provided and give it

18    the weight that I deem reasonable and appropriate based upon

19    my discretion.

09:11:04 20  **BY MR. SMITH:**

21  **Q**    So I'll just --

22                    MR. SMITH:  Thank you, Your Honor.

23  **BY MR. SMITH:**

24  **Q**    I'll just restate the question, Mr. Pfaff, so you

09:11:10 25    don't lose anything there.

**Pfaff (Direct)**

1      Do you know if Claudio disputed the ongoing issue with

2  the tooling?

3  **A**    My understanding is that he knew the tooling had

4  defects with them and that the tooling had the defects since

09:11:21  5  the beginning.

6  **Q**    Is there -- it looks like there is a reference to a

7  price adjustment in this email; is that right?

8  **A**    That is correct.

9  **Q**    Is it -- there's an attachment here, would you agree

09:11:36  10  with me?

11  **A**    Yes.  I see the attachment.

12  **Q**    Is this the price increase that is referenced in this

13  email?

14  **A**    Yes, it is.

09:11:46  15  **Q**    Is this also the price increase that ultimately is set

16  forth in the subsequent POs that we've looked at?

17  **A**    Yes.  The only difference is it became effective

18  October 1st, not September 1st.

19  **Q**    Understood.

09:12:01  20      I'm going to move to exhibit -- this is Defendant's

21  Exhibit C.

22      Have you seen this email before?

23  **A**    Yes, I have.

24  **Q**    It says here in the first sentence:  Thank you for

09:12:20  25  your time today.

32

**Pfaff (Direct)**

1      Let me -- who is this from and who is it to?

2  **A**     It's from CBAM's Claudio Caloura to my president, Tony

3  Parente.

4  **Q**     Okay.  And it says:  Thank you for your time today to

09:12:34 5  discuss your proposed price increase and issues with

6  production.

7      Do you see that there?

8  **A**     Yes, I do.

9  **Q**     Are you aware of this discussion?

09:12:43 10  **A**     Yes, I am.

11  **Q**     In the second sentence, it states, looks like --

12  excuse me, second paragraph:  Magna CBAM will agree to the

13  attached price increases under duress based on the threat of

14  stopped shipments from Anchor Manufacturing.

09:13:01 15      Do you see that?

16  **A**     Yes, I do.

17  **Q**     Are you aware, was that part of the discussion, this

18  notion of duress and threat of stopped shipments?

19  **A**     It was not part of the discussion.  In fact, when we

09:13:12 20  received this email and Tony showed it to me, I told him it

21  could not be said under duress because that was not the

22  case, and Tony agreed with me.

23      We had an agreement that they would have us write this

24  letter so they could give us the price increase relative to

09:13:28 25  the condition of the tool, and, therefore, subsequent

**Pfaff (Direct)**

1       discussions were for them to remove the word duress.

2       **Q**      So with respect to the price increase, was it actually

3       about the issue with the defective tooling?

4       **A**      Yes, it was.

09:13:40  5       The defective tooling causing us capacity issues,

6       making us work seven days a week, having extra rework, extra

7       grinding, extra sorting, extra scrap.

8       **Q**      Okay.  So this last paragraph I'm pointing to you

9       here, it says:  All of the above is predicated upon --

09:14:04  10      excuse me -- predicated based on Anchor providing written

11      documentation for the increase request and their position to

12      stop supply to Magna CBAM without increase with an effective

13      date of October 1st, '22.

14      Do you see that?

09:14:16  15      **A**      Yes, I do.

16      **Q**      So is this referencing the letter that Claudio had

17      asked that Anchor provide?

18      **A**      This did reference the letter that Claudio had asked

19      us to provide to them that CBAM could then give to General

09:14:34  20      Motors.

21      **Q**      Okay.  And then, I'm going to take you down -- is

22      this -- there's two attachments here.  I'm just going to

23      show you them.  You see this one and then this one.

24      Is this first attachment, is this the same price

09:14:49  25      increase or document setting forth the price increase that

**Pfaff (Direct)**

1    we just looked at in Exhibit B?

2    **A**    Yes, it is.

3    **Q**    Okay.  And then, this -- this -- what is this

4    document, this exhibit here?

09:14:59 5    **A**    This is a letter that was provided to us by CBAM, and

6    this letter, which I'm not sure who wrote it at CBAM, was

7    given to us saying:  We want you to sign and send this

8    letter back to us so we can use it to get a price increase

9    from General Motors.

09:15:14 10    **Q**    In all your years, have you ever seen the buyer ask

11    for a letter from the seller for a price increase?  Or has

12    it always been the other way around?

13    **A**    Usually it's the supplier who writes the letter that

14    would say something to the effect of you cannot have a price

09:15:34 15    increase.  This is the first time I had a customer write us

16    a letter that they say they want me to submit this.

17    **Q**    Why do you think that was?

18    **A**    I'm thinking that the -- that CBAM wanted to try --

19    they realized the tooling had issues and they felt that if

09:15:50 20    we were to go back to them and give them a letter, they

21    could use that letter with General Motors to basically get

22    General Motors to agree to a price increase.

23         However, I did not agree with this letter as it was

24    written.

09:16:06 25    **Q**    Why not?

**Pfaff (Direct)**

1    **A**    Because the letter makes no reference to the tooling

2    being the problem, which it was, and subsequent versions of

3    the letter mentioned the tooling in the drafts we sent back.

4    **Q**    Got you.

09:16:18  5    So I'm going to move to Exhibit D, this is Defendant's

6    Exhibit D.

7    Do you recognize this email?

8    **A**    Yes, I do.

9    **Q**    Okay.  And, primarily, I want to point to -- I'm going

09:16:32  10    to toggle back here from Exhibit C what we were just looking

11    at.  We talked about this sentence contained in the email

12    that says:  CBAM will agree to the attached price increases

13    under duress based upon threat of stopped shipments.

14    You testified about that; right?

09:16:47  15    **A**    Yes, I did.

16    **Q**    Okay.  Is that sentence in this email?

17    **A**    It's now the next day and because of us saying that

18    should not be there, because that was never discussed and is

19    not the case, it was removed.

09:17:15  20    Were you able to hear me?

21    **Q**    Yes.

22    **A**    Okay.

23    **Q**    So -- okay.  So moving to Exhibit E, have you seen

24    this document before?

09:17:28  25    **A**    Yes, I have.

**Pfaff (Direct)**

1    **Q**    What is this document?

2    **A**    This is our revised version of the letter, which I

3    wrote myself.

4    **Q**    Okay.  Does this document -- you indicated previously

09:17:42 5    that the letter that CBAM drafted, the initial letter,

6    didn't identify anything about the defective tooling; right?

7    **A**    That is correct.

8    **Q**    Did you insert that language here?

9    **A**    Yes, I did, in line 4.

09:17:56 10    **Q**    Okay.  Go ahead and read what your language was.

11    **A**    This includes the condition of the CBAM supplied

12    tooling as received at Anchor which has impacted production

13    lines -- sorry -- which has impacted Anchor's manufacturing

14    and cost structure.

09:18:10 15        The line above that also -- is also fairly important.

16    It says -- the last portion of that line says:  For the many

17    reasons we have discussed over the past several weeks.  We

18    are trying to make it clear that we are talking about the

19    tooling conditions and that is the reason that this price

09:18:27 20    increase is needed and that is what is causing the capacity

21    issue and that has been an ongoing discussion with them when

22    we started bringing it up back in August.

23    **Q**    Okay.  Moving to Exhibit F, was this -- have you seen

24    this document?

09:18:43 25    **A**    Yes, I have.

**Pfaff (Direct)**

1    **Q**    Did this document -- it appears there's highlighting

2    on this document.

3          Do you see that?

4    **A**    Yes.  I see the highlighting.

09:18:55  5    **Q**    Was this -- was this -- did this document, this

6    Exhibit F, come after the Exhibit E here?

7    **A**    Yes, it did.

8    **Q**    Okay.  Do you know why this -- these areas were

9    highlighted?

09:19:08 10    **A**    Yes.  I was the one who highlighted them.  These were

11    the two lines that, per what Tony told me, that CBAM wanted

12    to remove.  I had concern about removing those two lines

13    because they're the ones that link to the tooling.

14    **Q**    So, nevertheless, though --

09:19:25 15    **A**    Uh-huh.

16    **Q**    -- is the language contained in here still that the --

17    it says:  Purchase orders -- for the many reasons we have

18    discussed over the past several weeks.

19          Is that remaining?

09:19:36 20    **A**    Yes.  It remains.

21          And that's why we felt comfortable because the

22    previous drafts, and all of our discussions, were about the

23    condition of the tool.  We were verbally told by CBAM that

24    they did not want GM to know about the tooling conditions

09:19:51 25    and that, therefore, they did not want us to include those

**Pfaff (Direct)**

1    in the letter.

2    **Q**    Okay.  Moving to Exhibit G.

3         Okay.  Have you seen this document before?

4    **A**    Yes, I have.

09:20:04  5    **Q**    Is this what was -- this is the signed version; is

6    that right?

7    **A**    This was the signed version, which was sent on

8    November 28th, not October 28th.

9    **Q**    Okay.  So I want to stay there for a minute.

09:20:19 10         Did you hear testimony from Mr. Tanasoff about the

11   date of this document?

12   **A**    Yes, I did.

13   **Q**    Was there -- when you heard October 28th and -- did

14   you hear testimony regarding how this letter gave rise to

09:20:38 15   the price increase?

16   **A**    Yes.  I heard testimony that this letter that's dated

17   October 28th was the reason for giving Anchor the price

18   increase.

19   **Q**    What did you think about that?

09:20:48 20   **A**    I disagreed completely.  The price increase was

21   granted on November 10th.  We received an email on

22   November 28th, in the morning, asking us to give them the

23   final letter.  The final letter was given in the afternoon

24   of November 28th, which was 18 days after the price increase

09:21:06 25   was granted.

**Pfaff (Direct)**

1    **Q**    So, in your opinion, could this letter have given rise

2    to the price increase?

3    **A**    I do not believe it could have.  It was only a draft

4    form going back and forth at the time.

09:21:16 5    **Q**    And the letter was only with respect to trying to

6    recoup money from GM, not the impetus for granting the price

7    increase; is that right?

8    **A**    That is correct.

9         This letter's intent was to help them get recovery of

09:21:28 10   the price increase they had granted us.

11   **Q**    Is the language in this letter about the reasons

12   discussed over the past several weeks, is that language

13   still contained in the signed letter?

14   **A**    Yes.  It's in the third line and it's meant to

09:21:45 15   reference the issues of the tooling we have discussed.  We

16   felt we had enough other documentation about the tooling to

17   support that it was about the tooling.  Even if they did not

18   want to tell General Motors, we knew it was the defective

19   tooling.

09:21:57 20   **Q**    I'm going to move to Exhibit H.

21        Have you seen this?

22        And I can scroll through here because there are some

23   attachments.

24   **A**    I have seen this email and all the documents.

09:22:22 25   **Q**    Okay.  This first attachment to this -- well, let me

40

**Pfaff (Direct)**

1    go back.

2          This first email is from when?

3    **A**    November 10th.

4    **Q**    Okay.  And you just testified that this is when the

09:22:37 5    price increase was granted; is that right?

6    **A**    That is correct.

7    **Q**    Or agreed to?

8    **A**    Agreed to.  Yes.  Officially agreed to.

9    **Q**    And does this email also contain the purchase order

09:22:52 10    for -- containing the updated prices?

11    **A**    Yes.  It has all of the new pricing that we had

12    submitted and has been agreed to.

13    **Q**    Okay.  So, in your mind, is this, you know, a

14    subsequent agreement because it contains increased prices?

09:23:07 15    **A**    Yes.  This replaced the initial purchase order.

16    **Q**    Okay.  This -- so I'm looking now at this email, and

17    it's from Ben Nekola.

18          Do you see that?

19    **A**    Yes, I do.

09:23:19 20    **Q**    Who is Ben Nekola?

21    **A**    He works in purchasing, and I believe he works for

22    Mr. Tanasoff.

23    **Q**    Okay.  This -- also, this emails references retro

24    payments, 10-1-22 to 11-9-22.

09:23:36 25          What are those?

**Pfaff (Direct)**

1    **A**    Those are the payments that you see on the table

2    there.  They are the price increase that was granted from

3    October 1st through November 9th and the amount for each of

4    those, for the number of parts shipped times the price

09:23:49  5    increase.

6    We were told by CBAM that they wanted to hold back

7    this payment until the die exited Anchor.  At the point the

8    die would leave, they would pay us.  The reason they said

9    they wanted to hold it back was to ensure that we would

09:24:02  10    build the bank quantity as quickly as possible and be

11    cooperative, and so, therefore, we agreed to it.  And then,

12    when the dies exited Anchor, we were supposed to be paid

13    that amount immediately.

14    **Q**    And do you see where this says, this fourth column

09:24:16  15    contained in this embedded table, it says:  Payment owed to

16    Anchor post die exit?  Do you see that?

17    **A**    Correct.  Correct.

18    **Q**    Are these the retro payments or the lump sum payments?

19    **A**    Yes.  They're referred to as lump sum payments in this

09:24:31  20    proceeding.

21    **Q**    And you said that these payments were supposed to be

22    made once -- immediately upon the tooling leaving Anchor's

23    facility?

24    **A**    As the tool -- as the tool was exiting our facility,

09:24:42  25    we were supposed to be paid those amounts.

**Pfaff (Direct)**

1    **Q**    Has Anchor received the lump sum payments, all of the

2    lump sum payments that are set forth in this fourth column?

3    **A**    All of those dies are gone and we've received only six

4    of those 12 payments.

09:24:56 5    **Q**    Do you consider that to be a breach of the agreement?

6    **A**    I absolutely consider that to be a breach of the

7    agreement.

8    **Q**    This -- down here at this last sentence, it talks

9    about historical receipts.

09:25:15 10        Do you see that?

11    **A**    Yes, I do.

12    **Q**    It says:  Attached -- in the attached file, tab

13    historical receipts, is a tracking sheet for retro payments

14    that will be scheduled on all other parts, total

09:25:33 15    $274,888.55, for October 1st, '22 through November 9, '22.

16        Do you see that?

17    **A**    Yes, I do.

18    **Q**    What is this in reference to?

19    **A**    It's referencing there are parts not on this list that

09:25:45 20    we are supplying to CBAM.  Those parts, the intent was to

21    keep them here for an indefinite period of time, perhaps the

22    life of the product, and that $274,000 number was the price

23    increase on those parts that was effective 10-1, and it was

24    a lump sum payment that was made that day or the next day

09:26:05 25    for those parts not on the list.

**Pfaff (Direct)**

1    **Q**    So you recall some testimony back earlier about phase

2    1 and phase 2 tooling to be removed, and then, basically,

3    all of the other tooling.

4        Do you recall that?

09:26:19 5    **A**    Yes, I do.

6    **Q**    Do you recall some testimony about whether a lump sum

7    payment was supposed to be made for all phase 1/phase 2 and

8    basically the remainder of the tooling?  Do you recall that?

9    **A**    Yes, I do.

09:26:35 10    **Q**    Okay.  Is it your understanding, one way or another,

11    whether lump sum payments were to be made on parts for all

12    tooling or just phase 1 and phase 2?

13    **A**    This clearly, to me, spells out that all parts were

14    going to receive lump sum payments, some made immediately,

09:26:53 15    the other ones on the table to be made when the dies would

16    exit.

17    **Q**    Okay.  So I want to move not necessarily about to the

18    lump sum payments, but I want to focus a little bit on the

19    total, okay, the total amount --

09:27:06 20    **A**    Okay.

21    **Q**    -- that's due and owing to Anchor.

22        Do you know how much that is?

23    **A**    Yes, I do.

24    **Q**    How much is that?

09:27:13 25    **A**    It's 1 million -- roughly 1,918,000 and some change.

**Pfaff (Direct)**

1  **Q**     And is that -- and to be fair, is that -- is all of

2  that owed by CBAM to Anchor specifically?  Or do -- does

3  there need to be a raw material deduction?

4  **A**     There is a raw material offset that CBAM does take.

09:27:37  5  It's something they calculate, and I don't have enough

6  records to calculate it myself.  So there is some amount for

7  raw material that needs to be deducted.

8  **Q**     But you need that information from CBAM in order to

9  identify specifically what they owe?

09:27:52 10  **A**     Correct.  What the net AR is.

11  **Q**     Has CBAM provided that information?

12  **A**     We have an approximate number, that I can't audit,

13  that's of roughly $638,000.

14  **Q**     Okay.  So what's the balance, approximately, that's

09:28:06 15  presently owed to Anchor?

16  **A**     If that 638,000 is accurate, it would be roughly 1.28,

17  somewhere in that range.

18  **Q**     And it's your position, based upon all the agreements

19  we looked at and the relationship of the parties, that the

09:28:26 20  amount -- the amount is past due and owing or is due and

21  owing; is that fair?

22  **A**     I would say it's past due, based on the fact that the

23  dies have moved.

24  **Q**     And that failure to pay, to you, is that a breach of

09:28:36 25  the agreements?

**Pfaff (Direct)**

**A**      Yes, it is.  It's a breach of all the agreements we have with them.

**Q**      I want to show you -- share with you my screen, Exhibit J.  This is Defendant's Exhibit J.

09:28:58       Have you seen this document before?

**A**      Yes, I have.

**Q**      What is this document and what's its purpose, to your knowledge?

**A**      This is us letting CBAM know that this is the amount
09:29:10 that is owed to us.  At the time, we thought it was 1,999,000.  We rechecked our accounting and determined it was only 1,918,000.  And it's basically saying that we have a lien against their tool for that amount and we are not going to release the tool until that lien is fulfilled in
09:29:31 the amount of the open AR we have.

**Q**      Was a lien letter also sent to GM?

**A**      Yes, it was.

**Q**      So why -- why is Anchor in possession of this one tool and die set even though you returned the other 14?

09:29:54 **A**      CBAM has breached their agreement with us to pay upon return of the tools the open AR, lump sum payments, and, therefore, we felt the only way to get paid was to put a lien on this tool and hold this tool until we received our payment.

09:30:10 **Q**      Would you agree to -- would you agree to return the

**Pfaff (Direct)**

1    tooling?

2    **A**    I would immediately return the tooling upon payment of

3    the open AR.

4    **Q**    So the only thing standing in the way of returning the

09:30:21  5    tooling is CBAM paying Anchor what Anchor's owed?

6    **A**    That is correct.  For parts that I shipped that were

7    useable parts that were put in service.

8    **Q**    And, ultimately, even if CBAM, you know, had some

9    issue or claimed some set-off or something to that effect,

09:30:39 10   could those issues be worked out subsequent to the return of

11   the tooling?

12   **A**    The ideal situation would be for CBAM to pay the open

13   AR for good, useable parts I shipped them, and then, after

14   that, we can have a discussion and they get their tool back.

09:30:54 15  We have a discussion then about the cost they believe they

16   incurred and the costs I believe I incurred because of the

17   tooling, and then that issue could be resolved at a business

18   level hopefully.

19   **Q**    So, basically, the transition of the tooling from

09:31:07 20  Anchor back to CBAM, in your eyes, is purely monetary?

21   **A**    That is correct.  It's, for whatever reason, CBAM not

22   wanting to pay the accounts receivable owed to Anchor for

23   good, quality parts and us not releasing the tool until that

24   open AR, which is due to us contractually, is paid.

09:31:24 25  **Q**    And I just want to understand this now from more of a

**Pfaff (Direct)**

1    business perspective and the way that you view it, as far as

2    why you held on to the tooling.

3        I just want you to explain to the Court, you know, why

4    it is that, you know, you released the 14 tool and die sets,

09:31:40  5    but then you retained the last one.  We've gone through a

6    lot of material.  I want to just give you the opportunity to

7    explain why it is and why it's important for you to have

8    this tooling, recognizing all of the occurrences.

9    **A**    Well, I mean, perhaps being a small, family-owned

09:31:57 10   business, I'm too trusting.  And we expected we would get

11   paid for those tools when we released them.  We did not get

12   paid for those tools.  We then figured, okay, maybe they're

13   trying to catch up on their accounting.  They're a bigger

14   company, it may take them time.

09:32:09 15       And then, at the very end, as we got down to the last

16   set of tools, we kept saying:  Well, we need you to pay your

17   open AR, your lump sum payments, your open AR.  And then,

18   next thing we know, instead of paying us, I received a

19   lawsuit.  And I was very surprised at that because I was

09:32:24 20   hoping we'd have a business arrangement, like most companies

21   do, and say, okay, we owe you these for parts, we'll pay you

22   for the parts, we'll take our final tool.  But, instead,

23   like I said, I received the TRO and the lawsuit against us.

24   **Q**    Did you feel -- were you -- let me put it this way.

09:32:41 25       Were you surprised or did you feel -- I know you said

**Pfaff (Direct)**

1    too trusting.

2         Did you feel like, you know, one got pulled over on

3    you by sending the tooling out the door and not getting

4    paid?

09:32:51   5   **A**    I was taken.  Because after the first sets of tools

6    went out and the payment didn't come in, it all happened

7    very fast.  Our primary concern was to make sure we were

8    producing enough parts for them.  We were -- to make sure we

9    were hitting the bank builds, which we did, given -- the

09:33:06 10   numbers given to us by the two gentlemen on-site, we always

11   hit their numbers.  Or they said move it now, don't wait to

12   hit the number, just pull it and take it, and we followed

13   those instructions.

14        So, yes, I feel like, once again, I call it too

09:33:21 15   trusting, call me gullible.  I believed that I was going to

16   get paid for those tools, up until the very end until we had

17   the last tool and no payment came in and, instead, I got a

18   lawsuit.

19   **Q**    And was that belief based upon an agreement that you

09:33:35 20   reached that we went over with CBAM?

21   **A**    Yes.  It was the agreement we had reached that was

22   officially, November 10th was finalized in the email and the

23   purchase orders.  And that's the agreement I feel was

24   completely violated, which caused me then to have to place

09:33:46 25   the lien on the tooling so I can get my payment of the AR

**Pfaff (Direct)**

1    that's due to Anchor.

2    **Q**    Would Anchor be willing to manufacture parts for CBAM

3    until this, the payment issue, is resolved?

4    **A**    Yes.  I have made that offer numerous times, both

09:34:02  5    verbally and in writing, that we have the capability and

6    capacity to continue to produce parts, and we have already

7    produced parts over the last couple weeks, and we will

8    continue to do so to get this resolved so there is no

9    imminent danger of shutting down any customer.

09:34:16  10    **Q**    And so, therefore, you believe that this, making

11    parts, would ultimately alleviate the alleged supply chain

12    issues concerning the tooling?

13    **A**    Absolutely.

14         It has already because I've already run 12,800 more

09:34:29  15    parts, which takes it out over two and a half weeks.  I have

16    a few more parts here that they can take and ship out if

17    they want them.  I made that clear.

18         And I'm prepared to run more parts as I need to for

19    what it takes to resolve this issue on a business level.

09:34:42  20              MR. SMITH:  Thank you, Mr. Pfaff.

21         I have no further questions.

22              THE COURT:  Any cross-examination?

23              MR. DeWAARD:  Yes, Your Honor.

24              THE COURT:  All right.  You may proceed,

09:34:56  25    Attorney DeWaard.

## Pfaff (Cross)

1          MR. DeWAARD:  Thank you.

2          **CROSS-EXAMINATION OF FREDERICK PFAFF**

3     **BY MR. DeWAARD:**

4     **Q**     Mr. Pfaff, you've referenced a number of emails and

09:35:06  5    documents that your counsel has used in these proceedings.

6          Have you reviewed all of the exhibits that your

7     counsel presented to the Court to be used in these hearings?

8     **A**     I have seen all the exhibits.

9     **Q**     Have you reviewed the Cosma's exhibits as well that

09:35:27 10   were provided?

11    **A**     The majority of them.

12    **Q**     All right.  And your claim here is that Cosma was in

13    breach of contract from the very beginning when their

14    tooling was shipped to Anchor; correct?

09:35:45 15   **A**     That is correct.

16    **Q**     And when, to your recollection, was that tooling

17    shipped to Anchor?  When was it received by Anchor?

18    **A**     I believe it started in October of 2019.  And then,

19    subsequently, a few weeks after, some more came in.

09:36:03 20   **Q**     All right.  Now, in 2019, you don't provide to this

21    Court any communications or emails indicating that the tools

22    were defective when you received them, do you?

23    **A**     I do not.  I believe they're in the exhibit.

24    **Q**     Okay.  And you don't provide any emails or documents

09:36:25 25   in which Anchor claims the tools were defective in 2020, do

**Pfaff (Cross)**

1    you?

2    **A**    We -- they exist, but they were not provided.

3    **Q**    Okay.  And you didn't provide any emails that would

4    show Anchor claiming the tools were defective in 2021, do

09:36:44  5    you?

6    **A**    Once again, they exist, but were not presented.

7    **Q**    All right.  So we've had a number of hearings now, as

8    this has stretched over a period of time, you certainly had

9    an opportunity to provide those emails if you had them,

09:36:59 10    didn't you?

11    **A**    I -- I assume there's an opportunity.  I do not know

12    exactly how this all works with exhibits and disclosures, et

13    cetera, because I'm not a legal person.

14    **Q**    All right.  Now, during the relationship between Cosma

09:37:15 15    and Anchor, it's fair to say that Cosma was claiming that

16    quality issues were the fault of Anchor; correct?

17    **A**    That was an inappropriate assertion.  We --

18    **Q**    I --

19    **A**    -- argued that vehemently.

09:37:31 20    **Q**    I didn't ask you that.  My question was -- listen

21    carefully -- you're aware that Cosma was claiming the

22    quality issues were Anchor's, that's what they were

23    claiming; correct?

24    **A**    That is their claim.

09:37:42 25    **Q**    All right.  And that claim didn't start at this

**Pfaff (Cross)**

1    hearing, that claim stretched back to during the

2    relationship; right?

3    **A**    That claim was theirs since the tools arrived.

4    **Q**    Right.

09:37:53  5         And they claimed that there was cracking in the parts

6    and they claimed that was due to Anchor's production of the

7    parts; correct?

8    **A**    They said that.

9    **Q**    Yes.

09:38:02  10        And they said that there were other problems, such as

11   with the tabs that required grinding, they said that was due

12   to the fault of Anchor, that's what they said; right?

13   **A**    That is what they said.

14   **Q**    Okay.  So there is a dispute that has arisen between

09:38:18  15   Anchor and Cosma over whose fault the quality issues are;

16   correct?

17   **A**    Not in my mind.

18   **Q**    Well, isn't it a dispute when two parties don't agree?

19   **A**    If one party is correct and the other is not, it may

09:38:33  20   be a dispute, but it doesn't mean that it's some equal,

21   level playing field.

22   **Q**    Well, isn't it fair to say, in your business

23   experience, that both parties have a point of view, don't

24   they?

09:38:43  25   **A**    Yes.  But sometimes one is based on fact and one is

**Pfaff (Cross)**

1    not.

2    **Q**    All right.  And you haven't been able to present any

3    facts in any emails from 2019, 2020, or 2021 in which you

4    demonstrated there was any problems with the die, have you?

09:39:00 5    You haven't been able to produce those?

6    **A**    Those have not been put in front of the Court.

7    **Q**    And you claim, because you say the dies were defective

8    from the beginning, that the terms and conditions that Cosma

9    has and has presented in this hearing, that they don't

09:39:22 10    apply?

11    **A**    That is my feeling, yes.

12    **Q**    That's your feeling.

13          But that's not based on any facts, is it?

14    **A**    Well, it's based on the facts that tool arrived in bad

09:39:32 15    condition and we were told they were supposed to be in good

16    condition, and, therefore, the purchase order was based upon

17    that assertion made to us by CBAM.

18    **Q**    All right.  And there's no document or writing that

19    says the terms and conditions don't apply because of the way

09:39:48 20    the dies showed up, there's nothing that says that, is

21    there?

22    **A**    No.  But it doesn't change the reality of it.

23    **Q**    All right.  Well, let's take a look at Cosma's

24    Exhibit 1.

09:40:06 25          Do you have those in front of you?

**Pfaff (Cross)**

1    **A**    Actually, if you could pull it up, that would be

2    helpful, because I had them electronically, but now I'm on

3    the main screen.

4    **Q**    All right.  We'll pull it up here for a minute.

09:40:21  5    **A**    Thank you.  I appreciate that.

6    **Q**    I'm going to have Mr. Doyle pull it up so you can

7    still see me asking questions.  I suppose that won't matter.

8         Well, let me ask you the first question -- we'll pull

9    that up in a second -- but you've looked at those purchase

09:40:47 10   orders; right?

11   **A**    Yes, I have.

12   **Q**    And you're aware that there's language on each page

13   that says that the terms and conditions are integrated into

14   the purchase order?  You've seen that?

09:40:56 15   **A**    Well, we've reviewed it earlier today.

16   **Q**    Okay.  So you're aware that the document itself

17   integrates the terms and conditions?

18   **A**    Yes.

19   **Q**    You're aware that there's a statement at the end of

09:41:08 20   the purchase order that also says the terms and conditions

21   are part of the parties' contract?

22   **A**    They're part of the purchase order.  Correct.

23   **Q**    Which is the parties' contract; correct?

24   **A**    I believe so, yes.

09:41:24 25   **Q**    All right.  Well, since we've clarified that, why

**Pfaff  (Cross)**

1    don't we bring up, instead, Exhibit 8, which are the terms

2    and conditions, and let's look at paragraph 1(a) here.  Mr.

3    Doyle is going to bring it up.

4         All right.  You see 1(a) there?

09:42:02   5    **A**    Yes, I do.

6         Thank you.

7    **Q**    Have you ever reviewed this before?

8    **A**    I have looked at these before, yes.

9    **Q**    All right.  And we can go through this in detail, but

09:42:11  10   is it fair to say that the offer and acceptance section here

11   indicates that Anchor would accept the terms of the purchase

12   order, including the terms and conditions, by shipping

13   product?

14   **A**    I -- honest, sir, I read a lot of these, so I'd have

09:42:35  15   to refresh myself real quick.

16   **Q**    Okay.

17   **A**    Because I see a lot of these coming through our

18   organization.

19        Let's see, the -- yep, I see that now on item III that

09:42:48  20   you highlighted.  Thank you.

21   **Q**    So your claim is that this agreement to the terms and

22   conditions in the acceptance of the purchase order is

23   somehow dissolved by your claim that the tools were not up

24   to snuff when they were shipped?

09:43:06  25   **A**    I see the terms and conditions as an adjunct tied to

**Pfaff (Cross)**

1    the purchase order, and when the purchase order is violated

2    by having tools that are not able to produce parts to the

3    quality level and production level, that, therefore, it

4    voids out the purchase order, it breaches that, and,

09:43:22  5    therefore, everything attached to it, including the terms

6    and conditions, are no longer relevant.

7    **Q**    If that's true -- and you're in charge of contracting

8    there; right?  Is that what you said?

9    **A**    I review contracts that come through to us, yes.

09:43:34 10    **Q**    Okay.  If that's true, then what part of the --

11    anything in the purchase order would be enforceable?

12    **A**    It would be enforceable if the tools arrived in the

13    condition that they were promised to us and what we expected

14    and what our pricing was based upon and our capacity studies

09:43:55 15    were based upon, then everything would apply.

16    **Q**    My question is -- my question is:  If the terms and

17    conditions of the purchase order don't apply because of the

18    way the tools came, then why would any of the provisions

19    apply, including the price that you claim you're owed?

09:44:10 20    **A**    Can you ask that question again, sir?

21    **Q**    Sure.

22         You're claiming that the terms and conditions in the

23    purchase order don't really apply here because of the

24    conditions the tools were in when they arrived, according to

09:44:21 25    you.

**Pfaff (Cross)**

1        Then why would any of the terms and conditions or

2    purchase order apply to any of this?

3    **A**    Well, what I'm saying right now is the failure to pay

4    on the purchase order as agreed on November 10th has caused

09:44:38 5    a breach that has erased this.  And CBAM is not paying me,

6    therefore, CBAM has breached the purchase order, and,

7    therefore, they're the ones who violated the purchase order

8    and got rid of the terms and conditions.

9    **Q**    Okay.  I thought what you were saying was that the

09:44:51 10    terms and conditions don't apply because of the condition

11    that the tools came in.

12        You're not saying that?

13    **A**    No, I am saying that.  The condition the tools came in

14    is what initially has caused the issue with the purchase

09:45:04 15    order.  So, for me, at least, the initial purchase order had

16    a problem because we did not have appropriate, workable

17    tooling sent to us.  It was defective tooling.

18    **Q**    So you're --

19    **A**    It was slipped in to us.

09:45:17 20    **Q**    So your claim is because the tools didn't come in the

21    condition you thought they should be in, that the purchase

22    order and the terms and conditions don't apply?

23    **A**    My feeling is that since the tools were sent to us in

24    a defective condition, which was the premise for the initial

09:45:32 25    purchase order, that, therefore, that purchase order is not

**Pfaff (Cross)**

1  valid, and, therefore, anything associated with that

2  purchase order is also not valid.

3      Now, I am not a legal expert, but you asked me my

4  opinion, that is my opinion.

09:45:42 5  **Q**   Okay.  That's your opinion.

6      Then you don't really have a basis to demand any

7  amount of money from Cosma since there's no contract that

8  requires Cosma to pay the price?

9  **A**   Once again, I'm not an attorney, but I ship goods and

09:45:56 10  I expect payment for the goods I shipped.  I believe there's

11  other laws that govern that.

12  **Q**   Okay.  So your view is that none of these provisions

13  apply then because you didn't like the equipment of the

14  tooling?

09:46:08 15  **A**   Well, it's a rather broad statement.  I would say that

16  I believe the purchase order was breached because of the

17  condition of the tool.  The rest of it was more of a legal

18  matter as to what applies and does not apply.

19  **Q**   But you never declared a breach in 2019, 2020, or

09:46:25 20  2021; correct?

21  **A**   Had it not been for COVID, we probably would have had

22  that discussion a lot earlier, because there were

23  discussions about trying to improve the tooling with CBAM,

24  of us offering to rebuild some dies, if possible, to

09:46:37 25  actually build some brand new tools for ones that were

**Pfaff (Cross)**

1    poorly designed, and that discussion was ongoing until COVID

2    hit in the spring of 2020 and then everything dropped

3    because of COVID --

4    **Q**    Okay.

09:46:48 5    **A**    -- because everyone closed their doors.

6    **Q**    Listen to my question.  My question is:  Isn't it true

7    that you never declared a breach because of the tooling in

8    2019, 2020, or 2021; correct?

9    **A**    I gave you the why.  But the answer is, yes, we did

09:47:04 10    not declare a breach in any of those years.

11    **Q**    Okay.  And, in fact, in 2022, you didn't declare a

12    breach either, did you?

13    **A**    Towards the very end of the year, we were looking at

14    it as a breach because the payments were not being made

09:47:19 15    towards the end of the fourth quarter.  We did not write a

16    letter claiming a breach.

17    **Q**    And you went through the set-off provision in these

18    terms and conditions.

19        You would agree, would you, if these terms and

09:47:34 20    conditions did, in fact, apply, that it would permit Cosma

21    to set-off amounts that it claimed it was due; correct?

22    **A**    In my 37 years of doing this, whenever there's a

23    discussion of set-off amounts, it's a two-way street.  We

24    would look at Anchor's costs, verify them; we would look at

09:47:52 25    CBAM's costs, verify them, and see who really incurred more

**Pfaff  (Cross)**

1   damages.  This is a one-way discussion so far where I've

2   heard of CBAM's damages and no one seems to care about the

3   millions I've lost since 2019 because of these tools.

4   **Q**   Sir, my question is:  If the terms and conditions

09:48:11 5   apply, they set forth contractual terms; correct?

6   **A**   When they apply.

7   **Q**   Okay.  And you agree -- we can go look at it if you

8   want, but by the language of the set-off provision, Cosma

9   could set-off amounts from what it otherwise owes Anchor if

09:48:29 10  it claims it has damages; correct?

11  **A**   I disagree.  Because I myself believe that the

12  conditions of the tools is what caused all of this and that

13  is the responsibility of CBAM.  So I would argue with any

14  offset, that it's not a true offset.  It's CBAM covering for

09:48:47 15  their own lack of quality of tooling and trying to put it on

16  a supplier.  And I don't consider that a valid offset

17  because it was not an action of Anchor that created this.

18  **Q**   But that's just a dispute, isn't it?  You claim that

19  and Cosma claims the other?  That's a dispute; right?

09:49:07 20  **A**   Well, it says -- you're talking about recoupment

21  provided by law.  I mean, is it legal just to pick a number

22  and say I'm going to offset somebody?  It has to be actual

23  claims that are verified, which there's no verification.

24       And, frankly, I dispute the amounts that were put into

09:49:22 25  evidence here.  Several are impractical.  There's no way of

**Pfaff (Cross)**

1    doing $700,000 of die repair in two weeks.  That's

2    impossible.  If you add the hours up, it's 15,000 hours.

3    **Q**    Well go down to the second -- or the sentence that

4    starts with:  Buyer may do so without notice to seller or

09:49:37  5    its subsidiaries or affiliates.

6        Do you see the sentence that follows that?

7    **A**    The one about buyer -- about buyer may defer payment

8    amounts until obligations are resolved?  Is that what you're

9    referring to?  What one are you referring to, sir?

09:49:55  10    **Q**    I'm referring to the sentence that's highlighted right

11    now.

12    **A**    Okay.

13    **Q**    It says:  If any obligations of seller or its

14    subsidiaries or affiliates to buyer or its subsidiaries or

09:50:06  15    affiliates are disputed, contingent, or unliquidated -- let

16    me stop there.

17        So it can be amounts that are disputed, amounts that

18    are contingent, or unliquidated; right?  That's what that

19    language says?

09:50:20  20    **A**    That's what that one line says.

21        However, I look at it as a whole and I don't consider

22    the terms and conditions valid because of the breach that

23    occurred both on the fail of the lump sum payments, because

24    of the lack of the quality of the tooling coming in, and the

09:50:34  25    claim that no AR will be paid.

**Pfaff (Cross)**

1      So, therefore, I don't consider these terms and

2   conditions applicable.

3   **Q**    All right.  I heard your position.

4        And my question -- again, I'll clarify it -- is:  If

09:50:44  5   these are -- if these are indeed applicable, that language

6   does indicate that Cosma's claim can be set-off even if it's

7   disputed, contingent, or unliquidated, that's what that

8   says; correct?

9   **A**    You have a question there, a hypothetical.  So my

09:51:03  10   question to you is:  Are you talking to this case?  Or are

11   you talking in general, in the open world, is this what it

12   means if it's not referencing this case?  Because in this

13   case, they do not apply.

14   **Q**    Well --

09:51:14  15   **A**    If not, I can tell you what the words say.  But the

16   words are not applicable in this case in my opinion;

17   therefore, it's a hypothetical I cannot accept.

18   **Q**    You've repeated that numerous times and I think the

19   Court understands what you're saying.

09:51:27  20   **A**    Uh-huh.

21   **Q**    I want to make it clear here that if they do apply, if

22   they do, if the Court finds they apply, you would agree that

23   that would apply, this language would allow Cosma to set-off

24   claims even if they're disputed, contingent, or

09:51:43  25   unliquidated; correct?

**Pfaff (Cross)**

1    **A**    No, I don't agree.

2    **Q**    Even if these apply?

3    **A**    You said if they apply.  I heard you.  If they apply,

4    no, I do not agree.

09:51:52 5    **Q**    And you don't agree because you think disputed means

6    something other than the obvious commonsense meaning that it

7    has?

8    **A**    I could dispute the word claim what it means.  There's

9    all kind of things that I could dispute.

09:52:07 10    Like I say, I'm not a legal scholar, but, to me, this

11    does not allow the unfetterred rights for a customer not to

12    make payment on goods delivered.

13    **Q**    It does indicate here, doesn't it, that the buyer may

14    defer payment of amounts due until such obligations are

09:52:25 15    resolved?  It says that; correct?

16    **A**    You just read what the words said.

17    **Q**    And do you agree that what that means is:  If these

18    apply, if they do, then Cosma could defer payments, even if

19    amounts were due, until its claims are resolved?

09:52:44 20    **A**    I will go back to what I was saying, that I don't

21    believe they apply, and, therefore, on the if is a very big

22    contingent to be talking about in that hypothetical world.

23    **Q**    That's the question I'm putting to you.  I want you to

24    accept the if.  You've given your position as to why they

09:53:03 25    don't apply.

**Pfaff (Cross)**

1    If they do, you would agree this language would allow

2    Cosma to hold back payments even if due; correct?

3    **A**    I would further argue that if this was involved in a

4    standard business case that we have, that I would say that I

09:53:18   5    would not accept that language to mean that they could, on a

6    whim, defer payments.  I believe there's some expectation of

7    reasonableness and I do not believe it's unfettered, do as

8    we wish, just not pay you.  I do not read that into that

9    clause.

09:53:33  10    **Q**    All right.  So you testified you think this is being

11    done on a whim.  So let me ask you about that.

12    This number that you put, this moving number, you

13    started out in your demand at nearly $2 million, 1.19 --

14    1.99 and some change; correct?

09:53:51  15    **A**    Correct.  And it's moved $70,000, $80,000.

16    **Q**    But you're -- you are conceding that that number is

17    not accurate; correct?

18    **A**    The initial number I had to put together over New

19    Year's Day weekend when I was out of town and did the best I

09:54:07  20    could to get a number together.  We then, since, did more

21    accounting and realized the number was, I think, roughly

22    $80,000 too high, which we then corrected in subsequent

23    communications.

24    **Q**    The number is too high, by your own admission, because

09:54:24  25    it doesn't reduce it by the raw materials; correct?

**Pfaff (Cross)**

1   **A**    In addition to being the adjustment we made, which is

2   relative to shipments that we had to put through manually,

3   after the tools left, on parts, that was the 80,000.  The

4   remaining amount is not really known to us.  That's the

09:54:38  5   amount of raw material that was sent to us by CBAM, which is

6   then debited.

7       Plus, we also sent out a substantial amount of raw

8   material and we don't know how much of that was charged to

9   us by CBAM, yet shipped out to another supplier or a CBAM

09:54:54 10   location.

11   **Q**    You also include amounts that you claim are owed for a

12   lump sum payment; correct?

13   **A**    That is correct.

14   **Q**    But you never provided -- as these later dies were

09:55:07 15   released, you never provided amounts in connection with lump

16   sum payments for each of those dies as they were released,

17   did you?

18   **A**    Those lump sum payments were on an email dated

19   November 10th from Ben Nekola and clearly set out the

09:55:21 20   amounts.

21   **Q**    And those amounts are not included for this particular

22   die, 1213/1253, in that email, are they?

23   **A**    There were no lump sum payments for the 1213/1253, as

24   that was one of the dies that CBAM intended Anchor to keep

09:55:39 25   for an extended period of time, and potentially the life of

**Pfaff (Cross)**

1    the product.

2    **Q**      Correct.

3    **A**      Also, those lump sum payments were made as of

4    October 1st, and the retro payment made on November 10th,

09:55:49 5    and then paid subsequently at the higher piece price when

6    the AR is paid.

7    **Q**      And you've heard Cosma's position that the lump sum

8    payments that were agreed upon actually have been paid,

9    you've heard that from Mr. Tanasoff; correct?

09:56:01 10   **A**      I also saw an exhibit, your Exhibit N, that shows that

11   they were not paid.

12   **Q**      In that Exhibit N, though, that's the very email in

13   which you leveraged Cosma to pay $645,000, that would

14   include those payments; correct?

09:56:20 15   **A**      No.  That is an email from Ben Nekola outlining to my

16   CFO, Dan Piwowar, outlining what has been paid and what has

17   not been paid.

18   **Q**      Right.

19   **A**      And it shows six items paid and six not paid.

09:56:34 20   **Q**      And if you look later in that email, they actually,

21   Cosma, makes those payments in addition to, with that --

22   those particular dies, makes the payments of all parts on

23   that account; correct?

24   **A**      I can, with a hundred percent certainty, tell you that

09:56:49 25   those payments have not arrived.  And I know CBAM knows that

**Pfaff (Cross)**

1    also.

2    **Q**    You did require them, before those dies were released,

3    to pay all the accounts of those particular dies; correct?

4    **A**    As the dies were being released.  The agreement we had

09:57:07   5    was as the dies were being loaded on the truck, the payment

6    would be made.

7    **Q**    And on those dies that are referenced in that email,

8    those payments were made; correct?

9    **A**    No, they were not.  There are six tools -- and I know

09:57:19  10    what numbers are them -- that have not yet been paid, the

11    lump sum payments.  I can provide you those part numbers, if

12    you want.  They're in the Exhibit N.  I can read them off to

13    you, if you'd like.

14    **Q**    Well, in this hearing, you have not provided documents

09:57:56  15    that would show accounts not being paid, other than your

16    affidavit; correct?

17    **A**    Well, that, and your Exhibit N shows they're not paid.

18    **Q**    Doesn't, ultimately, Exhibit N include a payment of

19    645,000?  Do you agree with that?

09:58:15  20    **A**    There's a payment included in the Exhibit N.  Yeah,

21    it's in there eventually in some of the earlier payments

22    that came through.

23        But Exhibit N, dated December 1st email from Ben

24    Nekola at 10:57 a.m., shows that there are six dies that

09:58:31  25    were paid for and six that were not paid for.  And that has

**Pfaff (Cross)**

1    been acknowledged by CBAM to me.

2    **Q**    Where is that acknowledgement that lump sum payments

3    have not been paid?

4    **A**    I have emails not in record that occurred after the

09:58:49  5    start of the proceedings, but prior to -- prior to

6    negotiation for settlement, and I -- we were trying to

7    reconcile numbers.  I've had conversations with Mr. Tanasoff

8    on the same topic.

9    **Q**    As of this date, December 6th, they had paid for all

09:59:10  10   lump sum payments for dies that were released as of

11   December 6th; correct?

12   **A**    That is not true.  Those six dies still are missing

13   lump sum payments.  The remittance from CBAM shows that for

14   that payment.

09:59:42  15   **Q**    All right.  Well, let's take a look at that exhibit,

16   which is Exhibit 14.

17        At the very back of it --

18   **A**    I see something now.

19   **Q**    All right.  Let's work up to page 10.

10:01:18  20        All right.  This is the portion where you testified

21   earlier that has the amounts associated with the lump sum

22   payment?

23   **A**    That is correct.

24   **Q**    And by the way, the lump sum payment at this time

10:01:28  25   related to phase 1 and phase 2; correct?

**Pfaff (Cross)**

1    **A**    It referred to phase 1, but that phase 1 list right

2    here has nothing to do with the phase 1 list that we were

3    shown that was established in August, September.  They're

4    different parts.

10:01:48  5    **Q**    But there's no list that shows a lump sum payment due

6    for the die 1213/53 you're holding on to; correct?

7    **A**    That would be under the, what's called the historical

8    tab you see at the bottom there.  It was part of the

9    $274,888 payment that was made around that period of time.

10:02:07  10    **Q**    At this point in time, in November, that die wasn't

11    even going to be released; right?

12    **A**    That die was intended to keep at Anchor indefinitely.

13    **Q**    Okay.  So you go -- if you move up on this to the ones

14    that are claimed not to have been paid that you referenced

10:02:25  15    earlier in your testimony here --

16    **A**    Right there.

17    **Q**    -- the ones that are moved and the ones that are not

18    moved; correct?

19    **A**    That is whether they've moved or not moved as of that

10:02:35  20    date.

21        So you will see that $193,000 was part of the payment

22    that's in the first page of what you showed me.  However,

23    those other six dies, the ones in red, have moved and left

24    Anchor and those payments have not been made.

10:02:49  25    **Q**    Well, my question to you was:  At the time of this

**Pfaff (Cross)**

1    email, all payments had been made for the dies that had been

2    moved because you demanded that; correct?

3    **A**    All the dies that had moved as of that period of time

4    had been paid.

10:03:02  5    **Q**    Okay.  So you do agree with that; correct?

6    **A**    Yes.  I believe so.  I say with high certainty,

7    because I was not specifically involved with this list.  My

8    CFO was handling it.  But I would say most likely.

9    **Q**    Okay.  And the lump sum payment is just the delta

10:03:18 10    between -- is just the delta between the first and second

11    purchase orders; correct?

12    **A**    It's the delta between October 1st and November 9th,

13    before the new pricing went in November 10th, for just the

14    parts on that list.

10:03:34 15    **Q**    Right.

16    The lump sum is not an agreement to pay the whole

17    account, including any accounts receivable; correct?  That's

18    a different issue?

19    **A**    The lump sum payment only referred to the increase

10:03:46 20    between October 1st and November 9th.

21    **Q**    All right.  And you never had an agreement, did you,

22    in which Cosma agreed that it would pay the whole account on

23    all parts shipped before a die was released; correct?

24    **A**    There was no written agreement that I'm aware of,

10:04:06 25    other than there was discussion of as the dies would leave,

**Pfaff (Cross)**

1    the account would be cleared.

2    **Q**    There's nothing in writing that says that; correct?

3    **A**    I don't -- I do not see anything in writing in the

4    exhibits.

10:04:21  5    **Q**    Well -- and you saw Mr. Ross's email, correct, in

6    which he requested that full accounts be paid; correct?

7    **A**    I think request is being a nice word.  But, yes, he

8    used the word request.

9    **Q**    Okay.  That's what he said; right?  He said request,

10:04:42 10   didn't he?

11   **A**    Well, the purpose is because we needed payment in full

12   because, based on the experience of not receiving the lump

13   sum payments before, we had no belief that CBAM was going to

14   fulfill its obligations to pay its open AR because it did

10:04:56 15   not pay the open lump sum payments.  Therefore, we had grave

16   concern about getting paid.

17   **Q**    You never had an agreement to pay the full open sums

18   when the dies were released; correct?

19   **A**    There is nothing that I see in writing that supports

10:05:11 20   that.  Although, that was discussions.

21   **Q**    Nobody promised you that in writing or otherwise, did

22   they?

23   **A**    No one promised that in writing.

24   **Q**    Nobody promised that in discussions either, did they?

10:05:23 25   **A**    There were discussions that my people had relative to

**Pfaff (Cross)**

1  paying off the accounts as dies would go.

2  **Q**   Okay.

3  **A**   I personally did not have those discussions, but my

4  people said they did.

10:05:33  5  **Q**   All right.  So you have no personal knowledge to

6  testify here today that Cosma agreed to pay all accounts

7  before dies were exited; correct?

8  **A**   The knowledge I have comes from my president and from

9  my other staff.

10:05:48  10  **Q**   And you heard Mr. Ross testify that he was aware of no

11  such agreement; correct?

12  **A**   I don't have a recollection one way or another to tell

13  you, sir.

14  **Q**   All right.  And so, this amount, you're now asking for

10:06:05  15  the full account; right?

16  **A**   That is correct.

17  **Q**   Before you release the die, you want the full amount;

18  right?

19  **A**   That is correct.

10:06:12  20  **Q**   All right.  And many of these parts that were shipped

21  under the terms and conditions of when payments are due,

22  many of the payments aren't even due right now on those

23  parts that were shipped; correct?

24  **A**   That's assuming the terms and conditions still apply.

10:06:32  25  And as I mentioned earlier repeatedly, as you pointed out, I

**Pfaff (Cross)**

1    do not believe they apply because there's a breach to our

2    agreement, which then causes a new agreement to be made and

3    that new agreement, to me, is I need payment in full.

4    **Q**    Okay.  But you don't have an agreement for payment in

10:06:46  5    full; correct?

6    **A**    I am hoping to achieve one; hence, I put a lien on the

7    tool because we feel we need to have that agreement since

8    all other agreements have not been honored by CBAM.

9    **Q**    Right.

10:06:58  10    So you're basically placing leverage on Cosma by

11    liening the tool in the hope that Cosma will agree to pay

12    you everything that you believe you ultimately will be owed;

13    correct?

14    **A**    I have placed a lien on the tool to get what I feel is

10:07:14  15    rightfully owed to me, which is the amount of 1.918 million,

16    less whatever material offset actually exists.  So that is

17    my position.

18    **Q**    But it's not owed under the general terms and

19    conditions that have applied for payment terms; right?

10:07:29  20    **A**    Like I said earlier, I do not believe those general

21    terms and conditions apply any more because of the breach of

22    the contract for numerous reasons.

23    **Q**    All right.  So you want in this hearing for the Court

24    to decide the dispute over whether you're right about

10:07:52  25    whether you're owed payment or whether Cosma's owed payment?

**Pfaff (Cross)**

1    **A**     No.  I want the Court to let me be paid for the parts

2    I sent that were used by CBAM on General Motors' vehicles

3    that I shipped and were used in quality, I want that

4    payment.  And then, I believe that CBAM and Anchor can work

10:08:10  5    through the disputes of who actually has real costs and who

6    owes who money afterwards.

7          So if you want the die released, I hope the Court

8    would say:  Just pay the bill for the parts that you used to

9    build cars.  And I will release the tools.  And then we can

10:08:24 10   work with each other to work through the rest of the costs.

11   **Q**     Even though, in the ordinary course of the parties'

12   relationship, Cosma would pay on more or less 60-day terms;

13   correct?

14   **A**     Ordinary course was the keyword you used here.  We're

10:08:43 15   not in ordinary course because there's been violations of

16   agreements for payments and other.

17   **Q**     Right.

18         One of the amounts that you claim is based upon an

19   estimate; correct?

10:08:53 20   **A**     The -- no.  Actually, all those numbers now are

21   factual numbers that we have done.  There's one number that

22   CBAM has not approved and that's for the blanks that we were

23   asked to produce and shipped, which have shipped, where that

24   number has not been agreed to.  We submitted pricing and are

10:09:09 25   awaiting for agreement on that.  So there may be movement on

**Pfaff (Cross)**

1    that, but everything else is an actual number in the 1.918

2    number, less whatever is the amount of material that was

3    shipped to us that we did not ship back out.  But I need

4    CBAM's help to get that accounting done.

10:09:25  5    **Q**    So if this Court doesn't issue the preliminary

6    injunction, then, essentially, Cosma's just going to have to

7    pay what you say they have to pay to be able to get the

8    tool; correct?

9    **A**    I would continue to run parts, so there would be no

10:09:42 10    supply issue, and I would want to work through who actually

11    owes who what and do that in a business-like manner and make

12    sure everyone's satisfied with the accounting.

13          And then, for the parts we shipped that were good, I'd

14    want to get paid, less any raw material that I used that did

10:10:04 15    not get shipped back out.  That is all I'm looking for.  I'm

16    not looking for a premium or anything else.  I just want to

17    get paid for the parts I shipped.

18    **Q**    But, in the end, if this Court is not involved, that's

19    going to be ultimately up to you what amount that is; right?

10:10:14 20    **A**    It's something that I would work -- and I have

21    historically, of 37 years, been very fair, probably too

22    fair, which is how I got into this situation, that I would

23    work through and get a result that would be fair to both

24    companies.

10:10:35 25    **Q**    So, originally, the parts associated with 1213 and

**Pfaff (Cross)**

1    1215 [sic], you were going to keep those and keep running

2    those; correct?

3    **A**    We were going to keep running the tool, along with

4    several other tools.  Correct.

10:10:50  5    **Q**    And what happened at that time was your large press

6    broke in November; correct?

7    **A**    Correct.  Around November 14th, I believe.

8    **Q**    And at that point, this plan that you were going to

9    keep producing parts was scuttled; right?

10:11:11  10   **A**    We alerted Magna to our press issue.  Magna CBAM

11   attempted to help us find a replacement gear.  We also

12   looked.  We had one on order that wasn't coming in until the

13   end of January.  At that point in time, we started running

14   the parts by hand using alternate processes.  We explained

10:11:28  15   to CBAM the situation.  CBAM decided it was best to move the

16   tools to an alternative supplier.

17        And at that point in time, CBAM decided to start

18   moving the tools out and gave us the order of tools they

19   wanted to move, the amount of the bank build they wanted,

10:11:42  20   which we met or, in all cases, we gave the amounts that I

21   think a Peter Linkman [phonetic] told us what to use, and

22   that was the exit process.  That was CBAM's exit process.

23        CBAM ended up taking all of the tools out or wanted to

24   take all the tools out, which I don't think was necessary,

10:11:58  25   but that was the decision that CBAM made.

**Pfaff (Cross)**

1    **Q**    All right.  So this 1213/1215 [sic] you were running

2    by hand; correct?

3    **A**    Correct.

4    **Q**    And so, your original reason to exit production was

10:12:12  5    you couldn't keep up with the capacity; correct?

6    **A**    When all of the dies were here and the capacity

7    increased because of the die conditions, we could not keep

8    up long term at that capacity.

9    **Q**    And that would be true once the press broke for

10:12:31 10    1213/1253, you also would not have been able to meet the

11    capacity that Cosma required; correct?

12    **A**    It would have been very difficult for us to do so.  We

13    would have had to find some alternate methods beyond that.

14    Fortunately, a discussion came, because at that time

10:12:47 15    we were working very well together, that CBAM decided they

16    had other suppliers they could go to and move the parts and

17    we said we would help support the movement of these parts to

18    the alternate suppliers.

19    **Q**    All right.  And my question is, and -- that you didn't

10:12:59 20    have the capacity, once that press broke, to continue

21    meeting Cosma's requirements for 1213 and 1253; correct?

22    **A**    Long term, it would have been very difficult for us to

23    meet those requirements without bringing in other folks to

24    assist us.  Internally, it would have been very difficult.

10:13:16 25    **Q**    And, right now, you don't have the raw materials

78

**Pfaff (Cross)**

1    necessary to continue producing those parts; correct?

2    **A**    The raw material to get those parts could be at Anchor

3    within a day.  It exists.  We know where it exists.  And it

4    could be shipped to Anchor within less than 24 hours and we

10:13:34  5    could be running parts, if CBAM still wanted it to happen.

6    **Q**    Take a look at Exhibit 3.  We'll bring that up here a

7    second.  Look at page -- paragraph 16 first, which is on

8    page 3.

9         You see those initials there with a date of July 1,

10:14:27 10   2020?

11   **A**    Yes, I do.

12   **Q**    Those would be the initials of Michael Randall, your

13   chief financial officer at the time?

14   **A**    Yes, I believe so.

10:14:37 15   **Q**    So you agree that's likely when he signed that

16   agreement was on July 1, 2020?

17   **A**    I myself would look at the date on top of the

18   agreement.  But I was not -- at that time, I was not a

19   party, that I remember.  I see a lot of agreements.  So I do

10:14:58 20   not know the timing of when Michael signed that.

21   **Q**    All right.  And if you go to Exhibit A, this agreement

22   indicates that it applies to the die you're holding,

23   1213/1253, doesn't it?

24   **A**    If it was still valid, it would apply to that.

10:15:28 25   **Q**    Okay.  And there's a picture of it, of that die, as

**Pfaff (Cross)**

1    well in Exhibit B; correct?

2    **A**    I see the 1213 die now.

3    **Q**    Yes.  So there's a picture of it in the bailment

4    agreement as well; correct?

10:15:51 5    **A**    Yes.  It appears to be a picture of it, yes.

6    **Q**    And so, you agree that your CFO had the authority to

7    sign this agreement; correct?

8    **A**    Yes, he does.

9    **Q**    And there's no indication anywhere that there's a

10:16:09 10    different agreement that relates to this die, 1213/1253, is

11    there?

12    **A**    I'm not aware of any other agreement --

13    **Q**    All right.

14    **A**    -- relative to bailment.

10:16:20 15    **Q**    Okay.  And this bailment agreement, if you look to

16    paragraph 15, paragraph 15 indicates that you, Anchor,

17    agreed to keep that die free from any liens or claims of any

18    kind; correct?

19    **A**    And I will go back, again, that I don't believe this

10:16:54 20    document applies any more because of the breach of the

21    initial purchase order, and all of these secondary documents

22    are predicated upon having a valid purchase order in place.

23    So, therefore, no, I do not believe it gives the right

24    -- or keeps me from holding a lien on that property.

10:17:09 25    **Q**    But this --

**Pfaff (Cross)**

1    **A**     Otherwise --

2    **Q**     But this agreement, you would agree, is a signed,

3    standalone, separate agreement from the terms and

4    conditions; correct?

10:17:19 5    **A**     I do not see that as a signed, standalone agreement.

6    I believe all the agreements have to be looked at in whole.

7    When I do business, I look at all the agreements I have with

8    a customer, and those agreements are all part of one bigger

9    picture.

10:17:31 10         And when there's a breach on the purchase order,

11   which, to me, is the most important of all the documents,

12   that, to me, is the one that is the driving one.

13   **Q**     All right.

14   **A**     And, therefore, I feel appropriate to put a lien;

10:17:42 15   otherwise, I would not have done so.

16   **Q**     Okay.  And you indicated you're not a lawyer and you

17   don't have any special expertise, so your statements about

18   whether this agreement applies is really just a feeling;

19   correct?

10:17:55 20   **A**     Well, it's based on 37 years of doing what I do and

21   being involved with these for 37 years and seeing how

22   customer/supplier relations have worked over that period of

23   time.  Because I've been involved in hundreds of these.

24   **Q**     All right.  But --

10:18:07 25   **A**     Not to this level.

**Pfaff (Cross)**

1    **Q**    But you don't have any special expertise on the

2    legalities of contracts, do you?

3    **A**    Well, I took some contracts when I was getting my MBA

4    at Cornell, but not to the point of being an attorney.

10:18:21  5    **Q**    Okay.  So from a legal standpoint, despite your

6    knowledge you gained in your MBA program, you don't really

7    have an expert basis to say whether or not, legally or not,

8    this bailment agreement applies; correct?

9    **A**    I am not an attorney, but I do have, I said, 37 years

10:18:42  10    of experience, and experience means a lot sometimes in

11    seeing how these apply.

12    **Q**    Okay.  Let's go to paragraph 15 again and I'll just

13    ask you -- let's -- we've heard your statement about why you

14    think it doesn't apply.

10:18:55  15        But if it does apply -- if -- you agree that paragraph

16    15 indicates that Anchor has agreed to not put any liens on

17    the tools and to waive any liens on tools; correct?

18    **A**    It says to the extent permitted by law.

19    **Q**    All right.

10:19:16  20    **A**    And I think, my opinion, legally is I'm permitted to

21    the put that lien on because there are other factors that

22    come into play.

23    **Q**    And that's your feeling about it based upon your 37

24    years of experience; correct?

10:19:29  25    **A**    That is my experience tells me that I'm able to put

**Pfaff (Cross)**

1    that lien on there.

2    **Q**    All right.  Despite the language in paragraph 15?

3    **A**    Well, I look at the extent permitted by law, because I

4    believe that, and my belief -- of course, I'm not an

10:19:41 5   attorney -- that legally I'm permitted to put that lien on

6    because of the situation involving the purchase order

7    breach.

8    **Q**    All right.  Again, your basis legally is based upon

9    the breach, it isn't based upon any legal expertise;

10:19:53 10  correct?

11   **A**    It's based on experience with other customers and

12   dealing with these documents.  But I am not an attorney.

13   **Q**    Okay.  Paragraph 16 -- paragraph 16, if you look at

14   the second sentence, that states, doesn't it, that Cosma has

10:20:20 15  the right to enter Anchor's premises and remove the die at

16   any time; correct?

17   **A**    That's what the words say there.

18   **Q**    If you look at paragraph 17, in the middle there, it

19   says that Anchor acknowledges that any financial settlement

10:20:50 20  with respect to the amounts due in dispute relating to the

21   property of the purchase order will occur after Cosma is in

22   possession of the property; correct?

23   **A**    It doesn't apply in this case, in my opinion, but in

24   other cases, it may, based on what's written.  As I

10:21:07 25  indicated earlier, I do not believe this applies.

**Pfaff (Cross)**

1    **Q**    But if it did apply, that would tend to indicate that

2    Cosma can get the die and the dispute between the parties

3    would be figured out afterwards --

4    **A**    I think --

10:21:21  5    **Q**    -- that's what that says; right?

6    **A**    That's what you're saying it says.  I believe it does

7    not apply in this situation.  In other situations, it may

8    apply.

9    **Q**    By the way, your testimony was that they hadn't

10:21:56  10   received the die in -- until October 2019?

11   **A**    Roughly October, November period.  October I think was

12   the first set of tools.

13   **Q**    Okay.  So your CFO was changing this agreement and

14   initialling it after you had received 1213 and 1253;

10:22:18  15   correct?

16   **A**    I do not know when he signed the agreement.  And the

17   change is dated 7-1-2020 for changing 2(f) to 3(f).  I'm not

18   even sure what that references, tell you the truth.

19   **Q**    But that date, when he writes on this on July 1, 2020,

10:22:36  20   that's after you had received the tool; correct?

21   **A**    That I believe, in reading it now, is talking about

22   spare parts.  So perhaps additional spare parts showed up on

23   7-1-2020 that were added to a 3(f) list, that would be my

24   assumption, and he initialed it then.

10:22:53  25   **Q**    Let me ask the question in as simple way as possible.

**Pfaff (Cross)**

1    You, at Anchor, had received 1213/1253 before the date

2    of July 1, 2020; correct?

3    **A**    That is very likely to be true.  I can't be a hundred

4    percent sure, but it probably is most likely true, before

10:23:14 5    July 1st, 2020.

6    **Q**    Okay.  Take a look at paragraph 1 of the bailment

7    agreement.

8    Paragraph 1 indicates acknowledgement of the receipt

9    of tooling; correct?

10:23:36 10    **A**    It acknowledges receipt from the division of tooling,

11    yes, it does say that.

12    **Q**    And it indicates, the acknowledgement, it references

13    Schedule A; correct?

14    **A**    And as I mentioned earlier, I believe that that was

10:23:44 15    signed on March 5th, 2019, and then was amended to include

16    the other thing on July 1st, 2020.  So my contention is

17    still that this was signed prior to receipt of the tools.

18    **Q**    And your contention is based just upon the typed date

19    at the top; correct?

10:24:01 20    **A**    Correct.  Because usually there's a date by the

21    signature and there is no date by his signature.

22    **Q**    All right.  And it indicates here that the tools in

23    Schedule A, which includes 1213 and 1253, are in good order

24    and condition; correct?

10:24:17 25    **A**    It says that they're in good order and condition;

**Pfaff (Cross)**

1    although, we had not seen the tools.

2    **Q**    Well, you had seen them by July, though, of 2020;

3    right?

4    **A**    That July could be an amendment because it refers to

10:24:27  5    spare parts in section 2(e) -- 2(f) and 3(f), so it may have

6    been an amendment to add on spare parts.

7    **Q**    Okay.  So if that's true, then your CFO could have

8    also gone to paragraph 1 and made a note that the dies did

9    not show up in good order and condition; correct?

10:24:46 10    **A**    I really don't know what my CFO looked at at that

11    point in time.  When he amended that to go from 2(f) to

12    3(f), I do not know if he looked at the agreement in its

13    entirety or what he was considering at the time.

14    **Q**    Okay.  But your claim is that he wrote something on

10:24:58 15    here after the fact.

16    He could have wrote something about the conditions of

17    the dies as well; correct?

18    **A**    It's actually my assumption, not my claim, that he put

19    it on after the fact to change the thing, because I don't

10:25:11 20    know for sure.

21    **Q**    Well --

22    **A**    Yes, changed 2(f) to 3(f) --

23    **Q**    Whether he --

24    **A**    -- in that section.

10:25:18 25    **Q**    Whether he changed it before or after or at any time,

**Pfaff (Cross)**

1    he could have put a notation on this agreement that the

2    condition of the dies were not in good order or condition,

3    he could have done that; right?

4    **A**    I do not know if he revisited that.  I mean,

10:25:31  5    obviously, I could write something on there right now, so

6    anything is possible to be done at any point in time.  But,

7    like I said, I don't know what his thoughts and intentions

8    were when he made that revision to the document on July 1st,

9    2020.

10:25:44  10    **Q**    All right.  You don't have any documents, though, that

11    show that when the dies were received Anchor took the

12    position that they were not in good order and condition;

13    correct?

14    **A**    I have documents.  They are not entered as exhibits.

10:26:01  15    **Q**    So if you go back to that bailment agreement,

16    paragraph 19, wouldn't you agree that, essentially, this is

17    a statement that Anchor agrees there will be irreparable

18    harm if Anchor doesn't turn over the die to Cosma?

19    **A**    I have to read this briefly.

10:26:50  20        Once again, I do not believe this applies.  Due to

21    other reasons I stated earlier, it does not apply to this

22    situation for us.

23    **Q**    But if it did apply, the language clearly indicates an

24    agreement by Anchor that Cosma would have irreparable harm

10:27:08  25    if Anchor did not turn over the die, correct, if it does

**Pfaff (Cross)**

1    apply?

2    **A**    In other situations, with other companies, not talking

3    our situation, that is what the verbiage states.  I do not

4    believe it applies in this situation.  I also don't believe

10:27:25 5    irreparable harm will occur as I continue to run parts as we

6    work through this.

7    **Q**    But, yet, you agree that if you didn't provide the die

8    to Cosma, there would be irreparable harm, you agreed to

9    that in this bailment agreement; correct?

10:27:42 10    **A**    I disagree with that statement that there would be

11    irreparable harm because I would run more parts.  In other

12    circumstances where this may apply, with other customers and

13    other suppliers, it states there's irreparable harm.  I

14    don't believe it applies in this case.

10:27:57 15    **Q**    But this doesn't -- this agreement doesn't say if you

16    can run additional parts; this agreement states, in

17    paragraph 16, that Cosma can ask for this die at any time,

18    that's what it says?

19    **A**    And I -- and I, once again, say I don't believe it

10:28:12 20    applies in our case --

21    **Q**    Okay.

22    **A**    -- in our circumstances.

23    **Q**    Okay.  Because of your circumstances.

24    You're not claiming -- the language doesn't say that;

10:28:20 25    right?

88

**Pfaff (Cross)**

1    **A**    I will go back that I'm not an attorney.  But it says

2    the word will suffer irreparable harm.  I can read that.

3    But it may apply in other cases.  I don't believe it applies

4    in this relationship.  In other dealings you have, it may

10:28:33  5    apply.

6    **Q**    Well, what it says is that if Magna Cosma invokes its

7    rights under this agreement to obtain access to the

8    property, and bailee fails to cooperate with Cosma in

9    allowing Cosma access to the property in accordance with the

10:28:53  10    terms of this agreement, then there's irreparable harm;

11    correct?

12    **A**    I, once again, say this agreement, to me, is not

13    enforceable, and, therefore, does not apply to the current

14    situation because of the breach of the purchase order.

10:29:06  15    **Q**    Okay.  But if it was enforceable, that's what it says;

16    right?

17    **A**    In other situations, with other people and other

18    suppliers, it may be enforceable in their situations.  But

19    each situation is different.  It depends if all the

10:29:24  20    contracts are still enforceable or not.

21    **Q**    Let's take a look at Exhibit 9.  Exhibit 9 is an email

22    from Mr. Evans.

23         Who is Mr. Evans?

24    **A**    Bill Evans is my commercial strategy director and he

10:30:37  25    actually reports directly to myself.  Although, in the org

**Pfaff (Cross)**

1    chart, he goes through Rich Ross.  But I primarily direct

2    his actions.

3    **Q**    And in this email, it was Anchor's request to exit,

4    not Cosma's; correct?

10:30:59  5    **A**    This email is referencing the increased volumes and we

6    were warning CBAM that if something wasn't done, that there

7    would be capacity issues.

8          This was because, while in the prior two and a half

9    years we could meet demand because of COVID and chip

10:31:18  10    shortages, as the volume went, because of the condition of

11    the tooling, we would not be able to run all of the tools

12    for CBAM eventually because the dies did not have the

13    ability to run the stated rates and capacities per hour.

14    **Q**    Okay.  Listen to my question.  I think it's a yes or

10:31:34  15    no question.

16          True, it was Anchor that requested to exit; correct?

17    **A**    We did not ask to exit all of the CBAM business.  We

18    were -- we had discussions relative to the fact that with

19    this increased volume, we would not be able to run all of

10:31:49  20    the parts to meet your capacity.  And our concern was, in

21    the future, it was going to cause a supply problem.

22          No, we were not asking --

23    **Q**    And did you --

24    **A**    No, we were not ask -- there's four dies listed here,

10:32:00  25    sir.  You see them?  And those are the tools that are the

**Pfaff (Cross)**

1    greatest risk due to labor requirements and those four tools

2    are the ones we were discussing.

3    **Q**    And Anchor is the one issuing a request to exit with

4    those four tools; correct?

10:32:11  5    **A**    Those were the first four tools requested to exit.

6    Correct.

7    **Q**    Okay.  And in this email, yes or no, the reason stated

8    is because of capacity issues primarily; correct?

9    **A**    Because of the increased capacity and because of the

10:32:31  10   condition of the tools --

11   **Q**    Sir -- sir --

12   **A**    -- those four --

13              MR. DeWAARD:  Your Honor, I've let this go on

14   and on, but I'm asking really simple, direct questions here.

10:32:42  15   It's --

16              MR. SMITH:  Your Honor, it's --

17              THE COURT:  No.  Attorney Smith, I'm going to

18   stop you right there.

19        There's been a lot of leeway provided to this witness

10:32:52  20   in providing responses to answers that are calling for yes

21   or no responses.

22        At this point, there's a direct question being asked.

23   The witness will answer yes or no to the question being

24   asked.  I'll provide a limited opportunity for redirect, but

10:33:09  25   I think the issues and the topics that this witness has been

**Pfaff (Cross)**

1    put forth, both on direct and cross-examination, have been

2    thoroughly addressed.

3        But I will allow a limited opportunity for redirect,

4    Attorney Smith, where you can address any additional

10:33:25  5    questions that you may have.

6        But, at this point, Mr. Pfaff, when a question is

7    asked to you to provide a yes or no answer, I'm directing

8    you to provide a yes or no answer.

9            THE WITNESS:  Yes, Your Honor, I will.

10:33:41  10    **BY MR. DeWAARD:**

11    **Q**    I'll restate the question so it's clear on the record.

12        In this email, the reason stated as the primary reason

13    for exiting the business was capacity issues; correct?

14    **A**    Yes.

10:33:58  15    **Q**    This email says nothing about the condition of the

16    dies; correct?

17    **A**    Yes.

18    **Q**    I'm going to show you Exhibit 4, Plaintiff's

19    Exhibit 4.

10:35:19  20        Plaintiff's Exhibit 4 is a letter signed by Tony

21    Parente of Anchor and sent to Cosma; correct?

22    **A**    Yes.

23    **Q**    The last line of this letter states:  If Magna CBAM

24    does not grant the price increases listed in the attached

10:35:41  25    with an effective date of October 1, 2022, Anchor cannot

**Pfaff (Cross)**

1    continue to ship and will cease all payments [sic]; correct?

2    **A**    Yes.

3                    MR. SMITH:  Objection.

4          Doesn't say payments.

10:35:55 5    **BY MR. DeWAARD:**

6    **Q**    It says all shipments.  That's what it says; correct?

7    **A**    Yes.

8    **Q**    All right.  And that last line is true; correct?

9    **A**    No.

10:36:19 10    **Q**    So is it your testimony that if price increases were

11    not provided by Cosma, that Anchor would continue to ship at

12    the old prices?

13    **A**    Yes.

14    **Q**    You're claiming that you -- or nobody at your company

10:36:43 15    ever told Cosma that it would not ship if prices were not

16    increased?

17    **A**    That's not a yes or no question.

18    **Q**    Well --

19    **A**    We told Cosma that if we didn't have the date

10:37:02 20    October 1, as was asked for in the letter, that we were not

21    going to ship.  We would have continued to ship.

22    **Q**    But, ultimately, you wouldn't continue to ship if

23    there wasn't a price increase; correct?

24    **A**    We would have had to have found a different solution.

10:37:20 25    **Q**    So you're telling the Court that that line, the last

**Pfaff (Cross)**

1    line of the letter, was false?

2                  MR. SMITH:  Objection, Your Honor.

3          This is the piece about answering yes or no to the

4    questions.  He's trying to provide some background to it and

10:37:38  5    then he's limited on the way he can respond to the question.

6    I'm sure he would provide the background if given the

7    opportunity.

8                  THE COURT:  The objection is overruled.

9          The witness may answer the question, and the witness

10:37:51 10    may answer the question beyond a yes or no answer.

11                  THE WITNESS:  The question again, please?

12    **BY MR. DeWAARD:**

13    **Q**    Well, is this true or not that you weren't going to

14    ship unless you got the price increase?

10:38:07 15    **A**    We were negotiating to get a price increase.  We were

16    told to put in the letter that we would not ship if we did

17    not get a price increase, so we did in order to get the

18    price increase.

19    **Q**    Well, wasn't the purpose of the letter to formalize

10:38:20 20    your position so that Cosma could share it with General

21    Motors?

22    **A**    The purpose of the letter was for Magna CBAM to have

23    something to take to General Motors to get a price increase

24    from them.

10:38:33 25    **Q**    But Magna Cosma didn't tell you to put in false

**Pfaff  (Cross)**

1    information in the letter, did it?

2    **A**    The letter was written initially and suggested by

3    Magna CBAM.  We were told to say that we would stop shipment

4    if we didn't get a price increase.  It was in the initial

10:38:55 5    letter.  The reality is we would have worked to get a price

6    increase in some fashion or found another solution to the

7    issue.

8    **Q**    So you knew this letter was going to General Motors;

9    correct?

10:39:08 10    **A**    We were told by CBAM they were going to give it to

11    General Motors.  I do not know if it was ever given to them.

12    **Q**    Well -- so it's your position that this last line is

13    not accurate?

14    **A**    We would have found a solution to get either a price

10:39:25 15    increase in another fashion or found a solution that allowed

16    us to continue operation.

17    **Q**    You would agree, wouldn't you, that Cosma would have

18    expenses for transporting the dies to a new supplier;

19    correct?

10:39:51 20    **A**    There is a -- there is expense associated with that.

21    **Q**    And there's costs associated with setting up the dies

22    at new suppliers; correct?

23    **A**    Most of the time the cost is primarily in

24    transportation.  The new supplier generally absorbs the

10:40:06 25    setup costs.

**Pfaff  (Cross)**

1    **Q**     But you don't know in this circumstance if the new

2    suppliers absorbed the setup costs or not, do you?

3    **A**     Not in this circumstance.

4          I've received over 500 tools from other suppliers and

10:40:18 5    I've always absorbed the setup cost.

6    **Q**     In your exhibits, Anchor's Exhibit J, this was your

7    lien, purported lien letter.

8          While we've got that up there, you wrote this lien

9    letter after the lawsuit was filed; correct?

10:41:17 10   **A**     That is correct.

11   **Q**     And you have this amount that you have in here,

12   $1,999,808, that amount, you had never specifically demanded

13   that from Cosma before; correct?

14   **A**     Not the entire amount.

10:41:38 15   **Q**     And you would agree with me that the tools are owned

16   by General Motors; correct?

17   **A**     To the best of my understanding, yes.

18   **Q**     And General Motors is not your customer; correct?

19   **A**     Not in this transaction.

10:41:52 20   **Q**     Cosma is your customer; right?

21   **A**     That is correct.

22   **Q**     How did you get this lien letter to Cosma?

23   **A**     I had my attorneys arrange for service.

24   **Q**     And how did it -- how did that happen?  How did it get

10:42:18 25   to Cosma?  Do you know?

**Pfaff (Cross)**

1    **A**    I believe a process server served it to Cosma.  But I

2    do not have firsthand knowledge.

3    **Q**    You didn't put it in the mail?

4    **A**    After I signed the letter, it was then conveyed over

10:42:36 5    to a process server.

6    **Q**    All right.  So it wasn't sent by registered mail?

7    **A**    Not by myself.

8    **Q**    And do you know whether it was personally served on

9    Mr. Tanasoff?

10:42:48 10    **A**    I did not see the receipt, but I was told that service

11    was made effective to Cosma.

12    **Q**    Now, the amount claimed here, that's for more amounts

13    than relate to parts made by the die that you're holding;

14    correct?

10:43:11 15    **A**    Yes.

16    **Q**    How much is due, in your view, in connection -- just

17    with the parts relating to the die that you're holding?

18    **A**    I do not know that number.

19    **Q**    And out of the -- when there were five dies remaining,

10:43:51 20    you released four of those without demanding any amounts to

21    be paid; correct?

22    **A**    My accounting people, my CFOs, I believe were asking

23    for payment.  I personally did not ask for payment.

24    **Q**    Well, you don't know whether Mr. Ross asked for

10:44:09 25    payment, do you?

**Pfaff (Cross)**

1   **A**     Or Mr. Piwowar.  I do not know.  My CFO.  I do not

2   know for sure if they're asking for payment; although, we

3   all agreed that payment was due, and that included

4   Mr. Parente, my president.

10:44:32 5            MR. DeWAARD:  If I could just have a moment,

6   Your Honor.

7                 (Pause in Proceedings)

8            MR. DeWAARD:  Your Honor, I have nothing

9   further at this time.

10:45:06 10            THE COURT:  All right.  Attorney Smith, are

11   you requesting limited redirect?

12            MR. SMITH:  Yes.  Limited, Your Honor.

13            THE COURT:  All right.  Before we take that

14   limited redirect, let's take a brief recess.

10:45:19 15     It's currently 10:45.  Court will stand in recess

16   approximately ten minutes, until 10:55.

17     Mr. Pfaff, I remind you, you're still under oath.

18     Do you understand that, sir?

19            THE WITNESS:  Yes, I do, Your Honor.

10:45:35 20            THE COURT:  All right.  The Court will stand

21   in recess until 10:55.

22            THE WITNESS:  Thank you.

23                 - - -

24         (Recess taken at 10:45 a.m.)

10:57:23 25         (Court resumed at 10:57 a.m.)

**Pfaff (Redirect)**

1                          - - -

2                    THE COURT:  Okay.  Looks like everyone has

3       returned.

4            All right.  Attorney Smith, are you ready to begin

10:57:34  5       your limited redirect?

6                    MR. SMITH:  Yes, Your Honor.

7                    THE COURT:  All right.  Then let's make sure

8       we're back on the record.

9            Okay.  Attorney Smith, you may proceed.

10:57:46 10                    MR. SMITH:  Thank you, Your Honor.

11              **REDIRECT EXAMINATION OF FREDERICK PFAFF**

12      **BY MR. SMITH:**

13      **Q**     Mr. Pfaff, in your cross-examination, you looked at a

14      number of documents, the terms and conditions agreement, the

10:57:55 15      purchase order agreement, and also the bailment receipt.

16            Do you recall looking at those?

17      **A**     Yes.

18      **Q**     Do you believe that all of those agreements and the

19      documents that I just identified are predicated upon the

10:58:13 20      receipt of useable, nondefective tooling?

21      **A**     Yes, I do.

22      **Q**     So when we looked at all of the provisions and you

23      were required to, you know, read line by line, and then you

24      said several times that you didn't think that they applied,

10:58:28 25      is that because, in your eyes, you didn't get useable

**Pfaff (Redirect)**

1    tooling?

2    **A**    Yes.  That is correct.

3    **Q**    If you don't get useable tooling, can you comply with

4    the mandates under the parties' arrangement in the

10:58:40  5    agreement?

6    **A**    No.  It's not possible.

7    **Q**    Whose fault is that?

8    **A**    That is the fault of the person who gave me the

9    tooling, which would be CBAM.

10:58:49  10    **Q**    Okay.  I want to point you now specifically to the

11    terms and conditions, paragraph 24.

12        Do you see that here?

13    **A**    Yes.

14    **Q**    And I know you were talking about how you didn't

10:58:59  15    recall a specific writing requiring AR to be paid, and,

16    ultimately, what you said, to be paid for the parts that you

17    produced.

18        Do you recall that?

19    **A**    Yes.  Relative to the initial Ben Nekola discussions,

10:59:13  20    yes.

21    **Q**    Okay.  But with respect to paragraph 24, to the extent

22    that these terms are, you know, enforceable or you have to

23    comply with them, would you think -- do you believe that

24    CBAM has to comply with paragraph 24 when it terminated the

10:59:29  25    relationship?

**Pfaff (Redirect)**

1    **A**    Yes, I do.

2    **Q**    Does that specifically require payment for the parts

3    that you say that you just want to be paid for?

4    **A**    Yes, it does.

10:59:40  5    **Q**    We also -- you also discussed declaring a breach or

6    documents specifically stating that you informed CBAM that

7    the parts were -- excuse me -- the tooling was defective.

8        Do you recall that line of questioning?

9    **A**    Yes, I do.

10:59:56 10    **Q**    Did Anchor communicate, since day one, to CBAM that

11    the tooling was defective?

12    **A**    Yes, we did.

13    **Q**    Was that in oral conversations?

14    **A**    It was done in writing and verbally --

11:00:10 15    **Q**    And did --

16    **A**    -- and emails.

17    **Q**    Did Rich Ross testify to that fact, from your

18    recollection?

19    **A**    Yes, he did.

11:00:17 20    **Q**    So this notion of declaring a breach, do you

21    understand what that means?

22    **A**    Not completely.  I think it means that the contract is

23    not valid.

24    **Q**    But -- but you did communicate, or Anchor did

11:00:31 25    specifically communicate, that the tooling was defective,

**Pfaff (Redirect)**

1   which was an issue amongst the parties' relationship; is

2   that fair?

3   **A**    Yes.  We would use terms like the tooling is

4   defective, therefore, the contract's not valid.  It's

11:00:45  5   violated.  Generally, business people don't use the word

6   breach.

7   **Q**    I want to point you to what was Plaintiff's Exhibit I.

8   **A**    Yes.

9   **Q**    I believe it's Exhibit 9.

11:00:59  10   And this is the email that you discussed with -- on

11   your cross-examination.

12   Do you recall that?

13   **A**    Yes, I do.

14   **Q**    And I know there was some limitations there, but I

11:01:08  15   just want to be clear here that the first sentence says:  I

16   want to clarify that Anchor's reason for needing to exit the

17   CBAM business is primarily based on capacity issues.

18   You see that; right?

19   **A**    Yes, I do.

11:01:19  20   **Q**    But, then, the second sentence says:  We no longer

21   have the capacity, both in labor and press time, to meet the

22   schedules for the CBAM parts.

23   Do you see that?

24   **A**    Yes, I do.

11:01:28  25   **Q**    Is that based upon the tooling or some deficiency on

**Pfaff  (Redirect)**

1    the part of Anchor?

2    **A**    The change was the increase in schedules.  The tools

3    always were deficient; however, with lower demand, we were

4    able to meet the demand.  As demand increased, the problems

11:01:45 5    with the tools, as inherited, did not allow us to have the

6    capacity to meet schedules.

7    **Q**    And you hit on exactly where I was heading.

8         This is an August 25th, 2022 email; right?

9    **A**    Correct.

11:01:56 10   **Q**    Well into the parties' relationship; is that accurate?

11   **A**    That is correct.

12   **Q**    And was it at or about this time when CBAM increased

13   its demand?

14   **A**    The demand increase started in late July.

11:02:10 15   **Q**    And that was as a result of what, do you recall, the

16   demand increase?

17   **A**    From the market conditions.  General Motors started

18   building more vehicles because they had more availability to

19   chips and demand was still there, post COVID.

11:02:24 20   **Q**    So the concept is you were limping along through the

21   entirety of the relationship, demand goes up, and you can no

22   longer deal with the defective tooling that CBAM provided;

23   is that fair?

24   **A**    That is -- that is true.

11:02:38 25   **Q**    I want to take you to the bailment receipt.  This is

**Pfaff (Redirect)**

1    Exhibit C, but it's Plaintiff's Exhibit 3.

2          Do you recall discussing this document?

3    **A**    Yes, I do.

4    **Q**    And do you recall discussing that in this paragraph 1

11:02:56 5    it talks about the tooling and it characterizes it as the

6    property?

7    **A**    Yes.

8    **Q**    Okay.  And is your understanding that this entire

9    document is really based upon the tooling?

11:03:08 10   **A**    Yes.

11   **Q**    Does the tooling have to be nondefective or does it

12   have to be useable, would you imagine, for you to be able to

13   comply with anything related to this document?

14   **A**    The tooling would have to be in good working order for

11:03:20 15   us to be able to comply with that bailment agreement.

16   **Q**    And I guess my question is:  Does the tooling lie at

17   the core, at the center of this particular document?

18   **A**    To me, it does, yes.

19   **Q**    And it -- and it was defective is what you said?

11:03:34 20   **A**    Yes, it was.  It was defective tooling.

21   **Q**    I want to touch upon -- and, I'm sorry, I meant to

22   share the screen, just to make sure we're clear here.

23          This document, you probably now see it, where I was

24   referring to this paragraph 1 where it talks about the

11:03:53 25   property, and it specifically says tooling; right?

**Pfaff (Redirect)**

1    **A**    Yes.  I remembered it.

2    **Q**    Okay.  We also talked about the lump sum payments that

3    were due.

4          Do you recall that?

11:04:02  5    **A**    Yes, I do.

6    **Q**    Were those payments required based upon communications

7    with CBAM sort of outside the nature of these -- the

8    documents we looked at, the PO, the terms and conditions, or

9    the bailment receipt?

11:04:19 10    **A**    Yes.  They were outside the initial PO and all those

11    documents.

12    **Q**    And did CBAM, based upon the documents that we looked

13    at, agree to make lump sum payments; correct?

14    **A**    That is correct.

11:04:32 15    **Q**    And those lump sum payments to date have not been

16    made; is that right?

17    **A**    They have not all been made.

18    **Q**    And the last question I really have for you is just,

19    Mr. Pfaff, with respect to all of the documents that were

11:04:50 20    the agreements that you -- that you spoke to -- and I'm

21    talking about this bailment receipt, the PO, and then also

22    the terms and conditions -- I just want to understand,

23    you're testifying that you didn't believe that they were

24    applicable or enforceable.

11:05:08 25          Do I have that right?

**Pfaff (Redirect)**

1    **A**    Yes, you do.

2    **Q**    And I just want to understand, is that based upon the

3    fact that CBAM provided defective tooling to Anchor?

4    **A**    Yes.

11:05:23 5    The root of all the problems we were having is the

6    defective tooling we had upon receipt that we were not

7    expecting to receive in that condition.

8    **Q**    So the concept is you're not allowing or you don't

9    think it's appropriate to pick and choose terms that fit

11:05:37 10   CBAM even though they breached the agreement on the front --

11   the agreements on the front end?

12   **A**    That is very true.  One line of one document does not

13   rule when the whole thing -- you have to look at its

14   entirety in the situation.

11:05:50 15   **Q**    And if the tooling were not defective, or useable, is

16   it your belief that the parties would still be enjoying

17   their relationship?

18   **A**    Absolutely.

19   **Q**    Is that based upon your 37 years of doing this work?

11:06:05 20   **A**    The 37 years, and also knowing that when you are able

21   to supply parts on time, good quality, the customer almost

22   never leaves.

23             MR. SMITH:  No further questions, Your Honor.

24             THE COURT:  Attorney DeWaard, any additional

11:06:26 25   cross-examination based upon that limited redirect?

**Pfaff (Recross)**

1          MR. DeWAARD:  Very briefly.

2                **RECROSS-EXAMINATION OF FREDERICK PFAFF**

3     **BY MR. DeWAARD:**

4     **Q**     I'm going to bring up Exhibit 11.

11:06:43  5          Sir, you recall when I showed you the letter that

6     Mr. Evans of Anchor wrote in August of 2022; correct?

7     **A**     Yes.  Yes.

8     **Q**     All right.  And in that letter, there was no mention

9     of dies; correct?

11:07:16  10   **A**     The August letter I think mentioned four part numbers.

11    **Q**     Right.

12          But there was no mention of anything about dies or

13    dies being defective; correct?

14    **A**     Yes.  That's correct.

11:07:29  15   **Q**     All right.  And then, Mr. Evans wrote again on

16    September 6th of 2022, which is this Exhibit 11; correct?

17    **A**     Correct.

18    **Q**     This was, you know, weeks after his original letter;

19    correct?

11:07:48  20   **A**     Yes.  That's correct.

21    **Q**     All right.  And in this letter, he indicated that some

22    dies must exit first and immediately; correct?

23    **A**     Yes.  Correct.

24    **Q**     And then, he said here, at the bottom:  Next step --

11:08:10  25   he says, quote:  Next step would be to quickly bring our

**Pfaff (Recross)**

1    margins into alignment on the balance of the products, so as

2    there is value add to our production, close quote.

3         That's what he said in the letter; correct?

4    **A**    Yes.

11:08:25  5    **Q**    And then he says, quote:  Without this in place there

6    is no reason to have further discussion regarding a

7    beneficial relationship for both parties, close quote.

8         That's what he said in the letter; right?

9    **A**    Yes.

11:08:36  10   **Q**    So in this second email, again, Mr. Evans made no

11   claim that defective dies were the source of any problem;

12   correct?

13   **A**    No, he does.  The fourth bullet point, the line that

14   says:  They require rework after forming, again consuming

11:09:01  15   manpower.

16        Rework after forming is referring to a part coming off

17   the die which is not to quality standard and has to be hit

18   or worked over again, and that refers to the die conditions.

19   **Q**    This is only referencing a few of the days here

11:09:16  20   though; correct?

21   **A**    This references just the six days listed.  Correct.

22   **Q**    Okay.  He doesn't say anything about the other dies

23   that -- he's saying you need to bring your margins into

24   alignment.

11:09:30  25        He doesn't say anything about dies there; correct?

**Pfaff (Recross)**

1    **A**    Correct.

2    **Q**    And he's asking for a price increase on everything;

3    correct?

4    **A**    I do not know that, sir.  I don't read that.

11:09:46  5    **Q**    Well, he says on the balance of the products; correct?

6    **A**    He says balance of products.  Correct.

7    **Q**    So that would be everything, all the other dies and

8    parts; correct?

9    **A**    I don't assume that, sir, no.

11:10:00  10    **Q**    Well, doesn't balance mean the rest of them?

11    **A**    I do not know what scope he is referring to, sir.

12            MR. DeWAARD:  All right.  I have nothing

13    further.

14            THE COURT:  All right.  Thank you, Counsel.

11:10:13  15        And thank you, Mr. Pfaff.  You're now off the witness

16    stand.

17            THE WITNESS:  Thank you.

18            THE COURT:  Attorney Smith, any additional

19    witnesses?

11:10:21  20            MR. SMITH:  No, Your Honor.

21        Outside of just admitting my exhibits that were

22    discussed, per our prior discussion and agreement, my case

23    in chief will close.

24            THE COURT:  All right.  The parties have

11:10:37  25    previously agreed and the Court's indicated it would accept

1    for admission all exhibits that attorneys used during the

2    direct and cross-examination of witnesses, and, therefore,

3    the exhibits used in association with Mr. Pfaff's testimony

4    will be admitted and considered by the Court.

11:10:58  5        Now, Counsel, you had indicated that you would like an

6    opportunity to present brief closing argument.  I'll afford

7    each side an opportunity to do so.

8        Would you like to take a brief break before proceeding

9    to closing argument?  Or are you ready to proceed?

11:11:17 10              MR. DeWAARD:  I just need maybe a couple

11   minutes.

12              THE COURT:  Okay.  I've got 11:11 on my desk

13   here.

14        Five minutes, Counsel?  Or do you think more than

11:11:32 15   that?

16              MR. DeWAARD:  No.  Five is fine.

17              THE COURT:  All right.  Let's come back at

18   about 11:16.

19        Court stands in recess.

11:11:38 20                  - - -

21           (Recess taken at 11:11 a.m.)

22           (Court resumed at 11:18 a.m.)

23                  - - -

24              THE COURT:  All right.  We're back on the

11:18:58 25   record.

1         Attorney DeWaard, are you ready to proceed with

2  closing argument?

3              MR. DeWAARD:  I am, Your Honor.

4        Thank you.

11:19:04  5              THE COURT:  All right.

6              MR. DeWAARD:  Your Honor, before addressing

7  the standard and the law in a little more detail, I'd just

8  like to start out by addressing what I submit was outrageous

9  testimony today and the position taken in this case.

11:19:24 10        To claim that none of the parties' agreements apply

11  based upon a feeling of a breach that occurred three years

12  ago because of a claim of defective tooling is outrageous,

13  and it's not based in anything, legally certainly, but

14  certainly nothing factually.

11:19:44 15        Three years ago, they presented no evidence

16  whatsoever, an email, nothing, which they claim there was

17  something wrong with this tooling.  They -- in fact, the

18  bailment agreement, which is -- has an edit on it in

19  July 2020, well after this particular tool came, but all the

11:20:04 20  tools had been shipped, has no indication that the tooling

21  isn't working correctly or is in bad condition.

22        To the contrary, the bailment agreement is signed,

23  presumably in July, or at least edited in July, and there's

24  no notation, there's no indication that there's anything

11:20:20 25  wrong with the tooling.  In fact, even when they first came

1    and asked for their price increase and to have some of the

2    dies exit, all they claim was capacity issues.  They don't

3    claim that there's a problem with the die.

4         And then, when they leverage Cosma for a price

11:20:35 5    increase, and that's formalized in a letter, a letter that

6    was worked on together because it was going to go to GM,

7    they try to submit that they didn't really mean what they

8    said, that they wouldn't produce unless they got a price

9    increase, even though that's clearly what was going on.

11:20:51 10         The fact of the matter, and as Mr. Tanasoff testified,

11   this has been a failing supplier for a long period of time.

12   They've only been there since 2019 as a supplier.  But from

13   the beginning, they had quality issues, regular quality

14   problems, problems with cracking parts, problems with the

11:21:08 15   tabs.

16         If those related to the dies, the dies clearly would

17   have been fixed because Cosma, just from a commonsense

18   standpoint, isn't going to let poor dies, which GM pays for,

19   be in existence that causes quality problems for GM that

11:21:23 20   results in debits to the amount that Cosma charges them.  It

21   just makes no sense.  And there's no support for it

22   whatsoever in the record.  There's just this testimony.

23         And, in fact, what we know is this supplier couldn't

24   do anything right.  They can't provide quality parts.  And

11:21:44 25   then, they come and they say:  We can't keep up with your

1    capacity.  Which was true, they couldn't keep up with the

2    capacity, despite that they were contractually required to

3    do so under the parties' purchase order and the terms and

4    conditions.

11:21:57   5          And so, they have to exit certain parts, which, again,

6    Cosma has to do because Cosma cannot shut down General

7    Motors, so they start to figure out some kind of an

8    arrangement to keep this going so that GM doesn't fail,

9    where some parts can exit, a bank of parts can be built so

11:22:18  10   that exit is done in a way that isn't overly costly, it can

11   be done in an orderly fashion, it doesn't shut down General

12   Motors, and certain parts were going to stay that Anchor

13   thought they probably could keep up with capacity.

14          But they couldn't even do that because their equipment

11:22:33  15   is in such bad condition that their largest press failed

16   during this time that they're talking about doing this and

17   they couldn't fix it.  They didn't have the funds.  They

18   didn't have the ability to fix it.  So, now, in a rush, all

19   the parts had to exit because they couldn't do it.  And so,

11:22:52  20   even in that process, they have leveraged Cosma.

21          You saw the exhibit that we've referenced in which

22   there was this arrangement which lump sum payments were

23   going to be made.  It's Exhibit 14.  That whole email

24   string, if you work up, what happens is they're, Magna --

11:23:18  25   Cosma, rather, is going to make the lump sum payments.  But,

1  now, they change the agreement.  Anchor demands full payment

2  for all -- payment with all parts that were ever produced by

3  those dies, even though there was never an agreement for

4  that, even though those amounts aren't due under the terms

11:23:34  5  and conditions, and they will not release those particular

6  dies unless Cosma pays it.

7       So Cosma paid it, but they reserved all their rights,

8  they indicated that was a onetime payment, and there was no

9  agreement that they were going to pay the amounts and be

11:23:49 10  leveraged yet again by Anchor.  But that's exactly what they

11  did.

12       And there's no doubt when they come in and say today,

13  in this testimony that has no backup, that, oh, sure, we can

14  produce the parts.  Well, it isn't producing a few parts

11:24:08 15  like they did just to keep us alive here for the short

16  period of time while we're doing this preliminary

17  injunction.  It's -- to produce parts, they have to produce

18  to capacity.  These are the only dies for this part, so they

19  have to be able to meet the capacity; otherwise, the

11:24:24 20  cataclysmic events are all going to happen because there's

21  downtime at Cosma, they couldn't produce for GM.

22       And so, there's this incredible testimony today from

23  the owner of the company that, sure, oh, we can keep

24  producing parts.  It's not true and we know that because his

11:24:49 25  head of sales testified -- I would submit much more

1      candidly -- admitted that they cannot produce to capacity

2      even on this die that they're holding on to.

3           He testified, and I've got it right here -- I thought

4      I did -- he testified on page 159 of the transcript, which

11:25:29  5      has been filed with the Court, he did it generally in a

6      couple places in here, but I want to focus right in on this

7      portion where, on page 159, lines 14 through line 19, I

8      asked him:

9           Question:  You couldn't continue to supply parts as

11:25:48 10      needed because your press broke; right?

11           Answer:  On those, on the three part numbers.

12           Question:  All right.  And one of those parts was

13      1213/1253; correct?

14           Answer:  Correct.

11:26:01 15           He admitted, and it was obvious to everyone involved,

16      as Mr. Tanasoff testified, that they were done, they could

17      not produce to capacity.

18           And so, when those parts, when they got leveraged on

19      that one set of parts to make the onetime payment, Cosma had

11:26:18 20      to pay it because they were going to shut down GM because of

21      the press breaking.  They were just a day or so away from

22      where there would be no parts.

23           It cannot happen that they can continue to hold 1213

24      and 1253.  They've admitted, through Mr. Ross, their head of

11:26:35 25      sales, that they can't do it.  And so, it's just not true

1   that they're able to provide parts, because if they can't do

2   it to capacity, that's the same as not being able to do it

3   at all.

4          Now, as this Court well knows, to obtain injunctive

11:26:55  5   relief, there's a showing of the four tests.  It's federal

6   law, of course, that provides the law for the standard,

7   which is the first, of course, being the likelihood of

8   success on the merits.  And the second, whether Cosma would

9   suffer irreparable harm if the injunction was not entered.

11:27:14 10   Those are really the first two that almost every case is

11   decided on.

12          Of course, there's the third and fourth element that

13   we've addressed in our brief, but I want to talk principally

14   about those first two elements, and the first is the

11:27:27 15   likelihood of success on the merits.

16          Under any standard that you apply, whether it's the

17   cases that talk about clear and convincing, any standard, it

18   could be beyond a reasonable doubt, a criminal standard,

19   there can be no dispute that Magna, on the agreements that

11:27:42 20   apply to this case, has shown a clear likelihood of success

21   on the merit.

22          There can be no dispute, despite how Mr. Pfaff feels

23   about things, there can be no dispute that the terms and

24   conditions apply by virtue of the purchase order, which was

11:28:01 25   accepted and was followed for three years in this case by

1    the parties.

2          And those terms and conditions, as we've gone through

3    with all the witnesses, contain a right to a set-off.  And

4    that set-off doesn't require a judgment.  It doesn't require

11:28:20 5    liquidated amount.  The amount can be contingent.  It can be

6    unliquidated.  And there can be a dispute.  Magna -- Cosma,

7    rather, can still set it off.  The language is clear.

8          They don't have to have proof to some huge degree.

9    They have the ability to make a claim that gives rise

11:28:41 10    potentially to a dispute, but even where there's a dispute,

11    they have a right to set-off, which, of course, is the same

12    thing under the bailment agreement.

13          And Mr. Ross admitted numerous times throughout his

14    testimony that, yes, the parties have essentially a good

11:28:55 15    faith dispute.  We don't believe it's good faith, but,

16    nevertheless, at worst, or from the perspective of Anchor,

17    at best, it's a dispute.

18          Cosma has presented evidence through Mr. Tanasoff that

19    it's owed well in excess of any amount that Anchor can claim

11:29:15 20    it's due.  You've heard the amounts that Anchor has admitted

21    through both witnesses, that the amount that they demanded

22    and put into their purported lien is not anywhere near

23    accurate.  It doesn't include a huge reduction for the raw

24    materials.  It includes amounts that were estimated.

11:29:32 25          It's disputed whether the lump sum payment on the

1   tools that exited, the original tools in phase 1 and phase

2   2, were paid.  Cosma says they were.  They claim some of

3   them weren't.  And what they -- even they admit, a lot of it

4   isn't even due under the terms and conditions.  The terms of

11:29:53  5   payment, which are more or less 60 days, a lot of these

6   parts were shipped very recently.  In fact, most of them

7   were.  So those amounts aren't even due.

8        They are simply, by their own admission, leveraging

9   Cosma because they want to have this money paid under the,

11:30:11 10   you know, sort of made-up excuse that none of these

11   contracts apply.  But, obviously, they do.  And the nub of

12   this agreement should be decided based upon the bailment

13   agreement, which is our Exhibit 3.

14        Now, the bailment agreement couldn't be more clear.  I

11:30:33 15   would say it's a model of clarity as it relates to this

16   dispute.  And you don't have to believe me.  You can believe

17   their own witness, their head of sales, Mr. Ross, who had

18   admitted at each point that all of those terms meant what

19   they say.

11:30:46 20        And even when pressed, I would submit that Mr. Pfaff

21   also admitted that if these terms apply, they mean what they

22   say, which is, under paragraph 16, Cosma has the right to

23   get the tooling at any time for any reason, in paragraph 16.

24   In other words, there doesn't even have to be a dispute.  If

11:31:08 25   Cosma wants the tooling, it can get the tooling, which makes

1   perfect sense in the automotive industry, and why Anchor

2   would agree to sign such an agreement, because there can

3   never be a risk that a supplier, a subsupplier underneath

4   you, is not going to be able to perform.  Because if they

11:31:26 5   can't perform, the whole system falls down in automotive.

6   That means Cosma can't perform, which means GM can't

7   perform, result being:  Everything shuts down, which is

8   hugely expensive.  If one part in GM's line isn't there,

9   they have to shut the whole line down.  It's not like they

11:31:43 10   can put the car together and then add the part after the

11   fact.  That doesn't work very well.

12       And so, the cataclysmic damages that result require

13   these parties to have bailment agreements that allow Cosma

14   to go in and get that tool for that to happen, and that's

11:31:58 15   what happened here, so they have the right to get the tool.

16       But they're going to make sure that there's no issues

17   in a dispute -- and a dispute like this arises, they should

18   not have an issue, they make it clear, in paragraph 17, that

19   if there is a dispute over amounts, that the supplier

11:32:16 20   claims, well, you owe me some money, I'm not going to give

21   you the tool, exactly what's happened here, that's covered

22   in paragraph 17, which says even if there are amounts in

23   dispute, you still have to provide the tooling and

24   cooperate.  That financial settlement is dealt with after

11:32:30 25   the fact.

1          Here, we have a case, this case will deal with the

2     issue of who owes who money, but that issue is not relevant

3     to the injunctive relief being sought here.  Under the

4     parties' agreement, Magna's entitled to the tool even if

11:32:47 5    there's a dispute.

6          Now, we've demanded, and they've refused, and so,

7     their only potential argument as to why they don't have to

8     provide this tool would be if a new agreement was entered

9     into, a new agreement under which the parties agree:  All

11:33:09 10   right, we will agree that we will pay you everything before

11    you have to give us the tool.  Everything you could ever

12    claim, we will pay you.  If they had that agreement, then

13    maybe there would be an issue on the injunctive relief.

14         But they do not have that agreement.  It was very

11:33:26 15   clear through the testimony of both Mr. Ross, Mr. Pfaff,

16    that there is no such agreement.  First of all, any such

17    agreement, under the terms and conditions, paragraph 36 of

18    Exhibit 3, it would have to be in writing, signed by Cosma,

19    for there to be such an agreement to modify the terms and

11:33:45 20   conditions that apply to the parties' relationship.  There

21    is no writing.

22         But Mr. Ross made clear -- first of all, Mr. Pfaff

23    said maybe they talked about it, but he had no personal

24    knowledge.  He was not involved in any of these discussions.

11:33:58 25   Mr. Ross made clear in his testimony that there was no such

1     agreement.  There was no writing and there was no agreement

2     that he was aware of that Cosma would pay all the amounts as

3     Anchor is now claiming are due.  There's just no issue.

4     There's no issue of fact.  There can be summary judgment on

11:34:21  5     that issue right now if they were going to rely upon such an

6     agreement.

7          So, by any standard, the terms and conditions remain

8     unmodified on the issues, and the bailment agreement remains

9     unmodified on the issue that they have to turn over the tool

11:34:41 10     despite any dispute.

11          Page 151 of Mr. Ross's testimony, lines 3 through 6:

12          Question:  Are you aware of any writing, signed by

13     Cosma, in which it ever agreed to make payment of accounts

14     payable before it could get the tools held by Anchor?

11:34:59 15          Answer:  Not aware.

16          That's what Mr. Ross said.

17          So the sole argument that they have, and the argument

18     that they set forth in their opposition, is this argument

19     that the letter they wrote created a lien under Michigan

11:35:19 20     Special Tool Lien Act at MCLA 570.553, and that that lien

21     act and that that lien permits them to hold on to the tool

22     until they get paid for everything they claim they're owed.

23          But that doesn't work either because, paragraph 15 of

24     the bailment agreement, they agree to an advance lien

11:35:42 25     waiver.  The language, again, is clear, and both their

1   witnesses admitted it, that they waived any claim they have

2   to the property, they waived any lien -- they wouldn't put a

3   lien on it.  That's what paragraph 15 says.  And if there

4   was a lien, they would waive the lien claims.  And anti-lien

11:36:02  5   waivers -- advance lien waivers are a common agreement in

6   bailment agreements.  You see cases throughout the country

7   in which they're enforced.

8        So the way they try to get out of that is they refer

9   to Michigan's Construction Lien Act at 570.1151.  And that

11:36:24 10   statute contains a provision that says a construction lien

11   cannot be waived in advance of the work because it's

12   contrary to public policy.

13        Well, a tooling lien -- I don't think I have to go

14   into great detail here -- a tooling lien is very different

11:36:40 15   than a construction lien where somebody, some homeowner in

16   advance is going to waive a lien and so now -- or some

17   supplier is going to waive a lien and now they can't put a

18   lien on the constructed property.  That has been found in

19   the Construction Lien Act, the language is there, you can't

11:36:58 20   do an advance lien waiver.

21        That language is not in the Special Tool Act.  It's

22   not there.  And the legislature is capable of including that

23   language in any lien act that they see fit, and the only

24   lien act in Michigan where you find that is in the

11:37:14 25   Construction Lien Act.

1          So, basically, they want this Court to make new

2    Michigan law.  Even though it's not in the statute, they say

3    you should find that it should be in the statute; therefore,

4    you should allow our lien even though there is no

11:37:28  5    prohibition to an advance lien waiver in the Special Tool

6    Act.  And this Court can't do that.  This is not a

7    construction lien.

8          But it's interesting to me that they cite two cases

9    for the concept that the Court could look to other lien

11:37:47  10    statutes, to gloss over those lien statutes, this

11    prohibition on advance lien waiver.  I hope the Court reads

12    those cases because those two cases absolutely come out our

13    way when presented with this issue.  One case is *Kipin* and

14    one case is *In re ImagePoint*.  They both support the

11:38:09  15    enforcement of the advance lien waiver in this case.

16          First of all, they're construction cases, so they were

17    dealing with the Construction Lien Act, so they're not

18    really relevant, but if you were going to apply them and do

19    what they ask you to say, they still would apply the advance

11:38:25  20    lien waiver.  That's the reason because, just like in our

21    case, there was a choice of law provision and the choice of

22    law provision was Michigan, but the things that were

23    constructed in those two cases were outside of Michigan.

24    One was in -- they were in various different states.  But in

11:38:47  25    *In re Image*, they were in various different states.  And in

1    the *Kipin* case, they were in one state.

2         But they weren't states where like in Michigan you had

3    a prohibition on advance lien waivers and the court --

4    courts in those cases went through an in-depth analysis in

11:39:03 5    looking at the restatement of choice of law and found that

6    where the parties in their agreement actually intended there

7    to be an advance lien waiver, despite the fact that they did

8    a choice of law to Michigan which would prohibit such a lien

9    waiver, where the liens actually should have been in other

11:39:28 10   states because the parties -- the construction was done

11   there, the Court found that to enforce the will of the

12   parties, the intent of the parties that there would be an

13   advance lien waiver, the Court would ignore the choice of

14   law provision to Michigan in that circumstance to honor the

11:39:45 15   intent of the parties, which was to be an advance lien

16   waiver.

17        So I don't know why they cited those cases, but,

18   essentially, it answers the question in our situation.  Even

19   if you adopt their reasoning that you should look to the

11:39:57 20   Construction Lien Act for the advance -- the prohibition on

21   advance lien waivers, those courts specifically said even if

22   that were true, you should enforce the intent of the

23   bailment agreement, not apply the choice of law provisions,

24   and apply instead the law that you ordinarily would apply in

11:40:16 25   the case, absent the choice of law provision.  And in those

1    cases, those states, where the buildings were actually

2    constructed, there were no prohibitions on advance lien

3    waivers, so they enforced the lien waiver.

4         In our case, if you follow the reasoning of those

11:40:38  5    cases, and you follow their argument that you should apply

6    the prohibition, you look to Ohio law, because that's the

7    law that otherwise would apply, there was no choice of law

8    provision.  The property is in Ohio.  Anchor's in Ohio.

9    They're making the parts in Ohio.  You're in Ohio.  The

11:40:54  10   Court's in Ohio.  So, obviously, you would be applying Ohio

11   law to this, so there were no choice of law provision.

12        Well, Ohio, as we cited in our brief, does not prevent

13   advance lien waivers, even in the construction context, so

14   if you follow *Kipin* and *In re Image*, you would enforce the

11:41:15  15   advance lien waiver.

16        So they don't win because the advance lien waiver

17   prohibition is not in the Special Tooling Act.  But they

18   also don't win based upon the cases they cited in support of

19   their argument.

11:41:25  20        There's another reason why this particular lien is not

21   applicable here.  We cited in our reply brief the *Gateplex*

22   *v. Collins* case at 260 Mich. App. 722.  And that case

23   involved a very similar lien statute, the injection molder

24   statute, and that deals with plastic.  This -- this Special

11:41:57  25   Tool Lien Act that's at issue here deals with stamping.

1          But both of those lien statutes include the same

2     language, that the liens relate to tools that belong to the

3     customer.  The lien act here that applies says that the end

4     user has the lien, dependent on possession, when any special

11:42:23  5     tool in the end user's possession belonging to a customer

6     for the amount due the end user from the customer for metal

7     fabrication work performed with the special tool.  An end

8     user may retain possession of the special tool until the

9     amount is paid.

11:42:41 10          Okay.  Of course, that's waived, but this language

11     belonging to a customer was interpreted in the injection

12     molder statute, which mimics this one, that belonging to a

13     customer means that to make the lien effective the tools

14     have to belong to the customer.  Here -- so you can't assert

11:43:01 15     the lien against the supplier or to a buyer if the buyer

16     doesn't own the tools and it's your customer.

17          So, here, the customer is Cosma, as is clear and as we

18     established through both their witnesses, and we also

19     established, again, through both their witnesses and our own

11:43:16 20     witness, that the tools do not belong to the customer.  They

21     do not belong to Cosma.  They have the right to possession

22     of them, but they don't belong to them.  They belong to

23     General Motors.

24          So this lien act, even if it otherwise didn't have a

11:43:30 25     lien waiver, would have no application in this circumstance.

1    General Motors is not a customer, so the lien act doesn't

2    apply to them.  And the lien act doesn't apply to Cosma

3    because the tools don't belong to Cosma.  So under that

4    analysis, if you follow the Michigan law, that same language

11:43:53  5    would result in no lien.

6         Now, the lien that they threw on there right -- the

7    day or the night before they filed their response brief is

8    also just ineffective in general and not perfected because,

9    as you see in the lien act, it would have to relate only to

11:44:11 10   work performed with the special tooling.  They put in there

11   almost $2 million.  And again, by both witnesses' own

12   admission, it's not an accurate number and it's not -- it

13   doesn't relate solely to worked performed with the special

14   tool.

11:44:24 15        They've collected all the amounts that they claim are

16   due and said -- and are holding on to this tool.  The only

17   lien that they could possibly have is amounts that relate to

18   work performed with the special tool, tool 1213/1253.  They

19   don't even know that amount.  They can't even testify to it.

11:44:43 20   We asked Mr. Pfaff did he know the amount and he does not

21   know the amount.  So that's not a proper lien under any

22   circumstance because they're holding on to the tool with

23   amounts well beyond the amounts related to work performed

24   with the special tool.

11:45:00 25        So there are a variety of reasons why this lien is

1    completely ineffective in this case.  As a result, they

2    have -- we have, by any standard, likelihood of success on

3    the merits.  There's a clear right to possession at any

4    time.  There's a set-off right.  And there's a right to

11:45:23    5    possession even if there's disputed amounts owed.  And

6    there's no agreement that they would be paid all amounts

7    related to these tools that would modify those agreements.

8    And they have no lien under any lien statute that would

9    allow them to hold on to this tool under these agreements.

11:45:47   10    So there's clear likelihood of success on the merits.

11    Now, we didn't cite in our reply brief, because we

12    didn't have it, but in terms of irreparable harm, I will

13    note that we found a case that you had decided, Your Honor,

14    that was *Millennium Health versus Roberts* at 220 Westlaw

11:46:11   15    2812871, in which you noted Northern District of Ohio case

16    *Cabot Corp. v. King* at 790 F. Supp. 153, at page 155, in

17    which you indicated that if -- essentially -- I'm

18    paraphrasing here -- if a party could show a strong

19    likelihood of prevailing on the merits, that would permit

11:46:35   20    the Court to issue an injunction despite a lesser showing of

21    irreparable harm.

22    And we think we can make a strong, or we have made a

23    strong, showing of irreparable harm.  But I think it's worth

24    noting, the Court has referenced that authority before, that

11:46:51   25    it is a lesser showing that would be required when you have

1    such a strew -- a strong showing of likelihood of success on

2    the merits.

3         And also, we cited in our brief, the status quo here

4    is continuing supply, not them holding the tool.  And status

11:47:09 5    quo is really incidental to the issue of irreparable harm,

6    which should really govern the Court's decision, not some

7    kind of status quo argument.

8         As we've noted numerous times in our brief, but also

9    gained admission on their testimony, their witnesses --

11:47:28 10   again, both their witnesses -- they agreed in the bailment

11   agreement, at paragraph 9, that if they held on to this tool

12   and failed to turn it over, as Cosma's entitled to get it in

13   the bailment agreement, they agreed that would be

14   irreparable harm.

11:47:44 15        That agreement is in there to avoid this very

16   situation where they can make these arguments that are

17   tenuous and somehow try to avoid injunctive relief.  They

18   agreed.  They agreed that if they didn't cooperate, that

19   Cosma would be entitled to specific performance, as we're

11:48:00 20   requesting here.  They have agreed to this already.

21        That should be -- that, combined with the fact that we

22   should not have to make a strong showing of irreparable harm

23   in light of the strong showing of likelihood of success on

24   the merits, that should be enough right there to have

11:48:15 25   irreparable harm.  But there's more.

1        This is not an uncommon situation that courts have saw

2   or seen in these types of supply disputes.  We cited for the

3   Court a Northern District of Ohio case, recent case, 2021,

4   this *Thogus v. Bleep* case.  And again, it's pretty much the

11:48:38  5   exact same situation.  In that case, Bleep was demanding its

6   tools and Thogus was claiming we're not giving you the tools

7   because you owe us money.

8        Now, in that case, the contract actually had a

9   provision that said you could only get the tools if there

11:48:57 10   was a good faith dispute.  That was in the contract.  Here,

11   we don't have that sort of limitation.  I would submit there

12   is a good faith dispute, certainly on Cosma's part, but that

13   extra limitation is not in our -- the contracts at issue

14   here.

11:49:10 15        But in that case, the Court found there was a dispute,

16   the bailment agreement gave Bleep the right to the tools

17   despite there being a dispute, and so, there was a

18   likelihood of success on the merits.  The Court also found

19   in granting the preliminary injunction that there was

11:49:30 20   irreparable harm, because if the parts weren't provided,

21   that would have huge, you know, negative consequences that

22   were difficult to liquidate into damages if it was not

23   provided to Bleep.

24        And so, the Court granted the motion.  Same type of

11:49:49 25   situation.  A tooling case, 2021, applying federal law,

1    which is the law that applies to the standard for the

2    injunction here, and, you know, granted it.  Exact same kind

3    of case.

4        And I guess, you know, the argument was likely made

11:50:03   5    that, well, why don't you just pay Thogus what they claim,

6    Bleep, and then you can bring a lawsuit?  But you don't

7    really have irreparable harm because you have to pay us what

8    we're owed.

9        Well, this type of argument in an auto supply case is

11:50:25  10    no longer accepted in the federal courts.  It's -- it's

11    widely recognized that in an automotive case where supply

12    has become just in time, as a matter of course across the

13    industry, that if you idle a supplier to an OEM like General

14    Motors, like what happened if the tool is not provided here,

11:50:48  15    there are cataclysmic damages that will occur that clearly

16    are irreparable harm.  You know, there will be downtime for

17    Cosma, GM will screech to a halt.  The whole industry

18    screeches to a halt if parts don't come.

19        So there's a whole litany of what happens in these

11:51:05  20    cases that we've cited to you.  These damages are

21    incalculable.  The damage to Cosma's reputation is

22    incalculable if they shut down an OEM.  Every OEM is going

23    to hear about that.  So that is irreparable harm.

24        Well, the way that the suppliers, or the sellers, try

11:51:23  25    to get out of that is with, you know, the old classic, well,

1    there's an adequate remedy at law, you just have to pay what

2    we say you have to pay us.  This sort of economic extortion,

3    if you will, this we're going to hold you ransom.  We can

4    always get out of injunctive relief because we just say you

11:51:41  5    pay us what we say you owe and you can just sue us for it,

6    there's no irreparable harm.

7         That doesn't work and that's where we cited the

8    *Cooper-Standard* case which explains that that doesn't work,

9    that that doesn't solve irreparable harm.  The supplier, the

11:51:55  10   seller, can't set the standard by which there is or is not

11   irreparable harm.  They can't -- you're -- it goes back to

12   the *Eberspaecher* case.  We cited a different *Eberspaecher*

13   case than they do.  The case they do is an earlier case and

14   that's not irreparable harm in that case because the buyer

11:52:13  15   was already paying the higher price that was being demanded.

16   They were already paying, so they couldn't claim irreparable

17   harm.

18        In the *Eberspaecher* case that we cited in our brief,

19   it goes through this whole analysis clearly, and other

11:52:28  20   courts follow after it, including the *Cooper-Standard* and a

21   number of other cases in other jurisdictions that we cited

22   in our reply brief.  But the *Eberspaecher* court there in the

23   Eastern District of Michigan explained that if you do this

24   and allow parties to avoid providing the tools that's

11:52:43  25   clearly required under their contract by claiming just pay

1    us and there's no irreparable harm, you've -- you

2    essentially rewarded a breaching party and you incentivized

3    the parties to breach and simply say pay us, when we all

4    know a lawsuit can be difficult.

11:53:02  5    If the money is paid now to Anchor, it's going to cost

6    a lot of money to go get it back.  Who even knows if Anchor

7    will have it.  There may be collection issues.  Cosma should

8    not be put in that position when we have clear agreement

9    that allows them this tool.  And Anchor should not be able

11:53:17  10    to set a price or ransom that's contrary to the

11    *Cooper-Standard* case, to *Eberspaecher*, and it's contrary to

12    what's been decided in the Northern District in the *Thogus*

13    case.

14    Now, the last two point -- requirements, the balance

11:53:37  15    of the harm, all these cases that I've cited have held that

16    the third and fourth elements are also met because the

17    balance of the harm here, Anchor is in the same position

18    they were today, which is they're claiming payment, we can

19    have a lawsuit to decide that.  Cosma, by the same token, is

11:53:55  20    claiming payment, that will get decided in a lawsuit, but if

21    you don't grant it -- if you do grant it, they lose the tool

22    and they're not going to produce the part anyway.  If you

23    don't grant it, there's this huge cataclysmic harm.  So the

24    balance of the harm is clearly favored granting the

11:54:15  25    injunction, and they're not in any different position if you

1    do.

2          The public interest, that also favors granting it,

3    since in the public interest, there is a public interest in

4    enforcing contracts.  There is also a public interest in not

11:54:24 5    bringing a supply chain to its knees by having this tool

6    held up for ransom.

7          So, Your Honor, we believe, by any standard that you

8    could apply, the law and the agreements supports that

9    this -- the injunction should be entered, the tool should be

11:54:42 10    ordered to be immediately provided to Cosma, and the

11    evidence that you've taken in the case has only supported

12    this.  And even if we didn't call our own witness, their own

13    witness Rich Ross supported at every turn the enforceability

14    of those agreements.

11:55:01 15          And he even said at some point when asked:  Don't you

16    think it makes sense, and isn't it fair that Magna would not

17    pay under these circumstances when they're making this claim

18    and given these agreements?  And he said:  Yes, that's fair

19    to say.  Even he agreed it makes total sense that there

11:55:19 20    wouldn't be payment here, that it would be fought out after

21    the tools are provided.

22          There's simply no basis in this matter not to grant

23    the injunctive relief under the clear standards that exist

24    under the Michigan law and the federal law that applies to

11:55:32 25    injunctions.

1          Thank you, Your Honor.

2                    THE COURT:  Thank you, Counsel.

3          Attorney Smith.

4                    MR. SMITH:  Yes.  Thank you, Your Honor.

11:55:41  5          So I think that we first need to focus on the fact of

6     where the burdens presently exist, you know, recognizing,

7     Your Honor, that when you look at this case, completely and

8     from its entirety, after three lengthy discussions, a lot of

9     back and forth relative to the terms of the agreement, which

11:56:07 10    apply, defective tooling, other emails where we're talking

11    about agreements to pay, failure to pay, thought that there

12    was going to be payment relative to 14 dies but not

13    ultimately made, and then, ultimately, a lot -- and then

14    Mr. Tanasoff's testimony wherein he either agreed that the

11:56:30 15    payments ought to be made, whether it's lump sum payments or

16    the price increase, and then, ultimately, couldn't consider

17    one way or another whether the payments were made.

18          It's just an example across many, Your Honor, where

19    there clearly, in my opinion, and it's the position of

11:56:47 20    Anchor, Your Honor, that there has been a breach by CBAM.

21    Not Anchor here.  Yet, it ultimately is CBAM that is seeking

22    to enforce these -- the terms of these agreements and the

23    specific language of the agreements, which I'll get to in a

24    moment.

11:57:08 25          And the question is:  For what?  To return tooling.

1    Why?  Because they refuse to pay for parts that

2    unequivocally were provided by Anchor.  So they say:  Well,

3    you know, we shouldn't have to pay.  We should allow you to

4    run through a lawsuit before you're ultimately permitted to

11:57:29  5    seek any sort of payment whatsoever.  Ultimately, it -- but

6    we should get the tooling back first.

7         Your Honor, they're saying that we have the tooling,

8    we profited off the tooling by selling it further upstream

9    in commerce; yet, you have to wait for payment, even though

11:57:48 10    we promised to pay you, because there's going to be issues

11    downstream to the supply chain as well, even though, again,

12    we promised to pay.

13         The reality is it's a monetary discussion, Your Honor.

14    It's if you pay what you agreed that you would pay, then you

11:58:02 15    would have the tooling.  And that's the long and the short

16    of it.

17         Returning now to some focus on the factors here, Your

18    Honor.  The burden is on them.  They have the burden to

19    prove by clear and convincing evidence, number one, that

11:58:18 20    there is a substantial likelihood of success on the merits.

21         The word substantial was repeatedly omitted, you know,

22    during opposing counsel's argument.  And for obvious

23    reasons.  There's no way that they can even prove a

24    likelihood of success on the merits.

11:58:33 25         The testimony that was provided across the board, all

1   witnesses, was ultimately that Anchor was to receive tooling

2   and -- and was to receive tooling in connection with the

3   bailment receipt, the POs, and also the terms and

4   conditions.  What you heard, Your Honor, was that tooling

5   actually was used by a supplier for an even less period of

6   time than my client, Anchor, because the tooling was so

7   defective.  The designs were flawed.  The usability was

8   flawed.  You heard that over and over again.

9       There was an admission by CBAM that not only did that

10  tooling have to be refabbed, altered, and redesigned before

11  it arrived at Anchor, which my client didn't know before it

12  received the tooling, but, then, that had to happen again

13  after the tooling was shipped out and is being presently

14  used by another supplier.  In fact, Richard Tool & Die, the

15  tooling doctor, had to take the tooling and reassemble it

16  and reuse it.

17      You heard testimony regarding the fact that there was

18  such substantial designs in the 3-D, the three-dimensional

19  aspects of the tooling was so off that it couldn't -- really

20  could not be used.  That resulted in scrapping issues.  That

21  resulted in production issues.  And, ultimately, why it was

22  impossible, and at a minimum, the parties' relationship was

23  frustrated, to -- for my client's ability to actually

24  produce parts, which was -- which runs to the core of the

25  entire relationship, Your Honor.

1    So when we talk about substantial likelihood of

2   success on the merits, there are only two claims that are

3   before you, and both of those are breaches of contract, the

4   bail receipt and then the supply agreement, which is, you

12:00:25  5   know, my understanding is the terms and conditions.

6    But what you never heard from opposing counsel was

7   that to succeed on a breach of contract claim, the party

8   asserting that claim must have performed under the agreement

9   themselves.  That is an essential element of a breach of

12:00:44 10   contract.

11    We went through, over and over again, and the

12   undisputed testimony from across the board was that the

13   defective parts were caused by the defective tooling.  Now,

14   I would be the first to admit that, yes, Mr. Tanasoff stated

12:01:03 15   that there was a quality of parts issue.  But never did you

16   hear a connection with respect to the quality of parts issue

17   as it related to the core cause.

18    What you heard, however, from Anchor was that, from

19   day one, the tooling was defective.  The parts could not be

12:01:21 20   produced in line with the parties' agreement when they began

21   discussing the entirety of the relationship.

22    When it comes to these three -- when it comes to the

23   three agreements, I'm just focusing specifically, Your

24   Honor, on what I believe ultimately may be the position of

12:01:40 25   the plaintiff here, because it's a little unclear, but with

1    respect to the three agreements we're talking about -- the

2    terms and conditions, the bailment receipt, and then also

3    the POs -- there is no question, and it's agreed across the

4    board, that absolutely each one of those agreements is

12:01:56  5    premised on the fact that Anchor is going to be able to

6    provide parts.  It can't provide parts if there's defective

7    tooling.

8        And now, Your Honor, CBAM wants to hold Anchor

9    responsible for that and say that it's Anchor's issue, and

12:02:08 10    that even though Anchor bent over backwards repeatedly and

11    provided parts, refabbed parts, rebuilt tooling, and still

12    attempted in their best efforts to provide the parts as they

13    possibly could, now, ultimately, they have to sit here and

14    they have to wait for payment on parts that unequivocally

12:02:25 15    were provided to CBAM.  Why?  So that CBAM can come back and

16    say:  Oh, well, we have all these set-off issues relative to

17    the quality of the tooling, and, therefore, we don't ever

18    think that we ought to pay you to begin with.

19        The reality is, Your Honor, what needs to happen is

12:02:42 20    payment needs to be made, as it was agreed to, and then the

21    tooling can be returned.  And then, ultimately, the parties

22    can fight about whether or not -- what the damages look like

23    and who ought to be paid.  And I'll submit, Your Honor, that

24    we're substantially likely to see -- to succeed on the

12:02:57 25    merits of breaches of contract claims.

1          Now, if we specifically look at the agreements, again,

2     even though, like I said, the entirety of the agreements is

3     frustrated by the fact that there is defective tooling,

4     there's a -- there's a paragraph that is repeatedly ignored

12:03:21  5     by opposing counsel, and for obvious reason, and it's here,

6     and it's paragraph 24.

7          That when it's terminated, when Cosma decided to go to

8     a different supplier and remove tooling and die instead of

9     -- setting aside for a moment the fact that it agreed to pay

12:03:40  10    the lump sum payments, it also agreed under this specific

11    provision that when it decided to go in a different

12    direction, that it was going to make good and it was going

13    to take care of all of the AR, which is specifically set

14    forth under subsection (c).  That provision, Your Honor, was

12:03:57  15    also breached.

16          So setting aside the entire frustration of the purpose

17    of the agreement and failure to provide tooling that my

18    client could use, they still agreed to make the AR payments

19    under paragraph 24 but decided not to.  They want to point

12:04:10  20    to a different provision and say:  Well, no, we should be

21    able to set-off and you can get -- you can seek your damages

22    through this lawsuit at some point down -- years down the

23    road for a small business that anticipated receiving --

24    anticipated receiving the money from the parts at issue,

12:04:26  25    Your Honor.

1           This is not an insignificant breach.  It runs to the

2      core of the agreement.  I know they want to avoid the

3      tooling issue, but the reality is you can't produce parts

4      without -- without nondefective tooling.

12:04:47  5           I focus for a minute, Your Honor, on the terms and

6      conditions of the specific agreements, and I said a moment

7      ago that it's a little unclear to me what the contracts are

8      that they claim are at issue because, obviously, they say

9      that I think there are these three, but the reality is there

12:05:04 10      are different promises along the line beginning in October

11      that CBAM agreed also to make these lump sum payments.

12           The lump sum payments and the timing of those lump sum

13      payments, the terms of those, they don't show up anywhere in

14      the terms or the conditions or the payment obligations.  In

12:05:18 15      fact, the terms and conditions between the PO and the terms

16      and conditions themselves on those payment terms are

17      different.  So what are we supposed to follow?

18           What I would follow is the fact that there is a --

19      there is a writing.  There's also a claim that there's no

12:05:29 20      writing.  No.  There is a writing.  And it's specifically

21      sent by Mr. Tanasoff, and several of his other individuals,

22      Mr. Nekola and Claudio, who specifically state that,

23      ultimately, they will agree to make payment on lump sums

24      that were due as a result of the price increase.  There's a

12:05:48 25      direct relationship to the bad tooling, which everybody

1    knows existed from the very beginning.  That portion was

2    breached.

3         The testimony and the evidence is clear that the AR

4    hasn't been paid.  The lump sum payments haven't been made.

12:06:00  5    And those are breaches of Cosma's word.  Not to mention, the

6    issue with all of the tooling, Your Honor.

7         And I want to -- Your Honor, one of -- I didn't mean

8    to -- don't mean to bury the lead here, but when we talk

9    about the price increase, CBAM wrote the letter.  They said

12:06:21 10   in a text message:  Can you provide this letter?  And you

11   heard testimony from us, and the evidence, ultimately, that

12   was presented, that it was known that the tooling was bad

13   all along.  CBAM says:  Can you write this letter?  We'll go

14   back to GM and we'll try to get more money.  Because they

12:06:36 15   knew that it was all an issue.  But, please, don't include

16   the fact that the tooling is bad.  Even though everybody

17   knew that that was the impetus for the price increase.

18        But, yet, there's all these claims about, oh, it's

19   under duress and we weren't going to be able to receive

12:06:51 20   shipments.  No.  They knew the issue with the tooling and

21   they asked for the letter.  They wrote the first draft of

22   the letter and ultimately obtained a signed letter that we

23   don't know specifically the whereabouts or what happened in

24   that respect.  Notwithstanding all of that, lump sum

12:07:07 25   payments still weren't made.  AR payments were not made.

1      There was also some discussion on -- in closing from

2   opposing counsel regarding the amounts and they're allegedly

3   not known by my client.  Well, the reality, Your Honor, is

4   that the nature of the relationship amongst the parties is

12:07:27  5   that CBAM was going to take care of, and always had taken

6   care of, the raw material charge.  CBAM's the only one that

7   knows what the raw material charge is.  My client knows

8   specifically what it's owed from an AR perspective.

9      And I hope it -- it shined through, but I'll state it

12:07:45 10   emphatically here, that we're not claiming and Anchor is not

11   claiming that it's owed the raw material charges.  Those get

12   backed out.  But the amounts can't be determined until Cosma

13   provides those numbers.  They've refused.

14      So we issued the AR payments.  We issued the lump sum

12:08:00 15   payments.  The lump sum payments, I will also -- I will say

16   specifically, those are known and still haven't been paid.

17   But from the AR perspective, that's why you heard Mr. Pfaff

18   discuss the fact that, ultimately, once the raw material

19   numbers are backed out, then there should be a discussion

12:08:13 20   and that discussion should result in my client getting paid,

21   the return of the tooling, and then, ultimately, if there's

22   still a fight, then that fight can be had.

23      There was some -- there was some additional discussion

24   regarding, Your Honor -- and, ultimately, our -- Anchor's

12:08:30 25   position that there is a valid and enforceable lien on the

1    tooling, and there was some discussion about who is the

2    customer who actually holds and who owns the tooling at

3    issue.  GM owns the -- owns the tooling, but there's

4    Michigan case law to provide that if the lien -- if the lien

12:08:49  5    letter gets sent to GM, then, that ultimately is

6    satisfactory.  There was testimony by Mr. Pfaff that, yes,

7    GM also received the lien letter.

8          Then there was some -- there's some interesting

9    dancing going on around the choice of law, where it's -- it

12:09:06  10   seems that CBAM is trying to argue that Ohio law may apply

11   with respect to certain lien waivers based upon, I guess, a

12   case, but the reality -- a case that was talking about

13   Kentucky law and then Michigan law, and, then, ultimately,

14   where the existence is of the construction lien or where the

12:09:29  15   lien was actually applied.

16         But -- but, again, that case was based upon a

17   different type of lien, Your Honor, and, frankly, it's a bit

18   difficult to follow how they come up and try to dance,

19   whether it's Michigan law or Ohio law.  Our perspective is,

12:09:44  20   Your Honor, it's very clearly set forth in our briefing,

21   that Michigan law applies here.  And, ultimately, Michigan

22   law also allows for the specific type of lien that has been

23   issued by my client in this case.

24         Now, I think that there's been some

12:10:01  25   mischaracterization with respect to what we are -- what

1    Anchor is claiming with respect to the enforceability of

2    that lien.  What opposing counsel is saying is that, well,

3    because the case law we cited only related to a construction

4    lien, it can't apply.

12:10:17  5    But the reality is, Your Honor, this -- the reason

6    that -- and we specifically address this in a footnote in

7    our brief, and we specifically state that the construction

8    lien statute at issue has a public policy force behind it,

9    which is that the lien is enforceable notwithstanding an

12:10:36  10   advance lien notice.  That's exactly what's happening here.

11   Based upon opposing counsel's rationale, you can stop

12   a project, a construction project, but you can't stop

13   movement of tooling.  It doesn't make any sense.  The reason

14   is that we analogize that statute because, under Michigan

12:10:53  15   law, unequivocally, it violates public policy to prevent

16   lien waivers.  It's as exactly this type of situation.

17   Because then my client has to get embroiled into a

18   litigation for who knows how long, years potentially, to try

19   to obtain payment for a lien where it used tooling to

12:11:09  20   produce parts that unequivocally were provided to the other

21   side and profited from, but my client has to sit back and

22   wait.  It doesn't make any sense and that's why public

23   policy dictates specifically that lien waivers, like the one

24   that CBAM is seeking to enforce, are unenforceable as a

12:11:24  25   matter of public policy.  The briefing has been provided and

1    is in front of Your Honor.

2        There's one other position -- piece of this, Your

3    Honor, that I did bring up at the last hearing, and,

4    ultimately, I think has to be a part of the analysis here.

12:11:43  5    When we talk about substantial likelihood of success on the

6    merits, I think it's pretty clear that one of the core

7    issues here is the tooling and the defective nature of the

8    tooling.

9        What was ultimately received by my client, after it

12:11:57 10   had been once refabbed, once altered, and then ultimately

11   once it was moved and now is being used and altered, and

12   there's testimony specifically by Mr. Tanasoff that it had

13   to be altered, recalibrated, changed, and is presently being

14   used, there is an issue with a lack of preservation, whether

12:12:17 15   or not my client's going to ultimately have the ability to

16   review and look at, through experts and otherwise, what that

17   tooling looks like.

18       There's -- obviously, there are some evidentiary

19   considerations there, Your Honor, and I just bring that up

12:12:31 20   for purposes of the connection of the substantial likelihood

21   of success on the merits.

22       The last piece of this, Your Honor, as it relates to

23   substantial likelihood of success on the merits is,

24   ultimately, that something that we learned actually late

12:12:44 25   last week, and we did not learn before the prior hearings,

1    which is that Cosma's not registered with the Ohio Secretary

2    of State.  It doesn't have legal capacity to bring these

3    claims.  The case law in Ohio in the district courts is very

4    clear that in those circumstances the case actually has to

12:13:04 5    be dismissed for fear of judicial efficiency, that,

6    ultimately, it -- it would be dismissed potentially at some

7    point down the line.

8         So that also weighs specifically in favor of whether

9    or not this case could even proceed based upon the claims

12:13:18 10    that have been asserted.

11         Your Honor, I will move to the irreparable harm piece.

12    And I did not see the *Millennium Health* case until

13    co-counsel brought it up.  But the reality is, it actually

14    fits perfectly with what Anchor's position is here.  And

12:13:40 15    that's the case of *Millennium Health* where Your Honor

16    actually found that the preliminary injunction ought to be

17    denied; specifically, that the contracts that were before

18    the Court, there was not a substantial likelihood of success

19    on the merits with clear and convincing evidence.  And the

12:13:55 20    Court also found that irreparable harm didn't exist.  I just

21    point that out.

22         The irreparable harm piece is, Your Honor, again, this

23    is a matter where the entirety of this issue was caused by

24    CBAM.  They ultimately are the ones that refused to pay.

12:14:15 25    Had they paid and the tooling were sent back to or provided

1    back to CBAM, as my -- as the testimony clearly provides

2    that would happen if payment were made, we wouldn't be here

3    in front of you.  Maybe a lawsuit would be filed, but we

4    could have determined the issues at that point.

12:14:31  5         The sole reason we're here in front of Your Honor is

6    because payment hasn't been made.  It's a monetary issue.

7    There's no question about it.  These notions about supply

8    chain issues and downstream problems, they're all caused by

9    Cosma.  It can't -- Cosma can't benefit from its -- its own

12:14:51 10   failures and its own actions and omissions as far as not

11   paying for parts that unequivocally were manufactured by my

12   client.  It can't benefit and claim irreparable harm based

13   upon something it hasn't done.

14         They could pay, the tooling would be returned,

12:15:09 15   wouldn't have to litigate the dispute.  That's set forth in

16   our briefing, the specific -- specifically, the case law

17   that supports that out of Michigan.

18         And I will also say, we have a -- the exact opposite

19   experience when it comes -- when it comes to Michigan courts

12:15:29 20   and their evaluation of these specific issues.  Our

21   experience, and I'm specifically referring to my co-counsel,

22   Mr. Benko, who has been involved in hundreds of tooling

23   cases, all of which, you know, frankly, when we -- I heard

24   the word outrageous used, we have been outraged by the fact

12:15:47 25   that this was the type of preliminary injunction and

1    immediate injunctive relief that was being sought,

2    recognizing that when there's a payment owed and tooling has

3    not been returned, that issue generally never gives rise to

4    the type of injunctive relief that they're pursuing.  And

12:16:04  5    that's based upon, again, countless cases that I know that

6    my colleague and we have been involved with as well.

7        So, ultimately, Your Honor, when it comes to the first

8    two elements, we believe that those weigh heavily in favor

9    of Anchor, notwithstanding the fact that CBAM has to prove

12:16:21  10   by clear and convincing evidence those two, especially the

11   first one, by a substantiality.

12       The undue hardship, Your Honor, and I kind of made

13   reference to it earlier, and that is, it also weighs in

14   favor of Anchor, and here's why.  We have a situation in

12:16:43  15   which my client has produced parts.  There's no question

16   about that.  They've been provided to CBAM.  CBAM has

17   profited off those parts.  It's sitting on the money.  It

18   refuses to pay.  It tries to rely upon certain portions of

19   the contract but wants to ignore other aspects of it.  And,

12:17:00  20   frankly, the fundamental aspect of it as well.  Yet, it

21   wants this Court to force us to return this tooling because

22   it's decided not to pay.

23       If it pays, as has been agreed to over and over again,

24   we wouldn't be in this situation.  There would be no undue

12:17:15  25   hardship, except that's caused to my client, which now, if

1    Your Honor grants the injunctive relief, will have to wait

2    an untold amount of time to be able to have the money paid

3    to it for parts that were manufactured and shipped, you

4    know, months ago.

12:17:32  5        So allowing the AR to sit there and the -- the delta

6    or the lump sum payments not to be made and force the return

7    of the tooling would -- would honor the breaches by the --

8    by CBAM, but then also penalize my client for trying to make

9    this relationship work and bend over backwards repeatedly

12:17:56 10   and allow tools to go out the door on a belief that it was

11   going to get paid as promised by CBAM.

12        The last element, Your Honor, is obviously the public

13   policy here.  I mentioned already, and it's cited in our

14   brief, the lien waiver aspect.  That absolutely violates

12:18:16 15   public policy.  To try to force this exact situation -- I

16   thought it was interesting that opposing counsel brought up

17   the enforcement of contracts, because I'm sure that Your

18   Honor could see it from our perspective that there was an

19   agreement to -- for payment and then a return of the

12:18:31 20   tooling.

21        We started on down the returning the tooling, but CBAM

22   decided not to pay.  Whether it was under paragraph 24 or

23   whether it was subsequent agreements, regardless, never

24   paid, even though it said it was going to pay.  I think that

12:18:46 25   that's -- when we talk about enforcement of contracts and

1    agreements, that -- that absolutely weighs in favor of

2    Anchor as well.  Pay us what is owed, we'll return the

3    tooling, and we can continue this fight if it needs to be

4    continued.

12:18:59  5        That all, of course, would alleviate any issues with

6    the supply chain.  Not to mention, Your Honor, my client has

7    stated repeatedly that it would produce parts utilizing this

8    tooling.  In fact, the testimony supports that this tooling,

9    my client could utilize and has utilized over even the past

12:19:19 10   several weeks relative to providing -- to providing parts,

11   and that could continue to happen based upon prices that

12   were already discussed, and, if so, there you go, that

13   alleviates the problem as to the supply chain issues as

14   well; not to mention, just paying what's due and owing.

12:19:36 15        So, Your Honor, it's -- it's our position, and,

16   frankly, similar to what Your Honor ruled in *Millennium*

17   *Health*, where none of the four factors weighed in favor of

18   the entity seeking preliminary injunction, we actually

19   believe that to be the exact case here where, actually, all

12:19:55 20   four factors weigh heavily in favor of Anchor and the

21   preliminary injunction ought to be denied and payment ought

22   to be made and then the tooling can be returned.

23        Thank you, Your Honor.

24             THE COURT:  Thank you, Counsel.

12:20:10 25             MR. DeWAARD:  May --

1          THE COURT:  Attorney DeWaard.

2          MR. DeWAARD:  May I address some of these

3    arguments, Your Honor?

4          THE COURT:  Yes.  Briefly.

12:20:19 5          MR. SMITH:  Your Honor, may I just object

6    momentarily, just to say that, my understanding, the

7    Northern District of Ohio does not allow a redirect on

8    direct.

9      But, obviously, I recognize that --

12:20:25 10          THE COURT:  This is not direct.  This is

11    closing argument that I'm presiding over, Counsel.

12      I will allow additional argument, and I will give you

13    sufficient amount of time, Attorney Smith, to address any

14    issues by Attorney DeWaard.

12:20:40 15      Go ahead, Attorney DeWaard.

16          MR. DeWAARD:  Your Honor, I think it's fair to

17    say, it's clear the credibility lacks when their own witness

18    says there was no agreement to pay everything, and, yet, the

19    argument is made there was an agreement.  The only thing

12:20:50 20    these arguments have done is to attempt to muddy the waters

21    of the dispute.

22      But don't you think that if there was a claim that the

23    tooling was bad from the beginning, that we would have seen

24    some evidence of that, some document that would show they

12:21:02 25    claimed the tooling was bad?

1    But we don't even have to prove the tooling wasn't bad

2    because the contracts are what govern this dispute, Your

3    Honor, and the result of this injunctive relief request.

4         There can be a dispute, but the contracts between the

12:21:19  5    parties make it clear that if there's a dispute, we still

6    get the tooling.

7         And even beyond a quality issue, there's been no

8    challenge to the fact that their press broke, and when their

9    press broke, as I read from -- as you could see from

12:21:33  10   Mr. Ross's testimony, they could not supply.  Page 128.  You

11   can read it.  They could not supply when the press broke.

12   They were in breach.  They had no ability to supply the

13   parts and they have no ability now to supply 1213 and 1253

14   to the quantities required.  They have to run them by hand.

12:21:51  15        And this is not a termination by convenience, as they

16   keep citing to this paragraph in the terms and condition.

17   It was a breach.  There's no notice of convenience.  No

18   indication it's a notice, you know, termination by

19   convenience.  It wasn't that.  They had to exit because they

12:22:09  20   couldn't produce the parts that were required.  And,

21   regardless, even if it were under that paragraph, the

22   set-off rights also in the terms and conditions would still

23   apply.

24        The irreparable harm, you know their argument's weak

12:22:27  25   when they have to cite to Mr. Benko's experience without any

1    case law.  Well, we have -- Mr. Benko didn't testify.  We

2    have plenty of experience here too.  And our experience is

3    that when you have clear agreements for bailment, you can

4    get the tools, and you don't have to look any further than

12:22:44  5    to the Northern District's ruling in *Thogus*.

6         Your case, obviously, the one that we referenced,

7    didn't grant it, but that's a completely different case.

8    That was an employment case.  It was nothing to do with this

9    case where we have a clear bailment agreement, clear terms

12:22:57 10   and conditions.  Despite a dispute, we get the tool, and

11   there is no agreement to the contrary.

12        Now, they raised this motion to dismiss, another

13   Johnny-come-lately attempt to avoid the clear affect of the

14   contracts saying that we didn't -- are not registered,

12:23:13 15   Cosma's not registered under Ohio, and, therefore, can't

16   bring this action.

17        Well, you know, you only have to register if under the

18   statute you're transacting business in Ohio.  Cosma is not

19   transacting business by buying parts from an Ohio business.

12:23:29 20   That's not transacting business in Ohio.  It doesn't matter

21   if a few people were sent down there.  It doesn't matter if

22   GM's tools were there.

23        Those closed-door statutes that are across the county

24   have to do with parties that are trying to sell goods into a

12:23:41 25   state, where they are making goods in a state, they have

1    sales representatives in a state, and the Court looks at how

2    large the presence is in the state.  It shouldn't apply.

3        We can cite, and we'll file a response, Your Honor,

4    you know, we can cite to cases in numerous jurisdictions

12:24:00    5    where a buyer buying goods from a supplier in a state is not

6    transacting business, because there's an exception for

7    interstate commerce, and that's what we have here.  It's

8    interstate commerce.

9        Cosma's in Michigan.  The goods are being produced in

12:24:13    10    Ohio by Anchor.  They're being shipped to Michigan.  It's

11    interstate commerce.  But it's much ado about nothing.

12        Cosma, just to put this issue to rest, is going to go

13    ahead and before they respond, and I suspect we'll respond

14    tomorrow, if not by Wednesday morning, so that the Court

12:24:31    15    will have this issue removed, Cosma is going to go ahead and

16    file the registration, because it's just a simple online

17    filing.  It will have no affect because it won't have any

18    consequences.  They're really not doing business.  But

19    they'll go ahead and register to remove this.

12:24:47    20        And I was surprised that they cited to Your Honor the

21    *Midland* case as the case that governs here.  The *Midland*

22    case said that you can't cure it in the case.  The Court has

23    dismissed and you can't cure this by filing.  *Midland* is not

24    what the Northern District or any district in Ohio is doing

12:25:09    25    any more.  There is no decision by the Ohio Supreme Court on

1    whether or not the filing during the case of a registration

2    can cure the registration.  So what the federal courts have

3    to do is they have to determine what would the supreme court

4    of the state do.

12:25:30    5    Well, Judge Marbley in the Southern -- in the Southern

6    District of Ohio, in 2011, ten years after the *Midland* case,

7    wrote an in-depth analysis of that in the *Capital City*

8    *Energy Group versus Kelley Drye* case, it's at 2011 Westlaw

9    5175617, Southern District of Ohio, 2011, in-depth analysis,

12:25:53   10    and the Court there found that the cases that were saying

11    that you couldn't correct it were misreading, the *Hogan*

12    decision, and that you could correct it because the statute

13    says you can't bring a suit until you've registered.

14    Well, in that case, the *Capital City* case, it was the

12:26:14   15    exact same situation here.  The opposing party brought a

16    motion to dismiss, and before the response was filed, the

17    party that is in Cosma's position here filed the

18    registration and in the response indicated it was filed, and

19    the Court found if you do that, then -- before the motion

12:26:35   20    becomes ripe, before the response is due, you can correct it

21    and that that's perfectly appropriate under the state

22    decisions.

23    They also found that dismissing it would not be in

24    line with the purpose of the statute, which is not to deny

12:26:55   25    foreign corporations access to Ohio courts, but, instead, to

1    establish the procedures for such corporations to acquire

2    access.

3         Third, Judge Marbley found in that decision that

4    nearly all other jurisdictions have reached the same

5    conclusion that you don't dismiss during the case, you allow

6    the party to file the registration, because it would be

7    silly to do it because if you dismiss this without

8    prejudice, then the next day they refile the whole thing.

9         Finally, the Judge said:  It would be a complete waste

10   of judicial resources to have to dismiss and then require

11   the party to file again.  It would be a waste for the Court.

12   It would be a waste for all the parties involved.

13        And so, that's the -- the Court found with that

14   in-depth analysis you can correct this, if you have to.  And

15   we'll take the issue out of -- out of play by correcting it,

16   even though we don't have to.  And every decision in the

17   Northern District, and there's several of them, we'll cite

18   them in our response, have followed Judge Marbley in that

19   case.  Nobody cites the case that they rely on, *Midland*, but

20   they cite it because they know they're dead under the

21   current laws that the Northern District is following.

22        The only two cases in which they dismiss the case

23   based on this in the -- in the Ohio federal districts are

24   two where the defendant didn't fix it, they didn't file it,

25   and so, the motion was decided because it wasn't fixed.  We

1       will fix it.  This Court, I'm sure, will follow the good

2       reasoning of Judge Marbley, as every other court has

3       followed, and this will be a non-issue.

4           I only would say, if, for some reason, this Court were

12:28:37  5    going to dismiss it, that the Court do so quickly after we

6       file our response, because we will immediately refile the

7       case, which will result in the case coming back before the

8       Court and we have developed a -- a record here that can all

9       be used in a later case, we would attach that to our motion

12:28:56  10   for a preliminary injunction, there would be no reason for

11      any further proceedings, and you could decide the case since

12      the dismissal would be without prejudice.

13          But I'm sure you will not need to do that once we file

14      the registration, and we're not -- Cosma is not transacting

12:29:11  15   business in Ohio in any event.

16          Thank you, Your Honor.

17                THE COURT:  Attorney Smith, any final

18      argument?

19                MR. SMITH:  Yes.  Just -- I'll focus on this

12:29:20  20   piece of our motion to dismiss.

21          Again, I think this is just another example of somehow

22      Cosma's fault is our fault; that, you know, the failure to

23      register is somehow our issue.  We raised it to the Court

24      because it's a legal capacity issue.  That's what the cases

12:29:34  25   say specifically that we cited, one of which is from the

1    Northern District of Ohio, and it says judicial economy is

2    best served by dismissing the case now rather than taking

3    the case to a judgment that may later be rendered invalid

4    due to plaintiff's incapacity when the suit was commenced.

12:29:50  5    It's incumbent upon us to identify this as an issue.

6    And, also, the cases that we've cited where there's even one

7    specific contract or one engagement that ultimately occurs

8    between the parties, courts in Ohio specifically find that,

9    yes, you have to register, or, otherwise, dismissal is

12:30:06  10    warranted.  That's why we brought it up.  That's what --

11    that's what the briefing says.  That's what Ohio case law

12    says.

13    This is not a fault of Anchor somehow to play games.

14    It's the concept that if there's a legal capacity issue,

12:30:19  15    it's incumbent upon us to provide the Court with that

16    information, and that's what the brief says and that's also

17    what the Northern District of Ohio case law says.  And this

18    idea that -- that in those cases the parties did not

19    ultimately decide to register, well, the fact of the matter

12:30:36  20    is they argued that they didn't have to and then the cases

21    were dismissed, so it's not this idea that they registered

22    and otherwise.

23    But the point is, both Judge Smith and the Northern

24    District of Ohio, both specifically said that's not enough.

12:30:48  25    You know, the claims, you can't create legal capacity to sue

1   subsequently when you've already asserted claims.  That's

2   the concept.  So I just bring that up, Your Honor.

3        And then, the last piece of it is, there's, again,

4   this -- this statement that without a writing or something

12:31:05  5   like that or specific documents saying that there were

6   issues with the tooling somehow that didn't exist.  But you

7   heard the testimony from Rich Ross, who has dealt with CBAM

8   on a day-to-day basis who specifically said, through Claudio

9   and otherwise, that it was recognized that the tooling was

12:31:23  10   an issue from the very get-go.

11        That's the issue with the fundamental purpose of the

12   contracts and how they're written, and paragraph 24 about

13   this -- and this continued claim that it's a convenience

14   issue, that's not what it says.  It says for any other

12:31:36  15   reason, which is exactly what Cosma did, and then it refused

16   to pay, and now it wants the tooling back in breach of its

17   own agreements, Your Honor.

18        So the only reason I bring up the legal capacity

19   issue, along with several of the other ones, preservation

12:31:49  20   and otherwise, Your Honor, is because there's a clear issue

21   with being able to prove by a substantial likelihood of

22   success on the merits.  This may be a very heavy litigation.

23   It very well may be.  But there's -- in our opinion,

24   Anchor's arguments and its positions will prevail.  But

12:32:05  25   given the fact and the nature of how the evidence has been

160

1      presented, Your Honor, I think it's a far cry to be able to

2      say there's clear and convincing evidence that there's a

3      substantial likelihood of success on the merits or

4      irreparable harm when, simply, CBAM could just pay and have

12:32:20  5      the tooling returned, Your Honor.

6           So thank you very much.

7           And I very much appreciate the Court's indulgence

8      over, you know, the several days and several hours, Your

9      Honor, so I thank you very much for the Court's time, and we

12:32:31 10      would ask that the motion be denied.

11           THE COURT:  Thank you, Counsel.

12           Attorney Smith, let me ask this:  Isn't the

13      fundamental issue here -- the fundamental here is the

14      bailment agreement and whether or not plaintiff has a right

12:32:49 15      to demand access to the tooling, the die 1213/1253, and

16      whether your defendant has a legal right to refuse to allow

17      access to that tooling?

18           MR. SMITH:  You're asking if ultimately that's

19      what the other side is asserting or if --

12:33:11 20           THE COURT:  I'm asking:  Isn't that the

21      fundamental issue here?

22           I mean, we've got a breach of contract claim under the

23      bailment agreement.  You -- isn't the fundamental issue here

24      whether, under the bailment agreement, which both sides have

12:33:28 25      put these forward as contracts -- I understand what

1    Mr. Pfaff was testifying about with respect to whether or

2    not they're enforceable going forward -- but isn't the

3    fundamental issue here whether the plaintiff has made a

4    demand for the tooling, 1213/53, and whether or not they

12:33:53  5    have a right to access that tooling and whether Anchor has a

6    legal right to refuse to allow access to that tooling?

7              MR. SMITH:  Yes.

8         So long as it's tied specifically, Your Honor, to

9    their claim, which is the breach of contract.

12:34:12  10             THE COURT:  Which is breach of contract of the

11   bailment agreement, and they're saying, under the bailment

12   agreement, they have a right to demand access to this

13   tooling and it's to be made available.

14             MR. SMITH:  And that's what --

12:34:21  15             THE COURT:  I'm asking you, then, what is the

16   legal basis --

17             MR. SMITH:  Uh-huh.

18             THE COURT:  -- for Anchor to entirely refuse

19   to allow access to the tooling 1213/53?

12:34:33  20             MR. SMITH:  Well, there's two, Your Honor, I

21   guess.

22        And, specifically, I'll say that there is, number one,

23   there's a lien on that specific tooling.  That's number one.

24        And, number two, is I think that I have -- you have to

12:34:45  25   look at it within the confines of the motion that's been

1      filed, which is they're saying to this Court that there's a

2      substantial likelihood of success on the merits on their

3      breach of the bailment agreement, right, which is the

4      entirety -- in part, the entirety of the relationship, and

12:34:59  5      what we're saying to you, Your Honor, is that

6      notwithstanding the fact that that bail -- that the bailment

7      agreement was dated March 5th, before, you know, the tools

8      were even there, the fact is it identifies property in good

9      working order, which is -- which is false.

12:35:13  10          They can't -- they can't satisfy their burden by a

11     substantial likelihood of success that they're going to

12     prevail on the bailment agreement, so how can they enforce

13     one provision under it if ultimately they're going to fail

14     elsewhere?

12:35:26  15          And that's their burden.  I don't think they've

16     satisfied it.

17                  THE COURT:  And then, Counsel, what -- what's

18     your position with respect to the bailment agreement,

19     paragraph 16, that has the handwritten notation on it with

12:35:47  20     the date July 1, 2020?

21          And, in particular, I'm referring to the, what appears

22     to be initials M.P.R., with the date 7-1-2020, which the

23     parties have indicated refers to July 1, 2020, and the

24     bailment agreement itself was signed by Chief Financial

12:36:19  25     Officer Michael P. Randall, who has the initials M.P.R.

1      MR. SMITH:  I -- so that's the first

2 questioning, you know, we've heard today.  I do not -- I

3 don't know.  I haven't seen any email indicating that that's

4 the date that it was signed or otherwise.

12:36:38  5      My understanding, Your Honor, is that the date that's

6 set forth in the bailment receipt, March 5th, 2019, is the

7 date, and that, ultimately, even -- but I'll say this.  Even

8 if the -- even if it was initialed here, you know, I see --

9 it doesn't relate to this notion of the property and being

12:37:00 10 in good order.

11      To me, it seems it relates to a completely different

12 section, and, ultimately, if you catch a typo in a

13 particular paragraph and you modify it, I -- you know,

14 that's different than signing the agreement as a whole, in

12:37:15 15 my estimation, Your Honor.

16      So I -- the answer is I don't know.  And I guess

17 that's not -- you know, in some sense, that's why it's

18 incumbent upon the other side to come forward by clear and

19 convincing evidence to demonstrate that.  But from my

12:37:26 20 perspective, my -- from what I know, Your Honor, that the

21 March 5th date is -- is the operative date and the date from

22 which -- and the date that it was signed.

23      THE COURT:  And, Attorney Smith, am I correct

24 that, at present, based upon the evidence before me, Anchor

12:38:01 25 is asserting a -- it hasn't asserted a legal claim in this

1    case, but it's basically saying that it's entitled to

2    payment and it's demanding the payment be made before it

3    releases tool die 1213/53; is that correct?

4              MR. SMITH:  Correct.

12:38:20  5              THE COURT:  Okay.

6              MR. SMITH:  Should the payment be made, once

7    we get the raw material amount, the tooling would be

8    released immediately based upon our understanding of the

9    parties' arrangement.

12:38:27 10              THE COURT:  All right.  And how does their

11    situation change if I order that the tooling be made

12    accessible immediately to the plaintiff?

13         They would still be in the situation of claiming to be

14    owed money.

12:38:41 15         They wouldn't have physical possession of the tool,

16    yes, but how would their situation change otherwise?

17              MR. SMITH:  You're saying that if ultimately

18    you had the tooling returned, how would their -- how would

19    the situation change --

12:38:54 20              THE COURT:  Correct.

21              MR. SMITH:  -- from my client's perspective?

22              THE COURT:  Yes.

23              MR. SMITH:  Well, the issue is, then, that we

24    have -- now we're embroiled in litigation where the money is

12:39:03 25    staying with Cosma, and it's based upon monies that -- for

1    parts that were already produced and provided where there

2    was profit ostensibly from Cosma.

3                    THE COURT:  Isn't that the same situation

4    you're client's in right now with the retention of the tool

12:39:21  5    and die equipment that plaintiff is asserting must be made

6    available to them pursuant to their demand under the

7    bailment agreement?

8                    MR. SMITH:  If they continue to dispute and

9    not pay the money, I would guess so.

12:39:35  10        But I guess that's my point is if the money is paid,

11    then now we've -- we've shifted appropriately, they have the

12    tooling, we have the money that is our AR, and if we want to

13    fight about any of the rest of it going forward, based upon

14    the parties' dispute as it relates to the agreements, then

12:39:53  15    we can do that.

16        But my client isn't left holding the account for an

17    untold amount of time for parts it already produced and

18    provided.

19                    THE COURT:  But isn't that what the provisions

12:40:02  20    of the bailment agreement sets forth, once the demand is

21    made, the tool and die had to be made available to

22    plaintiff, or their agent, and that if there was a financial

23    dispute over amounts owed, that financial settlement would

24    be addressed after possession of the tooling and die was

12:40:27  25    taken by plaintiff or their agent?

1          MR. SMITH:  That's what the document says,

2    Your Honor.

3          I'll also say that the document was entered into based

4    on the belief that the tooling was going to be good.  I

12:40:35  5    don't think that the parties foresaw a situation where you

6    were going to incur all kinds of additional costs,

7    especially on the back end because Cosma provided defective

8    tooling.  Then, ultimately, all of these additional, the AR,

9    the payment that's outstanding, I don't think it's

12:40:53 10    contemplated.  If it were, and ultimately the issues were

11    known on the tooling, I can't say this for certain but I

12    would highly suspect that my client would take issue and

13    say:  Look, I'm not sure what this is.  Okay?  Now we're

14    going to limp along and see if we can make this work.

12:41:08 15          But I -- my point is, and the whole point, you know,

16    what I'm saying with respect to the overarching frustration

17    of the purpose of the agreement was the entirety of it was

18    to produce parts, produce parts using tooling, but the

19    tooling was defective, so how can we enforce certain aspects

12:41:24 20    but not -- but ignore the -- the very issues related to the

21    tooling that was the responsibility of Cosma.

22          THE COURT:  One of the difficulties there with

23    that argument, Attorney Smith, is that you and your client

24    are asking me to determine that the tooling was defective

12:41:39 25    when it was received, but have not provided exhibits or

1   contemporaneous documents that would support claims by

2   Anchor or its employees that you document alleged

3   deficiencies or defective nature of the tooling when it was

4   received, when it was used in 2019, 2020, 2021, and

12:42:03  5   thereafter.

6          MR. SMITH:  But, yet, there was -- Your Honor

7   took testimony, which is certainly evidence, and Rich Ross,

8   the only one who was part of any discussions, whether it was

9   Mr. Tanasoff or otherwise, he specifically testified that he

12:42:18  10  had conversations with Claudio at the very beginning of the

11  relationship of the defective nature of the tooling.  And

12  that exists.

13      And, ultimately, as we move forward, I -- you know,

14  there -- we'll show you emails, and we'll show the other

12:42:32  15  side emails, but there's testimony specifically on that

16  issue at the very beginning of the parties' relationship.

17      So it is in evidence in my opinion, Your Honor.

18          THE COURT:  I do have that testimony and I

19  recall that testimony and I'll weigh the testimony of all

12:42:43  20  witnesses and the exhibits provided as I consider the

21  motion.

22          MR. SMITH:  I would just say, Your Honor, if

23  you don't mind, the other side has relied heavily on

24  Mr. Ross's testimony otherwise.  You know, to me, if they're

12:42:57  25  believing that he's truthful, I can't see how he's not

1   truthful about there being an issue from the very beginning

2   about the defective nature of the tooling.

3               THE COURT:  All right.  Anything else,

4   Attorney Smith?

12:43:13  5               MR. SMITH:  No, Your Honor.

6         Again, I just very much appreciate the time.

7               THE COURT:  All right.  Then, with that, I'm

8   going to conclude our hearing.  We're going to go off the

9   record.

12:43:37  10        Court is adjourned.

11                           - - -

12               (Proceedings concluded at 12:43 p.m.)

13

14

15

16

17                    **C E R T I F I C A T E**

18        I certify that the foregoing is a correct transcript
    of the record of proceedings in the above-entitled matter
19   prepared from my stenotype notes.

20         */s/ Sarah E. Nageotte*                 *10/11/2023*
          SARAH E. NAGEOTTE, RDR, CRR, CRC            DATE
21

22

23

24

25